UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL VILLALPANDO, et al.,

Plaintiffs,

v.

EXEL DIRECT INC., et al.,

Defendants.

Case No.  12-cv-04137-JCS

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 141

## I.    INTRODUCTION

Plaintiffs in this putative class action are drivers who have provided delivery services for Defendants Exel Direct Inc., DPWN Holdings (USA), Inc. and Deutsche Post Beteiligungen Holding GmbH (collectively "Exel") in California.   Plaintiffs assert wage and hour claims under California law based on the allegation that Exel has misclassified its drivers as independent contractors.   Presently before the Court is Plaintiffs' Motion for Class Certification ("Motion"), in which Plaintiffs ask the Court to certify a class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.   The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).   A hearing on the Motion was held on Friday, November 14, 2014 at 9:30 a.m.   For the reasons stated below, the Motion is GRANTED.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Exel's Business

Exel is a federally authorized interstate motor carrier that provides transportation services to a variety of customers, including retailers.   *See*  Declaration of James H. Hanson in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Hanson Decl."), Ex. 3

United States District Court
Northern District of California

United States District Court
Northern District of California

(Declaration of Renee Albarano ("Albarano Decl.") ¶ 2; Declaration of Joshua Konecky in Support of Plaintiffs' Motion for Class Certification ("Konecky Motion Decl."), Ex. 2 (Dep. of Renee Albarano ("Albarano Dep.")) at 28-53 (describing types of services offered to retail customers); Ex. 5 (webpages describing services of MXD Group, Inc.).[1] These services include the delivery of furniture and other oversized items. Hanson Decl., Ex. 13 (Albarano Decl.) ¶ 2.

Exel drivers work out of either a "network hub" or a "dedicated business." Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 28-29. From its network hubs, housed in buildings that Exel leases, Exel provides services to multiple retail customers. *Id*. Exel drivers operating out of a network hub "comingle freight on the delivery trucks" and make deliveries for multiple retail customers along their route. *Id*. Thus, for example, the driver "could deliver a Pottery Barn sofa to stop one, then an Office Depot pallet of paper to stop two, and then perhaps a Restoration Hardware crib to stop three." *Id*. In California, there are two network hubs: one in Oakland serving the San Francisco Bay area, and one in Ontario serving the Los Angeles area. *Id*. at 30. Exel provides delivery services for Crate & Barrel, Office Depot, JC Penney, Williams-Sonoma, Ikea (Oakland only) and Restoration Hardware (Ontario only) out of these two hubs. Konecky Motion Decl., Ex. 8 (Response to Special Interrogatories, Set Three), No. 22. A driver working out of one of these hubs is likely to have delivered products for each of the Exel customers serviced at the hub. *Id*.

An Exel "dedicated business" operates off the back of a customer's facility rather than out of a leased building and provides services only for that retail customer. Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 29. Consequently, a driver working out of a dedicated business typically delivers products from only one particular Exel customer on any given route. *Id*. One of Exel's "dedicated businesses" is its Sears account. Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 35.

Exel's policies and procedures are largely the same whether a driver works out of a network hub or a dedicated business. Konecky Motion Decl., Ex. 2 (Albarano Decl.) at 44, 52-53.

---

[1] On August 20, 2013, Exel Direct Inc. changed its name to MXD Groups, Inc. Konecky Motion Decl., Ex. 6. To avoid confusion, the Court continues to refer to Defendants collectively as "Exel."

The only differences regarding Exel's "policies and procedures applicable to the drivers, in terms of the way they make the deliveries and perform their work for Exel" are: 1) those who work on Exel's account with Sears deliver and install appliances, while drivers on other retail customer accounts deliver furniture and other products; and 2) the way drivers confirm deliveries or report problems with a delivery (whether  by inputting information in a  handheld device or calling a hotline) varies depending on the particular retail customer for whom the delivery is made.  *Id.*

Exel has identified 373 individuals who were drivers for Exel in California between June 14, 2008 (the start of the liability period in this action) and March 11, 2014 (the date of Exel's interrogatory responses providing this information).  *See* Konecky Motion Decl., Ex. 7 (Interrogatory Response, No. 14).

### 2.  Hiring of  Exel Drivers

Prospective drivers "[m]ust be personally interviewed by an Exel representative to determine the driver qualifications, attitude and motivation."  Konecky Motion Decl., Ex. 10 (Transportation Safety & Regulatory Compliance Manual for:  Contractors, Qualified Second Drivers and Helpers ("Compliance Manual")) at 4.  Other requirements for Exel drivers include "Exel review of [an applicant's] Motor Vehicle Record" and a background investigation "conducted by Exel's Safety & Compliance Department using an independent third-party service engaged by Exel."  *Id.* at 5-6.  Other than a driver's license, drivers are not required to have any special licenses or experience to be eligible for hire.  *Id.*

When they are hired, Exel drivers are required to complete paperwork, including an "Independent Truckman's  Agreement," which is identical for all drivers.  Konecky Motion Decl., Decl., Ex. 2 (Albarano Dep.) at 83; Ex. 11 (Independent Truckman's Agreement ("ITA")). The ITA is presented to the drivers in English only.  Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 101.  Many of the drivers state in their declarations that English is not their first language, that they did not understand the agreements, and that Exel did not explain the terms of the agreements to them before asking them to sign them.  *See, e.g.,*  Villalpando Decl., ¶ 5;  Aguilera Decl., ¶ 5; Montes Decl., ¶ 5; Padilla Decl., ¶ 5; Sarabia Decl., ¶ 5; Alancastro Decl., ¶ 5; Delafuente Decl., ¶ 5; Lopez Decl., ¶ 5; Miranda Decl., ¶ 5; Navarro Decl., ¶ 5; Raymundo Decl., ¶ 5; Yako Decl., ¶ 5.

United States District Court
Northern District of California

### 3.   Independent Truckman's Agreement

The ITA is between Exel and the "CONTRACTOR." Konecky Motion Decl., Ex. 11 (ITA). Section 1 provides that the "CONTRACTOR's General Duties" are to "deliver consumer items for [Exel's] customers and perform such other transportation and related services as may be necessary to serve [Exel's] customers." *Id.*, Section 1.   Section 2 provides that the term of the agreement is one year, with subsequent year-to-year renewal to occur automatically unless the agreement is expressly terminated pursuant to the termination clause, in Section 3. The termination clause permits termination of the agreement "at any time" as follows:  "a) by mutual consent; b) by the insolvency of CONTRACTOR . . . ; c) <u>without cause</u> upon either party giving the other sixty (60) days written notice of termination; or d) <u>with cause</u> upon the breach of [the ITA] by either of the parties."  *Id.*, Section 3 (emphasis in original).

Under the "Payment" term, the ITA provides that the "CONTRACTOR" will be paid based on "hauling revenue."  *Id.*, Sections 4 & Exhibit A.[2]  Exhibit A to the ITA provides that the contractor "will receive a minimum of sixty percent (60%) of hauling revenue."  *Id.*, Ex. A.  The term "hauling revenue" is defined "in accordance with [Exel's] established accounting practices and past practices" and does not include "compensation for services above and beyond basic delivery services."  *Id.*, Ex. A.  "For example, compensation for routing and supervision, overhead, customer relations, order fulfillment, prenotification, cross-dock operations, transportation management, intercompany transfer and warehouse operations, among other things, are not considered elements of hauling revenue."  *Id.*

The ITA provides that the "CONTRACTOR shall provide its own vehicle and shall pay all costs attendant to its operation and maintenance."  *Id.*, Section 5. Drivers also must carry insurance on their vehicles.  *Id.*, Section 6.  In particular, the ITA provides that "CONTRACTOR

---

[2] Exel states in its Opposition brief that the compensation term in the ITA is "in accord with 49 C.F. § 376.12(d).  That provision (which is not expressly cited in the ITA) requires that where carriers provide transportation services in vehicles that they do not own, there must be a written lease that clearly states "the amount to be paid by the authorized carrier for equipment and driver's services," which "may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease." 49 C.F.R. § 376.12(d).

United States District Court
Northern District of California

will carry at its own expense public liability and property damage insurance upon any vehicles or other equipment used by it in carrying out its duties" under the agreement.  *Id*.  The ITA specifies that "[t]he insurance shall be in an amount consistent with minimum Exel requirements."  *Id*.

Section 7 of the ITA is entitled "Labor and Hold Harmless" and provides that the "CONTRACTOR shall, at its own expense . . . furnish whatever labor is necessary to provide delivery services to [Exel's] customers. "  *Id*., Section 7.  It further provides that the "CONTRACTOR" is "responsible for the payment of wages and social security and withholding taxes for any of its employees."  *Id*.

Under the term entitled "Control and Exclusive Use," the ITA provides as follows:

> In performing services under this Agreement, CONTRACTOR will direct the operation of any equipment in all respects and will determine the means of performance including but not limited to such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling of customer deliveries.  The parties intend to create an independent contractor relationship and not an employer-employee relationship.

*Id*., Section 9.

### 4.  Equipment Lease Agreement

All Exel drivers also are required to sign an Equipment Lease Agreement ("ELA") as a condition of the job.  *See* Konecky Motion Decl., Ex. 12.  The ELA mirrors the ITA in many respects, and expands upon certain provisions of the ITA.  The ELA, like the ITA, is between Exel and "CONTRACTOR."   *Id*.  It sets forth requirements regarding "LEASED EQUIPMENT," which is to be described in Exhibit A to the ELA.  The form to be completed as "Exhibit A" to the ELA contains columns for "YEAR," "MAKE" and "SERIAL NUMBER," suggesting that the ELA is used for drivers' vehicles rather than other equipment.  *Id*., Ex. A.[3]  The ELA provides that "CONTRACTOR shall pay all costs attendant to the operation and maintenance of the LEASED EQUIPMENT, including, but not limited to, the costs of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses and any unused portions of such items."  *Id*., Section 5.

---

[3] At oral argument, Exel stipulated that the ELA is typically used in connection with the drivers' trucks.

United States District Court
Northern District of California

1        Section 4 of the ELA sets forth payment terms, which are to be in accordance with Exhibit

2  B to the ELA.  *Id.*, Section 4.  Exhibit B, in turn, provides for a "delivery stop charge" to be paid

3  for "network solution customer deliveries," with compensation for all other deliveries to be paid

4  based on "hauling revenue."  *Id.*, Ex. B.  As under the ITA, the term "hauling revenue" "does not

5  include compensation for "services above and beyond basic delivery services."  *Id.*  Thus,

6  "compensation for routing and supervision, overhead, customer relations, order fulfillment, pre-

7  notification, cross-dock operations, transportation management, intercompany transfer and

8  warehouse operations, among other things, are not considered elements of hauling revenue."  *Id.*

9        Section 9 of the ELA provides that "CONTRACTOR will be liable for loss or damage to

10  items intended for transport which are in CONTRACTOR'S possession or under

11  CONTRACTOR'S dominion and control."  *Id.*, Section 9.  In addition, Section 10 of the ELA,

12  entitled "Chargeback Items," provides that expenses listed in Exhibit D will be "set-offs to

13  CONTRACTOR'S compensation."  *Id.*, Exhibit D.  Exhibit D lists numerous types of

14  "Chargeback Items," including deductibles for drivers who are insured under Exel's insurance

15  programs, charges for failure to report any liability/collision claim within 24 hours and for failure

16  to comply with Exel policies and/or state or federal requirements if the driver is involved in an

17  accident, losses covered in Section 9 and expenses associated with the "cost of operation paid on

18  [the driver's] behalf."  *Id.*  Specific expenses listed as cost of operation chargebacks include

19  insurance costs (for those drivers who are insured under Exel's programs), "[t]ruck rentals/leases

20  and repairs," "[f]ines [and] citations,"  "drug, alcohol, background and criminal checks,"

21  "[s]ervice apparel and cleaning," "[v]ehicle washes," "[i]n-home damage to customer's property,"

22  "[t]elephone," "[f]uel," "[t]ires," "[m]erchandise claims," "[p]hysical examinations," "[t]owing,"

23  "[d]elivery supplies," "[p]ostage," "[s]ettlement adjustments" and "[d]ebit memos, purchase

24  orders, or promissory notes with interest relative to operating or start-up costs."  *Id.*

25        The insurance provision of the ELA provides that Exel will cover insurance for "protection

26  of the public pursuant to U.S. Department of Transportation regulation under Title 49 U.S.C. §

27  13906," while the "CONTRACTOR will carry at its own expense" the following insurance:

28               (i)   commercial general liability and property damage insurance in

the amount of $5,000,000 per occurrence;   (ii) auto liability insurance upon the LEASED EQUIPMENT used in the amount of $5,000,000 per occurrence; and (iii) cargo insurance in the amount of $100,000 per occurrence.

*Id.*, Section 7.   Section 7 further requires that Exel must be named as "additional insured" on the "CONTRACTOR's" insurance policy.  *Id.*  If a "CONTRACTOR requests to be insured by [Exel's] insurer in lieu of providing its own coverage, CONTRACTOR shall be assessed charges" as set forth in Exhibit C to the ELA.  *Id.*  Exhibit C sets forth the requirements for Exel's "Company Sponsored Insurance Coverages."  *Id.*, Ex. C.

The ELA also includes a "Labor and Hold Harmless" provision.  *Id.*, Section 8.  This provision requires that "CONTRACTOR shall, at its own expense. . . furnish whatever labor is necessary to operate the LEASED EQUIPMENT."  *Id.*, Sections 8.  This provision also requires that the "Contractor" "shall provide workers' compensation insurance coverage for all labor furnished or utilized by CONTRACTOR."  *Id.*

The ELA contains a "Control and Exclusive Use" provision that is almost identical to the one in the ITA except that it is subject to the additional proviso that Exel "shall have such possession, control and use of the LEASED EQUIPMENT and its operation as required by Title 49 C.F.R. § 376.12(c)(1)."[4]  *Id.*, Section 11.

Addendum No. 1 to the ELA, which took effect on August 1, 2011, adds terms to the ELA relating to "compensation, safety and compliance with laws."  Konecky Motion Decl., Ex. 19 (Addendum No. 1).  In particular, Addendum No. 1 states that Exel and "CONTRACTOR" recognize that Exel's "Safety Measurement System ('SMS') evaluation published by the Federal Motor Carrier Safety Administration ('FMCSA') has economic value" and establishes a Driver Safety Accountability Program ("DSA") and a Safety Incentive Program whereby "CONTRACTORS" are charged liquidated damages (payable to Exel) for certain types of

---

[4] Section 376.12 provides that an authorized carrier may provide transportation services in equipment it does not own if there is a written lease agreement containing, *inter alia*, a provision "that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease."  In addition, "[t]he lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).

United States District Court
Northern District of California

violations and are paid additional compensation when there are no such violations reported over a specific period of time.  *Id.*

### 5.   Training and Procedures

Exel requires all drivers to regularly participate in its "stand-up morning meetings." Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 158-160. These generally happen "every day" and cover subjects such as new product lines, installation techniques, and customer service.  *Id.* at 158-159.  According to the putative class members, Exel uses these regular meetings to train the drivers as to its policies and procedures; teach drivers about customer service; provide feedback on the performance of individual drivers;  discipline or threaten discipline for drivers not performing up to company expectations, and hand out routes for the day.  See Compendium of Class Member Decls. at ¶¶ 7-9.  Certain agenda items come from corporate headquarters, which sends via email daily agendas for the stand-up meetings.  Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 165.  The meetings are led by Exel management.  *Id.* at 162.

In addition to the training provided at the mandatory stand-up meetings, Exel trains its drivers through its "development" programs, implemented by "Program Development Coordinators," who work with new Exel drivers and also provide "ongoing development." Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 34.  Through the development programs, drivers are taught Exel's "guidelines and standards."  *Id.* at 57.  These guidelines and standards are generally applicable to all Exel drivers.  *Id.*  The only differences as to the training provided to individual drivers under the development programs relate to the type of product a driver is delivering;  thus, a driver who works out of a Sears dedicated location, for example, will be trained to install appliances whereas a driver who works out of a network hub might learn how to install a crib.  *Id.* at 35-36.

Exel also provides to its drivers "training modules" and objectives, which include both paper documents and instructional videos.  *Id.* at 131-132;  *see also* Konecky Motion Decl., Ex. 14 (instructional videos offering training  on "The Safer Way of Protecting Floors" and "The Safer Way of Preventing Water Damage").  One of Exel's standardized training modules is entitled "Exel Direct Driver Training: US DOT Regulations." ("Exel's Driver Training").  *Id.*, Ex. 15.

1  This document summarizes Exel's training of drivers on issues such as safety, driver

2  qualifications, hours of service, and what to do at the scene of an accident.  *Id*. at EDV001540 -

3  001598.  In addition, Exel's Driver Training states that "[e]very driver must complete the Safer

4  Way of Defensive Driving Program," which is an Exel program facilitated by "the Exel Direct site

5  manager."  *Id*. at EDV001561; *see also* Konecky Motion Decl., Ex. 18 (documentation for "Exel

6  Safer Way of Driving" program).  Exel's Driver Training also provides that Exel drivers must

7  submit to "post-trip" inspections and have a "Mechanic or Exel Direct Manager" verify that all

8  necessary truck repairs are made.  Konecky Motion Decl., Ex. 15 (Exel's Driver Training) at

9  EDV001584.

10      Many of Exel's policies and procedures are set forth in its Compliance Manual, which is

11  provided to drivers to give them a "thorough understanding of what is expected of [them] as  . . .

12  independent contractor[s]" for Exel.  Konecky Motion Decl., Ex. 10 (Compliance Manual) at

13  EDV000302.  The Compliance Manual sets forth Exel's safety policy and lists the qualifications

14  for drivers.  *Id*. at EDV000305.  It makes clear that "[e]ach Contractor, Second Driver and helper

15  must be qualified through the Exel Delivery Specialist qualification process" and that "[a]

16  Contractor or second driver number and helper approval must be issued before a Contractor, driver

17  or helper commences service on behalf of Exel."  *Id*. at EDV000307-08.  The Compliance Manual

18  describes the procedures that should be followed by Exel drivers in case of an accident, instructing

19  them, *inter alia*, that they should "never accept or place blame on any person" and that they should

20  "not sign anything."  *Id*. at EDV000320; *see also* Konecky Motion Decl., Ex. 15 (Exel's Driver

21  Training) at EDV001593 (instructing drivers that if they are asked for a comment by news media,

22  they should respond by saying "I am not allowed to comment until the company's representative

23  gets here and has investigated what has happened").  Exel's Compliance Manual also sets forth

24  requirements as to how to maintain the appearance of the trucks and the equipment carried on the

25  trucks, conditions for cell phone usage "while performing services on behalf of Exel,"  how to fill

26  out and submit driver logs, time records, and vehicle inspection reports,  the submission of daily

27  trip reports and other documents that must be turned in "at the end of each trip," and various

28  loading and delivery procedures.  Konecky Motion Decl., Ex. 10 (Compliance Manual) at

United States District Court
Northern District of California

1    EDV00304-306, 310, 317, 320-321.

2             **6.   Uniforms and Logos**

3             Exel drivers (as well as second drivers and helpers) are required to wear uniforms

4    consisting of dark pants and logo shirts that carry either the Exel logo or, for drivers assigned to a

5    dedicated business, such as Sears, the logo of that business.  Konecky Motion Decl., Ex. 2

6    (Albarano Dep.) at 210; *see also id*., Ex. 13 at EDV000265 (listing what is included in "[t]he

7    standard Exel delivery uniform").  They are also required to be clean-shaven, well-groomed, have

8    their shirts tucked in, remove any earrings and cover tattoos.  *See* Villalpando Decl., ¶ 18;  Shekur

9    Decl., ¶ 21;  Aguilera Decl., ¶ 16; Herron Decl., ¶ 17;  Molina Decl., ¶ 18; Montes Decl., ¶ 18;

10   Padilla Decl., ¶ 18; Sarabia Decl., ¶ 15; Alancastro Decl., ¶ 17; Delafuente Decl., ¶ 18; Harper

11   Decl., ¶ 16; Jauregui Decl., ¶ 18; Johnson Decl., ¶ 18; Lopez Decl., ¶ 18; Marinov Decl., ¶ 17;

12   Miranda Decl., ¶ 18;  Navarro Decl., ¶ 18; Raymundo Decl., ¶ 19; Roumbanis Decl., ¶ 19;

13   Velasquez Decl., ¶ 18;  Yako Decl., ¶ 15.  Similarly, the drivers must carry the logos for Exel or,

14   in the case of a dedicated business, for the retail customer, on their trucks.  Konecky Motion Decl.,

15   Ex. 2  (Albarano Decl.) at 209-210.  In their declarations, the drivers state that they were not

16   permitted to exhibit any other logo on their trucks.  Villalpando Decl., ¶ 17;  Shekur Decl., ¶ 20;

17   Molina Decl., ¶ 17; Montes Decl., ¶ 17; Padilla Decl., ¶ 17; Delafuente Decl., ¶ 17; Jauregui Decl.,

18   ¶ 17; Johnson Decl., ¶ 17; Lopez Decl., ¶ 17; Marinov Decl., ¶ 16; Miranda Decl., ¶ 17;  Navarro

19   Decl., ¶ 17; Raymundo Decl., ¶ 18; Roumbanis Decl., ¶ 18; Velasquez Decl., ¶ 17.

20            **7.   Maintenance of and Inspection of Vehicles**

21            Exel requires that all drivers provide trucks that comply with certain "Standard Truck

22   Requirements."  Konecky Decl., Ex. 16 at EDV000465 (list of "Exel Standard Truck

23   Requirements");  Ex. 2 (Albarano Dep.) at 230 (testifying that list was used by recruiters when

24   "talking to prospective contractors as to what types . . . of equipment [they] would need").   Until

25   June 2013, Exel sometimes rented vehicles for its drivers to use and deducted the costs of the

26   rental from the drivers' compensation.  Konecky Decl., Ex. 2 (Albarano Dep.) at 215.  That

27   program was discontinued after June 2013, however.  *Id*. As noted above, Exel's drivers must

28   submit to "post-trip" inspections and have a "Mechanic or Exel Direct Manager" verify that all

United States District Court
Northern District of California

10

1   necessary truck repairs are made.  Konecky Motion Decl., Ex. 15 at EDV001584.

2   **8.   Work Assignments and Supervision**

3   Exel requires its drivers to "operate under certain procedures and mechanisms to ensure

4   that Exel's obligations to its customers are being carried out in the expected fashion." Konecky

5   Motion Decl., Ex. 2 (Albarano Dep.) at 77.  Exel's site managers "provide direction and oversight

6   of the drivers, to help Exel meet whatever service metrics are in the contracts with the customers

7   and thereby prevent Exel from incurring financial penalties." *Id*. at 78.  In addition,  Exel assigns

8   delivery routes to the drivers in documents called manifests, which list the delivery locations,

9   product orders, and delivery times for the routes.  Compendium of Class Member Declarations at

10  ¶¶ 8-10.  The drivers do not choose the stops or delivery times on the routes assigned to them.

11  Konecky Decl., Ex. 2 (Albarano Dep.) at 103.  Further, Exel's management "has the discretion

12  and authority to determine which routes go to which drivers." *Id*. at 106.   Drivers are permitted to

13  choose only which roads they take to get to the various addresses within the various delivery time

14  windows assigned to them.  *Id*. at 102.   According to the drivers, they frequently must work 12-

15  14 hour shifts without any breaks in order to complete their routes.  *See, e.g.,* Aguilera Decl., ¶¶

16  28-29; Herron Decl., ¶ 28;  Navarro Decl., ¶ 29-30; Shekur Decl., ¶¶ 43-44; Villalpando Decl., ¶¶

17  31-32.

18  Exel's Compliance Manual instructs drivers that they "must advise Exel Management" if

19  they are unable to make deliveries in accordance with the loading and delivery times provided and

20  "notify the dispatcher as soon as possible" if they encounter any problem with the delivery.

21  Konecky Motion Decl., Ex. 10 (Compliance Manual) at EDV000320.  In addition, Exel

22  management retains the authority to call the drivers throughout the day to change or add delivery

23  stops to the routes. See Compendium of Class Member Declarations, ¶¶ 10-11.  In order to allow

24  drivers to communicate with Exel management, drivers are required to lease handheld computers

25  under an amendment to the ELA.  *See* Konecky Motion Decl., Ex. 21 (Agreement to Use

26  Handheld Computer Device).  Under the amendment, the "CONTRACTOR shall accept the

27  opportunity to utilize the Handheld Computer device" provided for use by Exel and is

28  "responsible for the replacement cost or cost of repair" if the device is damaged or lost.  *Id*.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Exel also provides scripts for the drivers to use when interacting with the end-purchasers

2    of the merchandise and carrying the products into their homes. *See* Compendium of Class Member

3    Declarations, ¶¶ 11-12.

4    To ensure that drivers follow Exel's policies, Exel's general managers perform "ride-

5    alongs or ride behinds," where the manager "follows the contractor" to observe performance.

6    Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 177 -178.

7    ### 9. Helpers and Second Drivers

8    As noted above, Section 7 of the ITA provides that the "CONTRACTOR shall, at its own

9    expense . . . furnish whatever labor is necessary to provide delivery services to [Exel's]

10   customers."   Konecky Motion Decl., Ex. 11 (ITA), Section 7.  Pursuant to this provision, Exel

11   drivers hire Second Drivers and Helpers so that they are able to complete the routes that are

12   assigned to them.  Compendium of Drivers' Declarations, ¶¶ 17-23.  As noted above, the

13   Compliance Manual sets forth qualifications for drivers, including Second Drivers and Helpers.

14   Konecky Motion Decl., Ex. 10 (Compliance Manual) at EDV000305.  It makes clear that "[e]ach

15   Contractor, Second Driver and helper must be qualified through the Exel Delivery Specialist

16   qualification process" and that "[a] Contractor or second driver number and helper approval must

17   be issued before a Contractor, driver or helper commences service on behalf of Exel."  *Id*. at

18   EDV000307-08.  The use of a Helper or Second Driver who has not been approved by Exel is

19   considered to be a breach of contract and "any contractor who permits an unqualified driver or

20   helper to operate in Exel service is subject to immediate termination."  *Id*. at EDV000308.

21   Helpers and Second Drivers are also required to undergo the same training as the primary Exel

22   driver.  *Id*. at EDV000300-322;  *see also* Konecky Motion Decl., Ex. 2 (Albarano Dep.) at 132.

23   ### B.   The Motion

24   Plaintiffs seek to certify the following class under Rule 23(a) and (b)(3) of the Federal

25   Rules of Civil Procedure:

26       All individuals who have provided delivery services for Defendant
         Exel Direct in California, while being classified by Exel Direct as
27       independent contractors, at any time beginning June 14, 2008, until
         resolution of this action.

28

Motion at 1.  Plaintiffs ask the Court to certify this class for all of the remaining claims in the First Amended Complaint, asserting that all of these claims "turn on the overarching question of whether Exel has misclassified its delivery drivers as independent contractors rather than employees."  *Id*.  This question, according to Plaintiffs, "can be decided in 'one stroke' for all drivers by evaluating the standardized contracts and company-wide policies that Exel admits are uniform across the entire class."  *Id*. (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).

Plaintiffs contend the requirements of Rule 23(a) are met because numerosity, typicality and commonality are satisfied and the named plaintiffs are adequate representatives of the class. *Id*. at 14-16.  With respect to numerosity, Plaintiffs point to the fact that Exel has identified 373 individuals who fit the class definition, which is more than enough to establish numerosity.  *Id*. at 14.  The commonality requirement is met, Plaintiffs contend, because there is a central common question in this case that is "capable of classwide resolution" through common proof, namely, whether Exel misclassified its drivers as independent contractors under California law.  *Id*. at 14-15 (citing *Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 604 (S.D. Cal. 2010); *Dalton v. Lee Publications, Inc.*, 270 F.R.D. 555, 559 (S.D. Cal. 2010); *Phelps v. 3PD, Inc*., 261 F.R.D. 548, 557 (D. Or. 2009); *Smith v. Cardinal Logistics Mgmt. Corp*., 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203 (S.D.N.Y. 2006)).  The name plaintiffs are typical, Plaintiffs contend, because they are "part of the class and possess the same interest and suffer the same injury as the class members."  *Id*. at 15 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)).  Further, the name plaintiffs are adequate class representatives, Plaintiffs assert, because they share common interests with the unnamed class members, do not have interests that are antagonistic to the unnamed class members, and are represented by qualified counsel who will vigorously prosecute the interests of the class.  *Id*. at 16.

Plaintiffs argue that the proposed class also satisfies the requirements of Rule 23(b)(3), which provides that a class action may be maintained if Rule 23(a) is satisfied and: 1) "the questions of law or fact common to class members predominate over any questions affecting only

individual members";  and 2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id*. at 16-17.   Plaintiffs assert that the predominance requirement is met because in a misclassification case such as this one, "the ultimate merits burden is on the defendant to 'prove, if it can, that the presumed employee[s] [are] independent contractor[s].'" *Id*. at 17 (quoting *Narayan v. EGL, Inc*., 616 F.3d 895, 900 (9th Cir. 2010)). According to Plaintiffs, the "principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . ." *Id*. (quoting *Ruiz v. Affinity Logistics Corp*., 754 F.3d 1093 (9th Cir. 2014)). Plaintiffs contend the evidence shows that Exel "systematically has the right to control" its drivers based on uniform policies and identical contracts and therefore, this question is susceptible to common proof. *Id*. at 18.  Similarly, Plaintiffs assert, the "secondary" factors that are indicative of an employment relationship will also turn, in large part, on these uniform policies and contractual provisions and therefore should be addressed on a class-wide basis. *Id*. at 17-18 (citing *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341, 350-351 (1989);  *Ruiz*, 754 F.3d at 1100-1101).

Plaintiffs further contend that the elements of the underlying wage and hour claims are susceptible to common proof. [5] *Id*. at 21-23. These claims can be addressed on a class-wide basis, Plaintiffs contend, because Exel has uniform policies as to what is and is not reimbursed, what categories of expenses are deducted from wages under its "chargeback schedule,"  the provision of meal and rest breaks, and  the terms of compensation for drivers.  *Id*.

Finally, Plaintiffs argue that a class action is superior to multiple individual actions by the drivers because the superiority factors in Rule 23(b)(3) are met.  *Id*. at 23-25.

### C.    Opposition

In its Opposition brief, Exel asserts the requirements of Rule 23(a) are not met because

---

[5] Plaintiffs describe their claims as: 1) indemnification of expenses under Cal. Labor Code Section 2802; 2) unlawful deductions from wages and coerced purchases under Cal. Labor Code Sections 221, 223, 400-410, and IWC Wage Order 9-2001 § 8; 3) meal and rest period violations under IWC Order 9-2001 § 11 and Cal. Labor Code Sections 226.7 and 512;  4)  minimum wage violations; 5) overtime violations; and 6) penalties and UCL claims.

United States District Court
Northern District of California

commonality, typicality and adequacy of representation are not satisfied.  With respect to commonality and typicality, Exel points to the fact that many of the putative class members hire helpers and second drivers and do not personally perform the work that gives rise to Plaintiffs' claims.  *Id*. at 12-15.  To illustrate the lack of commonality, and to show that name Plaintiff Villalpando is not typical of the class members, Exel compares the testimony of Mr. Villalpando with that of another Exel driver (and putative class member), Victoriano Molina.  *Id*. at 5-10.  According to Exel, while Mr. Villalpando worked long hours and personally performed deliveries for Exel, Mr. Molina performed very few of the deliveries while under contract with Exel, instead hiring others to perform most of the deliveries.  *Id*.  The commonality requirement is not met, according to Exel, because there is a "wide gap between (a) an individual's claim . . . and (b) the existence of a class of persons who suffered the same injury as that individual."  *Id*. at 11 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)).   Thus, the inquiry under *Borello* as to whether an *individual* is an independent contractor or an employee does not fit with the circumstances of contractors like Molina, Exel argues.  *Id*. at 12-14.  Similarly, the typicality requirement is not met, Exel argues, because there is little "overlap" between Villalpando, the putative class representative, and absent putative class members like Molina.  *Id*. at 15-16.

Exel distinguishes the Ninth Circuit's recent decision in *Alexander v. FedEx Ground Package System*, *Inc*., 765 F.3d 981 (2014), in which the court held in a wage and hour case that delivery drivers were employees rather than independent contractors even though the drivers were permitted to hire additional drivers and take on extra routes.   *Id*. at 14.  According to Exel, *Alexander* does not support the conclusion that the commonality requirement is met here.  *Id*.   In particular, Exel asserts, the Ninth Circuit reasoned in *Alexander* that because the plaintiffs drove their own trucks, "it did not matter that FedEx offered them the opportunity to lease more than one truck . . . and hire[] other drivers."  *Id*. at 14 (quoting *Alexander*, 765 F.3d at 993).  *Alexander* does not apply here, Exel argues, because the "contractor does not have to and indeed does not 'personally drive full time.'"  *Id.*

Next, Exel asserts that the name Plaintiffs will not adequately represent the class because

15

1   the declarations they submitted cannot be squared with their sworn deposition testimony.  *Id.* at

2   16-18.   Exel cites examples of what it contends are inconsistencies between the declarations and

3   deposition testimony of Mr. Villalpando, Mr. Shakur and Mr. Molina.  *Id.*  It also argues that the

4   declarations are "functionally identical," suggesting that they may be simply "boilerplate attorney-

5   drafted declarations."  *Id.*

6        Exel argues further that the predominance requirement under Rule 23(b)(3) is not met.  *Id.*

7   at 18-25.  Again, Exel relies on the difficulty of determining which putative class members

8   personally performed deliveries such that they might be able to assert claims for indemnification,

9   meal and rest break violations or minimum wage and overtime compensation, and which did not.

10  *Id.*

11       **D.   Reply**

12       In their Reply brief, Plaintiffs argue that it is the uniform right of control over the class,

13  embodied in the contracts signed by all Exel drivers and the standardized policies and practices

14  relating  to all aspects of the drivers' work, that makes certification appropriate.  Reply at 1.

15  Plaintiffs also argue that another recently-decided misclassification case involving delivery drivers

16  – *Ayala v. Antelope Valley Newspapers,* 59 Cal. 4th 522 (2014) – supports their position that

17  Exel's uniform policies and practices with respect to its right to control its drivers make

18  certification appropriate.  *Id.*   Plaintiffs reject Exel's reliance on the fact that some of the putative

19  class members are not full-time drivers but instead, have hired helpers and second drivers to make

20  deliveries.  *Id.* at 2.  According to Plaintiffs, the same argument was recently rejected in *Alexander*

21  *v. FedEx Ground Package System, Inc.*, 765 F.3d 981 (2014).  Plaintiffs argue that Exel's attempt

22  to distinguish *Alexander* on the basis that the drivers in that case were *full-time* drivers fails

23  because the reasoning of *Alexander* applies regardless of whether the plaintiffs in this case worked

24  full-time or part-time.  *Id.* Plaintiffs note that Exel maintains a database of the drivers' logs and

25  thus, it is possible to identify the amount of time each class member personally provided delivery

26  services during the class period.  *Id.*  Plaintiffs further point out that Exel has not identified any

27  class member who did not personally provide delivery services at some point in the class period.

28

United States District Court
Northern District of California

*Id.*[6]  At most, Plaintiffs argue, the possibility that some of the putative class members did not personally make deliveries for Exel on a full-time  basis  is a question that goes to damages.  *Id.* Finally, Plaintiffs reject Exel's attempt to "manufacture 'credibility' issues" by quoting drivers' declarations and deposition testimony in an "incomplete and misleading way."  *Id.*

## III.    ANALYSIS

### A.    General Legal Standard for Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S.Ct. 2541, 2550 (2011) (internal quotation marks and citation omitted).  "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id*.  "Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. American Honda Motor Co., Inc*., 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186, *as amended by* 273 F.3d 1266 (9th Cir. 2001)).   This analysis does not focus on the probable outcome on the merits.  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, __U.S__, 133 S.Ct. 1184, 1195 (2013).  Rather, "[m]erits questions may be considered  . . . only to the extent . . .that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. (citation omitted).

Under Rule 23 of the Federal Rules of Civil Procedure, a party seeking certification must demonstrate that:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).    In addition, a party seeking class certification must demonstrate that one of the subsections of Rule

---

[6] At oral argument, Exel conceded that it could not point to any evidence in the record that there is any putative class member who *never* personally provided delivery services at any time while that individual was working for Exel.

United States District Court
Northern District of California

23(b) applies.  Plaintiffs in this action invoke Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### B.   California Law Governing Existence of Employment Relationship

Under California law, an individual who comes forward with evidence that he or she provided services for an employer is presumed to be an employee.  *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (citing *Robinson v. George*, 16 Cal.2d 238, 243 (1940)).  "The burden then shifts to the employer to 'prove, if it can, that the presumed employee was an independent contractor.'"  *Ruiz*, 754 F.3d at 1100 (citing *Cristler v. Express Messenger Sys., Inc.*, 171 Cal.App.4th 72, 83 (2009).   The California Supreme Court has identified a number of factors that courts should consider in making this determination, the most important of which is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . ."  *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 350 (1989).  The *Borello* court instructed that this test should not be applied rigidly, however, and that courts should also consider several "secondary" indicia of the nature of a service relationship.  *Id*.  The secondary factors listed in *Borello* are:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id*. at 351. "'Generally,  . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.'"  *Id*. (quoting *Germann v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 776, 783 (1981).  Further, "the label that parties place on their employment relationship 'is not dispositive and will be

18

ignored if their actual conduct establishes a different relationship.'" *Ruiz*, 754 F.3d at 1101

(quoting *Estrada v. FedEx Ground Package System, Inc*., 154 Cal. App. 4th 1, 10-11 (2007)).[7]

### 1.   *Ruiz v. Affinity Logistics Corp.*

In *Ruiz*, the court applied the *Borello* factors in a case involving delivery drivers who

alleged that they were misclassified as independent contractors. 754 F.3d 1093 (9th Cir. 2014).

The drivers alleged that because they were actually employees, they were entitled to sick leave,

vacation, holiday and severance pay and should not have been charged for workers' compensation

insurance. *Id.* at 1095.  The plaintiffs in the putative class were drivers for Affinity Logistics,

which provided delivery services for home furnishing retail stores.  *Id*. at 1096.  To be hired, the

drivers were not required to have any special license; they "simply had to have a driver's license,

sign the [Independent Truckman's Agreement] and [Equipment Lease Agreement], and pass a

drug test and physical exam." *Id*. at 1097.  As in this case, the Independent Truckman's

Agreement and Equipment Lease Agreement stated that the drivers were independent contractors

rather than employees. *Id*.  Under these agreements, the drivers were paid a "flat per-stop rate."

*Id*.

The drivers in *Ruiz* were also required to follow uniform procedures "regarding loading

trucks, delivering goods, installing goods, interacting with customers, reporting to Affinity after

deliveries, and addressing returns and refused merchandise, damaged goods, and checking in with

Affinity after deliveries." *Id*. at 1097.  These procedures were set forth in the Affinity Contractor

Procedures Manual.  *Id*.  Drivers were encouraged to lease their trucks from Affinity (in which

case, the cost was deducted from their compensation) but could lease a truck from an outside

source.  *Id*.  In either case, the drivers were required to paint the trucks white; only Affinity's

---

[7] Exel notes in passing that the *Borello* test "was developed in a worker's compensation case."
Opposition at 1.  While it is true that *Borello* involved workers' compensation claims, it is well
settled that the test set forth in *Borello* also applies in wage and hour cases.  *See Ayala*, 59 Cal. 4th
522 (2014) (looking to *Borello* factors to determine whether class certification was appropriate in
misclassification case in which plaintiffs asserted claims under the California Labor Code);
*Alexander*, 765 F.3d 981 (9th Cir. 2014) (looking to *Borello* factors to determine whether delivery
drivers were misclassified in a case asserting claims under California Labor Code);  *Ruiz*, 754 F.3d
1093 (9th Cir. 2014) (same).  Thus, there is no authority to support the suggestion that *Borello*
may not be the applicable framework for evaluating Plaintiffs' misclassification claim in this case.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    name and the Sears logo were permitted on the trucks. *Id.* The drivers were required to wear

2    uniforms. *Id.* at 1098. Similar to the drivers in this case, the drivers in *Ruiz* were required to

3    report to one of Affinity's warehouses every day to attend a morning "stand-up" meeting and

4    receive their route manifests. *Id.* at 1098. Drivers were not permitted to change the order of the

5    deliveries listed on the manifest route. *Id.* They were required to report frequently to dispatchers

6    throughout the day using a "specific type of mobile telephone." *Id.* Drivers were also required to

7    have a helper or secondary driver on the truck. *Id.* at 1097. The secondary drivers and helpers had

8    to submit to a background check and be approved by Affinity. *Id.* Affinity supervisors sometimes

9    conducted "follow-alongs" in which they "followed a driver for a few stops to ensure that the

10    driver was wearing the uniform and using proper delivery techniques." *Id.*

11       Following a bench trial, the district court in *Ruiz* entered judgment in favor of Affinity on

12    the basis that the plaintiffs were independent contractors. The Court of Appeals, however,

13    reversed, finding that consideration of the *Borello* factors supported the opposite conclusion, that

14    is, that the drivers were employees rather than independent contractors. *Id.* at 1101. First, the

15    court addressed the "most important" consideration, the right to control the details of the drivers'

16    work. *Id.* Based on the undisputed facts, the court found that this factor "indicate[d]

17    overwhelmingly that the drivers were Affinity employees." *Id.* at 1103. The court cited the

18    evidence that Affinity controlled the drivers' "rates, schedules and routes," as well as the

19    equipment they used and their appearance and that Affinity "closely monitored and supervised its

20    drivers." *Id.* at 1102. The court also pointed to the fact that the Independent Truckman's

21    Agreement permitted Affinity to terminate the drivers without cause with sixty days notice. *Id.*

22       The Ninth Circuit specifically rejected the conclusion of the district court that the drivers

23    were independent contractors because they could hire helpers and secondary drivers. *Id.* The

24    court reasoned that the district court had "overlooked the fact that often the reason drivers hired

25    helpers was that they were required to do so by Affinity" and further pointed to the fact that

26    "Affinity retained ultimate discretion to approve or disapprove of those helpers and additional

27    drivers." *Id.* at 1102.

28       The Ninth Circuit in *Ruiz* also found that "most of the secondary factors outlined in

*Borello*" supported the conclusion that the drivers were employees.  First, the court found that the district court had erred in finding that the "distinct occupation or business factor" supported the conclusion that the drivers were independent contractors.  *Id*. at 1103-1104.  In particular, the court found that the district court had placed too much weight on the fact that the drivers "had the ability to expand their businesses by hiring more employees, operating multiple trucks, and making managerial decisions regarding the employment and performances of the employees hired."  *Id*.  The district court had not placed enough weight, the court found, on "the fact that Affinity required drivers to create these businesses as a condition of employment."  *Id*.

The second and third *Borello* factors – whether "the work is usually done under the direction of the principal or by a specialist without supervision" and "the skill required in the particular occupation" – also supported the conclusion that the drivers were employees, the court found.  *Id*.  As to this factor, the court again found that the district court had erred, holding that it placed too much weight on the fact that drivers installed appliances without supervision, which the district court opined required "substantial skill."  *Id*. at 1104.  This conclusion was incorrect, the Ninth Circuit found, given that the drivers were not required to have any work experience or special licenses to be hired and that Affinity "closely supervised the drivers' work through various methods."  *Id*.  Thus, these factors supported the conclusion that the drivers were employees of Affinity.  *Id*.

The court found that the fourth *Borello* factor supported the same conclusion.  *Id*.  The fourth factor asks "whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work."  *Id*.  The district  court concluded that this factor supported the conclusion that the drivers were independent contractors because the drivers paid to lease their trucks and mobile telephones from Affinity.  *Id*.  The Ninth Circuit, however, held that the district court's conclusion was clearly erroneous because it failed to take into account the fact that "Affinity supplied the drivers with the major tools of the job by encouraging or requiring that the drivers obtain the tools from them through paid leasing arrangements."  *Id*.

Next, the court addressed the *Borello* factor that considers "the method of payment, whether by the time or by the job."  *Id*.  The court explained that payment "by the time" supports

a finding of employee status whereas payment "by the job" supports independent contractor status. *Id*. Citing evidence that drivers performed approximately eight deliveries a day and that the drivers' daily pay therefore "essentially remained the same," the court concluded that the method of compensation was by the time rather than by the job. *Id*. In reaching this conclusion, the court rejected the district court's reasoning that the flat per-delivery rate was more like "by the job" compensation because the time it took to complete each delivery varied and the drivers did not work "set hours." *Id*.

As to the *Borello* factor that asks courts to consider whether or not the parties believe they are creating the relationship of employer-employee, the court noted that both parties believed that they were entering an independent contractor relationship but that "'the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship.'" *Id*. at 1105 (quoting *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 11 (2007)).

The court next addressed the "right to terminate at will factor." *Id*. The Ninth Circuit, like the district court, found that the mutual termination provision in the Independent Truckman's Agreement was "consistent with either an employer-employee or independent contractor relationship." *Id*.

Finally, the court found that the "length of time for performance of services" favored an employer-employee relationship because "there was no contemplated end to the service relationship when the drivers signed their contracts, and drivers often stayed with Affinity for years." *Id*.

Based on the fact that Affinity had the right to control the details of the drivers' work and because the totality of the secondary factors supported the conclusion that the drivers were employees of Affinity, the Ninth Circuit reversed the district court's holding that the drivers were independent contractors and remanded to the district court for further proceedings. *Id*.

## 2. *Alexander v. FedEx Ground Package System, Inc.*

In *Alexander*, the Ninth Circuit again addressed the question of whether delivery drivers had been misclassified as independent contractors under California law. 765 F.3d 981 (9th Cir. 2014). In that case, numerous related cases involving FedEx delivery drivers were consolidated

for multidistrict litigation (MDL) proceedings.  In the MDL, the court certified a class as to the California state law claims and then granted summary judgment in favor of FedEx, finding, as a matter of law, that the plaintiffs were independent contractors.  *Id*. at 988.  The Ninth Circuit reversed, finding that the under the *Borello* factors, the plaintiffs were employees rather than independent contractors.  *Id*.

The facts in *Alexander* are, in many respects, very similar to the facts in *Ruiz*.  Like the drivers in *Ruiz*, the drivers in *Alexander* entered into a contract with FedEx ("the Operating Agreement") providing that they were independent contractors.  *Id*. at 984.   The Operating Agreement allowed drivers to operate more than one vehicle and route, but only with the consent of FedEx; it also permitted the driver to hire third parties to help perform their work, but the third party helpers were required to be qualified under federal, state and municipal safety standards, as well as FedEx's own safety standards.  *Id*. at 985-986.  The Operating Agreement specified an initial term of one, two or three years, with automatic renewal for one-year terms unless either party gives notice of its intent not to renew.  *Id*. at 986.  The Operating Agreement provided that the parties could terminate by mutual consent, for cause, including breach of the agreement, if FedEx stopped doing business in the driver's service area, or upon thirty days written notice by the driver.  *Id*.

FedEx imposed numerous requirements on the drivers as to how they performed their work.  *Id*.  This included making deliveries on every day that FedEx was open for business, delivering packages within the window of time negotiated between FedEx and its customers, wearing a FedEx uniform and adhering to FedEx personal grooming rules, using an electronic scanner  (purchased from FedEx) to send information to FedEx after each delivery, and adhering to FedEx standards and procedures regarding safety and customer interactions.  *Id*. at 985.  FedEx policy permitted a driver's manager to conduct up to four ride-along performance evaluations a year to ensure that drivers were adhering to FedEx standards.  *Id*.   Under the Operating Agreement, the drivers were required to provide and maintain their own trucks, which had to be approved by FedEx.  *Id*.  The drivers were required to pay the costs associated with maintaining and operating the trucks.  *Id*. The trucks, as well as the shelving inside the trucks, were required to

have specific dimensions.  *Id*.  They had to be painted with the FedEx colors and carry the FedEx logo.  *Id*.

Applying the *Borello* factors, the court concluded that FedEx's policies allowed it to "exercise a great deal of control over the manner in which its drivers do their jobs" and therefore, that this factor strongly supported the position of the drivers that they were employees.  *Id*. at 989. The court pointed to FedEx's policies governing uniforms and grooming, the appearance of the drivers' trucks, the times the drivers worked, and the way the deliveries were performed.  *Id*.  at 990. The court acknowledged that there were "details of its drivers work" that FedEx did not control  but found that these details were insignificant in comparison to the extensive control exercised over the drivers overall.  *Id*.

The court also rejected FedEx's argument that the drivers were not employees in light of the "flexibility and entrepreneurial activities" they were given and, in particular, "the ability to take on multiple routes and vehicles and to hire third-party helpers."  *Id*. at 991, 993. The court began its analysis of this question by examining *Borello*, in which the California Supreme Court held that "[a] business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers." *Id*. (quoting *Borello*, 48 Cal. 3d at 357). There, a commercial produce grower hired agricultural workers under sharefarmer agreements to harvest the crops in the plots assigned to them, with the assistance of their families.  *Id*. at 991 (citing *Borello*, 48 Cal. 3d at 357).  Although the sharefarmers used their own tools, set their own hours and were free to decide when to pick the crop to maximize profit, the court found that the workers were employees because the grower exercised a great deal of control over the business as a whole and exercised "all necessary control" over the work of the sharefarmers.  *Id*.  According to the *Alexander* court, California courts have applied the "all necessary control" test of *Borello* to delivery drivers,  recognizing that delivery drivers may be employees, despite operating with some degree of autonomy, because the employer exercises "all *necessary* control."   *Id*. at 991-992 (citing *JKH Enterprises, Inc. v. Department of Industrial Relations*, 142 Cal.App.4th 1046, 48 Cal.Rptr.3d 563, 568 (2006) and *Air Couriers Intern. v. Employment Development Dept.*, 150

24

1   Cal.App.4th 923, 931-932 (2007)).

2        The *Alexander* court went on to reject FedEx's reliance on a D.C. Circuit case, *FedEx*

3   *Home Delivery v. National Labor Relations Board*, 563 F.3d 492 (D.C.Cir.2009).  *Id.* at 993.  In

4   that case, the court noted, the D.C. Circuit shifted away from the control inquiry in favor of a test

5   that asks whether the "putative independent contractors have significant entrepreneurial

6   opportunity for gain or loss."  *Id.*  Because California has not adopted such a test, the *Alexander*

7   court found, FedEx's reliance on that case was misplaced.  *Id.*  The court also noted that its

8   conclusion was consistent with *Ruiz*, in which the Ninth Circuit "found that drivers were

9   employees where the company 'retained ultimate discretion to approve or disapprove of those

10  helpers and additional drivers.'"  *Id.* at 994 (quoting *Ruiz*, 754 F.3d at 1102).

11       Next, the court in *Alexander* examined the secondary factors under *Borello.*  The court

12  found that the first factor, the right to terminate at will, "slightly favor[ed] FedEx" because the

13  Operating Agreement did not give FedEx an unqualified right to terminate.  *Id.*

14       The court found that the second factor, whether the plaintiffs were engaged in a "distinct

15  occupation or business," favored the plaintiffs because "'the work performed by the drivers is

16  wholly integrated into FedEx's operation [and] [t]he drivers look like FedEx employees, act like

17  FedEx employees, [and] are paid like FedEx employees.'"  *Id.* (quoting *Estrada v. FedEx Ground*

18  *Package System, Inc.*, 154 Cal. App. 4th 1, 9 (2007)).

19       The court concluded that the third factor, whether the work is performed under the

20  principal's direction, "slightly favor[ed] plaintiffs" because "although drivers retain freedom to

21  determine several aspects of their day-to-day work, FedEx also closely supervises their work

22  through various methods."

23       The fourth factor –skill required in the occupation – also favored the plaintiff, according to

24  the court, because "FedEx drivers 'need no experience to get the job in the first place and [the]

25  only required skill is the ability to drive.'"  *Id.* (quoting *Estrada*, 154 Cal. App. 4th at 12).

26       The court found that the fifth factor, the provision of tools and equipment, only slightly

27  favored FedEx.  *Id.*  In particular, although the drivers provided their own trucks and were not

28  required to get other equipment from FedEx, this factor did not strongly support FedEx's position

United States District Court
Northern District of California

25

because FedEx was "'involved in the purchasing process, providing funds and recommending vendors.'"  *Id*. (quoting *Estrada*, 154 Cal. App. 4th at 9).

The court found that the sixth factor, "length of time for performance of services," supported the plaintiffs' position.  *Id*. at 996.  The court's conclusion is based on the terms of the Operating Agreement, which provides for an initial term of one to three years and automatic renewal for successive one-year terms if there is no notice of non-renewal by either party.  *Id*.

The court held that the "method of payment" factor was neutral.  According to the court, "FedEx pays its drivers according to a complicated scheme that includes fixed and variable components and ties payment to, among other things, packages, stops, and the ratio of driving time to deliveries. This payment method cannot easily be compared to either hourly payment (which favors employee status) or per job payment (which favors independent contractor status)."  *Id.*

The court held that the eighth factor, "whether the work is part of the principal's regular business," favored the plaintiffs because the work they performed – the pickup and delivery of packages – was "'essential to FedEx's core business.'"  *Id*. (quoting *Estrada*, 154 Cal. App. 4th at 9).

Finally, the court found that the parties' beliefs as to the nature of the relationship being formed slightly favored FedEx to the extent the Operating Agreement provides some evidence that both FedEx and the drivers believed they were forming an independent contractor's relationship. *Id*.  As in *Ruiz*, however, the court noted that "neither [FedEx]'s nor the drivers' own perception of their relationship as one of independent contracting' is dispositive.  *Id*. (citations omitted).

The court in *Alexander* concluded that the secondary factors did not strongly favor either employee status or independent contractor status but that the primary factor of the right to control test strongly favored the plaintiffs and therefore, that the drivers were employees as a matter of law under California's right-to-control test.  *Id*. at 1105.

## C.   Rule 23(a)

### 1.   Numerosity

Plaintiffs satisfy the numerosity requirement if "the class is so large that joinder of all members is impracticable."  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998).

1    Although the requirement is not tied to any fixed numerical threshold, courts have routinely found

2    the numerosity requirement satisfied when the class comprises 40 or more members.  *See E.E.O.C.*

3    *v. Kovacevich "5" Farms*, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007).    Because Exel

4    has identified 373 individuals who fit the class definition, the numerosity requirement is satisfied.

5                          **2.   Commonality**

6             The commonality requirement of Rule 23(a)(2) is met where "the class members' claims

7    'depend upon a common contention' such that 'determination of its truth or falsity will resolve an

8    issue that is central to the validity of each [claim] with one stroke.'"  *Mazza*, 666 F.3d at 588

9    (internal citation omitted) (citing *Wal-Mart*, __ U.S. __131 S.Ct. at 2551).  Thus, plaintiffs seeking

10   to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common

11   answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'"

12   *Id.* (citing *Wal-Mart*, __ U.S. __131 S.Ct. at 2551).  "[C]ommonality only requires a single

13   significant question of law or fact."  *Id.* at 589 (citing *Wal-Mart*, __ U.S. __131 S.Ct. at 2556).

14   "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion

15   requirements of Rule 23(b)(3)."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

16   "The existence of shared legal issues with divergent factual predicates is sufficient, as is a

17   common core of salient facts coupled with disparate legal remedies within the class."  *Id.*

18            Here, Plaintiffs assert there is a threshold issue as to all of their claims, namely, whether

19   they are independent contractors or employees of Exel.   The Court agrees, with the clarification

20   that class members must have personally made deliveries for Exel at some point during the class

21   period to be part of the class;  an individual who *never* made deliveries would not be able to

22   establish violations of at least some (if not all) of the wage and hour laws that are at issue in this

23   case.  For example, an individual who never actually made deliveries for Exel, instead hiring

24   others to drive the trucks and make the deliveries, could not recover damages for lost meal and rest

25   breaks on their own behalf.  With this clarification, the Court finds that the question of whether

26   Plaintiffs are independent contractors or employees of Exel is susceptible to classwide treatment

27   because of Exel's uniform policies and practices as to its drivers.  Therefore, this common legal

28   issue is sufficient to meet the commonality requirement.  *See Norris-Wilson v. Delta-T Group,*

United States District Court
Northern District of California

*Inc.*, 270 F.R.D. 596, 604  (S.D. Cal., 2010) (holding that question of whether workers who were hired by the defendant and classified as independent contractors under the same agreement  were independent contractors or employees was sufficient to meet commonality requirement under Rule 23(a)(2)).

### 3.  Typicality

In assessing typicality, under Rule 23(a)(3), courts consider "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992);  *see also Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S.Ct. 2541, 2550 (2011) ("a class representative must be part of the class and possess the same interest and suffer the same injury as the class members"). The typicality and commonality requirements "tend to merge" because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S.Ct. 2541, 2551 n. 5 (2011) (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-158, n. 13 (1982)).

Here, the typicality requirement is satisfied – again, with the clarification discussed above – because all of the putative class members allege the same injury, namely, that they were denied the protections of California's wage and hour laws on the basis that they were misclassified as independent contractors.  Further, the alleged injury results from a uniform course of conduct that affects all drivers, namely, the requirement that all drivers must sign the same ITA classifying them as independent contractors.

### 4.  Adequacy of Representation

Rule 23(a)(4), which requires that the class representatives "fairly and adequately protect the interests of the class," is satisfied if the proposed representative plaintiffs do not have conflicts of interest with the proposed class and are represented by qualified and competent counsel. *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 535 (N.D. Cal., 2012).  Exel does not dispute that Plaintiffs are represented by qualified counsel.  It contends, however, that the submission of "19

United States District Court
Northern District of California

functionally identical declarations"[8] and various discrepancies between the declarations and the deposition testimony indicate that the name plaintiffs have interests that are antagonistic to the class. *See* Opposition at 17-18 (citing *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D.Ill.,1990) (holding that case could not continue as a class action where name plaintiff had given false deposition testimony and class counsel had "encouraged plaintiff's false testimony," leading court to conclude that adequacy of representation requirement was not satisfied). The Court finds Exel's position to be unpersuasive.

First, even a cursory review of the declarations reveals that Exel mischaracterizes the record when it states that they are "functionally identical." While there is significant overlap, there are also differences between the declaration, indicating that these declarations are not mere boilerplate but rather, reflect both common experiences and certain variations in the drivers' experiences. For example, Mr. Villalpando describes asking for a Spanish language version of the ITA and being told by his manager, "You're in America now, you need to learn to speak and read English." Villalpando Decl., ¶ 5. Mr. Shekur recounts that a recruiter named "Maria" presented the ITA to him and that the only explanation offered by Exel personnel was that the paperwork would allow Exel to take $214/week out of his paycheck for a bond or he could pay $250 up-front for any property damage he might cause. Shekur Decl., ¶ 6. Mr. Herron states that when Exel presented the ITA to him no one explained what it meant *and* he was not provided sufficient time to review the documents. Herron Decl., ¶ 5. Mr. Alancastro describes asking a supervisor about the reimbursement rate he had received for mileage and being told it was because he was an independent contractor. Alancastro Decl., ¶ 27. The Court rejects Exel's suggestion that the declarations are so similar that they are not credible.

Second, the Court does not find that the deposition testimony offered by Exel as to Plaintiffs Shekur, Molina and Sarabia,[9] *see* Opposition at 16-18, suggests that these Plaintiffs' declarations contain any false statements. Rather, a comparison of the statements in the declarations and the cited deposition testimony indicates Exel has, again, mischaracterized the

---

[8] Plaintiffs submitted 21 declarations from putative class members. It does not appear that Exel intends to suggest that two of the declarations were *not* similar to the others; rather, it appears this is simply a clerical error.

[9] In the declaration, Mr. Sarabia's name is spelled with a "b" while the parties spell his name with a "v" in their briefs. The Court follows the spelling used in the sworn declaration.

United States District Court
Northern District of California

record, offering snippets of deposition testimony to suggest that the plaintiffs have made false

statements in their declarations even though the quoted testimony is, when read in context,

consistent with the declarations.

Therefore, the Court concludes that the adequacy of representation requirement is satisfied.

### D.    Rule 23(b)(3)

The predominance test of Rule 23(b)(3) is "far more demanding" than the commonality

test under Rule 23(a)(2). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "The Rule

23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Windsor*, 521 U.S. 591, 117

S.Ct. 2231, 2249). "When common questions present a significant aspect of the case and they can

be resolved for all members of the class in a single adjudication, there is clear justification for

handling the dispute on a representative rather than an individual basis." *Id*.; *see also Mazza*, 666

F.3d at 589.   The Court finds that this requirement is met because the threshold question as to all

of Plaintiffs' claims  – whether they are employees or independent contractors – is susceptible to

common proof, at least with the clarification that all class members must have personally made

deliveries for Exel at some point during the class period.  In addition, the elements of the specific

wage and hour claims asserted by Plaintiffs lend themselves to class treatment because of the

common policies and practices that apply to all drivers.  Finally, Exel has not demonstrated that

any individual issues that may need to addressed in adjudicating Plaintiffs' claims will be so

significant as to outweigh the benefits of class treatment.

### 1.   Whether Class Members are Employees or Independent Contractors

The question of whether Plaintiffs are employees or independent contractors under

California law turns on the application of the *Borello* factors, discussed above.  At the certification

phase, the relevant inquiry is not whether or not the specific factors support a finding that

Plaintiffs are employees of Exel.   Rather, the question is "one step . . . removed" from the merits

question. *See Ayala v. Antelope Valley Newspapers, Inc*., 59 Cal. 4th 522, 533 (2014). "A court

evaluating predominance 'must determine whether the elements necessary to establish liability

[here, employee status] are susceptible to common proof or, if not, whether there are ways to

1    manage effectively proof of any element that may require individualized evidence." *Id.* (quoting

2    *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1024 (2012)).  Thus, as to the most

3    important *Borello* factor, right of control, the Court must ask, "Is [Exel's] right of control over its

4    [drivers], whether great or small, sufficiently uniform to permit classwide assessment?" *Id.*

5    Similarly, in evaluating the secondary factors, the Court "must identify whether the factor will

6    require individual inquiries or can be assessed on a classwide basis." *Id.* at 538. For the reasons

7    stated below, the Court concludes the answer to both questions is "yes."

8         With respect to Exel's right to control, Plaintiffs rely heavily upon the contractual

9    agreements drivers are required to sign, the ITA and the ELA.   Such uniform contracts are a

10   significant focus of the "right to control" inquiry. *See Alexander*, 765 F.3d at 989-994;  *Ruiz*, 754

11   F.3d at 1102.  Moreover, to the extent *all* drivers are required to sign the same contracts, "the

12   degree of control [the contracts] spell[] out is uniform across the class." *Ayala*, 59 Cal. 4th at 534.

13   Plaintiffs also rely on Exel's policies as to safety, vehicle maintenance, grooming, the assignment

14   of delivery routes, and communications with customers, among other things, to show that the

15   degree of control Exel exercised over the class members makes them employees rather than

16   independent contractors.  Again, these were considerations that the courts in *Alexander* and *Ruiz*

17   found were highly relevant to the "right to control" test under *Borello*.  Further, Exel does not

18   dispute that these policies are the same for all class members.  Finally, while Exel points to the

19   ability to hire second drivers and helpers as evidence that the class members are independent

20   contractors, it does not dispute that all of the drivers are subject to the *same* rules and requirements

21   with respect to the hiring of second drivers and helpers.  Consequently, even the implications of

22   Exel's policies with respect to the hiring of helpers and second drivers is suitable for treatment on

23   a classwide basis.   As the "right to control" test is the most significant part of the *Borello* inquiry,

24   the fact that the evidence in this case on that issue lends itself to class treatment weighs in

25   Plaintiffs' favor as to the predominance inquiry.

26        In addition, many of the secondary factors in *Borello* are appropriate for treatment on a

27   classwide basis.   To the extent the drivers are performing the same type of work, the "distinct

28   occupation or business" factor can be decided on a classwide basis.  Similarly, to the extent that

United States District Court
Northern District of California

31

Exel has a uniform policy as to drivers' qualifications, set forth in the Compliance Manual, the "kind of occupation" factor, which asks whether work is done under the direction of a principal or by a specialist without supervision, can also be decided on a classwide basis.   Many other factors turn on (or are heavily influenced by) the provisions of the ITA and the ELA, including the length of time for which the services are to be performed, the method of payment, whether by the time or by the job, and Exel's right to terminate.   Thus, these factors as well are susceptible to class treatment.

### 2.   Whether other Requirements Specific to Individual Claims Are Susceptible to Common Proof

In addition to the threshold question of employee status, other issues relating to Plaintiffs' wage and hour claims are likely to be amenable to class treatment as well.

First, Plaintiffs' claim for reimbursement of expenses under Cal. Labor Code §2802, which provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties," lends itself to class treatment to the extent that Exel has a uniform policy as what is reimbursed and what is not.

Similarly, Plaintiffs' claims for unlawful deductions from wages and coerced purchases under Second, Cal. Labor Code §§221, 223, 400-410, and IWC Wage Order 9-2001 §8, are susceptible to common proof.  These provisions "prohibit deductions from an employee's wages for . . . business losses that may result from the employee's simple negligence." *Hudgins v. Neiman Marcus Group, Inc*., 34 Cal.App.4th 1109, 1118-19 (1995).  For all class members, the chargeback schedule in Exhibit D to the ELA will play an important part in establishing liability on these claims.

The meal and rest break claims also are susceptible to common proof.  Under IWC Wage Order 9-2001, §11, and Cal. Labor Code §§226.7 and 512, employers must provide employees with a reasonable opportunity to take off-duty meal periods during which they are completely relieved of duty for at least 30 minutes by every 5 hours of work, and must not impede or discourage them from taking such breaks. *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th

1004, 1040 (2012).  Employers must also "authorize and permit" ten minutes of rest for every four

hours worked or "major fraction thereof."  *Id*. at 1028.  Plaintiffs rely, in part on Exel's lack of a

policy to permit meal and rest breaks, which itself is an issue susceptible to common proof.  *See*

*Bradley v. Networkers International, LLC*, 211 Cal. App. 4th 1129, 1150 (2012) (holding that

meal and rest break claims based on employers *lack* of a policy involved companywide conduct

suitable for class treatment).  Plaintiffs also point to companywide practices with respect to

scheduling of deliveries that they contend make it difficult or impossible for drivers to take breaks.

These issues can be effectively addressed on a class-wide basis.

Plaintiffs' minimum wage and overtime claims also will raise issues that can be resolved

on a classwide basis.  In particular, the compensation provisions of the ITA and ELA, which apply

to all class members, specifically exclude pay for "non-hauling" activities, potentially resulting in

classwide minimum wage and overtime violations.   Further, certain classwide policies and

practices – such as the requirement that drivers participate in a daily stand-up meeting (which

presumably is a non-hauling activity) – may give rise to common questions on the merits as to

whether drivers were denied minimum wage and overtime pay.

### 3.  Individualized Inquiries

While key issues relating to Plaintiffs' claims may be resolved on a classwide basis,

Plaintiffs' claim raise some individual issues as well, primarily relating to damages.  For example,

if liability is established, it will be necessary to determine the amount of time each driver

personally performed deliveries for Exel as opposed to having a second driver and/or helper

perform the work.  There will also be individual issues related to determining how many hours

were worked at a rate below the minimum wage rate and, where applicable, the overtime rate.

Similarly, as Plaintiffs concede, there may be individual issues related to the reimbursement

claims because tools and supplies were purchased outside of Exel and do not show up on weekly

pay records.  *See* Reply at 13 n. 18.  However, "the presence of individualized damages cannot, by

itself, defeat class certification under Rule 23(b)(3)."  *Leyva v. Medline Industries Inc*., 716 F.3d

510, 514 (9th Cir. 2013).  Further, evidence maintained by Exel in the form of daily logs,

timesheets and manifests, will assist in the determination of damages.

The Court concludes that the issues that are amenable to class treatment predominate over the individual issues that may arise in this case and therefore, that the predominance requirement of Rule 23(b)(3) is met.

### 4.  Superiority

In evaluating superiority, a court considers the following non-exhaustive factors:

> (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Here, there is no indication that the class members have an interest in controlling the litigation; moreover, Plaintiffs contend the cost of individual actions is "prohibitively high" and that some drivers may fear reprisal.  Plaintiffs are not aware of any other litigation already begun nor has Exel pointed to any.  Further, concentrating the litigation in this forum will be beneficial to the parties because the Court has developed familiarity with the facts of this case.  Finally, the Court does not anticipate any significant difficulties in managing this class action: the size of the class is relatively modest and the claims asserted involve the law of only one state.  To the extent there are individual issues related to damages, the Court may bifurcate liability and damages (although the Court does not decide that issue here).   And both sides are represented by experienced counsel who are well-versed in handling the case management issues associated with litigating class actions.

## IV.        CONCLUSION

For the reasons stated above, the Motion is GRANTED.  The Court certifies the following class under Rule 23(a) and (b)(3)  of the Federal Rules of Civil Procedure:

> All individuals who have personally provided delivery services for Defendant Exel Direct in California while being classified by Exel Direct as independent contractors, at any time beginning June 14, 2008 until resolution of this action. Any individual who has signed the Independent Truckman's Agreement with Exel Direct but has

34

provided delivery services exclusively through the use of hired second drivers and who has *never* personally made deliveries for Exel is excluded from the Class.

A Case Management Conference shall be conducted on December 12, 2014 at 10:30 am. The parties shall meet and confer and submit to the Court an updated Case Management Statement, including a proposed schedule for the remainder of the case, one week in advance of the Case Management Conference.

**IT IS SO ORDERED.**

Dated: November 20, 2014

JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California