Joshua G. Konecky (SBN 182897)
Nathan B. Piller (SBN 300569)
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
180 Montgomery Street, Suite 2000
San Francisco, California 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
jkonecky@schneiderwallace.com
npiller@schneiderwallace.com

Ira Spiro, SBN 67641
SPIRO LAW CORP.
11377 W. Olympic Blvd., Fifth Floor
Los Angeles, CA 90064
Telephone: (310) 235-2350
Facsimile: (310) 235-2351
ira@spiromoore.com

Jeff Holmes, SBN 100891
BLANCHARD LAW GROUP, APC
3311 East Pico Blvd.
Los Angeles, CA 90032
Telephone: (310) 396-9045
Facsimile: (970) 497-4922
JeffHolmesJH@gmail.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL VILLALPANDO, individually and on behalf of all others similarly situated,<br><br>    Plaintiff(s),<br><br>vs.<br><br>EXEL DIRECT INC., et al.,<br><br>    Defendant(s). | Consolidated Cases:<br>Case No. 3:12-cv-04137-JCS<br>Case No. 4:13-cv-03091-JCS<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION OF DEFENDANTS' INDEPENDENT CONTRACTOR DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:  August 14, 2015<br>Time:  2:00 p.m.<br>Judge: The Honorable Joseph C. Spero |

1

2   TAFITI SHEKUR, individually and on    )
    behalf of all others similarly situated,    )
3                                                )
                                                 )
4                       Plaintiff,               )
                                                 )
5              vs.                               )
                                                 )
6   EXEL DIRECT INC., et al.,                    )
                                                 )
7                       Defendants.              )
                                                 )
8   _____        )

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                    ii
27   PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY
     ADJUDICATION OF DEFENDANTS' INDEPENDENT CONTRACTOR DEFENSE; MEMORANDUM OF
                       POINTS AND AUTHORITIES IN SUPPORT
                  Case No. 3:12-cv-04137-JCS & 4:13-cv-03091-JCS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on **August 14, 2015**, at **2:00 p.m.**, or as soon thereafter as counsel may be heard, plaintiffs will move the Court for an Order granting summary judgment and/or adjudication of defendants' affirmative defense that the Plaintiffs and Class Members are independent contractors.

This motion is based on the accompanying memorandum of points and authorities; the Declaration of Nathan Piller, including the deposition transcript excerpts and documents attached to the Declaration; such oral argument as may be heard by the Court; and all other papers on file in this action.

Respectfully submitted,

Dated:  May 22, 2015          SCHNEIDER WALLACE
                              COTTRELL KONECKY WOTKYNS LLP


                              /s/ *Joshua G. Konecky*
                              Joshua G. Konecky
                              Counsel for Plaintiffs

# **TABLE OF CONTENTS**

RELIEF SOUGHT ..........................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

   I.      INTRODUCTION .........................................................................1

   II.     SUMMARY OF UNDISPUTED FACTS COMPELLING SUMMARY JUDGMENT FOR PLAINTIFFS UNDER THE CONTROLLING LAW ...........2

   III.    STATEMENT OF UNDISPUTED FACTS ................................................5

       A.     Exel classified its Drivers as independent contractors to cut its costs ........5

       B.     Exel presents the job terms and pay rates to the Drivers on a take-it-or-leave-it basis ...........................................................................................5

       C.     Exel retains the right to terminate or transfer Drivers without cause, and to terminate any Driver for violating any of Exel's rules or instructions .......6

       D.     Exel provides the customers ....................................................................7

       E.     Exel provides the delivery routes .............................................................8

       F.     Until May 2015, Exel provided the operating authority and retained the right of exclusive possession, control, and use of the vehicles ..................8

       G.     Exel retains the right to control the Drivers' work hours and delivery schedules ...............................................................................................9

       H.     Exel provides appearance standards for the Drivers and their vehicles....10

       I.     Exel provides standard truck requirements and requires Drivers to use specific tools and devices ...................................................................12

       J.     Exel's compliance and training manuals contain mandatory language that commands the Drivers to work in a specific manner ...............................12

       K.     Exel's compliance and safety policies go "above and beyond the minimum legal requirements" ...............................................................................13

       L.     Exel monitors and enforces the Drivers' compliance with Exel's rules ... 13

       M.    Exel trains and requires the Drivers to meet specific customer service standards .............................................................................................15

       N.     Exel trains and directs Drivers on their loading and delivery techniques. 17

       O.     Exel requires Drivers to enlist helpers, and retains ultimate control over who may serve as a Driver's helper .........................................................18

       P.     Exel acts as the employer-lender and debt collector of the Drivers .........19

   IV.    THE DRIVERS ARE EMPLOYEES AS A MATTER OF LAW .......................20

       A.     The State's strong public policy against the exploitation of working people ............................................................................................................20

A

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION OF DEFENDANTS' INDEPENDENT CONTRACTOR DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:12-cv-04137-JCS & 4:13-cv-03091-JCS

B.     The Drivers are presumed to be employees, and Exel bears the burden of proving that it correctly classified them as independent contractors ........ 22

C.     Exel cannot defeat summary judgment for Plaintiffs unless it can raise a genuine dispute that it has not retained a right to control the details of the Drivers' work ........................................................................................... 22

D.     It is undisputed that Exel maintains the same policies that create an employment relationship as a matter of law under recent Ninth Circuit precedent ............................................................................................. 23

E.     The secondary factors also favor Plaintiffs ............................................... 27

F.     The so called "entrepreneurial opportunities" Exel claims to provide to the Drivers are immaterial to the independent contractor misclassification ... 28

G.     Exel's attempt to pass the buck to its retail customers and regulatory authorities is a phantom argument without any bearing on the issue of the Drivers' classification ............................................................................ 29

V.     CONCLUSION ................................................................................................. 33

1

## **TABLE OF AUTHORITIES**

2

**Federal Cases**

3

*Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981 (9th Cir. 2014). ................... passim

4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). .................................................. 24

5

*Bureerong v. Uvawas*, 922 F.Supp. 1450 (C.D. Cal. 1996)........................................ 21

6

*Devines v. Maier*, 665 F.2d 138 (7th Cir. 1981). ................................................ 33

7

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013). ........................... 33, 34

8

*Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853 (8th Cir. 2010). ........................... 25

9

*Kamar v. RadioShack Corp.*, 2008 WL 2229166 (C.D. Cal. May 15, 2008). ........................... 22

10

*Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010). ................................................ 23

11

*Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014). ........................................ passim

12

*Scott v. Harris*, 550 U.S. 372 (2007). ................................................................ 24

13

*Taylor v. Shippers Transp. Exp., Inc.*, 2014 WL 7499046 (C.D. Cal. Sept. 30, 2014). .............. 32

14

*Thomas v. Home Depot USA, Inc.*, 527 F.Supp.2d 1003 (N.D. Cal. 2007)................................ 21

15

*United States v. Sierra Pac. Indus.*, 879 F. Supp. 2d 1117 (E.D. Cal. 2012). ........................... 29

16

**State Cases**

17

*Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal.App.4th 580 (2011). ................................... 24

18

*Ayala v. Antelope Valley Newspapers*

19

   59 Cal.4th 522 (2014) .............................................................. 3, 4, 24

20

*California State Rest. Assn. v. Whitlow*, 58 Cal. App. 3d 340 (1976). ........................... 21

21

*Cristler v. Express Messenger Sys., Inc.*, 171 Cal.App.4th 72 (2009)........................... 23

22

*Earley v. Superior Court*, 79 Cal.App.4th 1420 (2000)........................................ 22

23

*Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1 (2007)................................ 32

24

*Isbister v. Boys' Club of Sana Cruz, Inc.,* 40 Cal.3d 72 (1985)........................................ 34

25

*Lazarin v. Superior Court*, 188 Cal. App. 4th 1560 (2010)........................................ 22

26

*Lusardi Construction Co. v. Aubry*, 1 Cal.4th 976 (1992)........................................ 21

27

1    *Marina Point, Ltd. v. Wolfson* 30 Cal.3d 721 (1982). ...................................................... 34

2    *Murphy v. Kenneth Cole Prods., Inc.,* 40 Cal. 4th 1094 (2007). ................................... 21

3    *Nicholas Laboratories, LLC v. Chen*, 199 Cal.App.4th 1240 (2011). ........................... 21

4    *Peters v. Haymarket Leasing, Inc.*, 64 Mass. App. Ct. 767 (2005). ............................. 31

5    *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785 (1999). ............................................. 21

6    *Robinson v. George*, 16 Cal. 2d 238 (1940). .............................................................. 23

7    *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341 (1989). ........... 9, 23, 30, 31

8    *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319 (2004)...................... 21, 22

9    *Stoumen v. Reilly*, 37 Cal.2d 713 (1951). .................................................................. 34

10   *Tamez v. Sw. Motor Transp., Inc.*, 155 S.W.3d 564 (Tex. App. 2004). ........................ 33

11   *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943 (1970). .................................. 23

**Federal Statutes**

49 U.S.C.A. Section 13902(a)(1)................................................................................. 32

**State Statutes**

California Labor Code ................................................................................... 2, 21, 22

**Regulations**

Federal Motor Carrier Safety Regulations, 49 C.F.R. Section 376.1. .............. 9, 31, 33

**Other Authorities**

Robert Reich, *Why We're All Becoming Independent Contractors*, The Huffington Post, Feb. 22, 2015. .............................................................................................................. 23

Secretary of Labor Thomas E. Perez, Testimony before the Committee on Education and the Workforce, U.S. House of Representatives, March 26, 2014.................................... 1

Steven Greenhouse, *U.S. Cracks Down on 'Contractors' as a Tax Dodge*, The New York Times, Business, Feb. 17, 2010. ............................................................................... 2

Webpage on official Internal Revenue Service website, entitled "Independent Contractor (Self-Employed) or Employee?"...................................................................... 1

D

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION OF
DEFENDANTS' INDEPENDENT CONTRACTOR DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:12-cv-04137-JCS & 4:13-cv-03091-JCS

**RELIEF SOUGHT**

In this wage and hour class action brought under California state law, Plaintiffs seek summary judgment and/or adjudication on the threshold question of whether Defendant Exel Direct, Inc. / MXD Group, Inc. ("Defendant" or "Exel") has misclassified its home delivery truck drivers ("Drivers")[1] as independent contractors rather than employees.  This will resolve Exel's first affirmative defense to operative complaint.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

United States Secretary of Labor Thomas Perez declared just last year that the misclassification of employees as independent contractors "is nothing short of workplace fraud, and it is a practice that has spread from construction to a variety of low-wage industries[.]"[2] Misclassification not only harms working people, but "also robs the public coffers of payroll taxes and forces employers who play by the rules to compete against those who cut costs by cutting corners."[3] Not surprisingly, truck drivers are among the workers most often misclassified,

---

[1] The term "Drivers" as used throughout this memorandum refers to the members of the Class certified by the Court in its Order of November 20, 2014.  Under that Order, Class Members are defined as: "All individuals who have personally provided delivery services for Defendant Exel Direct in California while being classified by Exel Direct as independent contractors, at any time beginning June 14, 2008 until resolution of this action. Any individual who has signed the Independent Truckman's Agreement with Exel Direct but has provided delivery services exclusively through the use of hired second drivers and who has *never* personally made deliveries for Exel is excluded from the Class." Order Granting Motion for Class Certification [ECF 150], at 34:26-35:2 (emphasis is original).

[2] Secretary of Labor Thomas E. Perez, Testimony before the Committee on Education and the Workforce, U.S. House of Representatives, March 26, 2014, attached as Exhibit 1 to the Declaration of Nathan Piller in support of Plaintiffs' Motion for Summary Judgment and/or Adjudication ("Piller Decl.").  All exhibits cited herein are attached to the Piller Decl.

[3] *Id.*; *see also* Exh. 2, webpage on official Internal Revenue Service website, entitled "Independent Contractor (Self-Employed) or Employee?" ("You do not generally have to withhold or pay any taxes on payments to independent contractors.").

according to a report by the New York Times.[4] Indeed, unlawful misclassification is precisely what Exel has done to its Drivers in this case.

Exel's Drivers are hired to perform the hard, manual labor required to carry out Exel's delivery business.  They routinely work 14-hour days, driving standard 26-foot trucks and hauling heavy furniture and appliances for Exel's retail clients.  Despite the long hours and heavy labor, Exel does not pay them any overtime or have any policies in place to provide them with off-duty meal or rest breaks. In fact, Drivers often have to go to the bathroom in a bottle while driving because they cannot realistically stop and still meet Exel's delivery schedules.  At the same time, the Drivers struggle to make ends meet (their take home pay often falls below the minimum wage) and many end up going broke or bankrupt as a result of the "start-up costs" they must incur to work for Exel.

If Exel actually provided its Drivers with the freedom of a true entrepreneur or "independent contractor," then perhaps these harsh conditions would comport with our society's expectation of risk, reward and fair dealing.  The undisputed material facts, however, show that Exel does not.  Rather, as Exel's own contracts, written policies and manager testimony indisputably demonstrate, Exel simply reserves the right to control too many details of the Drivers' work for it to be depriving them of the wage and hour protections the law guarantees to employees.

## II.  SUMMARY OF UNDISPUTED FACTS COMPELLING SUMMARY JUDGMENT FOR PLAINTIFFS UNDER THE CONTROLLING LAW

The Consolidated Amended Complaint in these actions alleges that Exel has violated the California Labor Code and California Code of Regulations by unlawfully deducting earned wages from the compensation owed to its Drivers, and by denying its Drivers minimum wage, overtime, off-duty meal and rest periods, and reimbursement of expenses necessarily and reasonably incurred in carrying out their work duties for Exel. *See* Complaint at ¶¶ 1, 2, 25-75,

---

[4] Exh. 3, Steven Greenhouse, *U.S. Cracks Down on 'Contractors' as a Tax Dodge*, The New York Times, Business, Feb. 17, 2010.

86-154 [ECF 65].  Exel's first affirmative defense to these claims is that the Drivers are

independent contractors rather than employees, and therefore are not protected by the labor laws

cited in the Complaint. *See* Answer at 21:26-27 [ECF 125].  Thus, before reaching Plaintiffs'

underlying claims, a determination can be made as to whether Exel can meet its affirmative

independent contractor defense.  The undisputed material facts show Exel cannot.

Under California law, Exel is the legal employer of the Drivers unless it can prove that it

does <u>not</u> reserve a right to control the details of the Drivers' job or the manner and means in

which it is performed. *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014).  The

question is not whether Exel always exercises this control, but whether it reserves the right to

exercise control. *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014).

It is undisputed that Exel reserves the right to control the most basic details of the

Drivers' work.  A few examples include:  the specifications and color of the trucks they drive;

the monikers on the uniforms they must wear; the products they deliver; the customer service

scripts they are trained to follow; the safety trainings and morning meetings they must attend; the

loading and installation procedures they must follow; the levels of insurance they must carry; the

tools they must stock; the helpers that assist them; and the base pay rates they cannot negotiate.

Simply put, Exel provides the customers; Exel provides the delivery routes; Exel provides the

rules.  And, of course, Exel reserves the right to terminate any Driver's "contract" if he or she

deviates from Exel's expectations.  There is no genuine dispute as to these material facts.

Moreover, until May 2015, the Drivers all performed their work under Exel's "operating

authority," which means Exel actually maintained "custody and control" over the Drivers'

vehicles and legal accountability over the Drivers' conduct.  While no one forced Exel to have

the Drivers operate directly under its operating authority, once Exel chose this business model, it

also chose to retain the right to exercise significant control over the details of the Drivers' work,

simply to fulfill its contractual commitments to the retail clients and its legal obligations to the

regulatory authorities.  Indeed, Exel manages its right to control the Drivers through an array of

techniques, from the mandatory language in its policies and contracts; to the regular practice of

having Exel management train, "ride along" and "ride behind" the Drivers to monitor and evaluate their performance; to the levying of monetary penalties for noncompliance with Exel's rules; to reserving the right to terminate any Driver without cause. Again, these material facts are not in dispute.

Exel's policies are the same as those that led the Ninth Circuit to twice hold in the past year that unmistakably similar classes of home delivery drivers were misclassified as independent contractors. *See Ruiz* 754 F.3d at 1101 (reversing judgment for logistics company after bench trial and holding that delivery drivers were employees as a matter of law); *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989-90, 988 (9th Cir. 2014) (reversing summary judgment for FedEx and holding that delivery drivers were employees as a matter of law). In fact, Exel took over the same account at issue in the *Ruiz* case.

In light of these undisputed facts, Plaintiffs move for summary judgment and/or adjudication of the threshold question of whether Exel can meet its affirmative defense to show that it properly classified the Drivers as independent contractors, rather than employees, under California law. This misclassification issue is well suited for summary judgment. Indeed, the California Supreme Court recently reiterated that "what matters under the common law is not how much control a hirer exercises, but how much control the hirer retains the right to exercise." *Ayala*, 59 Cal. 4th at 533 (emphasis added). Thus, the question of whether Exel has maintained the requisite control over its Drivers can be answered in Plaintiffs' favor by reviewing the uniform contracts, written policies and Exel-manager testimony regarding them. *Id.* at 534; *Ruiz*, 754 F.3d at 1102; *Alexander*, 765 F.3d at 989.[5]

---

[5] The Court's Scheduling Order anticipates an adjudication of the employee versus independent contractor defense before reaching the ultimate merits questions of whether Exel has violated California law concerning minimum wage, reimbursement of expenses, unlawful wage deductions and the duty to provide off-duty meal and rest periods. If Plaintiffs prevail on their motion concerning the independent contractor defense, then there will be subsequent proceedings to determine Exel's actual liability for the underlying claims.

III.    STATEMENT OF UNDISPUTED FACTS

    A.    **Exel classified its Drivers as independent contractors to cut its costs**

Exel adopted and maintained the independent contractor business model after running multiple "contractor versus employee cost analys[es]."  Exh. 5, Deposition of Rene Albarano ("Albarano (PMK) Depo.") at 240:2-6, 243:2-244:4.  The "financial delta between the [employee and independent contractor] models" was among the "largest reasons that [Exel] used in [its] analysis to continue a contracting model." *Id.* at 241:22-242:20.  Indeed, Exel's senior management team has projected that the company saves approximately $23,000 per truck, per year by classifying its Drivers as independent contractors rather than paying them as employees. Exh. 6, Second Deposition of Rene Albarano ("Albarano Depo II") at 50:1-51:2.  In turn, the deposition testimony and tax documents Exel obtained from Drivers through discovery show that Drivers typically take home less than $25,000 per year (and sometimes lose money over the course of a year), after expenses, despite working 14-hour days, 5-6 days a week. *See* Exhs. 51-59 (sample Class Member IRS Schedule C 1040 Forms showing profit or loss from business). By comparison, in 2006, when Exel still classified some drivers as employees, the average yearly salary was $52,238 (plus reimbursed expenses). Exh. 6 (Albarano Depo II at 81:2-82:14); Exh. 49, "Network Driver Pay," EDV065801, at 3.

    B.    **Exel presents the job terms and pay rates to the Drivers on a take-it-or-leave-it basis**

Exel's senior manager in charge of contractor recruiting and development testified that the company primarily recruits individuals who have not yet established a business before working with Exel.[6] Exh. 11, Deposition of Gregory Smigelsky ("Smigelsky (D's Witness)

---

[6] Although the Ninth Circuit has rejected the "entrepreneurial opportunities" approach to the employee versus independent contractor analysis, *Alexander*, 765 F.3d at 993, *infra*, it is noteworthy that as a class, the Drivers here are hardly entrepreneurs; many simply needed a job to survive. *See, e.g.*, Exh. 11, Deposition of Daniel Villalpando, Named Plaintiff ("Villalpando (Named Plaintiff) Depo.") at 23:7-11 (responded to Exel advertisement boasting $120,000 because he "want[ed] to get the job.") 105:5-8 ("In that time I don't know if you remember the economy for the country go really bad.  So it's so hard to find a job, so that's why I get the… opportunity to get this job"); Exh. 12, Deposition of Pedro Navarro ("Navarro (Class Member) Depo.") at 37:1-7 ("I thought to myself, well, if they pay better, of course I will want to work for

Depo.") at 113:3-18; *see also id.* at 5:21-6:20 (witness's description of his management responsibilities).  Still, Exel does not give them an opportunity to negotiate their pay rates or other terms of their work relationship with Exel, which are presented on a "take-it-or-leave-it basis." Exh. 5 (Albarano (PMK) Depo. at 83:13-24, 205:4-6; *see also* Exh. 8, Independent Truckman's Agreement ("ITA"), EDV001684-87.  Exel compensates them on a flat, per-stop rate that is "nonnegotiable." Exh. 13, Deposition of Cristina De La Rosa, Recuiter ("De La Rosa (D's Witness) Depo.") at 40:16-20.  As one Class Member put it, "[t]here was no – no sort of contract negotiation process allowed.  We were given a rate sheet that basically said, 'this is what we pay per stop.'"  Exh. 10, Deposition of Victoriano Molina, ("Molina (Class Member) Depo.") at 79:5-15; *see id.* at 79:17-23 (piece rate was cut by 25% "[a]t least twice a year… [a]nd we had no say in that.").

C.   **Exel retains the right to terminate or transfer Drivers without cause, and to terminate any Driver for violating any of Exel's rules or instructions**

Exel sets delivery, customer service, safety, and appearance "standards" that Drivers are "expected to follow." Exh. 7 (Smigelsky Depo. at 78:19-79:17); *see also* Exh. 5 (Albarano (PMK) Depo. at 233:16-19); Exh. 14, Deposition of Jason Moll, Director of Operations for the West ("Moll (D's Witness) Depo.") at 143:5-13.  Exel's senior manager in charge of contractor development and recruiting testified that Exel retains the right to terminate Drivers if they do not meet these standards:

> Q. Exel Direct retains that right and communicates that right to the drivers, that their contract could be terminated if they don't meet the standards set by Exel Direct; correct?
>
> A. Yes.

Exh. 7 (Smigelsky (D's Witness) Depo. at 79:24-80:3). Indeed, Exel's business depends on superior customer service, and Exel can terminate a Driver for failing to meet the company's particular "standards of quality or excellence" in this regard. *Id.* at 66:14-67:7.

---

them[.]"); Exh. 13, Deposition of Rafael Raymundo ("Raymundo (Class Member) Depo.") at 15:14-17 ("I didn't know about [Exel]. I just want to get a better job.").

Exel's right to terminate without cause is set forth in the written contracts and policies as well.  For example, Exel's Independent Truckman's Agreement ("ITA")—which all its Drivers must sign—gives Exel the right to terminate and/or transfer any Driver to any of Exel's other locations without cause at any time.  Exh. 5 (Albarano (PMK) Depo at 83:16-18); Exh. 8 (ITA, EDV001680); *see also* Exh. 5 (De La Rosa (D's Witness) Depo. at 22:16-19; 24:10-25:5) (testifying that Exel's site managers ask one another if they can "borrow" a Driver when they are "short.").  In addition, Exel's Transportation Safety & Regulatory Compliance Manual ("Compliance Manual") provides that "contractors who fail to comply with the provisions of this manual are subject to termination." *See* Exh. 15 (Compliance Manual, EDV000304); *see also* Exh. 7 (Villalpando (Named Plaintiff) Depo. at 119:2-4) (followed manager's instructions because "[t]hat's what he told me to do.  I do it to keep my job.")  Exel's Compliance Manual further provides that "violations [of Exel's own safety rules] may result in termination of the Equipment Lease Agreement and the Independent Truckman's Agreement executed with Exel." Exh. 15 (Compliance Manual, EDV000309).

It is further undisputed that Exel's various safety training manuals give Exel the right to deduct money from Drivers' paychecks for failure to comply with Exel's own safety guidelines, at least from August 2011 to July 2014. Exh. 14 (Moll (D's Witness) Depo. at 150:10-151:16). The monetary penalties Exel levied under this "Driver Safety Accountability Policy" included $250 for fatigued driving, and harsher penalties for "preventable accidents," a standard created by Exel, and which it describes as a "higher standard than legal liability." Exh. 16 (Exel Direct Driver Safety Accountability, EDV000286).

D.     **Exel provides the customers**

Drivers are told that "Exel Direct provides you with the customers." Exh. 7 (Smigelsky (D's Witness) Depo. at 196:1-8); Exh. 17, Realistic Preview of Business Opportunity, EDV012933, at 5. As one of Exel's recruiters put it, "we will have the client customers for them… it's already done [] for them." Exh. 18, Deposition of Maria Iniguez-Quintero, Recruiter

("Iniguez-Quintero (D's Witness) Depo.") at 89:18-24.  Exel admits that the Drivers do not choose the customers they serve or negotiate with them over "any of the contract terms…" including "requirements, the job, location" among other things.  Exh. 5 (Albarano (PMK) Depo. at 81:11-25; 82:19-83:3).  Rather, the Drivers provide delivery services to Exel's retail customers in the manner dictated by Exel's contracts with its retail customers. *Id*. at 81:11-18.

E.     **Exel provides the delivery routes**

It is undisputed that Exel has the discretion to "determine which routes go to which drivers" and that it assigns Drivers the "time windows for each stop." Exh. 5 (Albarano (PMK) Depo. at 102:5-103:23, 107:9-16); *see also* Exh. 7 (Villalpando (Named Plaintiff) Depo. at 177:2) (had "no choice" in routes); Exh. 19, Deposition of Juan Saravia ("Saravia (Class Member) Depo.") at 52:5-17 (route assignments sent "while you were sleeping, when you wake up, you see the list… on the phone already."). The Drivers only have a "choice" over what route to take insofar as they may select the streets and highways to take in between the required destinations and delivery time windows.  Exh. 5 (Albarano (PMK) Depo. at 102:2-21, 103:14-23).  Yet under some circumstances, Drivers lack even this basic leeway. *See* Exh. 14 (Moll (D's Witness) Depo. at 107:25-108:2) (confirming that dispatchers may provide "turn-by-turn driving directions" to Drivers). Exel's own management confirms that Drivers who do not make deliveries according to their assigned routes are subject to having their contracts terminated. Exh. 7 (Smigelsky (D's Witness) Depo. at 88:14-21).

F.     **Until May 2015, Exel provided the operating authority and retained the right of exclusive possession, control, and use of the vehicles**

As a motor carrier, Exel is subject to the Federal Motor Carrier Safety Regulations. 49 C.F.R. 376.1.  The Regulations require that motor carriers choosing to lease, rather than purchase equipment for transportation must have "exclusive possession, control, and use of the equipment for the duration of the lease" and "assume complete responsibility for the operation of the equipment for the duration of the lease."  49 C.F.R. 376.12(c)(1).[7]

---

[7] There is no legal requirement that—as an authorized motor carrier—Exel use an independent contractor business model or lease vehicles from independent contractors.  Moreover, the DOT

Until May 2015, Exel's Equipment Lease Agreement (ELA), which every Driver had to sign, provided Exel with "exclusive control" over the vehicles that the Drivers used. Exh. 16 (ELA, at EDV001638).  Indeed, Exel chose a business model that required the Drivers' trucks to run under Exel's operating authority, making Exel responsible for ensuring that they were driven safely and in accordance with regulations. Exh. 7 (Smigelsky (D's Witness) Depo. at 89:13-24).

Exel's Compliance Manual advises Class Members that they are operating the vehicles "under [Exel's] authority and insurance" and that the vehicles remain under the "care, custody, and control" of Exel. Exh. 15 (Compliance Manual, EDV000304).  Exel reminds Drivers that they are responsible for improving Exel's rating with the Federal Motor Carrier Safety Administration by maintaining the truck in a condition that will generate positive evaluations during roadside inspections.  *See* Exh. 21 (Addendum No. 1 to Equipment Lease Agreement, EDV001696).  Exel also requires the Drivers to pay "liquidated damages" for any roadside inspection that results in one or more reported violations. *Id*.

### G.     Exel retains the right to control the Drivers' work hours and delivery schedules

It is undisputed Exel requires that its Drivers begin their workdays with an early morning meeting. Exh. 5 (Albarano (PMK) Depo. at 160:1-2) (all Class Members are "required to attend."); *see also* Exh. 19 (Saravia (Class Member) Depo. at 50:14-23) (was required to arrive at warehouse at 5:30 AM to be ready for the meeting starting at 6:00 AM).  Before the Drivers depart, Exel provides them with manifests mandating two-hour "time windows" for each pre-scheduled delivery, and expects the Drivers to fulfill Exel's "commitment to deliver the product in the delivery window" for all its clients. Exh. 5 (Albarano (PMK) Depo. at 102:5-103:23, 107:9-16); Exh. 7 (Smigelsky (D's Witness) Depo. at 51:9-19).  Exel keeps track of whether

---

Regulations specifically warn logistics companies such as Exel that complying with them does not affect whether the driver is an independent contractor or an employee. 49 C.F.R. 376.12(c)(4).  That determination is made under applicable wage and hour law, such as the California right-of-control test. *See S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341, 350 (1989).  Exel's compliance with the DOT Regulation simply shows, as a factual matter, that it is retaining exclusive possession and control over the vehicles.

Drivers make deliveries within the time windows by reviewing "in window" percentage scores provided by retail clients, and provides "positive or negative" feedback to the Drivers to improve the timeliness of their deliveries. Exh. 14 (Moll (D's Witness) Depo. at 88:9-19).

According to Exel's senior manager in charge of contractor recruiting and development, the Drivers' typical work schedule is 5 to 6 and sometimes 7 days per week, and usually 10 to 12 hours per day. Exh. 7 (Smigelsky (D's Witness) Depo. at 192:6-15; 169:12-18). Indeed, Exel's recruiters are "only looking for [Drivers] who have full-time capacity[.]" Exh. 5 (De La Rosa (D's Witness) Depo. at 94:12-18). Given Exel's obligation to ensure capacity to serve its retail customers on a daily basis, the "recommended practice" is for the Drivers to seek permission from their local managers before taking a day off. Exh. 7 (Smigelsky (D's Witness) Depo. at 193:25-194:7). Numerous class members testified in their deposition as to having to work full weeks and long days without the opportunity to take off-duty breaks, or even to stop to get out of the truck to go to the bathroom.[8] Despite the time crunch of the delivery schedule, Exel admits that a Driver is subject to termination if caught asking to use a customer's restroom. Exh. 7 (Smigelsky (D's Witness) Depo. at 103:9-104:6).

H.     **Exel provides appearance standards for the Drivers and their vehicles**

Exel's "standard Exel delivery uniforms" consist of "navy blue pants or shorts (Dickies), navy blue shirt or delivery shirt (site specific), black shoes or boots (must be solid black), black belt, black socks," and permits "solid blue hats" so long as they do not contain graphics. Exh.

---

[8] *See, e.g.,* Exh. 11 (Villalpando (Named Plaintiff) Depo. at 294:8-12, 298:24-299:12, 311:13-25); Exh. 10 (Molina (Class Member) Depo. at 115:3-15); Exh. 22, Deposition of Asuncion Aguilera ("Aguilera (Class Member) Depo.") at 69:24-25; 98:20-99:2; Exh. 23, Deposition of Theodore Roumbanis ("Roumbanis (Class Member) Depo.") at 64:1-7, 106:9-13; Exh. 24, Deposition of Jose Alancastro ("Alancastro (Class Member) Depo.") at 60:20-24; Exh. 25, Deposition of Rogelio De La Fuente ("De La Fuente (Class Member) Depo.") at 61:16-20. Many were so restricted by these schedules that they had to keep a bottle in the truck to relieve themselves. Exh. 13 (Raymundo (Class Member) Depo. at 76:9-12); Exh. 10 (Molina (Class Member) Depo. at 115:3-15); Exh. 26, Declaration of Daniel Villalpando ("Villalpando (Named Plaintiff) Decl.") at ¶ 31; Exh. 27, Declaration of Abel Barajas Montes ("Montes (Class Member) Decl.") at ¶ 30; Exh. 28, Declaration of Miguel Jauregui ("Jauregui (Class Member) Decl.") at ¶ 28; Exh. 29, Declaration of Pedro Navarro ("Navarro (Class Member) Decl.") at ¶ 29.

30, "The standard Exel delivery uniform," EDV000265-66. Exel admits all Drivers must wear this uniform and that Exel's name must be affixed to the uniforms. Exh. 5 (Albarano (PMK) Depo. at 210:9-211:1). Exel actually provides the drivers with these uniforms as needed, and then deducts their cost directly from the Drivers' paychecks. *Id*. at 226:11-19.

It is also undisputed that Exel conveys to Drivers on an ongoing basis that they are expected to wear the required service apparel, keep the apparel clean, keep their trucks clean, and maintain a neat bodily appearance. Exh. 7 (Smigelsky (D's Witness) Depo. at 81:2-11; 82:6-15); *see also* Exh. 18 (Iniguez-Quintero (D's Witness) Depo. at 81:3-13 (testifying that it is important for Drivers to have "good hygiene" and to be "presentable" because it is a "customer standard"); 82:21-83:9 ("You want to have a nice [] shirt… nice pants… have that smile[.]")); Exh. 5 (De La Rosa (D's Witness) Depo. at 81:8-9) (Drivers must be "neat and well-groomed."). One recruiter agreed that "there was more of an emphasis on… making sure the contractors for Exel were in uniform when working for Exel" than there was when the same contractors were working for one of Exel's competitors. *See* Deposition of Jim Dalpino, Recruiter ("Dalpino (D's Witness) Depo.") at 66:4-66:17.

Exel's corporate name and logo, in specific color and typeset, must be displayed on placards on both doors and each corner of the boxes of all the Drivers' trucks. Exh. 7 (Smigelsky (D's Witness) Depo. at 218:2-219:13). Exel further requires that all trucks be painted white, and that they meet precise height, length, and other requirements. Exh. 5 (Albarano (PMK) Depo. at 209:24-211:1). Exel's "Standard Truck Requirements" include "interior slatted rails," "white box and cab," and "2008 or newer model year." Exh. 32 (EDV000465). Exel's managers are tasked with verifying that these general appearance requirements are met and to inspect Drivers' trucks to ensure that they are free of graffiti. *Id*. at 230:7-23; 231:18-22; *see also* Exh. 31 (Dalpino (D's Witness) Depo. at 77:5-20) (recruiter testifying he "needed to take a picture of each truck" as "part of the file requirement," to ensure that Drivers' trucks were painted white, had certain dimensions, and "look[ed] newer[.]").

I.     **Exel provides standard truck requirements and requires Drivers to use specific tools and devices**

Exel also distributes "Standard Truck Requirements" lists to the Drivers, which mandate a particular box length and height and width, roll up doors, side box turn signals, backup alarms, and interior slatted rails. Exh. 32 (EDV000465).  Exel requires every Driver to use a particular type of mobile phone to report deliveries and communicate with Exel management throughout the day. Exh. 33, Agreement to Use Handheld Computer Device, EDV001701; Exh. 14 (Moll (D's Witness) Depo. at 58:8-10, 93:14-94:9) (Drivers must use phones provided by Exel and programmed to communicate with Exel's delivery progress tracking computer system).  Exel's Compliance Manual additionally requires drivers to purchase and carry specific safety equipment, including "cargo securement equipment for safe and efficient transportation of load." Exh. 15 (Compliance Manual, EDV000317).  Exel aids Drivers in meeting this requirement by providing a "Suggested Tools List," which includes particular brands of delivery straps, and refers Drivers to particular dealers. Exh. 30 (EDV000265).  Exel also purchases equipment, such as blankets, straps and purchasing tape, for the Drivers and then charges the Drivers back for the costs. Exh. 7 (Smigelsky (D's Witness) Depo. at 200:18-201:11; *see also* Exh. 7 (Villalpando (Named Plaintiff) Depo. at 198:2-7) (managers inspect trucks for required equipment and if "it's not good," they provide Drivers with replacements and then "charge you later."); Exh. 6 (Molina (Class Member) Depo. at 100:14-22) ("I was not allowed the opportunity to authorize certain expenses, such as… blankets, tools, any sort of safety equipment… any sort of dollies… They were just docked from our check.").

J.     **Exel's compliance and training manuals contain mandatory language that commands the Drivers to work in a specific manner**

Exel's Compliance Manual and various training manuals are replete with mandatory language, such as "required," "never," and "must," rather than mere recommendations or guidelines. Exh. 15 (Compliance Manual, at EDV000308 (every driver "required" to maintain qualification status "as defined by [federal regulations] and company policy."); EDV000320 (in event of accident, "never accept or place blame on any person and do not sign anything.");

EDV000309, EDV000320 (rules regarding "customer relations" including how Drivers may interact with customers, and requiring Drivers to "[b]e courteous and cooperative with the homeowner.  If Contractor/driver encounters any problem, notify the dispatcher as soon as possible.")); Exh. 34, Exel Direct Driver Training: US DOT Regulations, ("DOT Manual"), at EDV001561 ("Every driver must complete the Safer Way of Defensive Driving Program."); Exh. 14 (Moll (D's Witness) Depo. at 152:8-15) ("when a new contract or driver starts with us we want him to go through the Safer Way training…"); Exh. 35, "The Exel Safer Way of Driving," at EDV000455 (directing Drivers to "never accept or place blame on any person and do not sign anything" in the event of an accident, and providing a word-for-word script Drivers must use in the event of an accident, including the direction not to comment to news media at scene of an accident "until my company's representative gets here").  The manuals contain detailed procedures all Drivers must follow, including: conditions for cell phone usage; how to fill out timekeeping records, inspection reports and other documents; various loading and delivery procedures, how to interact with customers; what to say to customers; and what to say to the press and how to behave in the event of an accident. Exh. 15 (Compliance Manual, at EDV000309-311; EDV000320).

### K.     Exel's compliance and safety policies go "above and beyond the minimum legal requirements"

Exel admits that its compliance and safety policies are "developed by Exel above and beyond the minimum legal requirements."  Exh. 5 (Albarano (PMK) Depo. at 233:11-15).  For example, Exel could disqualify a Driver under its "Driver Safety Accountability Program" for conduct that would not result in a disqualification under federal law, because the Program is more protective than federal law. Exh. 7 (Smigelsky (D's Witness) Depo. at 236:5-18).

### L.     Exel monitors and enforces the Drivers' compliance with Exel's rules

It is undisputed that Exel's Drivers have to attend regular "stand-up" meetings with Exel management concerning delivery techniques, customer service, and safety. Exh. 5 (Albarano (PMK) Depo. at 158:15-160:3); Exh. 14 (Moll Depo. at 68:7-13) (topics covered include "on-

time delivery performance"). Exel keeps track of attendance using a sign-in sheet, and admits that the Drivers were "required to attend." Exh. 5 (Albarano (PMK) Depo. at 158:20-21; 160:1-2; 165:13-166:2). Before the Drivers depart from the warehouses, Exel's managers "supervise" them and their helpers as they "load[] the trucks." Exh. 31 ("Dalpino (D's Witness) Depo.") at 128:2-10. Exel's managers and development coordinators also instruct the Drivers regarding loading procedures. Exh. 7 (Smigelsky (D's Witness) Depo. at 84:16-25).

Exel's monitoring practices continue throughout the workday. Drivers are subject to "ride-along" or "follow-along" evaluations at any time, during which an Exel manager "follows the contractor" to observe and ultimately critique the Driver's performance. Exh. 5 (Albarano (PMK) Depo. at 177:7-178:16; 179:2-6). Exel managers have used a set of similar "evaluation documents," "observation forms," and "compliance checklists," during the initial 2-week orientation period and subsequent ride-along evaluations to observe and report on the performance and behavior of the Drivers. Exh. 7 (Smigelsky Depo. at 143:7-17); *see, e.g.* Exh. 36, "Ride Evaluation Document," EDV015837; Exh. 37, "Shadow Vehicle Driving Observation Form," EDV015836; Exh. 38, "Manager's Ride Along Compliance Checklist," EDV022453.

Exel's Compliance Manual requires Drivers to notify Exel management if they will be unable to make deliveries in accordance with the customer's expectations, and must report all delays "immediately." Exh. 15 (Compliance Manual, EDV000320). Drivers also must "call Exel immediately" if a customer claims that cargo is damaged, and must report damage amounting to greater than $500 to Exel's "Risk Management Department." *Id.*; *see also* Exh. 5 (Albarano (PMK) Depo. at 45:14-18, 48:9-15). Drivers generally must resolve customer complaints regarding in-home damage by working with representatives of Exel, rather than negotiating a resolution with the customer independently. Exh. 7 (Smigelsky (D's Witness) Depo. at 63:21-64:3; 64:6-20).

Exel's dispatchers also use a computer program "to look at a day's deliveries and track to make sure if the drivers are running on time," and inform drivers when they are running late. Exh. 14 (Moll (D's Witness) Depo. at 87:3-21). When a Driver is running late, the computer

display turns from "green" to "yellow," at which point "there needs to be a communication between the driver and the dispatcher." *Id*. at 95:10-21.  When a Driver has not completed a delivery before the time window expires, the display turns "red," and dispatchers call the Driver for an estimated time of arrival. *Id*. at 96:16-97:12.  As Plaintiff Villalpando explained, "Exel have [sic] computers where it have [sic] every driver in the computer know where you at… [sic] When you running late right away they call you and say 'what happened? Why you not called in? [sic]" Exh. 7 (Villalpando (Named Plaintiff) Depo. at 162:18-163:8).  Exel managers review "on-time delivery reports" showing Drivers' on-time delivery percentages and use them to provide "feedback, positive or negative" to the Drivers. Exh. 14 (Moll (D's Witness) Depo. at 88:9-19).

It is also undisputed that Drivers are trained to conduct pre- and post-trip inspections on a daily basis, write reports, have a manager review them and verify that all necessary truck repairs have been made, all in order to avoid regulatory violations that could "jeopardize" Exel's motor carrier operating authority. Exh. 7 (Smigelsky (D's Witness) Depo. at 173:9-12; 233:4-234:9); Exh. 30 (DOT Manual, at EDV001584 (inspection requirements)); Exh. 35, Deposition Henry Capotosto, Safety Director ("Capotosto (D's Witness) Depo.") at 67:1-13 (reviews Drivers' reports as part of regulatory audit); *see also* Exh. 5 (Albarano (PMK) Depo. at 92:15-20).

M.     **Exel trains and requires the Drivers to meet specific customer service standards**

Exel requires the Drivers to adhere to specific customer service standards.  Some of these standards originate from Exel's retail clients, while Exel develops others itself. Exh. 7 (Smigelsky (D's Witness) Depo. at 49:10-22); Exh. 31 (Dalpino (D's Witness) Depo. at 76:20-23). Indeed, "regardless of the retailer on the account, there are going to be customer service requirements that the [Drivers] need to follow[.]" *Id*. at 76:3-9.  Exel has stipulated that its retail clients do not impose their delivery expectations on the Drivers, but that these requirements are actually provided to the Drivers by Exel directly. *See* Stipulation and Order, filed June 27, 2015 [ECF 140] at 3:14-21.  Either way, Exel expects Drivers to meet the "highest standards" and "to

exceed the expectations" of Exel's clients. Exh. 40, "Exel's Acceptance of Requirements of Delivery Specialist," EDV009746; Exh. 7 (Smigelsky Depo. at 45:24-46:11; 46:22-47:7).

To ensure the Drivers fulfill Exel's customer service and delivery expectations, Exel assigns them "professional development coordinators" who instruct them on retail client policy and interaction with customers, among other things, during an "orientation period" that typically lasts for two weeks and on an ongoing basis as well. Exh. 7 (Smigelsky (D's Witness) Depo. at 13:10-14:1; 71:5-8; 93:15-24).  As part of this development, Exel provides detailed customer service instructions to Drivers, such as suggestions for how to greet customers at the door, scripts outlining what to say to customers during a delivery, and even what language they should be using when interacting with customers. *Id*. at 98:17-99:6; 100:10-20.[9]  Exel further instructs Drivers regarding how to avoid conduct that may be perceived as culturally inappropriate or that has sexual overtones. Exh. 7 (Smigelsky (D's Witness) Depo. at 104:12-105:11).  Exel's professional development coordinators also participate in the "follow along" evaluations to observe how the Drivers make deliveries and "provide comments and feedback."  *Id*. at 18:8-12.  If a Driver needs more development and feedback, the development coordinators go on more "follow alongs," and continue to do so even after the initial orientation period. *Id*. at 18:22-19:10.

Exel's professional development coordinators work with the Drivers to develop various skills that drive higher customer service ratings from the surveys customers are asked to complete after the deliveries.  This training includes "soft skill survey enhancement," which is used to "ensure or promote better customer service to maybe get better survey results." *Id*. at 148:4-15; *see also* Exh. 31 (Dalpino (D's Witness) Depo. at 130:20-131:4) (testifying that Exel management reviews survey scores with Drivers). Among these items is the "Mrs. Jones Customer Service Program," under which the development coordinators suggest to Drivers what to say when greeting customers, give them "buzzwords" to use when providing customer service,

---

[9] *See* Exhs. 41-44 for sample customer service scripts provided by Exel to the Drivers.

and engage in "role-playing" to develop their customer service skills generally. Exh. 7 (Smigelsky (D's Witness) Depo. at 148:16-150:20).[10]  Exel uses checklists to keep track of the various customer service skills the Drivers are trained to develop.  Exh. 7 (Smigelsky (D's Witness) Depo. at 143:25-145:4); *See* Exh. 45, "Contractor Development," EDV022130 (checklist of skills development coordinators help Drivers to develop).

As a general operations practice, Exel retains the right to terminate Drivers for receiving poor scores on customer surveys. Exh. 7 (Smigelsky (D's Witness) Depo. at 58:24-59:3).  Until 2014, Exel actually administered a written personality test on its Drivers to ensure they would be capable of using acceptable communication and interpersonal skills. *Id*. at 172:10-173:3; *see also* Exh. 31 (Dalpino (D's Witness) Depo. at 47:20-48:21).

N.     **Exel trains and directs Drivers on their loading and delivery techniques**

Exel provides Drivers in orientation with "the details of the job that they would be performing when they came on board[.]" Exh. 31 (Dalpino (D's Witness) Depo. at 95:12-17. Among these "details" are "various types of specifics" addressing where the Drivers' trucks must be backed up at the loading dock, where they may pick up their manifests, where they should park their trucks, where they should bring their returned merchandise, which dock to use, and how to load merchandise onto the truck at the warehouse. *Id*. at 94:6-96:5.  Exel also tasks development coordinators with assisting Drivers as to "[h]ow to make the delivery, the specific delivery, tying down the merch[andise]… securing the merchandise in the back of the truck… helping with how to properly read the map book… how to carry the merchandise" and how to properly install specific appliances or other products. *Id*. at 121:2-25; Exh. 5 (Albarano (PMK) Depo at 35:11-16) (Drivers at dedicated locations "need to learn how to hook up a waterline, how to install a washer and dryer" and Drivers at network locations must learn "how to install a crib [and] would watch a specific video to install a crib.").

These procedures are detailed in the various mandatory training programs that are

---

[10] Exel's "Mrs. Jones Customer Service Guide," further directs the Drivers to speak only in English if at all possible. *See* Exh. 40, Mrs. Jones Customer Service Guide, "Describing the Possible Use of a Foreign Language, if Necessary," EDV063292, at 5.

"generally applicable" to the Drivers (Exh. 5 (Albarano (PMK) Depo. at 57:11-21)), and which contain compulsory language. *See* Exh. 34 (DOT Manual, EDV001561) ("[e]very driver must complete the Safer Way of Defensive Driving Program," which is an Exel program facilitated by "the Exel Direct site manager"); *see also* "The Safer Way of Protecting Floors" and "The Safer Way of Preventing Water Damage," Instructional DVDs, Exhibit 14 to the Declaration of Joshua Konecky in Support of Plaintiffs' Motion for Class Certification [ECF 142-17], EDV05080-5082.

O.    **Exel requires Drivers to enlist helpers, and retains ultimate control over who may serve as a Driver's helper**

It is undisputed that Exel requires Class Members to have at least one helper. Exh. 39 (Capotosto (D's Witness) Depo. at 46:1-25) (it is Exel's "operating practice" that every truck will have at least two persons making the deliveries); Exh. 14 (Moll (D's Witness) Depo. at 147:9-148:19) (testifying that Drivers must use a helper whenever backing up a vehicle); Exh. 35 (Safer Way, EDV000409 (Drivers must use a "spotter" when backing up)); *see also* Exh. 46, Deposition of Jim Dalpino in the matter of *Villalpando v. Transguard Ins. Co. of America* ("Dalpino (Transguard) Depo.") at 104:5 (testifying that Plaintiff Villalpando was required to have a helper). Exel requires the helpers to wear the same uniforms as the Drivers. Exh. 7 (Smigelsky Depo. at 161:20-162:3).  However, Exel forbids helpers from driving the vehicles "unless they have been approved by the company." Exh. 14 (Moll (D's Witness) Depo. at 146:14-147:8).  When a Driver's contract is terminated, Exel may transfer the former Driver's helper or second driver to work with another Driver. Exh. 7 (Smigelsky (D's Witness) Depo. at 215:12-17).  It is also undisputed that Exel has the ultimate discretion over who may serve as a Driver's helper, and reserves the right to terminate Drivers for allowing a helper to perform work without having already been approved by the company. *See* Exh. 15 (Compliance Manual, EDV000308).[11]

---

[11] In addition, Drivers have testified in deposition that Exel often selected their helpers or required them to terminate underperforming helpers. *See, e.g.* Exh. 10 (Molina (Class Member) Depo. at 45:25-46:1) (had to terminate an underperforming helper "or [the] truck is stopped.");

P.     **Exel acts as the employer-lender and debt collector of the Drivers**

Many Drivers do not have enough money to provide their own vehicles, so they rent or lease them.  *See, e.g.* Exh. 12 (Navarro Depo. at 41:24-42:1-4); Exh. 47, Deposition of Vladimir Marinov ("Marinov (Class Member) Depo.") at 45:8-9; Exh. 48, Deposition of Mazin Yako ("Yako (Class Member) Depo.") at 23:8-10.  Until June of 2013, Exel actually rented vehicles on behalf of many Class Members, and then deducted rental payments directly from their compensation. Exh. 5 (Albarano (PMK) Depo. at 215:10-24); *see also* Exh. 12 (Navarro Depo. at 42:1-4) (manager told him he "didn't have to pay for the truck 'cause they were going to rent it for [him]."); Exh. 47 (Marinov Depo. at 44:22-45:1) ("I told them that I wasn't going to be able to rent the truck and because it would be too expensive for me.  I wasn't going to be able to afford it.  At that point they asked me to come back to work and they would pay for the truck that I rented.").

Exel is aware of the Drivers' struggles to make ends meet.[12]  Exel responds to the challenge by taking on the role of an employer-creditor.  For example, Exel provides "loans" to Drivers when they lack "the means to pay for [] repairs upfront." Exh. 5 (Albarano (PMK) Depo. at 224:14-225:2); *see also* Exh. 7 (Villalpando (Named Plaintiff) Depo. at 93:2-14) (explaining that he was only making "200 dollars or 300 dollars a week, working 14 hours a day" and new tires cost $600 each, so an Exel manager "made me sign a document" that authorized a loan to purchase new tires).

Exel also makes numerous deductions from the compensation of the Drivers.  For instance, Exel unilaterally settles customer damages claims directly with the customer, and then deducts the payments from Drivers' compensation without giving them a choice in the matter.

---

Exh. 11 (Villalpando (Named Plaintiff) Depo. at 115:4-8) (Exel managers identified helpers for Class Members and determined their pay scales); Exh. 19 (Saravia (Class Member) Depo. at 48:8) ("Exel provided me with a helper for their work."); Exh. 23 (Roumbanis Depo. at 50:4-7) ("in all cases [the helper] was somebody that Exel referred to me.").

[12] Exh. 14 (Moll (D's Witness) Depo at 69:22-70:16) (Exel manager testifying that Drivers have raised the concern at morning meetings that "the amount that gets paid out is not enough to cover the costs."); Exh. 18 (Iniguez-Quintero (D's Witness) Depo. at 132:2-8 (testifying that among "main" reasons for Driver termination is that many are "unable to cover costs."); 133:12-17 (testifying that piece rate so low at some sites that it was "hard to recruit at that amount.")).

Exh. 7 (Smigelsky (D's Witness) Depo. at 65:2-21).  As one Driver explained, "[o]ftentimes, I would just receive my check and realize there's a deduction for $200 for a shop fee.  Whenever I would challenge it, it was too late" because the replacement piece had "already been delivered to the customer" and there was no opportunity to repair the damage instead. Exh. 6 (Molina (Class Member) Depo. at 102:2-14). Exel also provides required items and services, such as uniforms, truck repairs, insurance, and mandatory drug testing and physicals, directly to the Drivers, only to deduct the costs from their compensation later. Exh. 20, Equipment Lease Agreement, ("ELA") at EDV001637-38; EDV001650); *see* Exh. 8 (ITA at EDV001684); Exh. 7 (Smigelsky (D's Witness) Depo. at 65:2-21).

## IV.    THE DRIVERS ARE EMPLOYEES AS A MATTER OF LAW

### A.    **The State's strong public policy against the exploitation of working people**

The California Labor Code is a remedial statute reflecting a strong public policy of robust employee rights. *Murphy v. Kenneth Cole Prods., Inc.,* 40 Cal. 4th 1094, 1103 (2007) (citing *Sav–On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 340 (2004); *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 794 (1999); *Lusardi Construction Co. v.* Aubry, 1 Cal.4th 976, 985 (1992)) ("…statutes governing conditions of employment are to be construed broadly in favor of protecting employees."). It is a "comprehensive and detailed remedial scheme" designed to make workers whole. *Thomas v. Home Depot USA, Inc.*, 527 F.Supp.2d 1003, 1010 (N.D. Cal. 2007); *see also Bureerong v. Uvawas*, 922 F.Supp. 1450, 1470 (C.D. Cal. 1996) (adopting broad definition of 'employment,' given "the fundamental remedial purposes" of the Labor Code).

California's employee bond law and the Labor Code's provisions requiring reimbursement of ordinary business expenses are designed to protect employees from entering into exploitative lender-debtor relationships with their employers and acting as insurers of the company.  *California State Rest. Assn. v. Whitlow*, 58 Cal. App. 3d 340, 347 (1976) ("Section 450 manifests a legislative intent to protect wage earners against employer coercion to purchase products or services from the employer."); *Nicholas Laboratories, LLC v. Chen*, 199 Cal.App.4th 1240, 1247 (2011) ("California has a strong public policy that favors the indemnification and

defense of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment.").

In addition, the State's strong public policy in favor of strict enforcement of minimum wage and overtime laws is well-established and fundamental to the Labor Code's protective purpose. *See Sav-On Drug Stores,* 34 Cal. 4th at 340 (2004) (citing *Earley v. Superior Court,* 79 Cal.App.4th 1420, 1429–1430 (2000) ("Labor Code section 1194 confirms 'a clear public policy ... that is specifically directed at the enforcement of California's minimum wage and overtime laws for the benefit of workers.'") California's meal and rest period requirements also were designed to protect workers from substantial health and safety risks resulting from employer abuses. *Kamar v. RadioShack Corp.,* 2008 WL 2229166, at *12 (C.D. Cal. May 15, 2008); *see also Lazarin v. Superior Court,* 188 Cal. App. 4th 1560, 1582-83 (2010) (observing that "the adverse, noneconomic consequences to employees required to work through a mandatory meal or rest period" are what motivated the IWC to adopt mandatory meal and rest periods in the first place).

As a class, the Drivers here are precisely the vulnerable low-wage workers these provisions were designed to protect, and Exel has engaged in precisely the sort of overreaching and abuse that these provisions were designed to deter.  Exel targeted a group of Drivers—few of whom were in a strong bargaining position, sophisticated in business, or rich with capital—for positions requiring substantial capital investment, high operating costs, and relatively low income after expenses. *See* Exhs. 51-59 (Class Member tax schedules).  Exel's own analysis of Driver turnover identifies "earnings," "lost business," and the pursuit of "other business opportunities" as the most common reasons why Drivers left Exel.[13]

---

[13] Exh. 50, "Delivery Specialist Turnover Analysis," at EDV003952-57 (Of the 55 total terminations in California in 2010, whether initiated by Exel or by the Driver, 25 drivers decided to leave because of "earnings," "lost business," or the pursuit of "other business opportunities."); EDV003906-3914 (of 72 total terminations in 2011, 39 resulted from drivers leaving because of "earnings," "lost business," or the pursuit of "other business opportunities."); EDV003923-3933 (of 40 total terminations in 2012, 17 the result of "earnings," "lost business," or pursuit of "other business opportunities.")

These circumstances were not simply the result of unfavorable deals struck between Exel and each individual driver at the bargaining table.  Indeed, the Drivers simply were not given an opportunity to negotiate their pay rate and other terms of the working relationship, as most independent contractors are. *See* Section III(B), (D); *Ruiz*, 754 F.3d at 1101 ("Affinity set the drivers' flat 'per stop' rate; the drivers could not negotiate for higher rates, as independent contractors commonly can.").  Instead, the Drivers have been completely reliant on Exel to set a flat rate of compensation that would allow them to make ends meet.  The Drivers take the jobs in the first place because, as explained by former Secretary of Labor Robert Reich, "they can't find better ones.  And as the race to the bottom accelerates, they have fewer and fewer alternatives."[14]

B.      **The Drivers are presumed to be employees, and Exel bears the burden of proving that it correctly classified them as independent contractors**

Under California law, workers who have provided services for an employer are presumed to be employees. *Narayan v. EGL, Inc*., 616 F.3d 895, 900 (9th Cir. 2010) (quoting *Robinson v. George*, 16 Cal. 2d 238, 242 (1940) ("As the Supreme Court of California has held, '[t]he rule ... is that the fact that one is performing work and labor for another is <u>prima facie</u> evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary.'") (emphasis added); *see also Cristler v. Express Messenger Sys., Inc*., 171 Cal.App.4th 72, 83 (2009).  It is undisputed that the Drivers provide services for Exel, and Exel carries the burden of rebutting Plaintiffs' *prima facie* showing of employee status.

C.      **Exel cannot defeat summary judgment for Plaintiffs unless it can raise a genuine dispute that it has not retained a right to control the details of the Drivers' work**

"The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989) (quoting *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943, 946 (1970)).  The independent contractor versus

---

[14] Exh. 4, Robert Reich, *Why We're All Becoming Independent Contractors*, The Huffington Post, Feb. 22, 2015.

employee question revolves around "how much control the hirer retains the right to exercise"—not how much control the hirer actually exercises.  *Ayala*, 59 Cal. 4th at 533-34 (emphasis added).

Courts also consider several "secondary factors," but "[e]ven if one or two of the individual factors might suggest an [independent contractor] relationship, summary judgment is nevertheless proper when ... all the factors weighed and considered as a whole establish ... an [employment] and not an [independent contractor relationship.]" *Alexander*, 765 F.3d at 988 (quoting *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal.App.4th 580 (2011)).  The right to terminate at will, without cause, is strong evidence in support of an employment relationship.  *Alexander*, 765 F.3d at 988.

Thus, to defeat summary judgment for Plaintiffs on the question of misclassification, Exel will have to show that there is a genuine dispute as to a fact material to the question of whether it retained a right of control over the Drivers' work.  Exel cannot satisfy its burden merely by alleging that a few "secondary factors" cut in its favor. *Id.* Nor can it rely on base allegations that a factual dispute exists, or some metaphysical doubt as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  As Justice Scalia's opinion in *Scott* emphasizes, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)).

D.    **It is undisputed that Exel maintains the same policies that create an employment relationship as a matter of law under recent Ninth Circuit precedent**

Twice in the past year, the Ninth Circuit ruled in favor of highly analogous classes of delivery drivers on precisely the same issue presented here, based on contracts, policy manuals, and other evidence of company policies. *Ruiz*, 754 F.3d at 1102 (reversing trial court's ruling in favor of defendant after bench trial and granting judgment for plaintiffs because "…the provisions of the ITA and the Procedures Manual demonstrate that Affinity retained the right to control its drivers"); *Alexander*, 765 F.3d at 988-89 (holding drivers entitled to summary

judgment where "The [Operating Agreement] and FedEx's policies and procedures unambiguously allow FedEx to exercise a great deal of control over the manner in which its drivers do their jobs."); *see also Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 859 (8th Cir. 2010) (holding, under Missouri law, that company's written appearance requirements "show the extent of [company's] control" over drivers' work.).[15]

Under binding Ninth Circuit law, summary judgment for plaintiffs is appropriate where a logistics company such as Exel retains the right to control its delivery drivers' rates of pay, appearance, route schedules, truck specifications, and hired help. *Ruiz*, 754 F.3d at 1102; *Alexander*, 765 F.3d at 989-90 (granting summary judgment for Plaintiffs where FedEx controlled its drivers' schedules, delivery times, and appearance, even though it did "not require drivers to follow specific routes or to deliver packages in a specific order," and did not unilaterally set their rate of pay.)  Exel does not dispute that the ITA, ELA, and various written manuals and training materials set the Drivers' rates of pay, determine their appearance, routes, and schedules, and give Exel the authority to terminate, transfer or fine them. Section III(B), (C), (G), (H).  Based on these undisputed facts alone, the Court should grant summary judgment for Plaintiffs.

Just as in *Ruiz*, Exel's Drivers must sign the ITA and ELA to work for the company, and must work subject to termination without cause. Section III(B); Exh. 8 (ITA, EDV001680); Exh. 5 (Albarano (PMK) Depo. at 88:9-10). *See Ruiz*, 754 F.3d at 1096, 1102 ("…the provisions of the Independent Truckman's Agreement and Procedures Manual demonstrate that Affinity retained the right to control its drivers. The Independent Truckman's Agreement sets out the drivers' rate of pay, allows Affinity to terminate the drivers without cause…").

---

[15] Even if the language in Exel's various contracts and policy manuals was ambiguous as to control—which it is not—extrinsic evidence, including the sworn testimony of Exel's own witnesses, further shows that the Drivers are employees rather than independent contractors. *See* Section III(A)-(P); *Alexander,* 765 F.3d at 988 ("Here, much of the [Operating Agreement] is not ambiguous. To the extent it is ambiguous, the extrinsic evidence supports a conclusion that FedEx has the right to control its drivers. Viewing the evidence in the light most favorable to FedEx, we conclude that plaintiffs are employees.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Just as in *Ruiz* and *Alexander*, Exel's written policies and training materials contain compulsory rules that are "not mere suggestions." Section III(C), (J).  Indeed, Exel retains the right to control everything from the color of their socks and the type of mobile phone they must use, to what the Drivers can say or do at the scene of an accident. Section III(H), (I); Exh. 15 (Compliance Manual, EDV000320).  *See Ruiz*, 754 F.3d at 1102 ("…the guidelines contained in the Procedures manual were more than mere 'suggestions'" and included "procedures that Affinity *required* its drivers to follow.") (emphasis in original); *see also Alexander*, 765 F.3d at 990 ("The [Operating Agreement] requires drivers to comply with 'standards of service[.]'"). In fact, Exel arguably went *further* than did Affinity and FedEx, by threatening to levy, and levying monetary penalties for noncompliance. Exh. 16 (Driver Safety Accountability, EDV000286 ("chargebacks" for violations of Exel's "Driver Safety Accountability Program," for such infractions as "fatigued driving" and "preventable accidents," which Exel describes as a "higher standard than legal liability")).  Moreover, Exel reserves the right to terminate Drivers without cause, as well as for violating its rules. Exh. 5 (Albarano (PMK) Depo. at 83:16-18); Exh. 8 (ITA, at EDV001680).

Just like in *Ruiz* and *Alexander*, the Drivers were trained on how to follow various detailed procedures, including how to maintain the appearance of the vehicles, stock proper tools, use their phones, how to load and unload merchandise, how to deliver particular items, and how to interact with customers, among other rules. Section III(G), (I), (J), (L), (M), (N). For example, Exel uses "development coordinators" to train Drivers in various customer service techniques so they may obtain higher customer service scores, and can terminate Drivers for receiving poor scores. Exh. 7 (Smigelsky (D's Witness) Depo. at 58:24-59:3; 148:16-150:20); *Alexander*, 765 F.3d at 987 ("FedEx trains its drivers on how best to perform their job and to interact with customers. The [Operating Agreement] provides that… FedEx 'shall ... familiarize [drivers] with various quality service procedures…'"); *see also Ruiz*, 754 F.3d at 1102 ("The Procedures Manual outlined… procedures that Affinity required its drivers to follow, including wearing uniforms, loading trucks, delivery goods, and reporting to Affinity after deliveries.").

Just like in *Alexander* and *Ruiz*, Exel required its drivers to follow its own rules regarding interaction with customers and third parties. Section III(M).  For example, Exel's training materials warn drivers to "never accept or place blame on any person and do not sign anything" in the event of an accident, and provide a word-for-word script Drivers must use in the event of an accident. Exh. 35 ("Safer Way," EDV000455 (must not comment to news media at scene of an accident "until my company's representative gets here")).  Exel's own witnesses confirm that Exel expects the Drivers to conduct themselves in such a way as to meet Exel's expectations of providing excellent customer service, Exh. 7 (Smigelsky (D's Witness) Depo. at 45:7-23), and that its managers review Drivers' customer service scores and may terminate them for receiving low scores. *Id*. at 58:24-59:3.  This is exactly what happened in *Ruiz* and *Alexander*. *See Ruiz*, 754 F.3d at 1098 (Drivers "required to follow" procedures regarding "interacting with customers," and "[t]he Affinity supervisor would review the drivers' customer satisfaction survey scores from previous deliveries…"); *Alexander* 765 F.3d at 985-87 ("The [Operating Agreement] requires drivers to comply with 'standards of service'" and to "conduct themselves 'with integrity and honesty, in a professional manner, and with proper decorum at all times.'").

Just like in *Ruiz* and *Alexander*, Exel maintained various monitoring and supervision practices to track compliance with these rules, such as mandatory morning meetings, "ride-along" evaluations, regular inspections, route monitoring technology, mandatory reporting requirements, and regular communication with management using the mandatory mobile phones. Section III(L); *Ruiz,* 754 F.3d at 1098, 1099; *Alexander*, 765 F.3d at 990, 995.

Just like in *Ruiz* and *Alexander*, Exel requires Drivers to wear a uniform while working, down to the color of the shirt and shoes, to maintain a neat bodily appearance, and to ensure that their trucks are painted white, kept clean, meet height, length and size requirements, and bear Exel's corporate name, among other requirements. Section III(H); Exh. 32 (Standard Truck Requirements, EDV000265).  Again, this is the same as in *Ruiz* and *Alexander*. *See Ruiz*, 754 F.3d at 1097, 1098; *Alexander*, 765 F.3d at 986, 987.

Just like in *Ruiz*, Exel determined the routes and which Drivers would drive them. Section III(E).  *See Ruiz*, 754 F.3d at 1101 ("Affinity determined routes, and instructed drivers not to deviate from the order of deliveries listed on the route manifests Affinity created.").

In sum, Exel retained the right to control the Drivers' rates of pay, appearance, schedules, routes, equipment, and hired help, among other details of their work—the very rights the Ninth Circuit held gave rise to an employment relationship as a matter of law in *Ruiz. See* Section III(B)-(L), (O); *Ruiz*, 754 F.3d at 1101-02.  Moreover, Exel's policies actually reserve a *broader* right of control over the Drivers' work than did the policies maintained by FedEx in *Alexander*. For example, in *Alexander*, the Ninth Circuit held that FedEx's policies gave rise to an employment relationship as a matter of law even though they did "not require drivers to follow specific routes or to deliver packages in a specific order," lacked "an unqualified right to terminate," and had a "variable" pay rate. *See Alexander*, 765 F.3d at 989-90, 994, 996.  As shown above, Exel retains the right to control these factors and maintains an unqualified right to terminate Drivers without cause.

### E.     The secondary factors also favor Plaintiffs

Given the undisputed facts regarding Exel's right of control over the manner in which the Drivers perform their work, it is not necessary to examine the secondary factors of the right-to-control test. *See Alexander*, 765 F.3d at 988, 994.  Nevertheless, the secondary factors weigh heavily in favor of employment status.  *See Alexander*, 765 F.3d at 994-997 (finding no triable issue of fact as to employee status where only 5 of 9 secondary factors favored the plaintiffs).

First, it is undisputed that the ITA gives Exel an unqualified right to terminate the Drivers at will. Section III(C).  Second, it is undisputed that the Drivers' work is integral to Exel's regular business—indeed, Exel is in the business of home delivery and Exel hires the Drivers to carry out the home deliveries for Exel's customers. Section III(D).  Third, it is undisputed that the Drivers' work did not require substantial skill. Exh. 15 (Compliance manual, EDV000305-308 (requiring Drivers to be at least 21 years of age, to pass a physical examination, drug test, and criminal background check, and to have a clean driving record)).  Fourth, it is undisputed

that Exel and the Drivers did not contemplate an end to their relationship. Exh. 8 (ITA, 1684, at ¶ 2 (relationship automatically renewed year to year)).  Fifth, Exel subjected the Drivers to various methods of supervision. Section III(L).  Sixth, though Exel paid the Drivers per delivery rather than by the hour, Exel unilaterally set the pay rate and determined the amount of stops. *See* Section III(B).  Seventh, it is undisputed that Exel determined the tools and instrumentalities that the Drivers used to perform their job, even providing many of them directly to the Drivers. Section III(I).[16]

To the extent any secondary factors cut in Exel's favor, they are immaterial. For instance, Exel cannot raise a material issue simply by pointing to the provisions in the standardized, non-negotiable contracts labelling the Drivers independent contractors.  *United States v. Sierra Pac. Indus.*, 879 F. Supp. 2d 1117, 1125 (E.D. Cal. 2012) (rejecting argument that party's description of its own classification raises a triable issue of fact on the issue of misclassification); *see also Alexander*, 765 F.3d at 998 ("Bottom line? Labeling the drivers 'independent contractors' in FedEx's Operating Agreement does not conclusively make them so when viewed in the light of (1) the entire agreement, (2) the rest of the relevant "common policies and procedures" evidence, and (3) California law.").

### F.   The so called "entrepreneurial opportunities" Exel claims to provide to the Drivers are immaterial to the independent contractor misclassification

Exel has previously argued in this litigation that the Drivers are properly classified as independent contractors because theoretically, they can make more money by working more hours, becoming more efficient, and hiring other helpers and drivers to operate additional trucks for them.  This is a red herring.  In *Alexander*, the Ninth Circuit explicitly rejected the very same entrepreneurial argument. *Alexander,* 765 F.3d at 994 ("[t]here is no indication that California has replaced its longstanding right-to-control test with the new entrepreneurial-opportunities

---

[16] Again, the Ninth Circuit has held that these factors are not even necessary. *See Ruiz*, 754 F.3d at 1104 (finding employment relationship even where drivers provided tools); *Alexander*, 765 F.3d at 996 (finding employment relationship even where FedEx used variable pay scales and "provision of tools" factor favored FedEx).

1    test… entrepreneurial opportunities do not undermine a finding of employee status"); *see also*

2    *Ruiz*, 754 F.3d at 1103.   Whatever opportunities the Drivers may have, they—and their

3    helpers/second drivers—are still subject to Exel's extensive right to control the details of their

4    work. *See* Section III, *supra*.   Thus, Exel's entrepreneurial opportunities argument must fail here.

G.    **Exel's attempt to pass the buck to its retail customers and regulatory authorities is a phantom argument without any bearing on the issue of the Drivers' classification**

During this case, Exel has argued that it is merely doing the bidding of its customers, and

any resulting right of control it may hold over the drivers should be excused.  Again, the Ninth

Circuit has rejected Exel's contentions. *See Ruiz*, 754 F.3d at 1102 n.5 ("The district court also

erred by emphasizing that the rules regarding the drivers' appearance were 'intended to ensure

customer security rather than control the driver.' In doing so, the district court misunderstood the

*Borello* test….what matters only is whether Affinity had the right to control the drivers' work.")

(emphasis added). Indeed, California's foundational case setting forth the "right-to-control" test

rejects this very argument as well. *See Borello*, 48 Cal. 3d at 356-57 (rejecting defendant's

argument that because defendant's customers made defendant adopt the contract with its migrant

workers, the contract should not be considered as evidence of control).  As in *Borello*, Exel

admits that it provides the Drivers with all of their customers, and unilaterally sets the prices of

sale based on its agreement with the retail client. See Section III(B); Section III(D) (Drivers do

not negotiate with retail customers over any of the contractual terms).  Thus, Exel's argument

has not merit whatsoever.

Moreover, Exel has admitted that its retail customers have not exercised control over the

Drivers, and whatever policies to which the Drivers are subject are provided by Exel. [ECF Doc

140, Joint Stipulation and Order to Dismiss Customer Defendants] ("none of [the retail

customers formerly named as defendants] have exercised control through the Delivery

Expectations, directly or indirectly, over the manner and means by which [Class Members] have

performed delivery services for Exel.").  If the retail customers are not responsible for these

policies, then Exel must be. *Id.*

29

1    Exel has also argued throughout this case that regulatory requirements somehow excuse

2    its right of control.  In *Ruiz*, the Ninth Circuit reversed the district court for adopting this very

3    argument.  *Ruiz*, 754 F.3d at 1102 n.5 ("The district court incorporated a subjective requirement

4    when it dismissed Affinity's appearance requirements as not motivated by Affinity's intent to

5    control its drivers. <u>Whether Affinity intended to control the drivers does not matter under</u>

6    <u>*Borello*; what matters only is whether Affinity had the right to control the drivers' work.</u>")

7    (emphasis added); *see also i.d.* at 1102-1103 ("…while the district court found that approval was

8    largely based upon neutral factors, such as background checks required under federal regulations,

9    it is still true that the drivers did not have an unrestricted right to choose these persons, which is

10   an 'important right[ ] [that] would normally inure to  a self-employed contractor.') (internal

11   citations omitted); *see also Peters v. Haymarket Leasing, Inc.*, 64 Mass. App. Ct. 767, 775

12   (2005) ("We are not persuaded by the view of certain jurisdictions that control mandated by law

13   has little weight in the master-servant analysis… That the right to control is a product of a

14   regulatory requirement does not make it any less a right to control."). Simply put, Exel's right of

15   control is not excused just because it may exercise it in the course of complying with government

16   regulations.

17   Ye,t even if the regulatory requirements were relevant to Exel's right of control—though

18   they are not—Exel admits that even those policies related to the Federal Motor Carrier Safety

19   Regulations go above and beyond the regulatory requirements.  *See, e.g.,* Exh. 15 (Compliance

20   Manual at EDV000286 (monetary penalties for "preventable accidents" which is defined by

21   Exel, and is described as a "higher standard than Legal Liability")); *see also* Exh. 5 (Albarano

22   (PMK) Depo at 231:5-20; 233:11-15) (confirming Compliance Manual contains standards

23   "developed by Exel above and beyond the minimum legal requirements.").  Of course, the vast

24   majority of Exel's policies of control—such as standardized uniforms and truck appearance

25   requirements, and control over schedules, route assignments and rates of pay—are not required

26   by the Federal Motor Carrier Safety Regulations. *See* Section III(K) (manuals contain

27   requirements "above and beyond" regulatory requirements); Section III(F) (control over trucks

goes beyond regulatory requirements); *see Alexander*, 765 F.3d at 989 ("FedEx requires drivers to paint their vehicles a specific shade of white, mark them with the distinctive FedEx logo, and to keep their vehicles 'clean and presentable [and] free of body damage and extraneous markings.' These requirements go well beyond those imposed by federal regulations."); *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 12 (2007) ("The drivers were told they could not wear white shoes... We summarily reject FedEx's suggestion that constraints such as these are necessary to ensure the drivers' compliance with government regulations."); *cf Taylor v. Shippers Transp. Exp., Inc.*, 2014 WL 7499046, at *15 (C.D. Cal. Sept. 30, 2014) ("[defendant's] case is distinguishable from those Defendants cite in their opposition where the employer exerted only the control necessary to comply with federal regulations.")

In any event, neither the Federal Government, nor Exel's retail customers, ordered it to adopt an independent contractor business model—Exel *chose* to do so.  It was this choice that triggered any regulatory requirements, not the other way around.  As just one example, Exel's own "Equipment Lease Agreement" provides that it "shall have such possession, control and use" of the vehicles "as required by Title 49 C.F.R. (c)(1)," which requires "exclusive possession, control, and use of the equipment for the duration of the lease."  Yet this requirement does not apply to all motor carriers, but merely to those who *choose* to lease the vehicles they use in their operation.[17] Indeed, the regulation expressly provides that the lease arrangement has no bearing on whether the driver of the leased equipment is an independent contractor or an employee. 49 C.F.R. 376.12(c)(4).  In other words, the regulatory framework does not exist to shield motor carriers from exposure under the labor laws, but to ensure that they do not skirt other safety obligations by leasing vehicles rather than buying them, or by hiring independent

---

[17] Indeed, a "motor carrier" is a broad category of persons under the jurisdiction of the Secretary of Transportation "using self-propelled vehicles the motor carrier owns, rents or leases…" 49 U.S.C.A. 13902(a)(1).

contractors rather than employees.[18]   Exel could have purchased vehicles and hired drivers as employees, but it chose to adopt a less costly independent contractor model.

Nevertheless, Exel now argues that its unlawful policies should be excused because the Federal Government has identified its industry as one in which it is essential that regulated parties assume responsibility for the equipment they lease.   Defendant is manufacturing an unnatural scheme in order to justify an unlawful one. *Cf. Devines v. Maier*, 665 F.2d 138, 143 (7th Cir. 1981) ("The state may not severely limit or otherwise destroy private property rights and escape the obligation of just compensation by the circular reasoning that the private right was invalidated by the regulation and therefore never existed.").

Maximizing Exel's own profit—not regulatory concerns or customer demands—is the primary driver of Exel's policies. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 916 (S.D.N.Y. 2013) ("… defendants argue that the Guidelines with regard to dress code existed to perpetuate Rick's NY's "upscale club" feel… Although maintaining an atmosphere perceived as "upscale" may have helped the Club in its marketing or assisted it to appeal to a higher-end customer base, those goals had nothing to do with providing a safe and law-abiding venue. Rather, they helped Rick's NY achieve its business ends.")   As in *Hart*, Exel attempts to pass off the business purposes of its policies as safety precautions, but the language of the policies themselves exposes Exel's underlying business motivations. *See, e.g.* "Exel Direct Driver Safety Accountability" Policy, EDV000268 (describing policy of fining drivers for driving Exel deems unsafe as a "safety initiative to meet federal and state regulatory requirements *and increase operational efficiencies and profitability*) (emphasis added); Exh. 35 (Safer Way, EDV000353 (chart showing that the "indirect costs of accidents" are higher than the immediate costs, including "lost sales" and "productivity.")); Exh. 15 (Compliance Manual, EDV000309 ("The

---

[18] *Tamez v. Sw. Motor Transp., Inc.*, 155 S.W.3d 564, 573 (Tex. App. 2004) ("Because under the [Federal Motor Carrier Safety Regulations], interstate motor carriers have both a legal right and duty to control leased vehicles operated for their benefit, the regulations create a statutory employee relationship between the employees of the owners-lessors and lessee-carriers.") (internal citations omitted).

following provisions have been adopted by Exel to ensure safe operations, <u>to meet the needs of our various customers</u>, and to comply with Applicable Law.") (emphasis added)). *Compare Hart*, 967 F. Supp. 2d at 914-918 (mere assertion that employer's guidelines were motivated by safety and regulatory concerns insufficient to defeat summary judgment on independent contractor misclassification issue). In other words, the responsibility for policies catered to customer preferences or regulatory concerns lies with the companies who maintain the policies, not with the customers who enjoy them or the regulatory authority with which they must comply.

Indeed, the notion that a company could avoid liability merely because it adopted unlawful policies to please a customer or to do business in a particular way is nonsense. *See Isbister v. Boys' Club of Sana Cruz, Inc.,* 40 Cal.3d 72, 75 (1985) (business's focus on the "social needs" of boys did not excuse its unlawful exclusion of girls). A logistics company could not avoid liability for refusing to employ persons of color because a retail customer demanded that packages be delivered only by white drivers. *See Marina Point, Ltd. v. Wolfson* 30 Cal.3d 721, 741 (1982), citing *Stoumen v. Reilly*, 37 Cal.2d 713 (1951) ("…an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a 'rational' economic motive would not, of course, validate the practice.") Exel's desire to ensure that their clients' expectations are met simply does not excuse the right of control over the Drivers that Exel retained to meet those expectations. Therefore, the background regulation and customer demands are a red herring.

## V.    CONCLUSION

For all the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment and/or Summary Adjudication on Defendants' affirmative defense that the drivers are independent contractors. Given the undisputed material facts, the Court should hold that the Drivers are employees as a matter of law.

Respectfully submitted,

1

2

Dated:  May 22, 2015

SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP

3

4

/s/ *Joshua G. Konecky*
Joshua G. Konecky
Counsel for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION OF
DEFENDANTS' INDEPENDENT CONTRACTOR DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:12-cv-04137-JCS & 4:13-cv-03091-JCS