1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    DANIEL VILLALPANDO, et al.,            Case No.  12-cv-04137-JCS

                 Plaintiffs,
8
                                            **ORDER RE CROSS MOTIONS FOR**
         v.                                 **SUMMARY JUDGMENT**
9
                                            Re: Dkt. Nos. 175, 176
10   EXEL DIRECT INC., et al.,

                 Defendants.
11

12

13   **I.      INTRODUCTION**

14           Plaintiffs in this case are delivery drivers who assert wage and hour claims  against

15   Defendants Exel Direct Inc. (n/k/a MXD Group, Inc.), DPWN Holdings (USA), Inc. and Deutsche

16   Beteiligungen Holding GmbH (collectively, "Exel") based on their alleged misclassification as

17   independent contractors rather than employees.  Plaintiffs bring a Motion for Summary Judgment

18   and/or Summary Adjudication of Defendants' Independent Contractor Defense ("Plaintiffs'

19   Motion").  Defendants, in turn, bring a Motion for Summary Judgment ("Defendants' Motion")

20   seeking dismissal of Plaintiffs' claims on a variety of grounds, including federal preemption. The

21   Court held a hearing on the motions of Friday, August 14, 2015 at 2:00 pm.  The parties filed

22   supplemental briefs on August 21, 2015.  The parties have consented to the jurisdiction of the

23   undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated

24   below, Defendants' Motion is GRANTED in part and DENIED in part.  Plaintiffs' Motion is

25   GRANTED.

26   **II.     BACKGROUND**

27           **A.  Procedural Background**

28            This action was initiated on June 14, 2012 in the Superior Court of Alameda County,

California.  Defendants removed the action to federal court on August 6, 2012 under the Class

Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  The case was subsequently related to

*Shekur v. Exel Direct Inc.*, Case No. C-13-3091 KAW, *see* Docket No. 49, and the plaintiffs in the

two related actions filed a Consolidated First Amended Complaint  ("CFAC") on October 28,

2013.[1]

On March 23, 2014, the Court granted in part and denied in part Defendants' motion to

dismiss, dismissing Claims Seven, Eight and Thirteen on the basis that there was no private right

of action as to those claims.  *See* Docket No. 122 ("March 28, 2014 Order"). The Court rejected

Defendants' arguments that:  1) Plaintiffs' claims were insufficiently pled under Rule 8 of the

Federal Rules of Civil Procedure because they did not plead specific facts as to each of the named

defendants; 2) Plaintiffs' meal and rest break claims were preempted under the Federal Aviation

Administration Authorization Act of 1994 ("FAAAA"); and 3) Plaintiffs' claim under California's

Private Attorneys General Act ("PAGA") were insufficiently pled because they did not allege

facts showing that the requirements of Rule 23 of the Federal Rules of Civil Procedure were met.

With respect to Exel's federal preemption argument, the Court found that the allegations in the

complaint were not sufficient to establish preemption but left open the possibility that Exel might

be able to demonstrate preemption at a later stage of the case, when a factual record had been

developed as to the actual or likely effects of meal and rest break requirements on the motor

carrier industry.  *Id*. at 20-21 & n. 9.

On November 20, 2014, the Court granted Plaintiffs' Motion for Class Certification,

certifying a class of drivers who have "personally provided delivery services" for Exel since June

14, 2008 and excluding any individuals who signed the Independent Truckman's Agreement with

Exel but "provided delivery services exclusively through the use of hired second drivers and who

. . . *never* personally made deliveries for Exel."  Docket No. 150 at 34-35 (emphasis in original).

---

[1] The allegations and claims in the CFAC are summarized, in detail, in the Court's March 28,
2014 Order and therefore the Court does not repeat them here.

**B.  Defendants' Summary Judgment Motion**

   **1.   Motion**

   In Defendants' Motion, Exel challenges Plaintiffs' claims on numerous grounds.  First, Exel seeks summary judgment as to all of Plaintiffs' claims on the grounds that they are subject to federal preemption under the FAAAA.  *Id*. at 4.  In particular, Exel contends Plaintiffs' claims seek to impose a state obligation that cannot be avoided by contract and that relates to a motor carrier's prices, routes or services with respect to the transportation of property because by seeking reclassification as employees rather than independent contractors,  they are interfering with the financial arrangements between Exel and the class.  *Id*. at 5-6.  Such an attempt, it argues, is "inconsistent with the [FAAAA's] deregulatory purpose, since it imposes one system for those that the market might develop."  *Id*. at 6 (quoting *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc*., 697 F.3d 544, 552 (7th Cir. 2012)).  Further, Exel asserts, because the contractual arrangement between Exel and its drivers relates to "the manner and the financial terms upon which they agreed "to effectuate the 'transportation of property' under Exel's motor carrier authority," Plaintiffs' claims concern a motor carrier's "transportation of property" for the purposes of preemption.  *Id*. (citing *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 23 (1st Cir. 2014)).  A finding of preemption is further required, according to Exel, because there is no right to contract out of California's classification standards.  *Id*. at 6-7 (citing *Ruiz v. Affinity Logistics, Corp.*, 667 F.3d 1318 (9th Cir. 2012)).  Nor do the express exceptions to FAAAA preemption apply, Exel asserts.  *Id*. at 7-8.  Finally, Exel argues, the Ninth Circuit's decision in *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998) does not stand for a contrary result because it involved the application of a prevailing wage law to employees and therefore did not require the defendant to alter the way in which it provided transportation services.  *Id*. at 8-10.

   Second, Exel argues that Claim Two, for failure to pay overtime in violation of California Labor Code sections 510 and 1198, fails even if Plaintiffs were employees because, under California Code of Regulations title 8, section 11090(3)(L)(1), those provisions do not provide coverage to employees whose hours of service ("HOS") are regulated by the United States

1   Department of Transportation ("DOT").  *Id*. at 10-13.  According to Exel, this exemption ("the

2   California Exemption") applies because the DOT regulates hours of service for commercial motor

3   vehicle drivers operating in interstate commerce.  *Id*. at 11 (citing 49 C.F.R. §§ 395.1, 390.5).  As

4   Plaintiffs allege that they were commercial vehicle drivers and the Court has already found that

5   Exel is a motor carrier, the only remaining question is whether Plaintiffs transported goods in

6   interstate commerce, Exel contends.  *Id*. at 11.

7          Exel argues that Plaintiffs meet the interstate commerce requirement as well because

8   "numerous class members . . . picked up goods in California and delivered them outside the state."

9   *Id*. at 12 (citing Declaration of James H. Hanson in Support of Defendants' Motion for Summary

10  Judgment ("Hanson Motion Decl."), Ex. 3 (Declaration of Jason Moll[2] ("Moll Decl.")), Ex. 7

11  (Moll Depo.) at 138-39 (testifying that drivers operating out of Oakland hub make deliveries to

12  Nevada and that drivers for Crate & Barrel in Tracy, California make deliveries to Nevada), Ex. 8

13  (Deposition of Lazaro Padilla ("Padilla Depo.") at 101 (testifying that driver made deliveries in

14  California and Nevada)).

15         In addition, Exel contends, "class members picking-up and delivering goods entirely

16  within California likewise satisfy the interstate commerce requirement given the goods transported

17  are part of 'a practical continuity of movement from the manufacturers or suppliers [outside] the

18  state, through a warehouse and on to customers whose orders or contracts are being filled.'"  *Id*. at

19  12 (quoting *Klitzke v. Steiner Corp*., 110 F.3d 1465, 1469 (9th Cir. 1997) (quoting *Walling v.

20  Jacksonville Paper Co*., 317 U.S. 564, 569 (1943))).  Exel points to evidence regarding deliveries

21  within California for Sears, Williams-Sonoma and Crate & Barrel to show that the drivers are "on

22  the final leg of the freight's interstate voyage." *Id*. (citing *Ruiz v. Affinity Logistics Corp*., 2006

23  WL 3712942, at *3 (S.D. Cal. Nov. 9, 2006)).  In particular, Exel offers declarations of Blanca

24  Reynoso,[3] Thomas Moonan[4] and Pat Gottman,[5] who describe the supply chains for Sears,

25  _____

26  [2] Moll is an MXD Group, Inc. ("MXD") manager with oversight of "the California network
    locations in Ontario, California and Oakland, California that serve as the hubs for the logistics

27  services MXD provides to multiple retail customers in California, such as Crate & Barrel, Office
    Depot, JC Penney, Williams-Sonoma and Restoration Hardware."  Hanson Motion Decl., Ex. 3

28  (Moll Decl.) ¶ 3.  MXD was formerly known as Exel Direct, Inc.  *Id*. ¶ 2.
    [3] Reynoso is Region Manager for Delivery, West, for Innovel Solutions, Inc. f/k/a Sears Logistics

1    Williams-Sonoma and Crate & Barrel, respectively.  *See* Hanson Motion Decl., Ex. 4 (Reynoso

2    Decl.), Ex. 5 (Moonan Decl.) & Ex. 6 (Gottman Decl.).

3         Reynoso states as to the Sears inventory chain, that "[i]nventory, consisting primarily of

4    appliances and patio furniture, is transported from a variety of vendors across the United States

5    and abroad" to distribution centers in California "based on sales forecasts or key promotional

6    events that will drive customer demand or on customer orders for specialized items."  Hanson

7    Decl., Ex. 4 (Reynoso Decl.) ¶ 3.  Once specific orders are placed for the inventory, they are sent

8    on to MDOs for delivery to the customers.  *Id*.  She also states that inventory is tracked as it

9    moves from the vendor to the consumer, that "[t]he products are shipped into California packaged

10   and ready for delivery to the consumer," and that Sears maintains "title to the inventory while it is

11   being transported and is ultimately responsible for the transportation charges."  *Id*. ¶¶ 7-8.

12        Moonan states as to the Williams-Sonoma inventory chain that Williams-Sonoma furniture

13   is manufactured throughout the United States and worldwide and transported to distribution

14   centers, including distribution centers in California, based on "the anticipated customer needs in

15   the region covered by each distribution center and on special purchase orders from customers."

16   Hanson Decl., Ex. 5 (Moonan Decl.) ¶ 4.  "Once a customer order is placed, the furniture to fulfill

17   the order is transported" to hubs "where it is unboxed and, if necessary, assembled for final

18   delivery to Williams-Sonoma's customers by Exel contractors."  *Id*. ¶ 5.  According to Moonan,

19   Williams-Sonoma "tracks the furniture as it moves from the point of manufacture to the

20   customer," "maintains title to the furniture while it is being transported and is ultimately

21

United States District Court
Northern District of California

22   Services, Inc. and has oversight responsibility for 29 Market Delivery Operations ("MDOs") in the
     Western states, including MDOs in California.  Hanson Motion Decl., Ex. 4 (Reynoso Decl.) ¶ 1.

23   She has held that position since 2014; before that, she worked for almost 20 years for Innovel in
     other positions in the "distribution and or home/delivery area."  *Id*. ¶ 2.

24   [4] Moonan is Vice President of Regional Operations ("VPRO") for Williams-Sonoma for the
     Western and Central United States and is responsible for "the logistics, warehousing, distribution

25   and delivery of home furnishings from the distribution centers to the end customers in California
     and elsewhere in the United States." Hanson Motion Decl., Ex. 5 (Moonan Decl.) ¶ 1.  He has held

26   that position since September 2014; before that he held management positions with oversight over
     Williams-Sonoma's West Coast Distribution Center ("DC") in City of Industry, California and

27   over various Williams-Sonoma home delivery hubs ("HDHs").  *Id*. ¶ 2.
     [5] Gottman is Global Transportation Manager for Euromarket Designs, Inc. d/b/a Crate & Barrel

28   and manages Crate & Barrel's home delivery distribution network in California and other states.
     Hanson Motion Decl., Ex. 6 (Gottman Decl.) ¶ 1.

                                                    5

responsible for the transportation charges." *Id.* ¶¶ 5-6.

Gottman describes the Crate & Barrel distribution chain.  Hanson Decl., Ex. 6 (Gottman Decl.).  He states that Exel primarily delivers furniture for Crate & Barrel but that it sometimes delivers houseware products as well.  *Id.* ¶ 3.  These products are manufactured all over the world and are shipped to distribution centers ("DCs") in California.  *Id.*  Gottman states that the majority of the products it ships to the California DCs "are either earmarked to fulfill an existing customer order or kept as stock on hand at the California DCs on a short-term basis, based on a forecast of sales of customers serviced by the California DCs." *Id.* ¶ 4.  Crate & Barrel tracks the products as they move from the point of manufacture and maintains title to the products while they are being transported and is ultimately responsible for the transportation charges, according to Gottman.  *Id.* ¶¶ 5-6.

Third, Exel contends Claim Three, for failure to pay all wages earned in violation of Sections 201, 202, 204 and 221-223, fails because: 1) there is no private right of action under Sections 204 and 223; 2) Sections 222 and 22.5 are inapplicable;  and 3) Section 221 only prohibits employers from collecting or receiving from employees any part of wages the employer has already paid the employee.  Defendants' Motion at 13-14.  According to Defendants, Plaintiffs do not allege Exel improperly collected and received wages they had already been paid; rather, "they allege Exel never paid them for certain activities in the first place." *Id.* at 14.  At best, Defendants contend, "this claim is nothing more than an iteration of Plaintiffs' minimum wage claim." *Id.*

Fourth, Exel argues that Plaintiffs' meal and rest break claims, Claims Four and Five, are preempted by the DOT's HOS regulations, namely, the regulation that requires that drivers cease all work and go off duty no more than 14 hours after they start their day, regardless of the amount of time they have taken for breaks during the day.  *Id.* at 15 (citing 49 C.F.R. § 395.3(a)(1)(2)).  According to Exel, California's meal and rest break laws conflict with this requirement, and thus are preempted, because they "set a firm maximum on hours worked different from the maximum set by federal law." *Id.* at 15-16 (quoting *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1416-17 (9th Cir. 1990), *cert. denied*, 504 U.S. 979 (1992)).  Therefore, Defendants assert, these

6

1    claims are barred under the doctrine of implied preemption.  *Id.*

2        Fifth, Exel argues that Claims Ten, Eleven and Twelve fail because it has a good faith

3    belief that the class members are properly classified as independent contractors.  *Id.* at 16-19.

4    According to Exel, penalties on Claim Ten, for failure to keep accurate payroll records under

5    California Labor Code sections 1174 and 1174.5, and on Claim Twelve, for waiting time penalties

6    under Labor Code section 203, are available only when there is evidence of a "willful" violation.

7    *Id.* at 16 (citing *Dalton v. Lee Publ'ns, Inc.*, 2011 WL 1045107, at *4-6 (S.D. Cal. Mar. 22,

8    2011)).  Similarly, Exel asserts, recovery under California Labor Code section 226 requires a

9    "knowing and intentional" failure to provide employees with accurate wage statements.  *Id.*

10   Because there is a good-faith dispute as to whether Plaintiffs are properly classified as independent

11   contractors, these requirements are not met, Exel argues.  *Id.* at 17 (citing Cal. Code Regs. tit. 8, §

12   13520; *Dalton*, 2011 WL 1045107, at *5-6; *Hurst v. Buczek Enters., Inc.*, 870 F. Supp. 2d 810,

13   829 (N.D. Cal. 2012)).  In a footnote, Exel asserts that Claim Ten also fails because there is no

14   private right of action to obtain damages under California Labor Code section 1174.  *Id.* at 16 n.

15   17.

16       Sixth, Exel argues that Plaintiffs cannot recover vehicle lease payments on Claim Nine,

17   which seeks reimbursement for business expenses under California Labor Code section 2802 -

18   even if they prevail on their misclassification claim - because "although the costs of operating a

19   motor vehicle in the course of employment may be covered under Section 2802, the costs of

20   furnishing the vehicle *itself* are not."  *Id.* at 19 (emphasis in original) (citing *DLSE Interpretive*

21   *Bulletin No.* 84-7 (Jan. 8, 1985); *DLSE Opinion Ltr. 1991.02.25-1* (Feb. 25, 1991); *DLSE Opinion*

22   *Ltr. 1994.08.14* (Aug. 14, 1994); *DLSE Opinion Ltr. 1998.11.05* (Nov. 5, 1998); *Estrada v. FedEx*

23   *Ground Package System, Inc.*, 154 Cal. App. 4th 1, 21-25 (2007)).  According to Exel, this is

24   because employers in the delivery industry in California can require as a condition of employment

25   that drivers, at their own expense, must purchase or lease a truck that meets the employer's

26   specifications.  *Id.*

27       Finally, Exel argues that Plaintiffs do not have standing to seek injunctive relief under

28   California's Unfair Competition Law ("UCL") because Plaintiffs "no longer have any working

United States District Court
Northern District of California

7

relationship with Exel." *Id*. at 19-20 (citing *Richards v. Ernst & Young LLP*, No. C-08-4988 JF, 2010 WL 682314, at *3 (N.D. Cal. Feb. 24, 2010)).

### 2. Opposition

In their Opposition brief, Plaintiffs reject Exel's FAAAA preemption argument, contending Exel is "rehash[ing] issues that have already been decided" in this action and ignoring the Ninth Circuit's "decisive pronouncement [in *Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014)] that generally applicable wage laws do not 'bind' motor carriers to specific prices, routes, or services, and thus are not preempted under the FAAAA." Plaintiffs' Opposition at 1. According to Plaintiffs, Defendants are simply arguing that they "should not have to follow California wage and hour law because doing so would require them to change their policies and practices." *Id*. at 2. That is not the law, Plaintiffs assert, as such an approach would permit companies to "defend an illegal policy with the circular argument that it would need to change that very policy in order to comply with the law." *Id*. at 2, 5-11. Plaintiffs also reject as a "red-herring" Defendants' argument that Exel would have to reclassify its workers to comply with the law. *Id*. This same argument has already been rejected, Plaintiffs contend. *Id*. at 2-3 (citing *Robles v. Comtrak Logistics, Inc*., No. C-13-00161 JAM, 2014 WL 7335316, at *5 (E.D. Cal. Dec. 19, 2014); *People ex rel. Harris v. Pac. Anchor Transp., Inc.*, 59 Cal. 4th 772, 784-86 (2014)).

Plaintiffs also reject Exel's arguments challenging specific claims. First, as to Exel's assertion that Plaintiffs' overtime claim is barred by the California Exemption for deliveries made in interstate commerce, Plaintiffs argue that there are triable issues of fact that preclude summary judgment on this issue. *Id*. at 3, 11-18. This exemption is construed narrowly, Plaintiffs assert, and it is the employer who bears the burden of showing that it applies. *Id*. at 11. Further, the interstate nature of deliveries is "fundamentally a factual" question, Plaintiffs contend. *Id*. at 12. Defendants cannot meet their burden on summary judgment, Plaintiffs assert, because they have admitted the focus of their business in California is local. *Id*. at 12-13 (citing Declaration of Nathan Piller in Opposition to Defendants' Motion for Summary Judgment ("Piller Opposition Decl."), Ex. 4 (Deposition of Henry Capotosto ("Capotosto Depo.")) at 73-74 (testifying that most Exel deliveries are within 150 miles of where the drivers are based), Ex. 5 (Deposition of Jason

United States District Court
Northern District of California

Moll ("Moll Depo.")) at 138-140 (testifying that with respect to deliveries out of Exel's Oakland hub, approximately 2.5% by volume, or 5% by routes, cross state lines).  In addition, Plaintiffs assert, Exel cannot meet its burden under the exception for deliveries where there is "practical continuity of movement" across state lines.  *Id*. at 12.

According to Plaintiffs, a delivery is considered interstate under the "continuity of movement" requirement only where the shipper had a "fixed persisting transportation intent at the time of shipment," which is evaluated under a seven-factor test (the "I.C.C. Test").  *Id*. at 13 (citing *S. Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 617 (9th Cir. 1977); I.C.C. Policy Statement, 1992 WL 122949, at *2)).  The I.C.C. test is not met, according to Plaintiffs, where "a company places orders with an out-of-state vendor, with delivery to the company's intrastate warehouse for future delivery to customers yet to be identified."  *Id*. (quoting *Watkins v. Ameripride Servs.*, 375 F.3d 821 (9th Cir. 2004)).  Here, Plaintiffs contend, the declarations offered by Exel indicate that the end-users were not known at the time products were shipped from out-of-state to one of Exel's California warehouses and therefore, Exel is not entitled to summary judgment on this issue.  *Id*. at 13-14 (citing Hanson Motion Decl., Ex. 4 (Reynoso Decl.) ¶¶ 3-5, Ex. 5 (Moonan Decl.) ¶ 4, Ex. 6 (Gottman Decl.) ¶ 4; Piller Opposition Decl., Ex. 6 (Deposition of Blanca Reynoso ("Reynoso Depo.") at 40-42, 56, 64).

In addition, Plaintiffs argue, the declarations offered by Exel also raise fact questions as to many of the factors of the I.C.C. Test, such as whether a company's sales forecasts, if used to show "practical continuity of movement" have a factual basis, whether any processing or substantial product modification occurs at the warehouse, whether "modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse, and whether the merchandises is subject to the shipper's control and direction to the subsequent transportation once it reaches the intrastate warehouse.  *Id*. at 14-16 (citing Hanson Decl., Ex. 5 (Moonan Decl.) ¶ 3 (stating that merchandise is "unboxed and, if necessary, assembled" at the warehouse before it is sent on to customers); Piller Opposition Decl., Ex. 6 (Reynoso Depo.) at 57, 59 (testifying that "deluxing" is sometimes performed at the warehouse to meet customer needs, which could include installing a side-vent in a dryer that came with the vent

9

United States District Court
Northern District of California

in the back, or switching the door on a refrigerator so the handle is on the left rather than the right)).

Plaintiffs also filed a supplemental brief after they had had an opportunity to depose Moonan and Gottman on the interstate commerce issue.  *See* Plaintiffs' Supplemental Memorandum of Points and Authorities in Opposition to Defendants' Motion For Summary Judgment ("Plaintiffs' Supp. Opp.").  In the supplemental brief, Plaintiffs point to deposition testimony indicating that most of the Williams-Sonoma and Crate & Barrel goods that are shipped to California are for "future delivery to customers yet identified."  Plaintiffs' Supplemental Memorandum of Points  and Authorities in Opposition to Defendants' Motion For Summary Judgment ("Plaintiffs' Supp. Opp.") at 2-3 (citing Declaration of Nathan Piller in Support of Plaintiffs' Supplemental  Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment ("Piller Supp. Opp. Decl."), Ex. 1 (Moonan Depo.) at 20-21, 37-38, Ex. 2 (Gottman Depo.) at 25-26).  Plaintiffs also point to testimony by Moonan and Gottman indicating that they could not provide a "factual basis" for the sales forecasts on which shipments to California are based.  Plaintiffs' Supp. Opp. at 3 (citing Piller Supp. Opp. Decl., Ex. 1 (Moonan Depo.) at 48, Ex. 2 (Gottman Depo.) at 27).  Plaintiffs also assert in their supplemental brief that "[t]he very small minority of deliveries that crossed state lines raises at most a manageable damages issue."  *Id*. at 2 (citing *Butler v. Sears, Roebuck and Co*., 727 F.3d 796, 801-02 (7th Cir. 2013)).

In the alternative, even if the Court finds that the evidence is insufficient to demonstrate the existence of a factual dispute on the interstate commerce question, Plaintiffs assert that summary judgment should be denied on this issue under Rule 56(f) because Exel did not provide Plaintiffs with reasonable notice and opportunity to respond.  *Id*. at 17-18.  In particular, Plaintiffs argue the Exel failed to produce any documents responsive to Plaintiffs' request for production of documents directly relevant to the interstate commerce issue and have not cooperated in producing witnesses - including Jason Moll - for deposition.  *Id*. at 17.

Plaintiffs also reject Exel's assertion that their meal and rest break claims fail because they are preempted by the DOT Hours of Service regulations, arguing that the Ninth Circuit in *Dilts* -

and this Court – have held that California's meal and rest break laws are not preempted by the FAAAA.  *Id*. at 18-19.  Plaintiffs further assert that Exel's new preemption argument, while "cosmetically different" from the preemption argument it made at an earlier stage of this case (to the extent it is now based on a theory of implied preemption) is essentially the same as its previous argument, namely, "that California's meal and rest break laws are preempted because they reduce the amount of service that Defendants can provide."  *Id*. at 19.  Plaintiffs assert that Exel's argument is "muddled" and that it does not make clear which category of implied preemption it is asserting – impossibility or obstacle preemption.  *Id*.  In either event, Plaintiffs contend, Exel has not demonstrated that either theory applies because there is no evidence it would be impossible for Exel to comply with both the DOT Hours of Service regulations and the state meal and rest break laws and it also has not demonstrated that these laws are an obstacle to the objectives of Congress in establishing the DOT Hours of Service regulations.  *Id*. at 20.

With respect to Exel's assertion that it should prevail as to Claims Ten, Eleven and Twelve because of its good faith belief that its drivers are properly classified, Plaintiffs argue that Exel has "overstated the degree of intentionality necessary to show violations of Labor Code sections 203, 226 and 1174.5."  *Id*.  Further, Exel's knowledge and intent are factual questions that cannot be resolved on summary judgment, Plaintiffs argue.  *Id*. at 21 (citing *Lopez v. United Parcel Serv. Inc.*, No. C-08-5396 SI, 2010 WL 728205, at *9 (N.D. Cal. Mar. 1, 2010)).  Plaintiffs also cite evidence relating to the decision made by Exel senior management in 2007 to reclassify its employees as independent contractors, which Plaintiffs contend creates triable issues of fact as to Exel's intentions and good faith with respect to the independent contractor classification.  *Id*. at 21-22.

Plaintiffs argue that Exel is wrong in characterizing Claim Three, for failure to pay for all time work, as merely an "iteration of their minimum wage claim."  *Id*. at 22-23.  According to Plaintiffs, they are properly seeking straight time compensation for non-hauling activities that are not covered by the piece rates Exel pays its drivers for deliveries.  *Id*.  They note that the Court has already found, in this action, that a claim under Labor Code Section 221 is a claim for unpaid wages.  *Id*. at 22 (citing 2014 WL 1338297, at *18).  Plaintiffs argue further that even if the piece

11

1    rates paid by Exel would, if averaged over all working hours, exceed the minimum wage, this

2    would not be a defense to their claim.  *Id*. at 23 (citing *Gonzales v. Downtown LA Motors, LP*, 215

3    Cal. App. 4th 36, 49 (2013)).

4           With respect to Exel's request for summary judgment that reimbursement for vehicle lease

5    and rental payments is not available, Plaintiffs argue that the Court should wait until after the

6    misclassification question has been resolved to decide this issue, as did Judge Conti in a similar

7    case.  *Id*. at 23 (citing *Smith v. Cardinal Logistics Mgmt. Corp.*, No. C-07-2104 SC, 2009 WL

8    2588879, at *5 (N.D. Cal. Aug. 19, 2009)).

9           Finally, to the extent Defendants contend Plaintiffs do not have standing to pursue

10   injunctive relief against Exel, Plaintiffs argue that they should be permitted to substitute into the

11   case a new class representative with standing.  *Id*. at 23-24.  Plaintiffs note that although named

12   plaintiffs Villalpando and Shekur are not currently employed by Exel, many class members do

13   currently work for Exel and could represent the class as to the request for injunctive relief.  *Id.*

14          **3.   Reply**

15          In their Reply, Defendants reject Plaintiffs' arguments regarding preemption.  They argue

16   that the Ninth Circuit's recent decision in *Dilts* is distinguishable because the claims in that case

17   were brought by employee drivers.  Defendants' Reply at 3.  Exel also argues that whether the

18   Ninth Circuit applied a "binds to" analysis in *Dilts* is irrelevant because the Supreme Court has

19   held that the form of the law at issue does not have any bearing on whether it is preempted.  Exel

20   further asserts that it is not seeking to be excused from the requirements of California wage laws

21   but rather, is arguing that "Plaintiffs may not use a state law claim to reclassify them as employees

22   'when market forces have prompted [Exel] to adopt an independent contractor model.'"  *Id*. at 3-4

23   (quoting *Mass. Delivery Ass'n v. Coakley*, No. 10-cv-11521, 2015 WL 4111413 (D. Mass. July 8,

24   2015)).

25          Exel contends the state court's decision in *Harris*, cited by Plaintiffs in their Opposition

26   brief in support of the assertion that the FAAAA does not preempt state law misclassification

27   claims, is not binding on this court and that in any event, the defendant in that case conceded that

28   the effect of the unfair competition law at issue in that case on carriers' prices, routes and services

United States District Court
Northern District of California

United States District Court
Northern District of California

1   was "remote." *Id*. at 4 (citing *People ex rel. Harris v. Pac. Anchor Transp., Inc.*, 59 Cal. 4th 772

2   (2014)).  Defendants argue that Plaintiffs' reliance on *Robles v. Comtrak Logistics, Inc*., No. 11-

3   11094, 2013 WL 3353776 (D. Mass. July 3, 2013), is also unavailing because the court in that

4   case relied on *Harris* and on a Massachusetts district court decision, *Schwann v. FedEx Ground*

5   *Package Sys., Inc.*, that was withdrawn and reversed after the First Circuit's decision in *Mass.*

6   *Delivery Ass'n v. Coakley*, 769 F.3d 11 (1st Cir. 2014).  *Id*. at 4-5.

7          Exel rejects Plaintiffs' assertion that there are "triable issues of fact as to whether

8   Defendants would need to reclassify their drivers to comply with the law." *Id*. at 5.  This

9   argument is inconsistent with Plaintiffs' assertion in their own summary judgment motion that

10  reclassification is required as a matter of law, it contends.  *Id*. at 5.  In fact, Exel argues, "there is

11  no difference between Plaintiffs' claims and a 'law requiring a company to classify its laborers as

12  employees as a condition of doing business.'"  *Id*. at 6 (quoting Plaintiffs' Opposition at 9).

13  Furthermore, Exel argues, the question of whether a motor carrier is *able* to comply with state law

14  is not relevant to whether that law is preempted by the FAAAA.  *Id*. at 6-7.

15         On the question of whether the California Exemption applies to Plaintiffs' overtime claim,

16  Exel argues that it has demonstrated "practical continuity of movement" across state lines based

17  on testimony by Exel's customers that "they shipped product from out-of-state to California

18  pursuant to specific customer orders and based on forecasting of predictable customer demands."

19  *Id*. at 9.  According to Exel, "nothing more is required" and therefore, evidence that end customers

20  often are not ascertained at the time of shipment does not defeat summary judgment.  *Id*. at 9.  Nor

21  does the non-submittal of sales forecasts by Exel create a fact question, Exel asserts.  *Id*.

22  According to Exel, it has established the shippers' intent to move product in interstate commerce

23  based on projected customer demand and there is no evidence to establish a contrary intent.  *Id*.

24  Nor is evidence that furniture was unpacked and assembled sufficient to "alter the product's

25  interstate journey," Exel argues.  *Id*. at 10 (citing *Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d

26  692, 715-16 (S.D. Ohio Sept. 28, 2006); DOL Field Operations Handbook, § 24c02, 24d00).

27         Exel also argues that Plaintiffs are incorrect as to their assertion that the interstate

28  deliveries made by some class members are not sufficient to "wipe out all the overtime claims for

13

1   the entire class." *Id.* at 10 (quoting Plaintiffs' Opposition at 12 n. 4)). Even as to the drivers who

2   did not make interstate deliveries, Exel argues, the California Exemption applies because that

3   exemption applies to all drivers who could reasonably be *expected* to haul freight across interstate

4   lines. *Id.* (citing *Morris v. McComb*, 332 U.S. 422, 433-36 (1947); *Bishop v. Petro-Chemical*

5   *Transp., L.L.C.*, 582 F. Supp. 2d 1290, 1298 (E.D. Cal. 2008); *Resch v. Krapf's Coaches Inc*., 785

6   F.3d 869 (3d Cir. 2015)). Under the DOT regulations, DOT retains jurisdiction over any drivers

7   who could be called on to make interstate deliveries, Exel argues. *Id.* (citing 49 Fed. Reg. 37902-

8   02). Thus, the determination of when DOT rules apply is not based on a load-by-load analysis,

9   Exel asserts. *Id.* Further, Exel argues, the suggestion by Plaintiffs that the Court can address this

10  issue on a driver-by-driver basis as a matter of damages indicates that they no longer believe the

11  case should be certified. *Id.* Exel also rejects Plaintiffs' assertion that it did not give them

12  sufficient notice of its intent to assert the California Exemption as a defense and argues that the

13  Court should not permit Plaintiffs to conduct further discovery on this issue under Rule 56(f). *Id.*

14  at 11-12.

15      Exel reiterates its assertion that Claim Three is merely a minimum wage claim, arguing

16  that California Labor Code section 221 does not extend to claims for compensation where an

17  employee was never paid in the first instance. *Id.* According to Exel, Plaintiffs "implicitly

18  recognize" that this claim doesn't fall under section 221 to the extent they cite *Gonzales v.*

19  *Downtown LA Motors, LP*, 215 Cal. App. 4th 36 (2013). *Id.* The holding in *Gonzales*, Exel

20  asserts, "is based on an extensive analysis and application of *Armenta v. Osmose, Inc.*, 135 Cal.

21  App. 4th 314 (2005) - a minimum wage case decided under Cal. Lab. Code § 1194." *Id.*

22      Exel argues again that Plaintiffs' meal and rest break claims are preempted by the DOT

23  HOS because under California's rules, a driver loses one hour and thirty minutes a day of work

24  time, thus setting a firm maximum number of hours of 12.5 hours, which is different from the

25  number of hours permitted under federal law of 14 hours. *Id.* at 13. According to Exel, neither

26  this Court not the *Robles* court has reached a contrary result or indeed, even addressed this

27  preemption argument. *Id.*

28      With respect to Exel's request for summary judgment on Claims Ten, Eleven and Twelve

1   based on its good faith belief that its drivers are properly classified, Exel argues that its deliberate

2   attempt to use an independent contractor business model is irrelevant because this does not show

3   that Exel had any intent to violate the law.  *Id*. at 14.

4       As to Exel's request for summary judgment on the unavailability of vehicle lease payments

5   under California Labor Code section 2802, Exel points out that Plaintiffs did not make any attempt

6   in their opposition to demonstrate that there are any material disputes of fact that would preclude

7   summary judgment on this issue.  *Id*.  Exel argues that there is no reason to delay adjudication of

8   this issue.  *Id*. at 15.

9       **C.  Plaintiffs' Summary Judgment Motion**

10          **1.   Motion**

11       Plaintiffs seek summary judgment on Exel's first affirmative defense, that Plaintiffs'

12   claims fail because they are independent contractors.  Plaintiffs' Motion at 1.  According to

13   Plaintiffs, the undisputed facts establish, as a matter of law, that they have been misclassified and

14   are instead employees.  *Id*.  Plaintiffs cite "Exel's own contracts, written policies and manager

15   testimony," which they contend show that Exel retains the right to exercise control over its drivers

16   with respect to the manner in which they perform their work, which is the test for determining

17   whether an individual is an employee or an independent contractor.  *Id*. at 3 (citing *Ruiz v. Affinity

18   Logistics Corp*., 754 F.3d 1093, 1100 (9th Cir. 2014); *Ayala v. Antelope Valley Newspapers, Inc.*,

19   59 Cal. 4th 522, 533 (2014)).  The evidence offered by Plaintiffs in support of their request for

20   summary judgment is summarized below:[6]

21       Exel's Motive for Classifying its Drivers as Independent Contractors:  Plaintiffs contend

22   Exel adopted and maintained the independent contractor business model in order to cut costs.  *Id*.

23   at 5.  They cite the deposition testimony of Renee Albarano, Exel's "person most knowledgeable,"

24   who testified that Exel shifted from an employee model to an independent contractor model in

25   2007 after conducting cost analyses comparing the "estimated financial delta" between the two

26

27   ───────────

     [6] The Court notes that Plaintiffs' Motion in several instances references the wrong exhibit
     numbers for the evidence cited.  They have also provided incorrect page numbers for some

28   quotations.  The Court has corrected these clerical errors by replacing the cited page and exhibit
     numbers with the correct numbers.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    models and concluding the latter was more profitable.  *Id*. (citing Declaration of Nathan Piller in

2    Support of Plaintiffs' Motion for Summary Judgment and/or Summary Adjudication of

3    Defendants' Independent Contractor Defense ("Piller Motion Decl."), Ex. 5 (October 29, 2013

4    deposition of Renee Albarano ("Albarano Depo. I") at 240-44.  Albarano further testified that a

5    2007 analysis concluded that the cost of running a truck under the independent contractor model

6    as compared to the employee model saved approximately $23,000 per truck.  *Id*. (citing Piller

7    Motion Decl., Ex. 6 (May 12, 2015 deposition of Renee Albarano ("Albarano Depo. II") at 50-51).

8         At the same time, Plaintiffs contend, drivers' compensation dropped significantly with the

9    adoption of the independent contractor model.  *Id*.  Plaintiffs point to a 2006 presentation by

10   Albarano (or someone on her team) reflecting that in that year, the average annual salary for

11   Exel's drivers (many of whom were classified as employees) was $52,238.  *Id*. (citing Piller

12   Motion Decl., Ex. 49 ("Network Driver Pay") at 3).  A sampling of Class Member IRS Schedule C

13   1040 Forms showing profits and losses from business for subsequent years (between 2008 and

14   2011), when Exel had adopted the independent contractor model, shows that drivers typically took

15   home less than $25,000 per year, after expenses, despite working 14-hour days, 5-6 days a week.

16   *Id*. (citing Piller Motion Decl., Exs. 51-59).

17        <u>Negotiation of Pay Rate and Other Terms of Employment</u>:  Plaintiffs assert Exel presents

18   the job terms and pay rates to its drivers on a take-it-or-leave-it basis.  *Id*. at 5-6. Plaintiffs point to

19   the deposition testimony of a senior Exel manager, Gregory Smigelsky, testifying that during the

20   relevant period Exel mainly recruited individuals rather than companies, and to Albarano's

21   deposition testimony that Exel presents the Independent Truckman's Agreement ("ITA") to these

22   individuals without offering them any opportunity to negotiate specific terms of the contract.  *Id*.

23   (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 83, Ex. 7 (Smigelsky Depo.) at 113, Ex. 8

24   (ITA)).  Similarly, Cristina de la Rosa, an Exel recruiter, testified that drivers get paid a flat rate

25   for each stop and that the rate is non-negotiable.  Piller Motion Decl., Ex. 9 ( De La Rosa Depo.)

26   at 24-25, 40.  Plaintiffs also cite the testimony of class member Victoriano Molina, who testified

27   that drivers were given a rate sheet listing the amount paid per stop, that drivers were not

28   permitted to negotiate as to the rates, and that at least twice a year the rates were reduced.

United States District Court
Northern District of California

1    Plaintiffs' Motion at 6 (citing Piller Motion Decl., Ex. 10 (Molina Depo.) at 79).

2           <u>Exel's Right to Terminate or Transfer Drivers</u>:  Plaintiffs contend Exel retains the right to

3    terminate or transfer drivers without cause and to terminate any driver for violating any of its rules

4    and instructions.  *Id*.  It cites testimony by Smigelsky, Albarano and Moll that Exel maintains

5    standards as to customer service, safety and appearance and that Exel can terminate drivers who

6    fail to meet these standards.  *Id*. (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 233

7    (testifying that Exel has minimum qualifications for drivers, independent contractors and helpers

8    that exceed the minimum legal requirements and apply to all drivers and helpers),  Ex. 7

9    (Smigelsky Depo.) at 66, 78-79 (testifying that if drivers do not comply with Exel "standards of

10   quality or excellence," including appearance, customer service, delivery and safety standards, Exel

11   retains the right to terminate them), Ex. 14 (Moll Depo.) at 145-46[7] (testifying that drivers had to

12   be approved by Exel to drive a truck).

13          The right to terminate and transfer drivers is also contained in the ITA, Plaintiffs assert.[8]

14   *Id*. at 7 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 83),  Ex. 8 (ITA)). Plaintiffs also

15   cite the testimony of De La Rosa that general managers at different work sites routinely call each

16   other when they are short of drivers and ask if they can borrow a driver from another site for the

17   day.  *Id*. (citing Piller Motion Decl., Ex. 9 (De La Rosa Depo.) at 22, 24).

18          The right to terminate drivers for failure to follow Exel's standards is also contained in

19   Exel's Transportation Safety & Regulatory Compliance Manual ("Compliance Manual"),

20

21   _____

     [7] Although Plaintiffs cite page 145 of the Moll deposition transcript, that page was not included in
22   the cited exhibit, Exhibit 14.  Page 146, however, which was included in the exhibit, includes
     testimony that no individual could drive a truck unless approved by Exel.
23   [8] Paragraph 3 of the ITA provides, in relevant part, as follows:

24          **Termination.**  This Agreement may be terminated at any time: . . .
            (c) <u>without cause</u> upon either party giving the other sixty (60) days
25          written notice of termination; or (d) <u>with cause</u> upon the breach of
            this Agreement by either of the parties.  Upon any termination
26          <u>without cause</u> under Subsection (c), CONTRACTOR, at the
            COMPANY'S option, may be transferred to another location then
27          being served by the COMPANY.  Failure of CONTRACTOR to
            comply with the transfer, shall constitute a breach of this agreement.
28
     Piller Motion Decl., Ex. 3 (ITA), ¶ 3.

United States District Court
Northern District of California

1    Plaintiffs assert.  *Id.* (citing Piller Motion Decl., Ex. 15 (Compliance Manual) at EDV000303[9]

2    ("Contractors who fail to comply with the provisions of this manual are subject to termination of

3    their Agreement") and EDV000309 ("violation [of the provisions adopted by Exel to ensure safe

4    operations] may result in the termination of the [Equipment Lease Agreement] and the ITA

5    executed with Exel").  Plaintiffs also cite evidence relating to Exel's Driver Safety Accountability

6    Program, under which drivers were charged for accidents that were considered "preventable," a

7    standard that was higher than legal liability.  *Id.* (citing Piller Motion Decl., Ex. 14 (Moll Depo.) at

8    150-151, Ex. 16 (Exel Direct Driver Safety Accountability) at EDV000286 (stating that

9    "Preventability is a higher standard than Legal Liability")).

10          Exel's Provision of Customers: Plaintiffs point to evidence that Exel provides its drivers

11   with customers.  *Id.* at 7-8 (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 196 (testifying

12   that Exel provides drivers with customers so drivers do not need to sell their services to clients),

13   Ex. 17 ("Realistic Preview of Business Opportunity") at 5 ("With a small financial investment on

14   your part you are revenue producing and have 100% of your customers the first day that you are in

15   business"), Ex. 18 (deposition testimony of recruiter Maria Iniguez-Quintero) at 89 ("we will have

16   the client customers for" the drivers). Plaintiffs also offer evidence that the drivers are not

17   permitted to negotiate directly with these customers as to any of the terms of the service they

18   provide, including routes, delivery windows, or terms of payment or service; rather, these

19   requirements are dictated by the terms of the agreements between Exel and the customers who use

20   Exel's delivery services.  *Id.* at 8 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 81-82).

21          Exel's Assignment of Delivery Routes:  Plaintiffs contend it is undisputed that Exel has the

22   discretion to determine which routes are assigned to which drivers and that it determines the time

23   windows for each stop.  *Id.* at 8 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 102-03

24   (testifying that Exel puts together the overall routes, namely, the stops and time windows, while

25   the driver "determines the specific streets and roads to take in order to meet those time windows),

26   Ex. 11 (Villalpando Depo.) at 177 ( testifying that drivers have no choice as to their routes), Ex.

27   _____

28   [9] Although Exel cites page EDV000304 in its brief, the quoted language is found at page
     EDV000303.

19 (excerpt of deposition of class member Juan J. Saravia) at 52 (testifying that Exel came up with his routes during the night and sent them to his phone)).  Plaintiffs contend that while the drivers usually are permitted to decide which streets and highways to get from one stop to the next on their routes, sometimes they do not even have this discretion.  *Id*.  In support of this assertion, Plaintiffs cite the deposition testimony of Jason Moll that Exel's dispatchers sometimes provide "turn-by-turn driving directions" when "the driver needs help" and testimony by Smigelsky that drivers who "don't deliver their assigned routes" may be terminated.  *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 88, Ex. 14 (Moll Depo.) at 107).

<u>Exel's Right of Exclusive Possession, Control and Use of Vehicles Until May 2015</u>: According to Plaintiffs, until May 2015, the Equipment Lease Equipment ("ELA"), which every driver had to sign, provided that Exel would have "exclusive control" over the vehicles the drivers used – a requirement under the Federal Motor Carrier Safety Regulations for motor carriers that lease rather than purchase equipment for transportation.  *Id*. at 8-9 (citing 49 C.F.R. § 376.12(c)(1),[10] Ex. 20 (ELA)[11]).  Exel's Compliance Manual also states that drivers' vehicles are

---

[10] This subsection provides as follows:

> (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

49 C.F.R. § 376.12(c)(1).

[11] The ELA contains the following provision governing Exel's use and control of the drivers' vehicles:

> **<u>Control and Exclusive Use</u>**.   COMPANY shall have such possession, control and use of the LEASED EQUIPMENT and its operation as required by Title 49 C.F.R. Section 376.12(c)(1). Notwithstanding the above, in performing services under this Agreement, CONTRACTOR will direct the operation of the LEASED EQUIPMENT in all respects and will determine the means of performance including, but not limited to, such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling in accordance with customer delivery commitments.   The parties intend to create an independent contractor relationship and not an employer-employee relationship.

Piller Motion Decl., Ex. 20 (ELA) ¶ 11.

United States District Court
Northern District of California

1    operated under its "authority and insurance" and that they are under Exel's "care, custody and

2    control." *Id*. at 9 (citing Piller Motion Decl., Ex. 15 (Compliance Manual) at EDV000302,

3    000304).  Further, an addendum to the ELA acknowledges that Exel's safety ratings by the

4    Federal Motor Carrier Safety Administration have "economic value" and provides for the payment

5    of "liquidated damages" by drivers to Exel where they are found to have committed violations in

6    connection with roadside inspections conducted by the FMCSA.  *Id*. (citing Piller Motion Decl.,

7    Ex. 21 (Addendum to ELA)).

8         Exel's Right to Retain Control Over Drivers' Work Hours and Delivery Schedules:

9    Plaintiffs contend Exel retains control over the drivers' work hours and delivery schedules,

10   including requiring that all drivers attend an early morning meeting at the beginning of the work

11   day and providing each driver with a manifest listing the stops and time windows for the day.  *Id*.

12   at 9 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 102-03, 107 (testifying that Exel

13   determines the stops and time windows for the drivers), 159-60 (testifying that all drivers must

14   attend morning "stand-up" meeting every day), Ex. 7 (Smigelsky Depo.) at 51 (testifying that Exel

15   expects drivers to make deliveries within time windows provided), Ex. 19 (Saravia Depo.) at 50

16   (testifying that he had to arrive at work at 5:30 a.m. to attend morning meeting that started at 6

17   a.m.)).  According to Plaintiffs, Exel keeps statistics on the percentage of deliveries that are on-

18   time and gives positive or negative feedback to drivers as appropriate.  *Id*. at 10 (citing Piller

19   Motion Decl., Ex. 14 (Moll Depo.) at 87-88).  Further, Plaintiffs assert, Exel looks for drivers who

20   can work full-time and typically requires that its drivers work five to six (and sometimes seven)

21   days a week, between 10 and 12 hours a day.  *Id*.  (citing Piller Motion Decl., Ex. 7 (Smigelsky

22   Depo.) at 169, 192 (testifying that a typical work schedule is five to six, sometimes seven days per

23   week, usually 10-12 hours a day, and that Exel's goal is to keep Exel drivers operating at full

24   capacity), Ex. 9 (De La Rosa Depo.) at 94 (testifying that Exel only looks for full-time drivers)).

25   According to Smigelsky, it is the "recommended practice" that drivers who would like to take a

26   day off speak with the local manager.  *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at

27   193-94.  Plaintiffs offer testimony of class members that they work full weeks and long days and

28   that they often do not have time to take breaks, even to use the bathroom.  *Id*. (citing Piller Motion

1   Decl., Exs. 10-11, 22-29 (Class Member Declarations and Deposition Testimony)).  Plaintiffs also

2   point to Smigelsky's deposition testimony that Exel has the discretion to terminate a driver who

3   asks to use a customer's restroom.  *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at

4   103-04).

5         Exel's Appearance Standards for Drivers and Vehicles:  According to Plaintiffs, Exel

6   requires its drivers to comply with "appearance requirements" as to both their personal appearance

7   and the appearance of their trucks.  *Id*. at 10-11.  As to personal appearance, this includes wearing

8   a standard delivery uniform with the appropriate logo affixed to it, keeping the uniform clean, and

9   maintaining a neat bodily appearance.  *Id*. (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at

10  210-211, 226 (testifying that Exel drivers must wear uniforms with logo and that Exel buys and

11  provides the uniforms to its drivers and deducts the cost from their pay), Ex. 7 (Smigelsky Depo.)

12  at 81-82 (testifying that Exel expects drivers to wear uniforms), Ex. 9 (De La Rosa Depo.) at 81

13  (testifying that drivers should be "neat and well-groomed" because they are "going to people's

14  homes"), Ex. 18 (Iniguez-Quintero Depo.) at 81-82 (testifying that drivers are expected to have

15  "good hygiene" and be "presentable" to provide a good customer experience),  Ex. 30 (Suggested

16  Tools List, describing Exel delivery uniform)).

17        As to the appearance of the truck, Plaintiffs cite evidence that Exel requires all trucks: 1)

18  be painted white; 2) carry placards with Exel's name and logo on them, placed in specific

19  locations on the truck; 3)  meet certain dimensional requirements; and 4) have certain interior

20  features.  *Id*. at 11 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 209-211 (describing

21  logo requirements for trucks), Ex. 7 (Smigelsky Depo.) at 218-219 (describing placard

22  requirements), Ex. 31 (Dalpino Depo) at 77 (testifying that as a recruiter he had to take pictures of

23  new drivers' trucks and put them into the file to ensure that trucks met Exel's appearance

24  requirements), Ex. 32 (Exel Standard Truck Requirements)).

25        Exel's Requirements Governing Trucks, Tools and Devices: In addition to the Standard

26  Truck Requirements, Plaintiffs also point to requirements imposed on drivers mandating that

27  drivers use certain equipment and tools, including a particular type of cell phone to report

28  deliveries and communicate with management throughout the day and certain safety equipment

United States District Court
Northern District of California

such as "cargo securement equipment." *Id*. at 12 (citing Piller Motion Decl., Ex. 33 (Agreement to Use Handheld Computer Device), Ex. 14 (Moll Depo.) at 58, 93 (testifying that Exel distributes a certain type of phone that drivers are required to use to communicate with management), Ex. 15 (Compliance Manual) at EDV000317 (stating that all vehicles operated on behalf of Exel must carry certain "DOT required equipment on board"), Ex. 30 (Suggested Tools List listing tools drivers should have and specific tool supply companies)).  In addition, Plaintiffs cite testimony that Exel purchases certain types of equipment such as blankets, straps and packaging tape, which it then charges back to the drivers. *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 200-01.  Plaintiff Villalpando testified that sometimes managers inspected his truck and if they found the blankets were "dirty or smell" would give  him a pack of blankets, without asking, which he was later charged for. *Id*. (citing Piller Motion Decl., Ex. 11 (Villalpando Depo.) at 198).  Class member Molina testified that Exel provided equipment such as "blankets, tools, any sort of safety equipment" to drivers and charged the expense back to them without seeking authorization from the drivers. *Id*. (citing Piller Motion Decl., Ex. 10 (Molina Depo.) at 100).

> Exel's Compliance and Training Manuals Requiring that Work be Performed in a Specific Manner:  According to Plaintiffs, Exel's Compliance Manuals, as well as other training materials, "are replete with mandatory language, such as 'required,' 'never' and 'must,' rather than mere recommendations or guidelines." *Id*. at 12 (citing Piller Motion Decl., Ex. 14 (Moll Depo.) at 152 (testifying that when a new driver starts, Exel wants the driver to "go through the Safer Way training"), Ex. 15 (Compliance Manual) at EDV000308 ("Every Contractor/driver is required to maintain their qualification status as defined by 49 CFR § 391 and company policy"), EDV000320 ("After an accident, never accept or place blame on any person and do not sign anything") ("Drivers are expected to make deliveries in accordance with the expectations of our customers") ("Be courteous and cooperative with the homeowner.  If Contractor/driver encounters any problem, notify the dispatcher as soon as possible"), Ex. 34 (Exel Direct Driver Training:  US DOT Regulations) at EDV001561 ("Every driver must complete the Safer Way of Defensive Driving Program"), Ex. 35 (The Exel Safer Way of Driving) at EDV000455 (instructions for drivers at scene of accident including specific statement drivers should make if asked for comment

United States District Court
Northern District of California

by member of news media)).  According to Plaintiffs, the manuals contain "detailed procedures" all drivers must follow, including rules relating to cell phone usage, how to fill out certain forms and reports, various loading and delivery procedures and how to interact with customers." *Id*. (citing Piller Motion Decl., Ex. 15 (Compliance Manual) at EDV00309-11, EDV000320).

Exel's Compliance and Safety Policies:  Plaintiffs contend Exel has admitted its compliance and safety policies go above and beyond legal requirements, citing Albarano's deposition testimony.  *Id*. at 13 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 233).  As an example, Plaintiffs point to Smigelsky's testimony that Exel's Driver Safety Accountability Program is more protective than federal law, providing for disqualification of a driver under certain circumstances where federal law would not provide for disqualification.  *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 236).

Exel's Monitoring and Enforcement Activities: Plaintiffs contend Exel engages in extensive monitoring and enforcement of the rules it requires drivers to follow.  *Id*.  It cites as an example the daily stand-up meetings drivers are required to attend.  *Id*. at 13-14 (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 158-160, 165-66 (testify that attendance at stand-up meetings is required and describing topics covered, including "reinforcing certain safety guidelines"), Ex. 14 (Moll Depo.) at 68 ("And then we'll have such topics as safety topics or on-time delivery performance")).  Plaintiffs also point to evidence that Exel's managers supervise the drivers and their helpers as they load their trucks and instruct them on loading procedures.  *Id*. at 14 (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 84, Ex. 31 (Dalpino Depo.) at 128). Plaintiffs point to testimony that in addition to various evaluation forms and compliance checklists that are completed by managers during the driver's initial two-week orientation, managers also sometimes conduct "ride-alongs" or "follow-alongs" where they observe the driver's performance and complete evaluation forms.  *Id*. (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 177-79, Ex. 7 (Smigelsky Depo.) at 143, Ex. 36 (Ride and Evaluation Document), Ex. 38 (Manager Ride-A-Long Compliance Checklist)).

Plaintiffs also point to evidence that drivers are expected to report to management if they are experiencing a delay or are unable to make deliveries in accordance with customer

expectations. *Id.* (citing Piller Motion Decl., Ex. 15 (Compliance Manual) at EDV000320). The Compliance Manual also requires that if a customer refuses a shipment the driver must call Exel immediately, and damage exceeding $500 must be reported to Exel's Risk Management Department. *Id.* (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 45, 48 (testifying that if a driver "has an issue making the delivery" the driver "calls the Exel Direct dispatch associate at the local site"), Ex. 15 (Compliance Manual) at EDV000320-321). According to Plaintiffs, "[d]rivers generally must resolve customer complaints regarding in-home damage by working with representatives of Exel, rather than negotiating a resolution with the customer independently." *Id.* (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 63-64 (testifying that drivers "can resolve their own damages" but they should report to Exel that the damage has occurred and tell Exel if the issue has been resolved)).

Plaintiffs also provide evidence regarding the computer program Exel uses to track its drivers, in real time, to see whether they are on time in making their deliveries. *Id.* at 14-15. According to Jason Moll, the system, called "Cheetah ServiceDesk," works as follows:

> There is a platform on their computer screen. If I can paint a picture to you, it is a red/yellow/green scenario. Spreadsheet from top to bottom where the drivers' names are listed, and on the right from left to right is how many deliveries they have for the day. And when it is completed there is a dot on there, and it is green if they were within their timeframe. It is yellow if they are getting close to being late . . . and then it is red if the driver is outside his time frame. For example, if it's a 12:00 to 2:00 time, and it is 2:15, and the driver hasn't updated his Cheetah phone, by definition either he's out of range because the cellular service is out of range, or he's late and hasn't updated it. So we have a problem, we need to start calling the customer. That's how they utilize it throughout the day.

*Id.* (citing Piller Motion Decl., Ex. 14 (Moll Depo.) at 93-94). Moll further testified that the data from this system is used to generate reports, which are reviewed by managers and used to provide feedback to drivers. *Id.* (citing Piller Motion Decl., Ex. 14 (Moll Depo.) at 88). Plaintiffs offer testimony by Plaintiff Villalpando that when drivers are running late, dispatchers call them asking why they are late and why they have not called in. *Id.* at 15 (citing Piller Decl., Ex. 11 (Villalpando Depo.) at 162-163).

Exel Customer Service Standards: According to Plaintiffs, Exel requires its drivers to meet

24

1    specific customer service standards, some originating from Exel's clients and others developed by

2    Exel. *Id*. at 15-16 (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 49 (testifying that

3    drivers are expected to abide by the policies of their accounts), Ex. 31 (Dalpino Depo.) at 76

4    (testifying that regardless of the retailer or account, there are customer service requirements

5    drivers need to follow), Ex. 40 (Exel's Acceptance Requirements of Delivery Specialist) at

6    EDV009746 (stating that Exel provides "unmatched quality service" and promising to "exceed the

7    expectations of [Exel's] client")).  According to Smigelsky, Exel drivers are assigned

8    "professional development coordinators" during their orientation, who work with drivers on retail

9    client policy and interaction with customers.  *Id*. at 16 (citing Piller Motion Decl., Ex. 7

10   (Smigelsky Depo.) at 13).  Smigelsky testified that Exel provides drivers with instructions on how

11   to greet and interact with customers, how to avoid conduct that is culturally insensitive or has

12   sexual overtones, and provides scripts for various scenarios; it also provides training under the

13   Mother Jones Customer Service Program, which is a "universal program" about "how to treat

14   customers." *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 98-100, 104-05, 148, Exs.

15   42-44 (scripts)).  Professional development coordinators also review the results of surveys with

16   drivers to enhance their customer service skills.  *Id*. (citing Piller Motion Decl., Ex. 7 (Smigelsky

17   Depo.) at 148, Ex. 31 (Dalpino Depo.) at 130-31 (testifying that the retailer or Exel conducts

18   surveys in the home and reviews the results with the driver)).  According to Plaintiffs, Exel retains

19   the right to terminate drivers for receiving poor customer survey results.  *Id*. at 17 (citing Piller

20   Motion Decl., Ex. 7 (Smigelsky Depo.) at 58-59 (testifying that not doing well on a client

21   scorecard can be a reason for terminating a driver's contract)).

22          Exel Loading and Delivery Techniques: Plaintiffs offer evidence that Exel trains and

23   directs its drivers on their loading and delivery techniques, including where "their trucks must be

24   backed up at the loading dock, where they may pick up their manifests, where they should park

25   their trucks, where they should bring their returned merchandise, which dock to use, and how to

26   load merchandise onto the truck at the warehouse." *Id*. (citing Piller Motion Decl., Ex. 31

27   (Dalpino Depo.) at 94-95, 121).  Albarano testified that at some hub locations drivers would need

28   to learn specific skills, such as how to hook up a water line or install a washer or dryer or how to

United States District Court
Northern District of California

install a crib.  *Id.* (citing Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 35).  According to

Plaintiffs, these procedures are "detailed in various mandatory training programs."  *Id.* at 17-18

(citing Piller Motion Decl., Ex. 34 (Exel Direct Driver Training: US DOT Regulations) at

EDV0001561 (stating that "[e]very driver must complete the Safer Way of Defensive Driving

Program"); Declaration of Joshua Konecky in Support of Plaintiffs' Motion for Class

Certification, Ex. 14 (instructional DVDs:  "The Safer Way of Protecting Floors" and "The Safer

Way of Preventing Water Damage")).

 Exel's Policies and Practices Regarding Use of Helpers:  According to Plaintiffs, "[i]t is

undisputed that Exel requires Class Members to have at least one helper."  *Id.* at 18 (citing Piller

Motion Decl., Ex. 14 (Moll Depo.) at 147-48 (testifying that while "[t]here are instances where [a

driver] will not need a helper," "[d]rivers typically have helpers" and also that when drivers back

up, they are expected to have a spotter "which is typically the helper"), Ex. 39 (Capotosto Depo.)

at 46 (testifying that "[t]here are always two people on the truck.  There is the driver and the

helper" and that this is Exel's "operating practice"), Ex. 46 (Dalpino Depo. in *Villalpando v.*

*Transguard Ins. Co. of Am.* ("Transguard Depo.")) at 104 (testifying that Villalpando had to hire a

helper)).  Smigelski testified that the helpers "should be in the same apparel" as the driver, that is,

the Exel uniform.  *Id.* (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 161).  Plaintiffs

further contend "Exel forbids helpers from driving the vehicles 'unless they have been approved

by the company.'"  *Id.* (citing Piller Motion Decl., Ex. 14 (Moll Depo.) at 146-147).  Plaintiffs

also point to Smigelsky's testimony that the management has the discretion to assign a helper to

another driver if the former driver has been terminated.  *Id.* (citing Piller Motion Decl., Ex. 7

(Smigelsky Depo.) at 215).  Plaintiffs note that the Compliance Manual warns that the contract of

a driver "who permits an unqualified driver or helper to operate in Exel service is subject to

immediate termination."  *Id.* (citing Piller Motion Decl., Ex. 15 (Compliance Manual) at

EDV000308).  Plaintiffs also cite testimony by class members that "Exel often selected their

helpers or required them to terminate underperforming helpers."  *Id.* at 18 n. 11.

 Exel's Loans to Drivers and Collection of Debt:  Plaintiffs asserts that Exel acts as "the

employer-lender and debt collector" because its drivers "struggle to make ends meet."  *Id.* at 19.

1   According to Plaintiffs, until June of 2013, Exel rented trucks on behalf of class members and

2   deducted the rental payments from their compensation. *Id.* (citing Piller Motion Decl., Ex. 5

3   (Albarano Depo. I) at 215 (testifying that prior to June 2013, Exel could "rent a vehicle . . . assign

4   it to the contractor and do deductions from . . . a contractor's settlement, to pay for the rental"),

5   Ex. 12 (deposition of class member Pedro Navarro ("Navarro Depo.") at 42 (testifying that he

6   didn't have to pay for the truck because Exel was going to rent it for him), Ex. 47 (deposition of

7   class member Vladimir Marinov ("Marinov Depo.")) at 44-45 (same)).

8           Plaintiffs present evidence that Exel provides "loans" to drivers for other expenses as well,

9   for example, to cover the upfront cost of repairs to their vehicles. *Id.* (citing Piller Motion Decl.,

10  Ex. 5 (Albarano Depo. I) at 224 (testifying that if a driver does not have the money to pay for

11  repairs upfront, Exel will provide a loan and then charge the cost back to the driver), Ex. 11

12  (Villalpando Depo.) at 93 (testifying that when he did not have the money to pay for the new tires

13  he needed for his truck, Exel advanced him the money for the tires and then took deductions from

14  his paycheck)).  Plaintiffs also contend Exel "unilaterally settles customer damages claims directly

15  with the customer, and then deducts the payments from Drivers' compensation without giving

16  them a choice in the matter." *Id.* at 19-20 (citing Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at

17  65, Ex. 10 (Molina Depo.) at 102 (testifying that Exel took "shop fees" for damaged items out of

18  his pay without giving him an opportunity to assess the damage and determine whether it could be

19  repaired or to buy the item outright himself if it could not be repaired)).  Finally, Plaintiffs point to

20  evidence that Exel "provides required items and services, such as uniforms, truck repairs,

21  insurance, and mandatory drug testing and physicals, directly to the Drivers, only to deduct the

22  costs from their compensation later." *Id.* at 20 (citing Piller Motion Decl., Ex. 7 (Smigelsky

23  Depo.) at 65 (testifying that drivers are charged the cost of conducting required random drug

24  testing and biennial physicals), Ex. 8 (ITA) at EDV001684 (providing that drivers are responsible

25  for "all costs attendant to . . . operation and maintenance" of their vehicles and are "liable for loss

26  or damage to items intended for transport which are in [the driver's] possession or under its

27

28

United States District Court
Northern District of California

1  dominion and control"),  Ex. 20 (ELA) at EDV0001637-38[12]).

2    Plaintiffs contend the undisputed facts are sufficient to establish, as a matter of law, that

3  the class member drivers are employees rather than independent contractors.  *Id*. at 20.  As an

4  initial matter, they note that the California Labor Code is a remedial statute that reflects the State's

5  strong public policy of protecting workers.  *Id*. (citing *Murphy v. Kenneth Cole Prods., Inc*., 40

6  Cal. 4th 1094, 1103 (2007); *Ramirez v. Yosemite Water Co*., 20 Cal. 4th 785, 794 (1999); *Lusardi*

7  *Const. Co. v. Aubry*, 1 Cal. 4th 976, 985 (1992); *Thomas v. Home Depot USA, Inc*., 527 F. Supp.

8  2d 1003, 1010 (N.D. Cal. 2007); *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1470 (C.D. Cal.

9  1996)).  According to Plaintiffs, California's employee bond law and the Labor Code's provisions

10  requiring reimbursement of ordinary business expenses "are designed to protect employees from

11  entering into exploitative lender-debtor relationships with their employers and acting as insurers of

12  the company." *Id*. (citing *Cal. State Rest. Ass'n. v. Whitlow*, 58 Cal. App. 3d 340, 347 (1976);

13  *Nicholas Labs., LLC v. Chen*, 199 Cal. App. 4th 1240, 1247 (2011)).  Similarly, California has a

14  strong public policy in favor of strict enforcement of minimum wage and overtime laws, Plaintiffs

15  contend.  *Id*. at 21  (citing *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 340

16  (2004)).  Meal and rest break laws also are designed to protect from substantial health and safety

17  risks, Plaintiffs assert.  *Id*. (citing *Kamar v. RadioShack Corp*., 2008 WL 2229166, at *12 (C.D.

18  Cal. May 15, 2008); *Lazarin v. Superior Court*, 188 Cal. App. 4th 1560, 1582-83 (2010)).

19  According to Plaintiffs, the drivers in this case are just the "vulnerable low-wage workers these

20  provisions were designed to protect."  *Id*.

21    Plaintiffs contend there is a presumption under California law that workers who have

22  provided services for an employer are employees.  *Id*. (citing *Narayan v. EGL, Inc*., 616 F.3d 895,

23  900 (9th Cir. 2010)).  Because it is undisputed that Plaintiffs have performed services for Exel,

---

[12] The ELA provides that drivers must furnish their own insurance but may purchase company sponsored insurance coverage and have the charges deducted from their compensation.  Piller Motion Decl., Ex. 20 (ELA) ¶ 6 & Ex. C.  In addition, the ELA provides that certain items may be charged back to the driver.  *Id*. ¶ 10 & Ex. D (listing specific charge-back items, including cost of company sponsored insurance, truck rentals and repairs, fines and citations, drug testing and background checks, vehicle washes, in-home damage to customer's property, telephone, fuel, tires, merchandise claims, physical examinations, towing, delivery supplies and postage).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Plaintiffs assert, it is Exel's burden to rebut that prima facie case of an employee relationship. *Id.*

2   The relevant test, according to Plaintiffs, is "whether the person to whom service is rendered has

3   the right to control the manner and means of accomplishing the result desired." *Id.* at 22 (citing *S.*

4   *G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989)).  The focus of the

5   test, Plaintiffs assert, is how much control the hirer retains the right to exercise rather than how

6   much control the hirer actually exercises. *Id.* at 22-23 (citing *Ayala v. Antelope Valley*

7   *Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014)).  Plaintiffs acknowledge that courts "also consider

8   several 'secondary factors,' but '[e]ven if one or two of the individual factors might suggest an

9   [independent contractor] relationship, summary judgment is nevertheless proper when . . . all the

10  factors weighed and considered as a whole establish . . . an [employment] and not an [independent

11  contractor relationship.]" *Id.* at 23 (quoting *Alexander v. FedEx Ground Package Sys., Inc.,* 765

12  F.3d 981, 988 (9th Cir. 2014)). Plaintiffs further assert that the right to terminate at will, without

13  cause, is strong evidence in support of an employment relationship. *Id.* (citing *Alexander*, 765

14  F.3d at 988).  Plaintiffs argue that in order to defeat summary judgment on the misclassification

15  question, Exel must demonstrate that there is "a genuine dispute as to a fact material to the

16  question of whether it retained a right of control over the Drivers' work." *Id.*  It is not sufficient,

17  they contend, to merely "alleg[e] that a few 'secondary factors' cut in its favor." *Id.*

18          Plaintiffs argue that they are entitled to summary judgment that the drivers are

19  misclassified because the Ninth Circuit has reached the same conclusion in two cases involving

20  "highly analogous classes of delivery drivers," in *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093

21  (9th Cir. 2014) and *Alexander*, 765 F.3d 981 (9th Cir. 2014)).  *Id.*  According to Plaintiffs, these

22  cases stand for the proposition that "summary judgment for plaintiffs is appropriate where a

23  logistics company such as Exel retains the right to control its delivery drivers' rate of pay,

24  appearance, route schedules, truck specifications, and hired help." *Id.* at 24.  Plaintiffs argue the

25  undisputed facts here are essentially the same as those in *Ruiz* and *Alexander* with respect to the

26  following facts:

27          • Exel's drivers are required to sign the ITA and ELA as a condition of working for

28            the company and under these agreements, may be terminated without cause. *Id.* at

29

24.

- Exel's written policies and training materials contain compulsory rules that are "not mere suggestions." *Id*. at 25.

- Exel's drivers are trained on how to follow "various detailed procedures, including how to maintain the appearance of the vehicles, stock proper tools, use their phones, how to load and unload merchandise, how to deliver particular items, and how to interact with customers." *Id*.

- Exel requires its drivers to follow Exel's rules regarding interactions with customers and third parties. *Id*. at 26.

- Exel monitors and supervises drivers to track their compliance with Exel's rules. *Id*.

- Exel imposes specific requirements with respect to the appearance of drivers and their trucks. *Id.*

- Exel determines the routes drivers take and which drivers will be assigned to the particular routes.

All of these facts, Plaintiffs contend, support the conclusion that Exel's policies, which give it significant control over the manner in which drivers perform their work, give rise to an employment relationship as a matter of law, as in *Alexander* and *Ruiz*. *Id*. at 27.

Plaintiffs further assert that although it is not necessary to consider the secondary factors in light of the control Exel exercises over the drivers, these factors also support a finding of an employment relationship. *Id*. at 27. In particular, Plaintiffs argue that: 1) "it is undisputed that the ITA gives Exel an unqualified right to terminate the Drivers at will"; 2) "it is undisputed that the Drivers' work is integral to Exel's regular business"; 3) "it is undisputed that the Drivers' work did not require substantial skill"; 4) "it is undisputed that Exel and the Drivers did not contemplate an end to their relationship"; 5) "Exel subjected the Drivers to various methods of supervision"; 6) "though Exel paid the Drivers per delivery rather than by the hour, Exel unilaterally set the pay rate and determined the amount of stops"; and 7) "it is undisputed that Exel determined the tools and instrumentalities that the Drivers used to perform their job, even

United States District Court
Northern District of California

providing many of them directly to the Drivers." *Id*. at 27-28.

Plaintiffs reject the argument that Exel has made in the past that the "entrepreneurial opportunities" it offers its drivers support the conclusion that they are properly classified as independent contractors. *Id*. at 28-29. According to Plaintiffs, this same argument was rejected by the Ninth Circuit in *Alexander*, where the court found that "[t]here is no indication that California has replaced its longstanding right-to-control test with the new entrepreneurial-opportunities test . . . entrepreneurial opportunities do not undermine a finding of employee status." *Id*. (citing *Alexander*, 765 F.3d at 994). Plaintiffs also reject Exel's assertions during this case that it is not an employer because any control it exercises over the drivers is a result of regulatory requirements and the demands of its customers. *Id*. at 29-33. According to Plaintiffs, a similar argument was rejected by the California Supreme Court in *Borello*, where the employer argued that a contract between the defendant and its workers was not evidence of a right to control because the defendant's retail customers made the defendant adopt the contract. *Id*. at 29 (citing 48 Cal. 3d at 356-57). Plaintiffs also point to the Stipulated Dismissal of Exel's retail customers as defendants in this case, in which Exel stipulated that these customers do not exercise control over its drivers and that the policies to which the drivers are subject or those of Exel. *Id*. (citing Docket No. 140). Moreover, Exel asserts, *Ruiz* makes clear that the *Borello* test does not require that an employer have *intended* to control its workers; what matters is only whether the employer has the *right* to control its workers. *Id*. at 30. Thus, even if requirements imposed by Exel on its drivers were adopted in order to comply with government regulations, they may still support a finding that the workers are employees. *Id*. In any event, Plaintiffs assert, in this case it is undisputed that Exel's requirements exceed regulatory requirements. *Id*. Further, Plaintiffs contend, "neither the Federal Government, nor Exel's retail customers, ordered it to adopt an independent contractor business model - Exel *chose* to do so." *Id*. Many regulatory requirements flow from this choice, such as the requirement under 49 C.F.R. § 376.12(c)(1) that Exel must have "exclusive possession, control and use" of vehicles if it chooses to lease the vehicles its drivers use. *Id*.

**2.   Opposition**

1    Exel argues that summary judgment must be denied on the classification question because,

2    under *Borello*, courts must conduct a careful weighing of the evidence as to the twelve factors

3    identified in that case and Plaintiffs have relied on only one of the factors, the right to control.

4    Defendants' Opposition at 1.  According to Exel, Plaintiffs have relied almost entirely upon the

5    similarities between the facts here and those in *Alexander* and *Ruiz*, but those cases did not find

6    "that every independent contractor who contracts with a motor carrier is an employee as a matter

7    of California law."  *Id.*  Further, the *Ruiz* case was not decided on summary judgment, Exel points

8    out, but rather, was decided after a three-day trial addressing factual issues related to the

9    classification issue.  *Id.* at 1-2.  Here, Exel asserts, the Court should deny summary judgment

10   because *Borello* requires consideration not only of the right to control but also the secondary

11   factors and there are material disputes of fact as to both the right to control and the secondary

12   factors.  *Id.* at 2-5.

13   As a preliminary matter, Exel raises certain evidentiary objections to Plaintiffs' reliance on

14   the deposition testimony of Greg Smigelsky and James Dalpino, arguing that both testified that

15   they lacked personal knowledge of how Exel's California operations were run and the policies in

16   place during the applicable statute of limitations.  *Id.* at 5-7.

17   Exel contends there is conflicting evidence as to its right to control the work of its drivers

18   and that there is also evidence relating to secondary factors under *Borello* that supports the

19   independent contractor classification.  *Id.* at 8.  First, Exel argues that the "right to control" inquiry

20   looks to the individual worker; therefore, Exel contends, "when an individual is not required to

21   perform the work personally, he cannot be misclassified as an employee."  *Id.* (citing *Estrada v.*

22   *FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1 (2007); *Ayala v. Antelope Valley*

23   *Newspaper, Inc.*, 59 Cal. 4th 522, 548 (2014) (Baxter, J., concurring)).  Here, Exel argues, the

24   evidence establishes that Plaintiffs were not contractually required to perform the services

25   personally *and* that many class members did not, in fact, perform delivery services for Exel

26   themselves, instead hiring others and operating multiple trucks to perform deliveries.  *Id.*

27   Exel cites to the ITA and ELA, which require only that Plaintiffs "furnish whatever labor

28   is necessary to provide delivery services to [Exel's] customers."  *Id.* (citing Declaration of James

United States District Court
Northern District of California

H. Hanson in Support of Defendants' Opposition to Motion for Summary Judgment and/or Summary Adjudication of Defendants' Independent Contractor Defense ("Hanson Opposition Decl."), Ex. C (Exhibit 2 to Deposition of Tafiti Shekur (Copies of ITA and ELA signed by Shekur), Ex. D (Exhibit 3 to Deposition of Daniel Villalpando (Copy of ITA signed by Villalpando)).[13]  Similarly, Exel asserts, these contracts "leave to Plaintiffs the responsibility for 'direc[ting] the operation of any equipment in all respects and . . .determin[ing] the means of performance, including but not limited to such matters as choice of any routes, points of service of equipment, rest stops and timing and scheduling of customer deliveries.'" *Id.* [14]

Exel also points to the testimony of three class members who testified that they operated multiple trucks and hired others to operate them. *Id.* at 9-10.  First, Exel points to the deposition testimony of class Victoriano Molina, who testified that: 1) he started his hauling business in 2004 with one truck, one driver and one helper and later acquired a second truck and another driver and helper; 2) when he started his business it was "generally low maintenance enough for [him] to continue working full time in management on the side"; and 3) that he initially drove for Exel about two months and later drove only when needed, for example when one of his hired drivers was sick or he was waiting for a driver to go through Exel's orientation and approval process. *Id.* at 9 (citing Hanson Opposition Decl., Ex. E (Deposition of Victoriano Molina ("Molina Depo.")) at 23-24, 28-29, 49-50).

Exel also cites the testimony of class member Byron Cifuentes, who testified that his corporation, Cifuentes Trucking, has nine trucks, five of which make deliveries for a motor carrier company called CEVA and four of which deliver for Exel. *Id.* (citing Hanson Opposition Decl.,

---

[13] Exel cites both the ITA ¶ 7 and the ELA ¶ 7 for the quoted language.  In fact, this language appears only in ¶ 7 of the ITA.  Paragraph 7 of the ELA addresses insurance requirements. Presumably, Exel intended to reference ¶ 8 of the ELA, which contains similar (but not identical) language stating, "CONTRACTOR shall, at its own expense . . . furnish whatever labor is necessary to operate the LEASED EQUIPMENT."

[14] Again, Exel suggests that this language is found in both the ITA and the ITA at ¶ 9.  In fact, it is only found in the ITA.  However, very similar language is found in the ELA at ¶ 11, which states that "CONTRACTOR will direct the operation of the LEASED EQUIPMENT in all respects and will determine the means of performance including, but not limited to, such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling in accordance with customer delivery commitments."

United States District Court
Northern District of California

1   Ex. F (Deposition of Byron Cifuentes ("Cifuentes Depo.")) at 14.  Cifuentes testified that his

2   company provides delivery services for Exel in San Diego delivering Sears products, employing

3   five drivers and seven helpers at that location.  Hanson Opposition Decl., Ex. F (Cifuentes Depo.)

4   at 11-12.  Cifuentes testified that he personally operates a truck two or three days a week,

5   depending how busy things are.  *Id.* at 14.  On days that Cifuentes does not want to drive the truck

6   or needs to run personal errands, he assigns one of his employees to operate the truck.  Hanson

7   Opposition Decl., Ex. F (Cifuentes Depo.) at 15.

8           Finally, Exel relies on the testimony of class member Edmundo Vega.  Defendants'

9   Opposition at 9-10.  Vega testified that his business, E & J Trucking, owns four trucks that

10  provide delivery services for Exel and sometimes leases a fifth when business is good.  *Id.* (citing

11  Hanson Opposition Decl., Ex. G (Deposition of Edmundo Vega ("Vega Depo.")) at 14-15).  He

12  testified that he employs four drivers and four helpers and that when he hires drivers or helpers he

13  does so on the basis of referrals or because he knows the person.  *Id.* (citing Hanson Opposition

14  Decl., Ex. G (Vega Depo.) at 19, 56).  He testified that he manages the business and personally

15  drives a truck between three and six days a week, depending on the time of year and how busy

16  things are.  *Id.* at 9-10 (citing Hanson Opposition Decl., Ex. G (Vega Depo.) at 20, 62-65).[15]

17          Exel also challenges Plaintiffs' assertion that they "could not negotiate or request

18  additional compensation rates for their services."  *Id.* at 10.  Exel cites the testimony of class

19  member Juan Mena that on one occasion, "all the contractors got together" and asked for better

20  pay; according to Mena, Exel "raised up the delivery fee a little bit" in response.  *Id.* (citing

21  Hanson Opposition Decl., Ex. I (Deposition of Juan Mena ("Mena Depo.")) at 62-63).  Exel also

22  contends "Plaintiffs agreed that they would get higher rates for 'special deliveries.'"  *Id.* at 10-12

23  (citing Hanson Opposition Decl., Ex. G (Vega Depo.) at 14-15, 68-69 (testifying that when Exel

24  asks a driver to make a delivery that is out of the area, Exel and the driver negotiate a price), Ex. J

25  (Deposition of Asuncion Aguilera ("Aguilera Depo.")) at 87 (testifying that he was once paid a

26

27  ───────────
    [15] Exel also notes that one class member, Theodore Roumbanis, testified that he could hire another
28  driver to operate his truck so long as that person was approved by Exel.  *Id.* at 10 (citing Hanson
    Opposition Decl., Ex. H (Roumbanis Depo.) at 49).

United States District Court
Northern District of California

1   higher rate of $150 for a special delivery, though he did not negotiate with Exel to get that

2   amount)).  As another example of negotiation of compensation by class members, Exel cites

3   testimony of Lazaro Padilla.  *Id.* at 12.  Padilla testified that he never negotiated about pay with

4   Exel but that when Exel failed to pay for the diesel fuel, which Exel was supposed to pay, he

5   would go to the manager's office and try to get paid the full amount; he testified, "sometimes I get

6   paid, sometimes they don't pay for . . . the diesel."  Hanson Opposition Decl., Ex. K (Deposition

7   of Lazaro Padilla ("Padilla Depo.")) at 58-60.

8       Exel also points to the testimony of Barajas Montes that he sometimes asked for and

9   received "a little bit more" pay if he had to wait for a customer or return later to do a delivery.

10  Defendants' Opposition at 12 (citing Hanson Opposition Decl., Ex. L (Deposition of Barajas

11  Montes ("Montes Depo.")) at 52-53).  Exel also presents a declaration by class member Charlie

12  Martinez, who states that during the "busy season" MXD "agrees to pay for [his] rental truck  . . .

13  on top of whatever per-stop amount [he] receive[s]."  *Id.* (citing Hanson Opposition Decl., Ex. M

14  (Declaration of Charlie Martinez ("Martinez Decl.")) ¶ 5).  According to Exel, another class

15  member, Mauricio Torres, also testified that when he was asked to make certain deliveries he

16  would request additional compensation and Exel would counter with another number, which he

17  would accept.  *Id.* (citing Hanson Opposition Decl., Ex. N (Deposition of Mauricio Torres

18  ("Torres Depo.")) at 33-34).[16]

19      Next, Exel argues that the testimony of Cifuentes, Molina and Torres directly contradicts

20  Plaintiffs' assertion that they were "restricted to working for Exel and dependent on Exel for their

21  work."  *Id.* at 12-13 (citing Hanson Opposition Decl., Ex. E (Molina Depo.) at 35 (testifying that

22  he has accounts with "numerous brokers"), Ex. F (Cifuentes Depo.) at 38 (testifying that in

23  addition to providing services for Exel he also contracted with another company to provide

24  delivery services), Ex. N (Torres Depo.) at 6, 28 (testifying that his trucking company provided

25  delivery services for both Exel and Affinity)).

26

27  ────────────────────

28  [16] Torres testified that "[t]his was like a game. . . . [I]t was practically not a negotiation.  They
    would just give me what they were going to give me."  Hanson Opposition Decl., Ex. N (Torres
    Depo.) at 33.

United States District Court
Northern District of California

Exel also rejects Plaintiffs' assertion that they did not have control over their delivery routes. *Id*. at 13-14. It points to Cifuentes's testimony that when a customer is not ready for a delivery and there is another customer nearby, the driver can call the next customer and ask if they can make that delivery first, without asking permission from Exel. *Id*. (citing Hanson Opposition Decl., Ex. F (Cifuentes Depo.) at 89, 91). In fact, Exel asserts, the testimony of many class members shows that "it was common practice to alter the delivery route." *Id*. (citing Hanson Opposition Decl., Ex. N (Torres Depo.) at 46-47 (testifying that where he had to make two deliveries in same area but manifest had him making a delivery somewhere else between the first and second delivery, he called the customer to see if he could rearrange the order of the deliveries), Ex. O (Deposition of Miguel Jauregui ("Jauregui Depo.")) at 56-60 (testifying that sometimes he adjusted the order of the stops if he thought the route was not good and the customers agreed and usually did not call in to Exel for permission to make the change), Ex. P (Marinov Depo.) at 36-37 (testifying that when he received his manifest in the morning he would call customers and try to come up with more efficient route and that was how he completed route earlier)). One class member cited by Exel also testified that he was required to make deliveries to stores as well as individuals and that there were no delivery windows for the deliveries to stores. *Id*. at 13-14 (citing Hanson Opposition Decl., Ex. Q (Deposition of Wayne Vivolo ("Vivolo Depo.")) at 81).

Exel argues further that to the extent its requirements were based on federal law - such as the Federal Motor Safety Carrier Regulations requiring that a motor carrier retain "exclusive possession, control and use of the equipment for the duration of the lease" - these requirements are not indicative of an employer-employee relationship as a matter of law. *Id*. at 14 (citing *Amerigas Propane, L.P. v. Landstar Ranger, Inc.*, 184 Cal. App. 4th 981, 997 (2010); *Sw. Research Inst. v. Unemployment Ins. Appeals Bd.*, 81 Cal. App. 4th 705, 708-09 (2000); *Sahinovic v. Consol. Delivery & Logistics, Inc.*, No. C-02-04977 SBA, 2004 WL 5833528, at*7 (N.D. Cal. Sept. 13, 2004); *Desimone v. Allstate Ins. Co.*, No. 96-03606 CW, 2000 WL 1811385, at *13 (N.D. Cal. Nov. 7, 2000)). Similarly, Exel argues, "[n]o case has held that compliance with customer expectations constitutes a putative employer's control *as a matter of law*." *Id*. (emphasis in

1    original).

2        Exel also argues that the evidence shows that Plaintiffs controlled their own work

3    schedules and hours, with some class members working only a few days a week and others

4    working five to six days a week.  *Id.* at 15 (citing Hanson Opposition Decl., Ex. F (Cifuentes

5    Depo.) at 14-15 (testifying that the number of days per week he works varies), Ex. G (Vega

6    Depo.) at 61 (testifying that he takes a vacation about three times a year of no more than five

7    days), Ex. M (Martinez Decl.) ¶ 5 (stating that he can drive part-time because he has other

8    drivers), Ex. P (Marinov Depo.) at 72-73 (testifying that he doesn't usually take days off but once

9    he took a few months off to go to Russia without a problem), Ex. R (Albarano Depo.) at 64

10   (testifying that "[t]he independent contractors have the ability to determine what schedule they

11   would like to work, what their availability is")).

12       Exel also contends class members "operated their own businesses" and that it was their

13   own decision, not Exel's as to whether to form a business.  *Id.* at 15. As examples, they cite to the

14   testimony of several class members who established trucking business of their own that provide

15   delivery services to Exel.  *Id.* at 15-16 (citing Hanson Opposition Decl., Ex. E (Molina Depo.) at

16   19-23, 50), Ex. F (Cifuentes Depo.) at 7-8, 14-16, 87-88, Ex. H (Rambounis Depo.) at 41, Ex. I

17   (Mena Depo.) at 23-26, 65, Ex. J (Aguilera Depo.) at 95-97, Ex. M (Martinez Decl.) ¶ 3).

18       Exel rejects Plaintiffs' assertion that it requires helpers and that it controls the selection of

19   drivers.  *Id.* at 16-17.  It points to the testimony of Cifuentes that when he hired drivers, "they

20   asked [him] for a job and [he] gave them a job."  *Id.* (citing Hanson Opposition Decl., Ex. F

21   (Cifuentes Depo.) at 75).  Exel also cites the testimony of Jason Moll that while Exel drivers

22   typically have helpers because many services (such as furniture delivery) require two people, there

23   are some routes where a driver does not need a helper.  *Id.* (citing Hanson Opposition Decl., Ex. S

24   (Moll Depo.) at 147).  According to Exel, "[t]he United States Department of Transportation sets

25   the qualification requirements for individuals who want to operate commercial motor vehicles."

26   *Id.* at 16 (citing 49 C.F.R. § 391.11)  Exel further asserts, "Plaintiffs could use any driver they

27   wanted so long as the driver satisfied those federal qualifications."  *Id.* at 17 (citing Hanson

28   Opposition Decl., Ex. G (Vega Depo.) at 60-61, Ex. H (Rambounis Depo.), Ex. O (Jauregui

United States District Court
Northern District of California

37

1    Depo.) at 56, Ex. Q (Vivolo Decl.) ¶ 9).

2         In support of the independent contractor classification, Exel also points to evidence that

3    Plaintiffs provided their own tools. *Id.* at 17.  In particular, Exel presents evidence that class

4    members purchased their own trucks rather than obtaining them from Exel. *Id.* (citing Hanson

5    Opposition Decl., Ex. E (Molina Depo.) at 40-41, 44-45, Ex. F (Cifuentes Depo.) at 14, 16, Ex. G

6    (Vega Depo.) at 16-18, Ex. I (Mena Depo.) at 32-33, Ex. J (Aguilera Depo.) at 33, Ex. N (Torres

7    Depo.) at 7, Ex. U (Deposition of Rogelio De La Fuente) at 17).  Exel also points to testimony that

8    it did not tell its drivers where they should go to have maintenance on their trucks performed. *Id.*

9    at 17-18 (citing Hanson Opposition Decl., Ex. F (Cifuentes Depo.) at 95, Ex. G (Vega Depo.) at

10   41-42, Ex. K (Padilla Depo.) at 72, Ex. N (Torres Depo.) at 27).  Nor did it dictate to its drivers

11   whether they would provide their own insurance or participate in group insurance available to Exel

12   contractors, Exel contends. *Id.* at 18 (citing Hanson Opposition Decl., Ex. G (Vega Depo.) at 36).

13        Another *Borello* factor that supports Exel's classification of its drivers as independent

14   contractors, Exel asserts, is the fact that Exel pays by the job rather than on an hourly basis. *Id.* at

15   18.  Exel rejects Plaintiffs' assertion that Exel sets the rate, arguing that this is not the test and in

16   any event, the evidence shows that Exel sometimes pays its drivers a higher rate when requested,

17   as discussed above. *Id.*

18        Exel also contends it does not supervise Plaintiffs' work, citing Albarano's deposition

19   testimony that Exel does not "oversee the work that the contractors do throughout the day making

20   deliveries." *Id.* (citing Hanson Opposition Decl., Ex. R (Albarano Depo.) at 252).  Exel cites

21   testimony of a number of Plaintiffs that while making deliveries, they only communicated with

22   Exel when problems arose. *Id.* (citing Hanson Opposition Decl., Ex. F (Cifuentes Depo.) at 70,

23   Ex. G (Vega Depo.) at 95-96, Ex. V (Raymundo Depo.) at 55-57).  Exel also rejects Plaintiffs'

24   reliance on evidence relating to ride-alongs and follow-alongs to establish an employment

25   relationship. *Id.* at 19.  Exel cites Cifuentes's testimony that he did not recall that he or his drivers

26   had ever experienced a ride-along and that he remembered only one follow-along, where an Exel

27   employee and a Sears employee followed him for one or two stops and asked him if everything

28   was going okay. *Id.* (citing Hanson Opposition Decl., Ex. F (Cifuentes Depo.) at 103-04).

United States District Court
Northern District of California

38

1   According to Exel, this sort of limited oversight does not convert an independent contractor

2   relationship into an employer-employee relationship.  *Id.* (citing *Beaumont-Jacques v. Farmer*

3   *Grp., Inc.*, 217 Cal. App. 4th 1138, 1143 (2013) (citing *McDonald v. Shell Oil*

4   *Co.*, 44 Cal. 2d 785 (1955)); *Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1377-78 (M.D. Ga.

5   2005) (citing *Desimone v. Allstate Ins. Co.*, No. C-96-03606 CW, 2000 WL 1811385, at *13 (N.D.

6   Cal. 2000)); *N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C. Cir. 1989)).

7        Finally, Exel contends, the independent contractor classification is supported by evidence

8   that Plaintiffs have the opportunity for profit and loss - a fact they contend is relevant under

9   *Borello* even though California courts have not adopted the "economic realities" test that applies

10  under the FLSA.  *Id.* at 19-20.  According to Exel, "the import of this factor on the inquiry is

11  evident – an independent contractor can make decisions that will impact the amount of revenue

12  and profit he generates, whereas an employee cannot."  *Id.* at 20.  The testimony of Plaintiffs

13  "demonstrates that Plaintiffs had precisely those freedoms and opportunities," Exel contends,

14  pointing to the testimony of class members Cifuentes, Molina, Vega and Martinez discussed

15  above.  *Id.*

16       In sum, Exel asserts there is conflicting evidence as to the right of control as well as the

17  secondary factors under *Borello* and therefore the Court should deny Plaintiffs' request for

18  summary judgment that they are misclassified as independent contractors.  *Id.* at 20-21.

19       **3.   Reply**

20       In their Reply brief, Plaintiffs contend Exel has attempted to demonstrate a fact question as

21  to their classification based on how Exel *actually* exercises control over its drivers when the

22  applicable standard requires the Court to look to the amount of control Exel retains the *right* to

23  exercise.  Plaintiffs' Reply at 1 (citing *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522,

24  533 (2014)).  According to Plaintiffs, Exel's "written policies, contracts and procedures . . . are

25  indisputably uniform across the Class, regardless of what differences or disputes there may be in

26  how Exel actually exercises its control" and therefore, the Court can decide the classification issue

27  on summary judgment.  *Id.*  In particular, Plaintiffs contend Exel has not demonstrated a material

28  dispute of fact that "Exel retains the right to: control the appearance of the Drivers; control the

United States District Court
Northern District of California

39

United States District Court
Northern District of California

1    appearance and  specifications of their delivery vehicles; determine the customers, packages, and

2    time windows for the deliveries on the Drivers' routes; set the 'per stop' rate of pay; hold regular

3    morning meetings for the Drivers to attend with Exel management; conduct 'follow-alongs' to

4    monitor and evaluate Driver performance; terminate Drivers without cause; and distribute policy

5    and procedure manuals containing mandatory language, among other things." *Id.* These same

6    facts were sufficient to support a finding that drivers were misclassified in *Ruiz* and *Alexander*,

7    Plaintiffs contend.  *Id.* Further, they support a finding under *Borello* that Plaintiffs are employees,

8    Plaintiffs assert.  *Id.* at 3-6.

9         According to Plaintiffs, the Ninth Circuit's interpretation of state law in *Alexander* is

10   binding on this court and applies here, despite Exel's argument to the contrary.  *Id.* at 6 (citing

11   *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co*., 219 F.3d 895, 903 (9th Cir.

12   2000)).  Plaintiffs further assert that the California Supreme Court's decision in *Ayala* shows that

13   the *Alexander* decision correctly interprets *Borello*.  *Id.*  Plaintiffs reject Exel's assertion that they

14   have ignored the secondary factors under *Borello* and argue that those factors do not change the

15   result.  *Id.* at 6-8.  Plaintiffs also argue that Exel has not demonstrated that there is a material

16   dispute of fact as to the right of control because, rather than addressing the policies and procedures

17   that give Exel the *right* to control the manner in which the class members perform their work, Exel

18   focuses on the testimony of what Plaintiffs call "happy campers" (Cifuentes, Torres, Mena and

19   Vega), who offer testimony that at best establishes fact questions as to how Exel *exercises* its

20   control.  *Id.* at 8-11.  Plaintiffs also contend that the "happy campers" are "outliers" and that even

21   they "balked at the suggestion that Exel permitted them an opportunity to negotiate pay rates."  *Id.*

22   at 10.

23        Plaintiffs reject Exel's objection to their reliance on the Smigelsky testimony.  *Id.* at 11.

24   According to Plaintiffs, Exel's objection is based on a mistaken belief that Smigelsky must have

25   personal knowledge of Exel's "operations on the ground" to testify as to the right of control

26   conferred by Exel's nationwide policies.  *Id.*  Plaintiffs contend that as a high-ranking manager,

27   Smigelsky is familiar with Exel's uniform policies applicable to its drivers, including in

28   California, and therefore, that he is qualified to testify as to those policies, regardless of whether

                                        40

1    he is physically based in California. *Id*.[17]

2           Plaintiffs argue that Exel has also attempted to manufacture disputes by mischaracterizing

3    the testimony of its witnesses. *Id*. at 11.  For example, it asserts, Exel's Safety Director admitted

4    that Exel's policy is that every driver must have at least one helper and Exel's training materials

5    emphasize the importance of using a helper for safety reasons, but Exel now points to the

6    testimony of Jason Moll to suggest that Exel does *not* require its drivers to have helpers.  *Id*. at 12

7    (citing Reply Declaration of Nathan Piller in Support of Plaintiffs' Motion for Summary Judgment

8    and/or Summary Adjudication of Defendants' Independent Contractor Defense ("Piller Reply

9    Decl."), Ex. 14 (The Safer Way of Driving) at EDV000409 (backing accidents are "entirely

10   preventable" and are commonly caused by not using a spotter), Ex. 15 (Capotoso Depo.) at 46 (it

11   is an "operating practice" that "[t]here are always two people on the truck.  There is the driver and

12   the helper.")).  Plaintiffs note that although Moll testified that helpers are not always used, he

13   testified that a helper *is* needed for furniture and appliance deliveries. *Id*. (citing Piller Reply

14   Decl., Ex. 8 (Moll Depo.) at 147).  Further, Plaintiffs assert, Moll was not able to identify any

15   specific route or service that would not require a helper. *Id*.  In addition, although Exel cited to

16   testimony by one class member, Wayne Vivolo, that he does not use a helper, Vivolo is

17   "inherently an outlier because he did not perform home deliveries." *Id*. at 12 (citing Hanson

18   Opposition Decl., Ex. T (Vivolo Decl.) ¶¶ 4-5).

19          Similarly, Plaintiffs contend, Exel attempts to manufacture a dispute about whether it

20   supervises its drivers by citing testimony by Albarano that Exel does not "oversee the work that

21   the contractors do throughout the day making deliveries." *Id*.  Yet Albarano admitted in her

22   deposition that Exel *does* supervise drivers during the day with the use of ride-alongs, as well as

23   other monitoring or supervision practices. *Id*. at 12-13 (citing Piller Reply Decl., Ex. 2 (Albarano

24   Depo.) at 48-49, 52, 134-35, 178, 252).

25          Plaintiffs argue that the "happy camper" declarations should be discounted because

26   testimony elicited by current employees is inherently suspect. *Id*. at 13 (citing *Mevorah v. Wells*

27   _____

28   [17] Plaintiffs do not respond to Exel's objection to the testimony of James Dalpino, a former Exel
     recruiter who testified in his deposition that he had not worked for Exel since March 30, 2009.

United States District Court
Northern District of California

1   *Fargo Home Mortg., Inc.*, No. C-05-01175 MHP, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005)).

2   Even if this testimony is taken at face value, however, it does not support a finding under *Borello*

3   that Plaintiffs are independent contractors, Plaintiffs assert.  *Id*. These drivers testified that they

4   work part-time and take vacations, but neither is inconsistent with a finding that they are

5   employees, Plaintiffs assert.  *Id*. (citing *Estrada v. FedEx Ground Package Sys., Inc*., 154 Cal.

6   App. 4th 1, 14 (2007); *Dole v. Snell*, 875 F.2d 802, 806 (10th Cir. 1989)).  Plaintiffs assert that

7   evidence that three class members out of 400 worked for other companies while employed by Exel

8   also does not undermine Plaintiffs' position because "working two jobs is fully consistent with

9   employee status."  *Id*.  Similarly, evidence that class members negotiated pay rates also does not

10  support a finding that they are independent contractors because "negotiation over pay rates is

11  commonplace in employment relationships."  *Id*. at 14 (citing *Saraff v. Standard Ins. Co.*, 102

12  F.3d 991, 993 (9th Cir. 1996)).  Nor is the evidence that Plaintiffs can select their own second

13  drivers or helper relevant, Plaintiffs assert, given that it is undisputed that Exel has the right to

14  reject those drivers and helpers, just as in *Alexander* and *Ruiz*.  *Id*.

15          Finally, Plaintiffs reject Exel's assertion that its right of control is not indicative of an

16  employer-employee relationship because it is simply a reflection of requirements that arise from

17  customer needs and federal law.  *Id*. at 15.  According to Plaintiffs, the law on this point is not

18  unsettled, as Exel suggests, but rather, is well-established, holding that the employer's *intent* as to

19  its exercise of control is not relevant to the classification question.  *Id*. (citing *Borello*, 48 Cal. 3d

20  at 356-57; *Ruiz*, 754 F.3d at 1102 n. 5).  In any event, Plaintiffs assert, Exel's argument fails

21  because the evidence shows (and Exel has admitted) that its policies go beyond what is required

22  under federal law.  *Id*.

23  **III.    LEGAL STANDARD UNDER RULE 56**

24          Summary judgment on a claim or defense is appropriate "if the movant shows that there is

25  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

26  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

27  the absence of a genuine issue of material fact with respect to an essential element of the non-

28  moving party's claim, or to a defense on which the non-moving party will bear the burden of

United States District Court
Northern District of California

42

1    persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

2    made this showing, the burden then shifts to the party opposing summary judgment to designate

3    "specific facts showing there is a genuine issue for trial."  *Id*.  On summary judgment, the court

4    draws all reasonable factual inferences in favor of the non-movant.  *Scott v. Harris*, 550 U.S. 372,

5    378 (2007).

6            "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot

7    present facts essential to justify its opposition, the court may  . . . defer considering the motion"

8    and may also "allow time to obtain affidavits or declarations or to take discovery."  Fed. R. Civ. P

9    56(d); *see also Tatum v. City & County of San Francisco*, 41 F.3d 1090, 1100 (9th Cir. 2006) ("A

10   party requesting a continuance pursuant to [Rule 56(d)] must identify by affidavit the specific facts

11   that further discovery would reveal, and explain why those facts would preclude summary

12   judgment").  The court may deny a request pursuant to Rule 56(d) where a party has failed

13   diligently to pursue discovery prior to summary judgment.  *Mackey v. Pioneer Nat'l Bank*, 867

14   F.2d 520, 524 (9th Cir. 1989) ("A movant cannot complain if it fails diligently to pursue discovery

15   before summary judgment").

16   **IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

17          **A.    Whether Plaintiffs' Misclassification Claims are Preempted by the FAAAA**

18          In the Court's March 28, 2014 Order, it rejected Exel's argument that Plaintiffs' meal and

19   rest break claims were preempted by the FAAAA but left open the possibility that at a later stage

20   of the case, when a factual record had been developed, Defendants might be able to establish that

21   California's meal and rest break requirements would have an effect on Exel's prices, routes or

22   services that is significant enough to give rise to preemption.  March 28, 2015 Order at 21-22.

23   Now, Exel raises the issue of FAAAA preemption once again.  It does not do so, however, based

24   on the evidence that has been obtained through discovery.  Rather, it seeks another bite at the

25   apple, raising a theory of FAAAA preemption that it could (and should) have raised in its motion

26   to dismiss.  Instead of arguing that the FAAAA preempts Plaintiffs' meal and rest break claims

27   because meal and rest break laws reduce the amount of service a carrier can provide – a theory that

28   was rejected by the undersigned and also by the Ninth Circuit in *Dilts v. Penske Logistics, LLC*,

United States District Court
Northern District of California

43

1  769 F.3d 637 (9th Cir. 2014)  –  Exel now argues that the FAAAA preempts *all* of Plaintiffs'

2  claims because Plaintiffs' claims would require it to change its business model and reclassify its

3  drivers as employees.  Even assuming that Exel has not waived this argument by failing to raise it

4  in its motion to dismiss, the Court finds its new theory of preemption unpersuasive.[18]

5      The FAAAA preemption clause preempts state laws and regulations "related to a price,

6  route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C.

7  § 14501(c)(1).  As the Court stated in its previous order, "[t]he FAAAA preemption clause was

8  intended to have a broad scope" but "it does not preempt state requirements that have only a

9  'tenuous, remote, or peripheral' relationship to prices, routes or services."  March 28, 2014 Order

10  at 19 (citing *Morales v. TWA*, 505 U.S. 374, 383-84 (1992)).  Further, the Supreme Court has

11  made clear that "it is not sufficient that a state law relates to the 'price, route, service' of a

12  motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of

13  property.'"  *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778-79 (2013) (quoting 163

14  N.H. 483, 490 (2012)).

15      The Supreme Court has held that "what is important . . . is the effect of a state law,

16  regulation or provision, not its form."  *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1430 (2014)

17  (holding that the Airline Deregulation Act, which contains a preemption clause that is identical to

18  the one in the FAAAA, can be undermined "just as surely by a state common-law rule as it can by

19  a state statute or regulation").  Nonetheless, the Ninth Circuit has found that in enacting the

20  FAAAA, "Congress did not intend to preempt generally applicable state transportation, safety,

21  welfare or business rules that do not otherwise regulate prices, routes, or services."  *Dilts v. Penske*

22  *Logistics, LLC*, 769 F.3d 637, 644 (9th Cir. 2014) (citing *Californians for Safe & Competitive*

23  *Dump Truck Transp. v. Mendonca* 152 F.3d 1184, 1187-89 (9th Cir. 1998)).  Thus, in *Mendonca*,

24  the Ninth Circuit found that the FAAAA does not preempt a state's prevailing wage law, while the

25  *Dilts* court held that the FAAAA does not preempt California's meal and rest break laws.  *Id*. at

[18] In its March 28, 2014 Order, the Court summarized the history of the FAAAA and provided an overview of the authority relating to FAAAA preemption.  *See* March 28, 2014 Order at 10-15. Therefore, the Court does not repeat that discussion here.

44

644, 650.  As the court in *Dilts* explained, "generally applicable background regulations that are several steps removed from prices, routes or services, such as prevailing wage laws or safety regulations, are not preempted even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide." *Id*. at 646.

Exel, however, contends the claims asserted by Plaintiffs will have the effect of requiring that Exel reclassify its drivers as employees - an issue that was not addressed in *Dilts* or *Mendonca* because neither involved drivers who were classified as independent contractors.  Therefore, it asserts, the enforcement of California's classification  rules will alter the manner in which it provides transportation services to its customers and impose the state's own public policies or theories of competition on the operation of a motor carrier - a result that is impermissible under the FAAAA preemption clause.  Exel points to *American Trucking Ass'ns, Inc. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ("*ATA I*") in support of its position.  That case involved a program that required companies seeking to provide drayage driving services at the Port of Los Angeles to enter into a concession agreement under which the companies agreed to transition from an independent contractor model to an employee business model.  559 F.3d at 1049-50.  The court granted a preliminary injunction preventing implementation of the program, finding that it was "highly likely" that the independent contractor phase-out provision would be found preempted by the FAAAA and noting that the program was an "extensive attempt to reshape and control the economics of the drayage industry" of the Port of Los Angeles.  *Id*. at 1055-56.  Exel's reliance on *ATA I*  is misplaced, however because Plaintiffs' claims in this case (in contrast to the required concession agreement in *ATA I*) do not *require* Exel to choose one business model over another. Exel may use independent contractors or it may use employees; Plaintiffs simply seek to apply generally applicable wage and hour laws based on the policy that Exel has chosen to apply with respect to its drivers.

Both a federal district court and the California Supreme Court have reached the same conclusion in cases that have addressed similar claims.  *See Robles v. Comtrak Logistics, Inc*., 2014 WL 7335316, at *5 (E.D. Cal. Dec. 19, 2014); *People ex rel. Harris v. Pac. Anchor Transp.,*

*Inc.*, 59 Cal. 4th 772, 784-86 (2014).  In *Robles*, the plaintiff in a purported class action was a delivery driver who asserted wage and hour claims under California law against "a major provider of full dray truckload transportation services," asserting that the defendant had misclassified its drivers as independent contractors to avoid its obligations under the California Labor Code and IWC Wage Orders.  2014 WL 7335316, at *1.  The defendant brought a motion to dismiss, asserting the plaintiff's claims were preempted by the FAAAA because, under *ATA I*, they would have the effect of requiring the defendant to reclassify its drivers as employees.  *Id.* at *4.  The court in *Robles* disagreed, finding that the law in *ATA I* was not analogous to the plaintiff's claims in that case because the former *required* the motor carriers to cease using independent contractors whereas the latter merely sought to "hold [the defendant] accountable for its obligation to properly classify its drivers."  *Id.*  The court held that the plaintiff's claims were not preempted by the FAAAA, finding that this result "appropriately effectuated Congress's purpose in passing the FAAA Act and avoid[ed] the perverse application of the law to circumvent basic labor protections."  *Id.* at *7.

In *Harris*, the State of California brought an action under California's unfair competition law based on allegations that the defendant, a trucking company that employed drivers as independent contractors, had misclassified the drivers and thereby illegally lowered its cost of doing business by failing to meet certain employer requirements, including paying certain taxes, providing worker's compensation and meeting the California minimum wage requirements.  59 Cal. 4th at 776.  The defendant asserted the State's UCL claim was preempted by the FAAAA, arguing, *inter alia*, that the claim would "significantly affect motor carrier prices, routes, and services because its application will prevent their using independent contractors, potentially affecting their prices and services."  *Id.* at 785.  The *Harris* court disagreed, finding that "[n]othing in the [State's] UCL action would prevent defendants from using independent contractors."  *Id.*  Rather, the State was simply asserting that the defendant must classify the drivers appropriately and comply with generally applicable labor and employment laws.  *Id.*

Further, the *Harris* court found, such laws are not preempted by the FAAAA.  *Id.*  In support of this conclusion, the court pointed to the Supreme Court's decision in *Dan's City Used*

46

1    *Cars, Inc. v. Pelkey*, 133 S. Ct. 1769 (2013), in which the Court "observed that the 'target at which

2    [Congress] aimed' the FAAAA was 'a State's direct substitution of its own governmental

3    commands for competitive market forces in determining (to a significant degree) the services that

4    motor carriers will provide.'" *Id.* (quoting *Dan's City*, 133 S.Ct. at 1780 (internal quotation

5    omitted)). The court in *Harris* went on to note that "*Dan's City* emphasized the FAAAA limiting

6    phrase 'with respect to the transportation of property,' which strongly supports a finding that

7    California labor and insurance laws and regulations of general applicability are not preempted as

8    applied under the FAAAA, even if they form the basis of the [State's] UCL action." *Id.* at 786.

9         The undersigned finds the reasoning of *Harris* and *Robles* to be persuasive and Exel's

10    efforts to distinguish those cases unavailing. Exel argues that the Court should not adopt the

11    reasoning of *Harris* for two reasons. First, it contends the defendant in that case "conceded that

12    the FAAAA did not preempt the laws underlying the state's Unfair Competition claim because

13    their 'effect[] on the carrier's prices, routes and services is remote'" whereas Exel makes no such

14    concession. Defendant's Reply at 4 (quoting *Harris*, 59 Cal. 4th at 785). Exel's argument

15    mischaracterizes the *Harris* decision. The court in *Harris* noted that the defendant in that case

16    conceded that *some* of the underlying laws were ones of general application whose effects on

17    prices, routes and services were remote, but that the defendant did *not* concede this point as to

18    IWC No. 9, which governs minimum wage requirements in the transport industry. 59 Cal. 4th at

19    785. Nor did the defendant concede that the effect of the State's UCL claim was too remote to

20    give rise to preemption; rather, it argued that the claim would affect prices and services by forcing

21    it to reclassify its workers (just as Exel argues here).

22         Second, Exel asserts the *Harris* court's conclusion that a misclassification claim is not

23    preempted by the FAAAA has been "dispatch[ed]" by the First Circuit in *Massachusetts Delivery

24    Association v. Coakley*, 769 F.3d 11 (1st Cir. 2014). In that case, the First Circuit addressed

25    whether a provision of the Massachusetts Independent Contractor law that set forth a test for

26    independent contractor status was preempted by the FAAAA. One of the requirements of the law

27    was that an independent contractor had to be performing "outside the usual course of business of

28    the employer" – a requirement that abrogated the traditional common law control test that had been

47

1    followed in Massachusetts and which is also the test in California, as discussed below.  769 F.3d

2    at 14-15; *see also Amero v. Townsend Oil Co*., 25 Mass. L. Rptr. 115 at *2 (Super. Ct. Mass.

3    2014) (explaining that prior to 2004, Massachusetts, like many other states, applied a multi-factor

4    control test to determine whether a person was an employee or an independent contractor but that

5    "[i]n 2004, G.L.C. 149 was amended to make it more difficult for employers to classify workers as

6    independent contractors").  "The legislative purpose of [the law] [was] to protect employees from

7    being deprived of the benefits enjoyed by employees through their misclassification as

8    independent contractors."  769 F.3d at 15 (internal quotations and citations omitted).  The district

9    court concluded that the effect of the law on "prices, routes, and services" was too remote and

10   tenuous to give rise to preemption and that in any event, the law did not relate to the

11   "transportation of property" as that phrase was construed in *Dan's City*.  *Mass. Delivery Ass'n v.

12   Coakley*, No. 10-11521, 2013 WL 5441726, at * 9 (D. Mass. Sept. 26, 2013)).

13           The First Circuit disagreed with the trial court's analysis, finding that it had misread *Dan's

14   City* as requiring that a law must "regulate" rather than "concern" a motor carrier's transportation

15   of property.  769 F.3d at 22.  To the extent the Massachusetts law would force the plaintiffs to

16   treat their drivers as employees, the court found, it could have an impact on the services the

17   delivery companies provided, the prices charged and the routes taken, and therefore it "concerned"

18   the transportation of property, the First Circuit found.  *Id*. at  23. The court of appeals remanded

19   the case to the trial court to address whether there was sufficient evidence to establish that the

20   impact of the law on prices, routes and services was significant enough to give rise to preemption.

21   *Id*. at 22-23 (declining to express a view on the sufficiency of the evidence on this issue and

22   instructing district court to "address on remand whether this effect on delivery companies' prices,

23   routes, and services rises to the requisite level for FAAAA preemption").  It further instructed that

24   empirical evidence is not required to establish preemption; instead, courts should consider the

25   "statute's 'potential' impact on carriers' prices routes, and services."  *Id*. at 21 (citing *N.H Motor

26   Transp. Ass'n v. Rowe*, 448 F.3d 66, 82 n. 14 (1st Cir. 2006)).

27           On remand, the district court found that the challenged Massachusetts law would have a

28   significant impact on prices, routes, and services.  *See Mass. Delivery Ass'n v. Healey*, No. 10-cv-

United States District Court
Northern District of California

1    11521, 2015 WL 4111413 (D. Mass. July 8, 2015).[19]  In reaching this conclusion, the court relied

2    heavily on the fact that the delivery companies in that case provided "on-demand" delivery

3    services, providing "prompt, unscheduled deliveries" in response to customer needs.  2015 WL

4    4111413, at * 5.  They accomplished this through the use of independent contractors who could

5    accept or reject a request for an on-demand delivery.  *Id*.  Under the new law, however, the

6    delivery companies would have to "retain employees who are on-call and must be compensated

7    for that time, which is different from [their] current business model."  *Id*.  Because of the increased

8    cost, the court found, the companies would be forced to abandon their on-demand service if they

9    did not raise their prices.  *Id*.  The court concluded, "Massachusetts seeks to enforce a policy of

10   hiring employees when market forces have prompted delivery companies to adopt an independent

11   contractor model" and therefore, "[t]he law would have the effect of limiting a courier company to

12   the provision of scheduled service at the expense of on-demand deliveries."  *Id*. at *6.

13   Consequently, the court found that the law was preempted by the FAAAA.  *Id*.

14          The Court concludes that the *MDA* cases do not support Exel's preemption argument under

15   the circumstances here.  The statutory provision at issue in those cases, in contrast to the general

16   wage and hour laws challenged here, changed the test for independent contractors vs. employees

17   in order to effectuate a policy of making it more difficult to qualify for independent contractor

18   status.  To the extent the law was applied to motor carriers, it could be seen as an attempt by the

19   State to impose its own public policies or theories of competition on a motor carrier.  *See Am.*

20   *Airlines v. Wolens*, 513 U.S. 219, 229 n. 5.  In contrast, Plaintiffs here simply rely on California's

21   well-established test for independent contractors to assert claims under general wage and hour

22   laws that the Ninth Circuit has already found are not preempted by the FAAAA in *Dilts* and

23   *Mendonca*.

24          The Court further finds that the facts here are distinguishable from those the *MDA* cases.

25   In the *MDA* cases, the delivery companies demonstrated a potential impact on prices, routes and

26

27   ───────────────
     [19] The Court refers collectively to *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11 (1st Cir. 2014)

28   and *Mass. Delivery Ass'n v. Healey*, No. 10-cv-11521, 2015 WL 4111413 (D. Mass. July 8, 2015)
     as "the *MDA* cases."

                                                       49

United States District Court
Northern District of California

services based on the fact that the on-demand deliveries they provided were unscheduled and therefore required a "flexible workforce that does not need to be compensated while waiting for a job." 2015 WL 4111413, at *5.  No comparable showing has been made here.  To the contrary, it appears to be undisputed that Exel, as a general practice, schedules deliveries in advance and provides a list of stops that drivers must complete every day at morning meetings; there is no suggestion (much less evidence) that Exel's business model is based on the availability of drivers who can make on-demand deliveries but who need not be compensated between those deliveries.

Finally, to the extent that the First Circuit's holding in *MDA v. Coakley* is based on a narrower reading of *Dan's City* than was adopted by the courts in *Harris* and *Robles*, the Court concludes that the broader reading adopted in the latter cases is more consistent with the decisions of the Ninth Circuit and therefore declines to follow the approach that was taken by the First Circuit in *MDA v. Coakley*.

The Court also concludes that many of the cases cited by Exel do not support its position. Exel relies heavily on a Seventh Circuit case,  *S.C. Johnson & Sons, Inc. v. Transport Corporation of America*, which it contends stands for two propositions: 1) "that the FAAAA will not preempt a state law that impacts the cost of the services a transportation company elects to provide" because these laws affect only the cost of "inputs," but that 2) the FAAAA does "preempt a plaintiff from using a state law claim as a vehicle to change the terms of the 'agreements the parties had reached.'" Defendants' Motion at 10 (citing *S.C. Johnson*, 697 F.3d at 557).  In that case, the court found that claims for fraudulent misrepresentation and conspiracy to commit fraud asserted against defendant trucking companies were preempted by the FAAAA but that claims for bribery and racketeering were not.  *Id.* at 561.

As to the fraud claims, the court noted that "[s]tate consumer protection laws often contain well-meaning provisions but widely varying paternalistic provisions designed to protect consumers from the rigors of the market" and concluded that "Congress decided . . . in both the ADA and the FAAAA that it did not  want (nor did it want the states) to displace the market in this way."  *Id.* at 557.  On the other hand, the court found that the bribery and racketeering claims were based on the type of background laws that may affect the price of inputs and thereby increase the

50

price of outputs but were "too tenuously related to the regulation of the rates, routes, and services in the trucking industry to fall within the FAAAA preemption rule." *Id*. at 559.  Citing *Mendonca* as an example, the court expressly likened these laws to "comparable state laws" such as minimum wage laws, that "regulate . . . inputs [but] operate one or more steps away from the moment at which the firm offers its customers a service for a particular price." *Id*. at 558.  According to the court, "[n]o one thinks that the ADA or the FAAAA preempts these" laws.  *Id*.  The Court finds nothing in *S.C. Johnson* that is inconsistent with its conclusion that the claims in this action are not preempted.  Rather, the claims in this case are just the sort that the *Johnson* court recognized are, in general, not preempted.

Exel's reliance on *DiFiore v. American Airlines, Inc.,* 646 F.3d 81 (1st Cir. 2011) is also misplaced.  In that case, airport baggage porters asserted that a $2 charge for bags checked at the curb adopted by American Airlines violated a state law governing tips.  The airline, in turn, asserted that the tips law was preempted by the Airline Deregulation Act.  646 F.3d at 84.  The court agreed, but in doing so, it expressly distinguished the tips law claim in that case from claims such as prevailing wage claims, opining that the "Supreme Court would be unlikely . . . to free airlines from most conventional common law claims for tort, for prevailing wage laws, and ordinary taxes applicable to other businesses." *Id*. at 87 (relying, in part, on the Ninth Circuit's holding in *Mendonca*, 152 F.3d at 1189).  The court explained that the "dividing line turns on the statutory language 'related to price, routes, and services." *Id*.  It stated, "[i]mportantly, the tips law does more than simply regulate the employment relationship between the skycaps and the airline;  unlike the cited circuit cases, the tip law has a *direct connection* to air carrier prices and services and can fairly be said to regulate both." *Id*. at 87.  The court found this direct connection because the airline's "conduct in arranging for transportation of bags at curbside into the airline terminal en route to the loading facilities [was] itself a part of the 'service' referred to in the federal statute, and the airline's 'price' includes charges for ancillary services as well as the flight itself." *Id*.  Here, on the other hand, there is no such direct connection between the wage and hour laws invoked by Plaintiffs and Exel's prices, routes, and services.  If anything, the reasoning in *DiFiore*, as in *S.C. Johnson*, supports Plaintiffs' assertion that their claims are *not* preempted.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Another case cited by Exel, *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1442 (2014), also involved a claim that was closely related to services, in contrast to the general wage laws at issue in this case.  There, the plaintiff asserted a breach of implied covenant of good faith and fair dealing in connection with the airline's termination of his frequent flyer account. 134 S. Ct. at 1427.  The Court found that the frequent flyer program was related to both rates and services because "the program awards mileage credits that can be redeemed for tickets and upgrades" and also may give passengers "access to flights  and to higher service categories."  *Id.* at 1431.  It further concluded that under Minnesota law, parties cannot contract out of the implied covenant and therefore, the claim was preempted under the FAAAA.  *Id.* at 1432.  As the Ninth Circuit explained in *Dilts*, the Court's decision in *Ginsberg* illustrates the point that "[l]aws are more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices."  769 F.3d at 646 (citing *Ginsberg*, 134 S. Ct. at 1431).  "On the other hand," the court explained, "generally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws . . . , are not preempted, even if employers must factor those provisions into their decisions about the prices they set, the routes they use, or the services they provide."  *Id.*

In sum, the Court rejects Exel's assertion that all of Plaintiffs' claims are preempted because they would have the effect of requiring it to adopt a business model based on the use of employees.  Exel may adopt whatever business model it wishes.  What it cannot do is treat its drivers as employees while avoiding California's wage and hour rules by requiring its drivers to enter into a contract that simply *calls* the drivers independent contractors.  *See Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101 (9th Cir. 2014) (noting that "the label that parties place on their employment relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship'" (quoting *Estrada v. FedEx Ground Package Sys.*, 154 Cal. App. 4th 1, 10 (2007))).

**B.   Whether Plaintiffs' Overtime Claim (Claim Two) Fails Because it is Subject to the California Exemption**

Exel asserts that Plaintiffs' claim for overtime wages under California Labor Code sections

52

1    510, 515.5, 1194 and 1198 and IWC Wage Order No. 9 fails, as a matter of law, because their

2    hours of service are regulated by DOT and therefore, they are exempt from California's overtime

3    law.  The Court finds that there are fact questions that preclude summary judgment on this claim.

4         Under California Code of Regulations title 8, section 11090(3)(L)(1), employees whose

5    Hours of Service are regulated by the DOT are exempt from California's overtime law.  *See* Cal.

6    Code Regs. tit. 8, § 11090(3)(L)(1) ("The provisions of this section are not applicable to

7    employees whose hours of service are regulated by . . . The United States Department of

8    Transportation Code of Federal Regulations, Title 49, Sections 395.1 to 395.13, Hours of Service

9    of Drivers").  DOT regulates Hours of Service for commercial motor vehicle drivers operating in

10   interstate commerce.  *See* 49 C.F.R. § 390.5, 395.1.  It is undisputed that Plaintiffs are commercial

11   motor vehicle drivers.  The parties disagree, however, as to whether the drivers operate in

12   interstate commerce.

13        The California Exemption is construed narrowly and the burden is on the employer to

14   prove it is entitled to the exemption.  *See Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1468 (9th Cir.

15   1997).[20]  "Whether transportation is interstate or intrastate is determined by the essential character

16   of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of

17   the shipment, and is ascertained from all of the facts and circumstances surrounding the

18   transportation."  *S. Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 617 (9th Cir. 1977).  A driver

19   operates in interstate commerce not only when the driver actually transports goods across state

20   lines but also when there is a "practical continuity of movement from the manufacturers or

21   suppliers without the state, through [a] warehouse and on to customers whose prior orders or

22   contracts are being filled."  *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567, 569 (1943).

23        To determine whether there is "practical continuity of movement," courts look to a 1992

24   Interstate Commerce Commission policy statement, which sets forth seven factors that may be

25   _____

26   [20] In determining whether an employee's Hours of Service fall under the California Exemption,
     court often look  for guidance to a similar exemption under the FLSA, referred to as the Motor
27   Carrier Act ("MCA") Exemption, which applies to "any employee with respect to whom the
     Secretary of Transportation has power to establish qualifications and maximum hours of service."
28   *See Watkins v. Ameripride Services*, 375 F.3d 821, 825 n. 2 (9th Cir. 2004) (quoting 29 U.S.C. §
     213(b)(1)).

United States District Court
Northern District of California

considered.  *Ruiz v. Affinity Logistics Corp.*, No. C-05-2125 R(CAB), 2006 WL 3712942, at *4

(S.D. Cal.  Nov. 9, 2006) (citing 8 I.C.C. 2d 470, 1992 WL 122949 ("1992 I.C.C. Policy

Statement")).  Those factors are as follows:

Factual basis for sales projections:  Even where a shipper "does not know in advance the

ultimate destination of specific shipments," the conclusion that it had a fixed and persistent intent

to have shipments continue in interstate commerce may be supported where the shipper "bases its

determination of its determination of the total volume to be shipped through the warehouse on

projections of customer demand that have some factual basis, rather than a plan to solicit future

sales within the State." 1992 I.C.C. Policy Statement at *2.

Absence of processing or substantial product modification at the warehouse:  Where "[n]o

processing or substantial product modification of substance occurs at the warehouse or distribution

center, this factor supports a finding of fixed and persistent intent, even if products are repackaged

or reconfigured at the warehouse." *Id.*

Shipper's control in the warehouse:  A finding of fixed and persistent intent is supported

when, "[w]hile in the warehouse, the merchandise is subject to the shipper's control and direction

as to the subsequent transportation." *Id.*

System for tracking merchandise:  A finding of fixed and persistent intent is supported

when "[m]odern systems allow tracking and documentation of most, if not all, of the shipments

coming in and going out of the warehouse or distribution center." *Id.*

Shipper responsible for transportation charges:  A finding of fixed and persistent intent is

supported where "[t]he shipper . . .must bear the ultimate payment for transportation charges even

if the warehouse or distribution center directly pays the transportation charges to the carrier." *Id.*

Warehouse owned by the shipper:  A finding of fixed and persistent intent is supported

where "[t]he warehouse utilized is owned by the shipper." *Id.*

Storage in transit provision: A finding of fixed and persistent intent is supported where

"[t]he shipments move through the warehouse pursuant to a storage in transit tariff provision." *Id.*

Further, the Supreme Court has held that DOT is authorized to regulate the Hours of

Service for all drivers employed by a carrier, even if the carrier's involvement in interstate

54

commerce is minor, where the "interstate commerce trips [are] distributed generally throughout the year and their performance [is] shared indiscriminately by the drivers and [is] mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce." *Morris v. McComb*, 332 U.S. 422, 433 (1947). Thus, in *Morris*, the Court found that even though only 4% of a delivery company's time and effort was engaged with interstate commerce over the course of a year, all of the drivers who made deliveries for the company (including some drivers who *never* made interstate deliveries) were subject to the authority of the Interstate Commerce Commission ("I.C.C.") (the predecessor of the Department of Transportation). *Id.* at 433.

Based on *Morris*, the Ninth Circuit has held that in order for the MCA exemption to apply, "a corporation need not have all of its drivers actually undertake trips across state lines, but rather, all of its drivers must have a reasonable expectation that they will engage in interstate commerce." *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1158 (9th Cir. 1994); *see also Bishop v. Petro-Chemical Transp., LLC*, 582 F. Supp. 2d 1290, 1298 (E.D. Cal. 2008) ("A driver is considered to be driving in interstate commerce if the driver is called upon to drive in interstate commerce as part of the driver's regular employment, or, even if the driver has not personally driven in interstate commerce, if, because of company policy and activity, the driver could reasonably be expected to drive in interstate commerce").

Finally, while *Morris* holds that the MCA Exemption applies even where only a small percentage of a carrier's deliveries are interstate, some courts have found that there is a *de minimis* exception where less than 1% of deliveries are interstate deliveries. *See Turk v.Buffets, Inc.*, 940 F. Supp. 1255, 1261-62 (N.D. Ill. 1996) (citing *Kimball v. Goodyear Tire & Rubber Co.*, 504 F. Supp. 544, 549 (E. D. Tex.1980) (holding that truck drivers were not exempted from the overtime provision where only 0.17% of trips were interstate); *Coleman v. Jiffy June Farms, Inc.*, 324 F. Supp. 664, 670 (S. D. Ala. 1970), *aff'd*, 458 F.2d 1139 (5th Cir. 1971), *cert. denied*, 409 U.S. 948 (1972)). Courts that have found a *de minimis* exception cite to *Pyramid Motor Freight Corp. v. Ispass*, in which the Supreme Court remanded with instructions that if the mere handling of freight before loading formed a "trivial, casual or occasional a part of an employee's activities," and did

55

1   not affect the safety of operation, then the activity would not serve to bring the employees under

2   the MCA exception.  330 U.S. 695, 708 (1947).

3          Some courts have concluded that the *de minimis* exception may never be applied to drivers

4   because any amount interstate deliveries by a carrier, no matter how small, implicate safety.  *See,*

5   *e.g., Turk*, 940 F. Supp. at 1261.  The Ninth Circuit in *Reich v. American Driver Services*,

6   however, suggested that the *de minimis* requirement may be applicable to drivers, citing *Coleman*

7   *v. Jiffy June Farms, Inc.*, 324 F. Supp. 664 ((S.D. Ala. 1970) with approval.  In *Coleman*, the court

8   held that the *de minimis* exception applied where interstate deliveries constituted only .23% of all

9   deliveries  by the company.  324 F. Supp. at 666.  At least one district court in this district has also

10  found, based in part on *American Driver Services*, that the *de minimis* exception may, under some

11  circumstances, apply to drivers.  *See Veliz v. Cintas Corp*., No. C-03-1180 RS,  2009 WL

12  1107702, at *8 (N.D. Cal. April 23, 2009) (declining to grant summary judgment on FLSA

13  overtime claim on the basis that there was a material dispute of fact as to whether *de minimis*

14  exception applied to drivers who claimed that proportion of interstate goods delivered was less

15  than one percent).

16         Turning to the facts here, the Court finds that there are material disputes of fact as to: 1)

17  the nature of the deliveries made by the class members, that is, whether the shippers of the

18  products delivered by the class members have a fixed and persistent intent that shipments continue

19  in interstate commerce; 2) whether the class members have a reasonable expectation that they will

20  engage in instate commerce; and 3) whether the interstate deliveries by the class members may be

21  *de minimis*.

22         As to the nature of the deliveries, there are fact questions relating to whether the products

23  shipped to California for delivery based on sales forecasts (rather than specific orders from

24  identified customers) were shipped with a fixed and persisting intent.  While a fixed and persisting

25  intent does not *require* an intent that a product be delivered to a specific customer, *see Ruiz*, 2006

26  WL 3712942, at * 9, where shipments into the state are based on projections of  *future* customer

27  orders, courts look to whether there is a factual basis for those projections as an indication of the

28  shipper's intent.  Plaintiffs have pointed to testimony by Mr. Moonan (who stated in his

United States District Court
Northern District of California

56

1    declaration that shipments by Williams-Sonoma are based on "anticipated customer needs in the

2    region") that he did not have *any* specific knowledge of how sales projections are made.  *See*

3    Hanson Motion Decl., Ex. 5 (Moonan Decl.) ¶ 4; Piller Supp. Opp. Decl., Ex. 1 (Moonan Depo.)

4    at 48.  Similarly, Mr. Gottman (who stated that Crate & Barrel ships products to California "based

5    on a forecast of sales of customers" in the region) testified that he is "not familiar with sales

6    forecasts" and that it is "not something [he] pay[s] attention to."  *See* Hanson Motion Decl., Ex. 6

7    (Gottman Decl.); Piller Supp. Opp. Decl., Ex. 2 (Gottman Depo.) at 27.  Defendants also have not

8    offered any other evidence showing how sales forecasts are made by these retailers.  This is in

9    contrast to the facts of *Ruiz*, cited by Exel, where there was evidence that sales forecasts were

10   based on historical sales information provided by the individual retail stores and that they were

11   reviewed and adjusted on a weekly basis.  2006 WL 3712942, at *1, 5.

12          There is also evidence that some modifications are made to products shipped to California

13   by these retailers, in contrast to *Ruiz*, where there was no evidence of processing, repackaging or

14   product modification at the distribution centers where the products were store before being

15   delivered on to customers.  *Id.* at * 6; Piller Opp. Decl., Ex. 6 (Reynoso Depo.) at 57-58

16   (describing "deluxing" products at the warehouse); Piller Supp. Opp. Decl., Ex. 2 (Gottman

17   Depo.) at 45 (describing assembly of furniture that occurs at the warehouse).  And as to Crate &

18   Barrel, there is evidence that another factor - the ability to track products from shipment to

19   ultimate purchaser - is also lacking.  *See* Piller Supp. Opp. Decl., Ex. 2 (Gottman Depo.) at 46.

20   Consequently, the Court does not find the undisputed evidence to be sufficient to establish, as a

21   matter of law, that deliveries by Exel drivers of these retailers' products satisfies the continuity of

22   movement test.

23          Further, to the extent there is evidence that at least *some* of the products shipped by Exel

24   are either special orders (and thus satisfy the continuity of movement test) or are actually delivered

25   across state lines by Exel drivers, Exel has not demonstrated, as a matter of law, that on a class-

26   wide basis Plaintiffs could reasonably expect to be assigned one of these interstate deliveries.

27   Where a carrier "seeks application of the exemption to an entire class of employees throughout

28   their term of employment based on the limited interstate activities of a few," "[t]he analysis is

United States District Court
Northern District of California

57

necessarily fact-specific" and "focus[es] on the proportion of interstate-to-intrastate employee activity, the method by which the carrier assigns the interstate activity to the pertinent class of employees and the overall nature of the carrier's business." *Kosin v. Fredjo's Enter.s, Ltd.*, No. 88 C 5924, 1989 WL 13175 (N. D. Ill. Feb. 14, 1989) (citing *Morris v. McComb*, 332 U.S. 422 (1947)). Here, Exel has not offered undisputed evidence showing that on a class-wide basis all of the drivers, regardless of where they are based, could reasonably be expected to make deliveries in interstate commerce.

Finally, although Exel has offered evidence (apparently undisputed) as to the percentage of products shipped into California pursuant to special orders by three specific shippers - Crate & Barrel, Williams-Sonoma and Sears - there is no evidence in the record establishing the percentage of *all* deliveries performed by Exel drivers that are interstate in nature. As a consequence, the Court cannot find, as a matter of law, that the *de minimis* exception is unavailable to Plaintiffs.

In sum, the Court finds that factual disputes preclude summary judgment on this claim.

### C.   Whether Plaintiffs' Claim for Failure to Pay for All Hours Worked (Claim Three) Fails Because that Claim Merely Duplicates Plaintiffs' Overtime Claim

The parties' dispute with respect to Claim Three comes down to whether under California Labor Code section 221 Plaintiffs may seek straight time compensation for non-hauling activities that are not covered by the piece rates Exel pays its drivers for deliveries. The Court concludes that they may.[21]

Section 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Cal. Lab. Code § 221. "Section 221 was enacted in order to prevent employers from utilizing secret deductions or kickbacks to pay employees less than their stated wages." *Finnegan v. Schrader*, 91

---

[21] The Court notes that although it held in its March 28, 2014 Order that a claim under section 221 "is a claim for unpaid wages," it did not address the argument made by Exel here, namely, that section 221 only covers situations in which an employer has taken from an employee compensation that it had previously paid to the employee. In the Court's previous order, it was addressing Exel's argument that there was no private right of action under section 221. Having failed to persuade the Court that the section 221 claim fails on that ground, Exel has now come up with a new theory. This theory also has no merit.

Cal. App. 4th 572, 584 (2001).  This provision is commonly invoked where an employer advances

commissions to an employee that are contingent upon some future event and then seeks to recover

the commissions when the event does not occur.  *See, e.g., Harris v. Investor's Bus. Daily, Inc.*,

138 Cal. App. 4th 28, 41 (2006); *Hudgins v. Neiman Marcus Grp.*, 34 Cal. App. 4th 1109, 1117-

25 (1995).  It is not limited to that scenario, however.  As the language in *Finnegan* suggests,

California courts have also applied the provision to situations in which employers made unlawful

*deductions* from employees' pay, that is, where the employee seeks to recover pay that the

individual did not receive "in the first instance" from the employer.  *See Quillian v. Lion Oil Co*.,

96 Cal. App. 3d 156 (1979).  For example, in *Quillian*, the court found that a monthly "bonus"

payment that was calculated so as to deduct cash and merchandise shortages violated Section 221;

the employee did not receive payments that she had to return.  Rather, she simply received a lower

bonus amount.  *Id.* at 158-59.  Similarly, in *Kerr's Catering Service v. Department of Industrial

Relations*, the court found that deductions from employees' wages based on shortages that were

not due to employee negligence violated section 221.  57 Cal. 2d 319, 328 (1962).

In *Gonzalez v. Downtown LA Motors, LP*, the court applied section 221 to facts similar to

the allegations here.  In that case, automotive service technicians were paid on a piece-rate basis

but were not paid for time spent waiting for repair work or on non-repair tasks.  215 Cal. App. 4th

at 40.  The plaintiffs challenged this practice under a number of provisions, including Labor Code

sections 221, 222 and 223.  *Id*. at 50.  The employer rejected the plaintiffs' reliance on these

provisions, arguing that they were inapposite because it "did not collect or receive any previously

paid wages from its employees, it does not have a collective bargaining agreement or any other

agreement setting a wage rate higher than the minimum hourly wage, and it did not secretly pay a

lower amount than promised to technicians."  *Id*.  The court disagreed, reasoning as follows:

> Labor Code sections 221, 222, and 223 govern an employer's
> obligation to pay "wages," a term that is defined to include piece-
> rate compensation as well as hourly pay.  Averaging piece-rate
> wages over total hours worked results in underpayment of employee
> wages required "by contract" under Labor Code section 223, as well
> as an improper collection of wages paid to an employee under Labor
> Code section 221, as illustrated by the following example: a
> technician who works four piece-rate hours in a day at a rate of $20
> per hour and who leaves the job site when that work is finished has

1

2

3

4

5

> earned $80 for four hours of work. A second technician who works the same piece-rate hours at the same rate but who remains at the job site for an additional four hours waiting for customers also earns $80 for the day; however, averaging his piece-rate wages over the eight-hour work day results in an average pay rate of $10 per hour, a 50 percent discount from his promised $20 per hour piece-rate. The second technician forfeits to the employer the pay promised "by statute" under Labor section 223 because if his piece-rate pay is allocated only to piece-rate hours, he is not paid at all for his nonproductive hours.

6

*Id.*

7

The Gonzalez court relied, in part, on *Armenta v. Osmose, Inc.,* 135 Cal. App. 4th 314, 323

8

(2005).  In that case, in which employees sought to recover minimum wage for certain

9

uncompensated work, the court held that California labor law requires that minimum wage

10

violations be assessed with reference to each and every hour worked and thus, in contrast to

11

federal labor law, does not permit employers to average the total compensation paid over all hours

12

worked (whether paid or unpaid) to determine whether employers are meeting their minimum

13

wage obligations.  135 Cal. App. 4th at 323-24.  Although the employees' claim was asserted

14

under California Labor Code section 1194, the court in *Armenta* relied on section 221 in support

15

of its conclusion, reasoning as follows:

16

17

18

19

20

21

22

23

24

> Sections 221, 222, and 223 articulate the principal that all hours must be paid at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation. For example, section 221 provides: "It shall be unlawful for any employer to collect or receive from an employee *any part of wages* theretofore paid by said employer to said employee." (Italics added.) Section 222 provides: "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either willfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee *any part of the wage agreed upon.*" (Italics added.) Finally, section 223 provides: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." As the trial court noted, adopting the averaging method advocated by respondents contravenes these code sections and effectively reduces respondents' contractual hourly rate. Federal law provides no analogous provisions to sections 221-223.

25

135 Cal. App. 4th at 323.

26

In short, the Court finds no authority for Exel's narrow reading of section 221.  Even the

27

cases cited by Exel indicate that this section covers "deductions" and is not limited to situations

28

where an employer seeks to recover money already paid to the employee.  Further, the reasoning

United States District Court
Northern District of California

60

1  of both *Gonzales* and *Armenta* supports the conclusion that a practice of compensating individuals

2  on a piece-rate basis for certain activities while failing to compensate them for time spent on other

3  activities amounts to a deduction because the employer has effectively reduced the individual's

4  pay rate.  Exel's request for summary judgment on Claim Three is therefore denied.

5

6      **D.      Whether Plaintiffs' Meal and Rest Break Claims (Claims Four and Five) Are
              Preempted by the DOT HOS Regulations**

7          Having failed to persuade the Court that Plaintiffs' meal and rest break claims are

8  preempted under the FAAAA, Exel now advances another theory, arguing that these claims are

9  preempted because California's meal and rest break laws conflict with a DOT regulation that

10  limits the total number of hours on duty, without regard to the amount of time taken for meal or

11  rest breaks, to fourteen hours.  *See* 49 C.F.R. § 395.3.  Exel has offered no explanation for its

12  failure to make this argument in its motion to dismiss, when it challenged Plaintiffs' meal and rest

13  break claims on the grounds of federal preemption.  Even assuming this argument was not waived

14  by Exel's failure to bring it in its earlier motion, the Court finds that it fails on the merits.

15          "It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art.

16  VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough*

17  *Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) (quoting *Gibbons v. Ogden*,

18  22 U.S. (9 Wheat.) 1, 211 (1824)).  A law may be preempted where Congress has completely

19  displaced state regulation, under the doctrine of field preemption, or where it actually conflicts

20  with federal law.  *Id.*  Exel contends Plaintiffs' meal and rest break claims are preempted because

21  they actually conflict with federal law.  An actual conflict may occur either when compliance with

22  both federal and state law is impossible or when "state law 'stands as an obstacle to the

23  accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.* (quoting

24  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  When addressing whether a state law that

25  "regulate[s] the employment relationship to protect resident workers" is preempted, however, the

26  court starts with the assumption "that the historic powers of the States were not to be superseded

27  by federal legislation unless that was the clear and manifest purpose of Congress."  *Pac. Merch.*

28  *Shipping v. Aubry*, 918 F.2d 1409, 1415-16 (9th Cir. 1990).

United States District Court
Northern District of California

61

The regulation cited by Exel states, in relevant part, as follows:

> a) Except as otherwise provided in § 395.1, no motor carrier shall permit or require any driver used by it to drive a property-carrying commercial motor vehicle, nor shall any such driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, unless the driver complies with the following requirements:
>
> (1) Start of work shift. A driver may not drive without first taking 10 consecutive hours off duty;
>
> (2) 14-hour period. A driver may drive only during a period of 14 consecutive hours after coming on duty following 10 consecutive hours off duty. The driver may not drive after the end of the 14-consecutive-hour period without first taking 10 consecutive hours off duty.
>
> (3) Driving time and rest breaks.
>
> (i) Driving time. A driver may drive a total of 11 hours during the 14-hour period specified in paragraph (a)(2) of this section.
>
> (ii) Rest breaks. Except for drivers who qualify for either of the short-haul exceptions in § 395.1(e)(1) or (2), driving is not permitted if more than 8 hours have passed since the end of the driver's last off-duty or sleeper-berth period of at least 30 minutes.

49 C.F.R. § 395.3.  Nothing in California's meal and rest break laws, which Exel contends limits actual driving time to 12.5 hours, makes it impossible for drivers to comply with the federal regulation.  To the contrary, the federal regulation imposes a *lower* limit on total permitted driving time than do the state laws challenged by Exel.

Similarly, Exel has not demonstrated that California's meal and rest break laws stand as an "obstacle" to accomplishing Congress's purpose as reflected in the DOT regulation.  In particular, to the extent California's meal and rest break requirements would prevent drivers from driving more than 12.5 hours in a single fourteen hour shift, that result does nothing to undercut Congress's expressed intent, that is, to limit actual driving time to eleven hours in a shift.  Of course, neither California meal and rest break laws nor the federal regulation impose any affirmative obligation to drive the maximum number of hours permitted under the regulation.  Thus, even if the regulation did not include a limit on actual driving time permitted during a driver's shift that is lower than the amount of hours these state laws would effectively allow a

62

1    driver to drive during a single shift, California's meal and rest break laws would not undermine

2    Congress's purpose as to the fourteen-hour limit.

3            The Ninth Circuit cases cited by Exel in support of preemption do not support a contrary

4    result.  In *Agsalud v. Pony Express Courier Corp. of America*, the Ninth Circuit held that the

5    Federal Motor Carrier Act, which provided for a maximum work week of 60 hours, did not

6    preempt a state overtime law requiring employers to pay one and a half time for work in excess of

7    forty hours in a week.  833 F.2d 809 (9th Cir. 1987).  The court rejected the carrier's argument

8    that the state law conflicted with the federal requirement because it "did not show that [the State's]

9    overtime pay statute has the same effect as a regulation setting a firm maximum on hours

10   worked."  *Id.*  The court reasoned further, "[o]ne need not be an economist to realize that some

11   employers may continue to provide more than 40 hours of work even though an overtime premium

12   is required . . ."  Similarly, in *Pacific Merchant Shipping Association v. Aubry*, the Ninth Circuit

13   rejected the arguments of a shipping company that California's overtime law requiring payment of

14   overtime wages for work in excess of eight hours a day was preempted by the federal Shipping

15   Act, which imposes penalties where an employee is required to work more than nine hours a day

16   while in port or twelve house a day while at sea.  918 F.2d  at 1416-17.  As in *Agsalud*, the court

17   found that because the state overtime law did not "have the effect of establishing a firm

18   maximum," it did not conflict with the federal law.  *Id.*

19           *Agsalud* and *Pacific Merchant* stand for the proposition that there is no actual conflict

20   between a federal law that imposes a limit on work hours and a state wage and hour law that

21   requires the payment of overtime wages for some of those hours but does not actually prohibit

22   employees from working up to the maximum established by federal law.  The implication in those

23   cases is that a state law that actually capped the number of hours that could be worked at a level

24   lower than the federal maximum *might* be in conflict with federal law.  As discussed above,

25   however, the federal regulation at issue here permits a lower number of driving hours than the

26   effective limit on driving time that results from enforcement of California's meal and rest break

27   laws.  Therefore, these cases do not support a finding of conflict preemption.

28           Accordingly, the Court rejects Exel's assertion that Plaintiffs' meal and rest break claims

63

1    are preempted.

2

3    **E.   Whether Claims Ten, Eleven and Twelve Fail on the Basis of Exel's Good-Faith
          Belief that Plaintiffs are Properly Classified as Independent Contractors**

4         Exel argues it is entitled to summary judgment on Plaintiffs' claims under California Labor

5    Code sections 203, 226, 1174 and 1174.5 because it has a good faith belief that it has properly

6    classified its drivers as independent contractors.  The Court finds that Exel is entitled to summary

7    judgment on these claims.

8         California Labor Code section 203 provides that an employer may be subject to "waiting

9    time" penalties for failure to timely pay wages upon termination of employment, allowing the

10   employee to continue to accrue wages "from the due date thereof" for up to 30 days "until paid or

11   until an action therefor is commenced." Cal. Lab. Code § 203(a).  Penalties are assigned where an

12   employer "*willfully* fails to pay." *Id.* (emphasis added).  Similarly, section 1174.5 provides for

13   civil penalties where an employer "willfully fails to maintain" payroll records required under

14   section 1174.  Section 226 provides for damages where there is a "knowing and intentional failure

15   by an employer" to provide accurate wage statements.

16        The willfulness requirement in section 203 is subject to a good faith defense under

17   California Code of Regulations Title 8, section 13250, which provides, in relevant part, as follows:

18             A willful failure to pay wages within the meaning of Labor Code
               Section 203 occurs when an employer intentionally fails to pay
19             wages to an employee when those wages are due. However, a good
               faith dispute that any wages are due will preclude imposition of
20             waiting time penalties under Section 203.

21             (a) Good Faith Dispute. A "good faith dispute" that any wages are
               due occurs when an employer presents a defense, based in law or
22             fact which, if successful, would preclude any recover on the part of
               the employee. The fact that a defense is ultimately unsuccessful will
23             not preclude a finding that a good faith dispute did exist. Defenses
               presented which, under all the circumstances, are unsupported by
24             any evidence, are unreasonable, or are presented in bad faith, will
               preclude a finding of a "good faith dispute."

25   Cal. Code Regs. Tit. 8, § 13520; *see also Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1,

26   8 (1981) (declining to impose penalties under California Labor Code section 203 on the basis of

27   uncertainty in the law and defendants' good faith belief that it was acting lawfully when it took a

28   set-off for an employee's wages for debts owed at the time of discharge, even though court

64

1  ultimately found that employer's conduct was not lawful).

2      California and federal district courts have held that this defense applies not only to section

3  203 claims but also claims under Cal. Labor Code Sections 226 and 1174.  *See Dalton v. Lee*

4  *Publications, Inc.,* No. 08CV1072 BTM NLS, 2011 WL 1045107, at *5 (S.D. Cal. Mar. 22, 2011)

5  (granting summary judgment on claims under California Labor Code sections 203, 226 and 1174

6  on the basis that there was a good faith dispute as to whether defendant had properly classified

7  plaintiffs as independent contractors rather than employees); *Harris v. Vector Mktg. Corp.*, 656

8  F.Supp.2d 1128, 1146 (N.D.Cal.2009) (Chen, J.) (granting summary judgment on claims under

9  California Labor Code sections 203 and 226 on the basis that there was good faith dispute as to

10  whether defendant had properly classified plaintiffs as independent contractors rather than

11  employees);  *Reber v. AIMCO/Bethesda Holdings, Inc.,* No. SA CV07–0607 DOC RZX, 2008 WL

12  4384147, at *9 (C.D.Cal. Aug. 25, 2008) (granting summary judgment in favor of defendant on

13  claims under California Labor Code sections 203 and 226 on the basis that there was a good faith

14  dispute as to whether defendant had properly classified plaintiffs as administrative employees);

15  *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1174, 1219 (affirming trial court judgment,

16  which "determined Cintas's violation of the [Living Wage Ordinance] was not willful, [and]

17  declined to impose the higher penalty rates plaintiffs sought," including penalties under section

18  226).

19      In *Woods v. Vector Mktg. Corp.*, Judge Chen recognized that in applying the "good faith

20  dispute" rule to Section 226, courts are extending a defense that was initially applied to the

21  willfulness standard (the standard that applies to claims under Section 203 and 1174) to the

22  "knowing and intentional" standard of section 226.  *See Woods v. Vector Mktg. Corp.*, No. C-14-

23  0264 EMC, 2015 WL 2453202, at *3-4 (N.D. Cal. May 22, 2015).  In that case, the court found

24  that similar treatment of the two standards is "consistent with the Labor Code," offering several

25  specific reasons for its conclusion.  *Id.* at 3.  "First, California courts have defined willful as

26  intentional."  *Id.* (quoting *Barnhill*, 125 Cal. App. 3d at 7 ("[a]s used in section 203, 'willful' [ . . .

27  ] means that the employer intentionally failed or refused to perform an act which was required to

28  be done'" (quoting *Davis v. Morris,* 37 Cal. App. 2d 269, 274(1940))); and citing *Amaral*, 163

United States District Court
Northern District of California

Cal. App. 4th at 1201 ("The settled meaning of 'willful,' as used in section 203, is that an employer has intentionally failed or refused to perform an act which was required to be done")). "Second, the Labor Code itself treats 'willful' and 'knowing and intentional' violations with similar weight" by imposing civil penalties for violations of both provisions. *Id.* at * 4. Finally, the California Supreme Court has equated the willfulness standard to the knowing and intentional standard. *Id.* (citing *Ex parte Trombley*, 31 Cal. 2d 801, 807-08 (1948)).

The undersigned finds the reasoning of Judge Chen in *Woods* to be persuasive and therefore concludes that the good faith defense that applies to claims under section 203 also applies to Claims asserted under section 226 and 1174. Further, while the Court ultimately concludes that Plaintiffs have been misclassified, as discussed further below, Plaintiffs have not demonstrated that there is a fact question as to Exel's intent. Truck drivers who own their own trucks have been found to be independent contractors in a variety of contexts. *See, e.g., United States v. Silk*, 331 U.S. 704, 719 (1947) (holding that truck drivers who owned their own trucks and hired their own helpers were "small businessmen" who were properly classified as independent contractors); *Merchants Home Delivery Serv., Inc. v. N.L.R.B.*, 580 F.2d 966, 968 (9th Cir. 1978) (holding that delivery truck drivers for Exel's predecessor company were properly classified as independent contractors); *N.L.R.B. v. A. Duie Pyle, Inc.*, 606 F.2d 379, 388 (3d Cir. 1979) (finding that drivers who owned their own trucks and were "not instructed how to do their job" were acting as independent contractors when they delivered coal for defendant). In light of this authority, it was not unreasonable for Exel conclude that it could lawfully classify its drivers as independent contractors.

Nor have Plaintiffs pointed to any evidence that Exel did not have a good faith belief that its classification of its drivers as independent contractors was legally proper. The evidence cited by Plaintiffs indicating that Exel made a conscious decision to classify (or reclassify) its drivers as independent contractors in order to cut costs does not create a material issue of fact on this issue because Exel's financial motivation is not relevant to whether it believed its classification was legal. Accordingly, the Court finds that Exel is entitled to summary judgment on these claims.

F.      **Whether Plaintiffs Can Recover Vehicle Lease Payments**

Defendants assert that they are entitled to summary judgment on Claim Nine to the extent Plaintiffs seek reimbursement for vehicle rentals or leases.  The Court agrees.

The DLSE has found that although the costs of operating a motor vehicle in the course of employment may be covered by California Labor Code section 2802, the costs of furnishing the vehicle itself are not.  *See DLSE Interpretive Bulletin No.* 84-7 (Jan. 8, 1985) ("Bulletin 84-7") ("an applicant for employment may be required, as a condition of employment to furnish his [ ] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid").  In several Opinion Letters, the DLSE has assumed that employers may require employees to provide their own trucks or automobiles without directly addressing the question. *See DLSE Opinion Ltr. 1991.02.25-1* (Feb. 25 1991 Opinion Letter presuming that employer may require employee to use own car while opining that employer must reimburse for insurance premiums); *DLSE Opinion Ltr. 1991.08.30* (Aug. 30, 1991 Opinion Letter presuming that employer can require employee to use own truck but opining that employer must reimburse employee for costs of operation); *DLSE Opinion Ltr. 1994.08.14* (Aug. 14, 1994 Opinion Letter presuming employees may be required to provide own trucks or automobiles and addressing reimbursement rates); *DLSE Opinion Ltr. 1998.11.05* (Nov. 5, 1998 Opinion Letter presuming employee could be required to use own vehicle while opining that employer must reimburse for insurance premiums).

In *Estrada v. FedEx Ground Package System, Inc*., the California Court of Appeal examined the opinions of the DLSE on this issue and addressed whether an Opinion Letter issued on January 22, 1997 represented a limitation on the DLSE's earlier opinion, in Bulletin 84-7.  154 Cal. App. 4th 1 (2007) (citing *DLSE Opinion Ltr. 1997.01.22*, opinion that an employer could not require an employee to purchase a customized truck for $50,000 as a condition of employment). The *Estrada* court rejected this argument, finding that apart from "two tangential and conclusory sentences" in the January 22, 1997 Opinion Letter that could be read to support a contrary conclusion, all of the commentary supported the conclusion that "an employer may require its employees to provide their own trucks."  *Id*. at 25.

United States District Court
Northern District of California

1    Plaintiffs have not offered any substantive arguments suggesting that the conclusion in

2  *Estrada* is incorrect.  Indeed, even the case they cited on this issue, *Smith v. Cardinal Logistics*

3  *Mgmt. Corp*, 2009 WL 2588879 (N.D. Cal. Aug. 19, 2009), supports the conclusion that under

4  section 2802 an employer may require employees to furnish their own trucks as a condition of

5  employment.  In that case, an employer requested summary judgment as to claims by drivers

6  seeking reimbursement under section 2802 for lease payments they made on their trucks, which

7  they used to perform delivery services for the defendant.  2009 WL 2588879, at *4-5. Judge Conti

8  acknowledged that even if the drivers (who were considered by the employer to be independent

9  contractors) were found to be employees, "the *Estrada* decision provides strong support for [the

10  employer's] contention that class members are not entitled to be reimbursed for their truck lease

11  payments."  Judge Conti declined, however, to decide the question at the summary judgment stage

12  of the case.  *Id*.  Rather, he deferred ruling on the question, finding that "prior to a determination

13  that [the defendant's] drivers are employees, the Court is not willing to engage in hypothetical

14  speculation about whether the lease payments in this case are or are not reimbursable."  *Id*.  at *5.

15    Judge Conti's decision to defer ruling on the question of whether lease payments were

16  available was appropriate under the facts of that case, given that the proper classification of the

17  drivers had not yet been resolved and therefore, the availability of lease payments might not need

18  to be reached, depending on what the jury decided on the classification issue.  Here, on the other

19  hand, the Court finds that the classification question is suitable for determination on summary

20  judgment and that Plaintiffs are employees.  Therefore, the justification for waiting to decide this

21  issue in *Smith* is not present here.  Further, under the authority discussed above, the Court

22  concludes Plaintiffs are not entitled to recover their lease payments and thus, that Exel is entitled

23  to summary judgment on this claim.

24  **G.    Whether Plaintiffs Have Standing to Seek Injunctive Relief**

25    Exel argues that Plaintiffs' claim for injunctive relief must be dismissed because neither of

26  the named Plaintiffs is currently employed by Exel.  Exel is correct that "a former employee lacks

27  standing to seek prospective injunctive relief on behalf of a putative class containing both former

28  and current employees."  *Richards v. Ernst & Young LLP*, No. C08-4988 JF(HRL), 2010 WL

682314, at *3 (N.D. Cal. Feb. 24, 2010).  Plaintiffs, however, have offered declarations by two class members, Pedro Alvarez and Abel Barajas Montes, who are currently employed by Exel and can represent the class as to the injunctive relief claim.  *See* Piller Opposition Decl., Exs. 13 (Alvarez Decl.) & 14 (Montes Decl.).  Where the claims of class representatives are rendered moot, the court may substitute appropriate representatives with live claims.  *See Kremens v. Bartley*, 431 U.S. 119, 135 (1977); *Nat'l Fed'n of Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1201 (N.D. Cal. 2007).  Exel does not challenge the adequacy of these individuals to act as class representatives.  Nor does it dispute that the class, which has already been certified, contains numerous class members who are currently employed by Exel.  Further, although Exel has asserted, in a conclusory manner, that it will be prejudiced if the Court permits new plaintiffs to substitute in, it has not pointed to any specific prejudice.  Under these circumstances, the Court finds that it is appropriate to permit Plaintiffs to substitute in individuals who have standing to pursue the injunctive relief claim.  Therefore, the Court denies Exel's request for summary judgment on Plaintiffs' request for injunctive relief.

## V.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### A.    Evidentiary Objections

Exel objects to Plaintiffs' reliance on the testimony of James Dalpino and Greg Smigelsky on they basis that these witnesses do not have personal knowledge of Exel's California operations during the relevant time period.  *See* Defendants' Opposition at 7.  Plaintiffs do not oppose Exel's request to strike citations to the Dalpino testimony.  Therefore, the objections to the citations of the Dalpino testimony are sustained and the testimony listed in Defendants' Opposition at 7:25 - 27 is stricken.  The Court overrules Exel's objections to the deposition testimony of Greg Smigelsky.  Plaintiffs cite Smigelsky's testimony to establish Exel's policies and practices.  As a high-level manager who is responsible for recruitment and development of drivers for the entire company, Smigelsky has sufficient knowledge and experience to testify on these subjects. Further, to the extent Exel contends Plaintiffs have mischaracterized Smigelsky's testimony, this challenge is more appropriately addressed on the merits than in the context of an evidentiary objection.

United States District Court
Northern District of California

**B.    Legal Standards Governing Classification of Employees vs. Independent Contractors Under California Law[22]**

Under California law, an individual who comes forward with evidence that he or she provided services for an employer is presumed to be an employee.  *Narayan v. EGL, Inc*., 616 F.3d 895, 900 (9th Cir. 2010) (citing *Robinson v. George*, 16 Cal. 2d 238, 243 (1940)).  "The burden then shifts to the employer to 'prove, if it can, that the presumed employee was an independent contractor.'"  *Ruiz*, 754 F.3d at 1100 (citing *Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 83 (2009)).  The California Supreme Court has identified a number of factors that courts should consider in making this determination, the most important of which is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."  *S. G. Borello & Sons, Inc. v. Dep't. of Indus. Relations*, 48 Cal.3d 341, 350 (1989).  The *Borello* court instructed that this test should not be applied rigidly, however, and that courts should also consider several "secondary" indicia of the nature of a service relationship.  *Id*.  The court noted that "[s]trong evidence in support of an employment relationship is the right to discharge at will, without cause."  *Id*. (internal quotations and citations omitted).  The *Borello* court listed the following secondary factors:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id*. at 351.  "'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.'"  *Id*.

---

[22] In the Court's Order Granting Motion for Class Certification [Docket No. 150], the Court provided an overview of the California law governing the classification of workers as employees vs. independent contractors, including an examination of *Ruiz* and *Alexander*, the primary cases upon which Plaintiffs rely in support of their request for summary judgment on the classification issue.  For the convenience of the reader, the Court includes that overview here, with minor changes.

United States District Court
Northern District of California

(quoting *Germann v. Workers' Comp. Appeals Bd*., 123 Cal. App. 3d 776, 783 (1981)).  Further,

 "the label that parties place on their employment relationship 'is not dispositive and will be

ignored if their actual conduct establishes a different relationship.'"  *Ruiz*, 754 F.3d at 1101

(quoting *Estrada v. FedEx Ground Package Sys., Inc*., 154 Cal. App. 4th 1, 10-11 (2007)).

### 1. *Ruiz v. Affinity Logistics Corp.*

In *Ruiz*, the court applied the *Borello* factors in a case involving delivery drivers who

alleged that they were misclassified as independent contractors. 754 F.3d 1093 (9th Cir. 2014).

The drivers alleged that because they were actually employees, they were entitled to sick leave,

vacation, holiday and severance pay and should not have been charged for workers' compensation

insurance.  *Id*. at 1095.  The plaintiffs in the putative class were drivers for Affinity Logistics,

which provided delivery services for home furnishing retail stores.  *Id*. at 1096.  To be hired, the

drivers were not required to have any special license; they "simply had to have a driver's license,

sign the [Independent Truckman's Agreement] and [Equipment Lease Agreement], and pass a

drug test and physical exam."  *Id*. at 1097.  As in this case, the Independent Truckman's

Agreement and Equipment Lease Agreement stated that the drivers were independent contractors

rather than employees.  *Id*.  Under these agreements, the drivers were paid a "flat per-stop rate."

*Id*.

The drivers in *Ruiz* were also required to follow uniform procedures "regarding loading

trucks, delivering goods, installing goods, interacting with customers, reporting to Affinity after

deliveries, and addressing returns and refused merchandise, damaged goods, and checking in with

Affinity after deliveries."  *Id*. at 1097.  These procedures were set forth in the Affinity Contractor

Procedures Manual.  *Id*.  Drivers were encouraged to lease their trucks from Affinity (in which

case, the cost was deducted from their compensation) but could lease a truck from an outside

source.  *Id*.  In either case, the drivers were required to paint the trucks white; only Affinity's

name and the Sears logo were permitted on the trucks.  *Id*.  The drivers were required to wear

uniforms.  *Id*. at 1098.  Similar to the drivers in this case, the drivers in *Ruiz* were required to

report to one of Affinity's warehouses every day to attend a morning "stand-up" meeting and

receive their route manifests.  *Id*. at 1098. Drivers were not permitted to change the order of the

deliveries listed on the manifest route. *Id*. They were required to report frequently to dispatchers throughout the day using a "specific type of mobile telephone." *Id*. Drivers were also required to have a helper or secondary driver on the truck. *Id*. at 1097. The secondary drivers and helpers had to submit to a background check and be approved by Affinity. *Id*. Affinity supervisors sometimes conducted "follow-alongs" in which they "followed a driver for a few stops to ensure that the driver was wearing the uniform and using proper delivery techniques." *Id*.

Following a bench trial, the district court in *Ruiz* entered judgment in favor of Affinity on the basis that the plaintiffs were independent contractors. The Court of Appeals, however, reversed, finding that consideration of the *Borello* factors supported the opposite conclusion, that is, that the drivers were employees rather than independent contractors. *Id*. at 1101. First, the court addressed the "most important" consideration, the right to control the details of the drivers' work. *Id*. Based on the undisputed facts, the court found that this factor "indicate[d] overwhelmingly that the drivers were Affinity employees." *Id*. at 1103. The court cited the evidence that Affinity controlled the drivers' "rates, schedules and routes," as well as the equipment they used and their appearance and that Affinity "closely monitored and supervised its drivers." *Id*. at 1102. The court also pointed to the fact that the Independent Truckman's Agreement permitted Affinity to terminate the drivers without cause with sixty days notice. *Id*.

The Ninth Circuit specifically rejected the conclusion of the district court that the drivers were independent contractors because they could hire helpers and secondary drivers. *Id*. The court reasoned that the district court had "overlooked the fact that often the reason drivers hired helpers was that they were required to do so by Affinity" and further pointed to the fact that "Affinity retained ultimate discretion to approve or disapprove of those helpers and additional drivers." *Id*. at 1102.

The Ninth Circuit in *Ruiz* also found that "most of the secondary factors outlined in *Borello*" supported the conclusion that the drivers were employees. First, the court found that the district court had erred in finding that the "distinct occupation or business factor" supported the conclusion that the drivers were independent contractors. *Id*. at 1103-04. In particular, the court found that the district court had placed too much weight on the fact that the drivers "had the ability

1    to expand their businesses by hiring more employees, operating multiple trucks, and making

2    managerial decisions regarding the employment and performances of the employees hired." *Id*.

3    The district court had not placed enough weight, the court found, on "the fact that Affinity

4    required drivers to create these businesses as a condition of employment." *Id*.

5           The second and third *Borello* factors – whether "the work is usually done under the

6    direction of the principal or by a specialist without supervision" and "the skill required in the

7    particular occupation" – also supported the conclusion that the drivers were employees, the court

8    found. *Id*. As to this factor, the court again found that the district court had erred, holding that it

9    placed too much weight on the fact that drivers installed appliances without supervision, which the

10   district court opined required "substantial skill." *Id*. at 1104. This conclusion was incorrect, the

11   Ninth Circuit found, given that the drivers were not required to have any work experience or

12   special licenses to be hired and that Affinity "closely supervised the drivers' work through various

13   methods." *Id*. Thus, these factors supported the conclusion that the drivers were employees of

14   Affinity. *Id*.

15          The court found that the fourth *Borello* factor supported the same conclusion. *Id*. The

16   fourth factor asks "whether the principal or the worker supplies the instrumentalities, tools, and

17   the place of work for the person doing the work." *Id*. The district court concluded that this factor

18   supported the conclusion that the drivers were independent contractors because the drivers paid to

19   lease their trucks and mobile telephones from Affinity. *Id*. The Ninth Circuit, however, held that

20   the district court's conclusion was clearly erroneous because it failed to take into account the fact

21   that "Affinity supplied the drivers with the major tools of the job by encouraging or requiring that

22   the drivers obtain the tools from them through paid leasing arrangements." *Id*.

23          Next, the court addressed the *Borello* factor that considers "the method of payment,

24   whether by the time or by the job." *Id*. The court explained that payment "by the time" supports a

25   finding of employee status whereas payment "by the job" supports independent contractor status.

26   *Id*. Citing evidence that drivers performed approximately eight deliveries a day and that the

27   drivers' daily pay therefore "essentially remained the same," the court concluded that the method

28   of compensation was by the time rather than by the job. *Id*. In reaching this conclusion, the court

United States District Court
Northern District of California

73

United States District Court
Northern District of California

1    rejected the district court's reasoning that the flat per-delivery rate was more like "by the job"

2    compensation because the time it took to complete each delivery varied and the drivers did not

3    work "set hours." *Id.*

4         As to the *Borello* factor that asks courts to consider whether or not the parties believe they

5    are creating the relationship of employer-employee, the court noted that both parties believed that

6    they were entering an independent contractor relationship but that "'the parties' label is not

7    dispositive and will be ignored if their actual conduct establishes a different relationship.'" *Id.* at

8    1105 (quoting *Estrada v. FedEx Ground Package Sys., Inc.,* 154 Cal. App. 4th 1, 11 (2007)).

9         The court next addressed the "right to terminate at will factor." *Id.* The Ninth Circuit, like

10   the district court, found that the mutual termination provision in the Independent Truckman's

11   Agreement was "consistent with either an employer-employee or independent contractor

12   relationship." *Id.*

13        Finally, the court found that the "length of time for performance of services" favored an

14   employer-employee relationship because "there was no contemplated end to the service

15   relationship when the drivers signed their contracts, and drivers often stayed with Affinity for

16   years." *Id.*

17        Based on the fact that Affinity had the right to control the details of the drivers' work and

18   because the totality of the secondary factors supported the conclusion that the drivers were

19   employees of Affinity, the Ninth Circuit reversed the district court's holding that the drivers were

20   independent contractors and remanded to the district court for further proceedings. *Id.*

21            **2.   *Alexander v. FedEx Ground Package System, Inc.***

22        In *Alexander*, the Ninth Circuit again addressed the question of whether delivery drivers

23   had been misclassified as independent contractors under California law. 765 F.3d 981 (9th Cir.

24   2014). In that case, numerous related cases involving FedEx delivery drivers were consolidated

25   for multidistrict litigation (MDL) proceedings. In the MDL, the court certified a class as to the

26   California state law claims and then granted summary judgment in favor of FedEx, finding, as a

27   matter of law, that the plaintiffs were independent contractors. *Id.* at 988. The Ninth Circuit

28   reversed, finding that under the *Borello* factors, the plaintiffs were employees rather than

74

1    independent contractors. *Id.*

2        The facts in *Alexander* are, in many respects, very similar to the facts in *Ruiz*. Like the

3    drivers in *Ruiz*, the drivers in *Alexander* entered into a contract with FedEx ("the Operating

4    Agreement") providing that they were independent contractors. *Id.* at 984. The Operating

5    Agreement allowed drivers to operate more than one vehicle and route, but only with the consent

6    of FedEx; it also permitted the driver to hire third parties to help perform their work, but the third

7    party helpers were required to be qualified under federal, state and municipal safety standards, as

8    well as FedEx's own safety standards. *Id.* at 985-986. The Operating Agreement specified an

9    initial term of one, two or three years, with automatic renewal for one-year terms unless either

10   party gave notice of its intent not to renew. *Id.* at 986. The Operating Agreement provided that

11   the parties could terminate by mutual consent, for cause, including breach of the agreement, if

12   FedEx stopped doing business in the driver's service area, or upon thirty days written notice by the

13   driver. *Id.*

14       FedEx imposed numerous requirements on the drivers as to how they performed their

15   work. *Id.* This included making deliveries on every day that FedEx was open for business,

16   delivering packages within the window of time negotiated between FedEx and its customers,

17   wearing a FedEx uniform and adhering to FedEx personal grooming rules, using an electronic

18   scanner (purchased from FedEx) to send information to FedEx after each delivery, and adhering to

19   FedEx standards and procedures regarding safety and customer interactions. *Id.* at 985. FedEx

20   policy permitted a driver's manager to conduct up to four ride-along performance evaluations a

21   year to ensure that drivers were adhering to FedEx standards. *Id.* Under the Operating

22   Agreement, the drivers were required to provide and maintain their own trucks, which had to be

23   approved by FedEx. *Id.* The drivers were required to pay the costs associated with maintaining

24   and operating the trucks. *Id.* The trucks, as well as the shelving inside the trucks, were required to

25   have specific dimensions. *Id.* They had to be painted with the FedEx colors and carry the FedEx

26   logo. *Id.*

27       Applying the *Borello* factors, the court concluded that FedEx's policies allowed it to

28   "exercise a great deal of control over the manner in which its drivers do their jobs" and therefore,

United States District Court
Northern District of California

that this factor strongly supported the position of the drivers that they were employees. *Id*. at 989. The court pointed to FedEx's policies governing uniforms and grooming, the appearance of the drivers' trucks, the times the drivers worked, and the way the deliveries were performed. *Id*. at 990. The court acknowledged that there were "details of its drivers work" that FedEx did not control  but found that these details were insignificant in comparison to the extensive control exercised over the drivers overall. *Id*.

The court also rejected FedEx's argument that the drivers were not employees in light of the "flexibility and entrepreneurial activities" they were given and, in particular, "the ability to take on multiple routes and vehicles and to hire third-party helpers." *Id*. at 991, 993. The court began its analysis of this question by examining *Borello*, in which the California Supreme Court held that "[a] business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers." *Id*. (quoting *Borello*, 48 Cal. 3d at 357). There, a commercial produce grower hired agricultural workers under sharefarmer agreements to harvest the crops in the plots assigned to them, with the assistance of their families. *Id*. at 991 (citing *Borello*, 48 Cal. 3d at 357).  Although the sharefarmers used their own tools, set their own hours and were free to decide when to pick the crop to maximize profit, the court found that the workers were employees because the grower exercised a great deal of control over the business as a whole and exercised "all necessary control" over the work of the sharefarmers. *Id*.  According to the *Alexander* court, California courts have applied the "all necessary control" test of *Borello* to delivery drivers,  recognizing that delivery drivers may be employees, despite operating with some degree of autonomy, because the employer exercises "all *necessary* control." *Id*. at 991-92 (citing *JKH Enter., Inc. v. Dep't of Indus. Relations*, 142 Cal.App.4th 1046, 1049 (2006) and *Air Couriers Int'l v. Emp't Dev. Dep't*., 150 Cal.App.4th 923, 931-32 (2007)).

The *Alexander* court went on to reject FedEx's reliance on a D.C. Circuit case, *FedEx Home Delivery v. National Labor Relations Board*, 563 F.3d 492 (D.C. Cir. 2009). *Id*. at 993.  In that case, the court noted, the D.C. Circuit shifted away from the control inquiry in favor of a test that asks whether the "putative independent contractors have significant entrepreneurial

76

United States District Court
Northern District of California

1    opportunity for gain or loss." *Id*.  Because California has not adopted such a test, the *Alexander*

2    court found, FedEx's reliance on that case was misplaced.  *Id*.  The court also noted that its

3    conclusion was consistent with *Ruiz*, in which the Ninth Circuit "found that drivers were

4    employees where the company 'retained ultimate discretion to approve or disapprove of those

5    helpers and additional drivers.'"  *Id*. at 994 (quoting *Ruiz*, 754 F.3d at 1102).

6           Next, the court in *Alexander* examined the secondary factors under *Borello.*  The court

7    found that the first factor, the right to terminate at will, "slightly favor[ed] FedEx" because the

8    Operating Agreement did not give FedEx an unqualified right to terminate.  *Id*.

9           The court found that the second factor, whether the plaintiffs were engaged in a "distinct

10   occupation or business," favored the plaintiffs because "'the work performed by the drivers is

11   wholly integrated into FedEx's operation [and] [t]he drivers look like FedEx employees, act like

12   FedEx employees, [and] are paid like FedEx employees.'"  *Id*. (quoting *Estrada v. FedEx Ground

13   Package Sys., Inc.*, 154 Cal. App. 4th 1, 9 (2007)).

14          The court concluded that the third factor, whether the work is performed under the

15   principal's direction, "slightly favor[ed] plaintiffs" because "although drivers retain freedom to

16   determine several aspects of their day-to-day work, FedEx also closely supervises their work

17   through various methods."  *Id*. at 995.

18          The fourth factor – skill required in the occupation – also favored the plaintiffs, according

19   to the court, because "FedEx drivers 'need no experience to get the job in the first place and [the]

20   only required skill is the ability to drive.'"  *Id*. (quoting *Estrada*, 154 Cal. App. 4th at 12).

21          The court found that the fifth factor, the provision of tools and equipment, only slightly

22   favored FedEx.  *Id*.  In particular, although the drivers provided their own trucks and were not

23   required to get other equipment from FedEx, this factor did not strongly support FedEx's position

24   because FedEx was "'involved in the purchasing process, providing funds and recommending

25   vendors.'"  *Id*.  (quoting *Estrada*, 154 Cal. App. 4th at 9).

26          The court found that the sixth factor, "length of time for performance of services,"

27   supported the plaintiffs' position.  *Id*. at 996.  The court's conclusion was based on the terms of

28   the Operating Agreement, which provided for an initial term of one to three years and automatic

renewal for successive one-year terms if there was no notice of non-renewal by either party.  *Id.*

The court held that the "method of payment" factor was neutral.  According to the court, "FedEx pays its drivers according to a complicated scheme that includes fixed and variable components and ties payment to, among other things, packages, stops, and the ratio of driving time to deliveries. This payment method cannot easily be compared to either hourly payment (which favors employee status) or per job payment (which favors independent contractor status)."  *Id.*

The court held that the eighth factor, "whether the work is part of the principal's regular business," favored the plaintiffs because the work they performed – the pickup and delivery of packages – was "'essential to FedEx's core business.'"  *Id.* (quoting *Estrada*, 154 Cal. App. 4th at 9).

Finally, the court found that the parties' beliefs as to the nature of the relationship being formed slightly favored FedEx to the extent the Operating Agreement provided some evidence that both FedEx and the drivers believed they were forming an independent contractor's relationship.  *Id.*  As in *Ruiz*, however, the court noted that "neither [FedEx]'s nor the drivers' own perception of their relationship as one of independent contracting" is dispositive.  *Id.* (citations omitted).

The court in *Alexander* concluded that the secondary factors did not strongly favor either employee status or independent contractor status but that the primary factor of the right to control test strongly favored the plaintiffs and therefore, that the drivers were employees as a matter of law under California's right-to-control test.  *Id.* at 1105.

## C.   Application of the *Borello* Test to the Undisputed Facts in This Case

Plaintiffs are entitled to summary judgment on Exel's independent contractor defense only if the undisputed facts, viewed in the light most favorable Exel, demonstrate that Exel will be unable to meet its burden in establishing that Plaintiffs are independent contractors under California law.  In making this determination, the Court is "bound by decisions of the state's highest court."  *Nelson v. City of Irvine*, 143 F.3d 1196, 1206 (9th Cir. 1998).  Further, "[a]lthough a circuit court's prediction of state law is not binding in the same way as is its definitive interpretation of federal law, as a practical matter a circuit court's interpretations of state law must

78

be accorded great deference by district courts within the circuit." *Johnson v. Symantec Corp.,* 58 F. Supp. 2d 1107, 1111 (N.D. Cal. 1999). Here, the Ninth Circuit has applied the *Borello* factors to highly analogous facts, not once but twice in recent years, in *Ruiz* and *Alexander*, and concluded that the plaintiffs were employees; in *Alexander*, the Court found that the plaintiffs were entitled to summary judgment on this question and in *Ruiz*, the Court of Appeals applied what amounted to a summary judgment standard, finding that the undisputed facts established that plaintiffs were employees as a matter of law. While it might be appropriate for this Court to deviate from the Ninth Circuit's approach in *Alexander* and *Ruiz* if later-filed California cases suggested that these Ninth Circuit's opinions were not an accurate prediction of how the California Supreme Court would rule, *see Owen v. United States,* 713 F.2d 1461, 1464 (9th Cir. 1983), the Court finds no such cases here. To the contrary, the *Ayala* decision, which was issued by the Supreme Court of California before *Alexander* but after *Ruiz*, is in line with the Ninth Circuit's reasoning and holdings in those two cases. Applying the *Borello* factors to the facts of this case, the Court finds, as a matter of law, that Plaintiffs are employees rather than independent contractors and therefore, that Defendants cannot defeat Plaintiffs' request for summary judgment on this issue.

### 1. Exel's Right to Control Manner and Means of Accomplishing Result Desired

The undisputed facts establish that Exel exercises significant control over how Plaintiffs do their job, which is the "most important" factor under *Borello*. *See* 48 Cal. 3d at 350. As discussed below, this control is reflected in the ITA, Exel's Compliance Manual and training materials, and undisputed testimony relating to Exel's policies and procedures.

First, it is undisputed that the ITA allows Exel to terminate drivers without cause with 60 days notice. Piller Motion Decl., Ex. 8 (ITA) ¶ 3. The same provision was found to support the conclusion that the drivers in *Ruiz* were employees, *see* 754 F.3d at 1102, and is strong evidence of Exel's right to control its drivers. *See Ayala*, 59 Cal. 4th at 531.[23]

---

[23] The Court notes that there is some apparent ambiguity in the case law as to where the contractual right to terminate fits into the *Borello* inquiry. In *Alexander*, the court addressed this question as a secondary factor. *See* 765 F.3d at 994 (referring to the "right to terminate at will" as the first of the secondary factors). In *Ruiz*, on the other hand, the court cited the ITA provision

1   Second, it is undisputed that both drivers and their trucks must meet Exel's appearance

2   requirements.  In particular, Exel's policies require that drivers wear uniforms carrying the Exel

3   logo and adhere to a specific color scheme, while their trucks must meet certain dimensional and

4   color requirements and carry the Exel corporate name.  These requirements are reflected in policy

5   documents produced by Exel and confirmed by Exel's "person most knowledgeable."  *See* Piller

6   Reply Decl., Ex. 2 (Albarano Depo.) at 210-211 (testifying that drivers are required to wear Exel

7   uniforms at all California locations), Ex. 6 (describing "[t]he standard Exel delivery uniform"),

8   Ex. 7 (describing "Exel Standard Trucking Requirements"). Exel has not disputed that it requires

9   Plaintiffs to adhere to these rules; nor has it offered evidence that in actual practice, Plaintiffs are

10  permitted to deviate from these appearance requirements.  To the contrary, Exel's Greg Smigelsky

11  admitted that failure to follow these appearance requirements can be grounds for termination.

12  Piller Motion Decl., Ex. 7 (Smigelsky Depo.) at 79.  Again, no contrary evidence was offered that

13  controverts Smigelsky's testimony.  As the court in *Ruiz* found, this control over "'every exquisite

14  detail' of the drivers' appearance" is indicative of an employer-employee relationship.  *See* 754

15

16  permitting the company to terminate drivers without cause with sixty days' notice as evidence that
    the company retained a right to control the drivers, which is the primary inquiry under *Borello*.
17  *See* 754 F.3d at 1102.  It went on, however, to address the "[r]ight to terminate at will" as a
    secondary factor as well, finding that because the provision was mutual, it was "consistent with
18  either an employer-employee or independent contractor relationship."  *Id*. at 1105.  The Court
    finds that the approaches of these two cases are reconcilable and consistent with California case
19  law.  In particular, the California Supreme Court has recognized that "[p]erhaps the strongest
    evidence of the *right to control* is whether the hirer can discharge the worker without cause,
20  because '[t]he power of the principal to terminate the services of the agent gives him the means of
    controlling the agent's activities.'"  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522,
21  531 (quoting *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951) (emphasis added)).  The *Ayala* court also
    recognized, however, that "[t]he worker's corresponding right to leave is similarly relevant: 'An
22  employee may quit, but an independent contractor is legally obligated to complete his contract.'"
    *Id*. at 531 n. 2 (quoting *Perguica v. Indus. Accident Comm'n, 29 Cal. 2d 857, 860 (1947)).  *Ayala*
23  indicates that a contractual right to terminate without cause is an important consideration in
    determining whether there is a right to control but that other aspects of a termination clause (such
24  as whether it is mutual) may also be considered as secondary indicia of the nature of the
    employment relationship.  This is consistent with the Ninth Circuit cases; in *Alexander*, the
25  termination clause did not give the employer an "unqualified right to terminate" and thus, the court
    addressed the termination provision of the contract only as a secondary factor.  In contrast, in *Ruiz*,
26  where the contract gave the employer the right to terminate without cause, the court addressed this
    provision *both* with reference to the primary *Borello* inquiry (the right to control) and as a
27  secondary factor.  Because this case involves the same termination clause as was considered in
    *Ruiz*, the Court concludes that it is relevant both to the right of control *and* as a secondary factor
28  and therefore, like the *Ruiz* court, considers the termination clause of the ITA as part of both
    inquiries.

1    F.3d at 1102 (quoting *Estrada v. FedEx Ground Package Sys., Inc.,* 154 Cal. App. 4th at 11-12

2    ("FedEx's control over every exquisite detail of the  drivers' performance, including the color of

3    their socks and the style of their hair, supports the trial court's conclusion that the drivers are

4    employees, not independent contractors")); *see also Alexander*, 765 F.3d at 989 (holding that

5    appearance requirements that included grooming rules and uniforms, as well as requirements

6    governing truck colors and placement of logo, supported conclusion that drivers were employees).

7         Third, the undisputed facts indicate that Exel, as a matter of general policy, engages in

8    extensive training of its drivers and subjects them to significant managerial oversight, expecting

9    them to follow very specific guidelines as to how they perform their jobs.  This is reflected in

10   undisputed testimony as well as written training materials and manuals that use mandatory

11   language and provide detailed procedures for conducting a wide variety of activities related to the

12   services the drivers provide, and even scripts with language drivers should use in specific

13   situations.  *See, e.g.,* Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 158-160, 165-66 (testifying

14   that attendance at stand-up meetings is required and describing topics covered, including

15   "reinforcing certain safety guidelines"), 177-79 (testifying that managers may conduct "ride-

16   alongs" or "ride-behinds" to "make sure [a driver is not having problems or issues in making the

17   deliveries"), Ex. 7 (Smigelsky Depo.) at 13, 98-100, 104-05, 148 (testifying that when they are

18   hired, drivers are assigned "professional development coordinators" who work with drivers on

19   retail client policy and interaction with customers, both during initial orientation and later), 58-59

20   (testifying that not doing well on a client scorecard can be grounds for termination),  Ex. 14 (Moll

21   Depo.) at 88, 93-94 (describing how Cheetah system is used to monitor progress of drivers

22   throughout the day and testifying that reports are generated from this system and are provided to

23   managers so that they can provide feedback to drivers), 152 (testifying that when a new driver

24   starts, Exel wants the driver to "go through the Safer Way training"), Ex. 15 (Compliance Manual)

25   at EDV000308 ("Every Contractor/driver is required to maintain their qualification status as

26   defined by 49 CFR § 391 and company policy"), EDV000320 ("After an accident, never accept or

27   place blame on any person and do not sign anything") ("Drivers are expected to make deliveries in

28   accordance with the expectations of our customers") ("Be courteous and cooperative with the

81

1   homeowner.  If Contractor/driver encounters any problem, notify the dispatcher as soon as

2   possible") (where "value of the loss [for in-home damage claims] is greater than $500" the driver

3   must report the claim to a special hotline), Ex. 34 (Exel Direct Driver Training:  US DOT

4   Regulations) at EDV001561 ("Every driver must complete the Safer Way of Defensive Driving

5   Program"), Ex. 35 (The Exel Safer Way of Driving) at EDV000455 (instructions for drivers at

6   scene of accident including specific statement drivers should make if asked for comment by

7   member of news media), Ex. 36 (Ride and Evaluation Document), Ex. 38 (Manager Ride-A-Long

8   Compliance Checklist), Ex. 40 (Exel's Acceptance Requirements of Delivery Specialist) at

9   EDV009746 (stating that Exel provides "unmatched quality service" and promising to "exceed the

10  expectations of [Exel's] client"); *see also* Declaration of Joshua Konecky in Support of Plaintiffs'

11  Motion for Class Certification, Ex. 14 (instruction DVDs:  "The Safer Way of Protecting Floors"

12  and "The Safer Way of Preventing Water Damage").

13          Admittedly, Exel has offered some evidence that the degree of oversight that is actually

14  exercised over particular drivers may vary somewhat.  Several drivers testified that they

15  sometimes altered the order of the deliveries on their manifests when a customer was unavailable

16  or when doing so would be more efficient, and at least one expressly testified that he did not

17  always ask for permission from Exel dispatchers before making these changes.  *See* Hanson

18  Opposition Decl., Ex. N (Torres Depo.) at 46-47 (testifying that where he had to make two

19  deliveries in same area but manifest had him making a delivery somewhere else between the first

20  and second delivery, he called the customer to see if he could rearrange the order of the

21  deliveries), Ex. O (Jauregui Depo.) at 56-60 (testifying that sometimes he adjusted the order of the

22  stops if he thought the route was not good and the customers agreed, and that usually he did not

23  call in to Exel for permission to make the change), Ex. P (Marinov Depo.) at 36-37 (testifying that

24  when he received his manifest in the morning he would call customers and try to come up with

25  more efficient route and that was how he completed route earlier)).  In addition, Exel points to

26  testimony by one driver that he had never experienced a ride-along and that he remembered only

27  one follow-along, where an Exel employee and a Sears employee followed him for one or two

28  stops and asked him if everything was going okay.  Hanson Opposition Decl., Ex. F (Cifuentes

United States District Court
Northern District of California

82

1   Depo.) at 103-04.

2          These variations in Exel's practices do not give rise to a *material* dispute of fact.  Even

3   assuming Exel has not conducted ride-alongs of some of its drivers, and that Exel drivers are

4   permitted to rearrange the order of their stops on occasion, either because a customer is

5   unavailable or the order of deliveries on the manifest is inefficient, this limited flexibility is not

6   inconsistent with the conclusion that the degree of control retained by Exel is sufficient to

7   demonstrate an employer-employee relationship. *See Alexander*, 765 F.3d at 991-92 (recognizing

8   that delivery drivers may be employees, despite operating with some degree of autonomy, because

9   the employer exercises "all necessary control" under *Borello*).  Exel does not dispute that it can

10  (and does) conduct ride-alongs and follow-alongs of its drivers, that each morning it provides its

11  drivers with a list of deliveries, including specific time windows for each delivery, and that it

12  monitors the drivers' progress throughout the day.  Nor does it dispute that where a driver is late

13  or a problem arises, the driver is expected to contact Exel dispatchers, or that the results of Exel's

14  daily monitoring of its drivers are used to give feedback to drivers.  In other words, as in

15  *Alexander* and *Ruiz*, Exel retains the right to exercise extensive control over its drivers, whatever

16  minor variations there may be between drivers with respect to the exercise of that authority.  *See*

17  *Alexander*, 765 F.3d at 990; *Ruiz*, 754 F.3d at 1101.

18         The undisputed facts show that Exel also retains control over *when* its drivers perform their

19  work.  It is undisputed that Exel drivers are required to attend scheduled morning stand-up

20  meetings and that at these meeting, Exel provides drivers with daily manifests that set out the

21  delivery locations and time windows for delivery.  Thus, while Exel does not "set specific working

22  hours down to the last minute," it has a "great deal of control over drivers' hours" because its

23  managers decide what deliveries to assign to the drivers.  *See Alexander*, 765 F.3d at 989-90;

24  Piller Motion Decl., Ex. 5 (Albarano Depo. I) at 102-03 (testifying that Exel puts together the

25  overall routes, namely, the stops and time windows, while the driver "determines the specific

26  streets and roads to take in order to meet those time windows"), Ex. 7 (Smigelsky Depo.) at 51

27  (testifying that Exel expects drivers to make deliveries within time windows provided), Ex. 11

28  (Villalpando Depo.) at 177 (testifying that drivers have no choice as to their routes); Ex. 19

United States District Court
Northern District of California

83

1   (Saravia Depo.) at 50, 52 (testifying that Exel came up with his routes during the night and sent

2   them to his phone and that he had to arrive at 5:30 am to attend morning standup meeting).  Exel

3   makes much of the testimony of some individual drivers that they have been permitted to take

4   time off for vacations or to work part-time for Exel.  Again, however, this evidence does not create

5   a material dispute of fact because working a part-time schedule and taking vacations is no more

6   characteristic of independent contractors than it is of employees.  *See Air Couriers Int'l v. Emp't*

7   *Dev. Dep't*,  150 Cal. App. 4th at 46-47 ("no inconsistency between employee status and the

8   drivers discretion on when to take breaks or vacation" where drivers worked regular schedule).

9           Similarly, the Court rejects Exel's reliance on testimony that drivers are permitted to hire

10  helpers and second drivers and operate more than one truck to show that Plaintiffs are not

11  employees.  Virtually the same argument was rejected by the Ninth Circuit in both *Alexander* and

12  *Ruiz*.  In *Alexander*, as in this case, FedEx argued that the drivers' "ability to take on multiple

13  routes and vehicles and to hire third-party helpers" was inconsistent with employee status.  765

14  F.3d at 993.  The court rejected this argument on two grounds.  First, it looked to *Borello*, citing

15  the California Supreme Court's reasoning that "[a] business entity may not avoid its statutory

16  obligations by carving up its production process into minute steps, then asserting that it lacks

17  'control' over the exact means by which one such step is performed by the responsible workers."

18  *Id*. at 991 (quoting *Borello*, 48 Cal. 3d at 357).  Second, the court found that "[t]here is no

19  indication that California has replaced its longstanding right-to-control test with the new

20  entrepreneurial-opportunities test developed by the D.C. Circuit.  Instead, California cases indicate

21  that entrepreneurial activities do not undermine a finding of employee status."  *Id*. at 993.  The

22  reasoning in *Alexander* applies here as well.[24]

23          The *Ruiz* court also found that the ability to hire helpers and second drivers was not

24  inconsistent with the conclusion that the plaintiffs were employees.  754 F.3d at 1102.  First, the

25

26  _____

27  [24] In a footnote, Exel implies that *Alexander* may be distinguishable because that case "was limited
    to 'drivers who personally drive full time for FedEx.'"  Defendants' Opposition at 2 n. 5.  In this
    case, however, the Court also has limited the class to individuals who have *personally* driven for

28  Exel.  Exel has not explained why the reasoning of *Alexander* would not apply to a class that
    includes both full-time and part-time drivers.

court pointed to the fact that "often the reason drivers hired helpers was that they were required to do so" by the employer. *Id.* Further, as to both helpers and second drivers, the company had the ultimate discretion as to whether to approve or disapprove of them and therefore, the drivers did not have "unrestricted right to choose these persons." *Id.* Finally, the court noted that "any additional drivers were subject to the same degree of control exerted by [the defendant] over the drivers generally." *Id.* at 1103. The reasoning of *Ruiz* is equally applicable here. It is undisputed that Exel typically requires drivers to use helpers, both for safety reasons and because the delivery of furniture and appliances requires a second person.[25] It is also undisputed that drivers and helpers must be approved by Exel before they can perform deliveries and that once approved, they are subject to all the same requirements as drivers generally.

For these reasons, the Court rejects Exel's assertion that Plaintiffs are not employees – or that there is a fact question as to its right to control the manner and means of their work – because some of them hire multiple drivers and helpers and operate more than one truck.

Similarly, the testimony of one class member, Mr. Cifuentes, that his company also performs deliveries for another motor carrier also does not change the Court's conclusion. At best, this evidence reflects the fact that there may be entrepreneurial opportunities available to individuals who drive for Exel. Notwithstanding such opportunities, however, all class members are subject to the extensive control of Exel when they perform deliveries for Exel, as discussed above, which is sufficient to demonstrate employee status under California law. *See Alexander*, 765 F.3d at 993.

Finally, the Court rejects Exel's attempt to avoid the legal consequences of its right to control its drivers by arguing that the detailed requirements it imposes on its drivers are merely intended to meet customer needs or comply with federal law. Exel has conceded that its safety requirements are more stringent than what is required under federal law. *See* Piller Motion Decl.,

---

[25] Exel cites testimony by Jason Moll that occasionally a second driver isn't required, but Moll conceded that a helper is required when the driver makes deliveries of furniture and appliances. *See* Piller Reply Decl., Ex. 8 (Moll Depo.) at 147. Further, he could not identify any specific routes driven by Exel drivers that do not require a helper. *Id.* Therefore, the Moll testimony is not sufficient to demonstrate a material issue of fact.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Ex. 5 (Albarano Depo. I) at 233 (admitting Exel's compliance and safety policies go above and

2   beyond legal requirements), Ex. 7 (Smigelsky Depo.) at 236 (testifying that Exel's Driver Safety

3   Accountability Program is more protective than federal law, providing for disqualification of a

4   driver under certain circumstances where federal law would not provide for disqualification).

5   Further, the detailed requirements as to customer service go far beyond what is necessary to ensure

6   that the drivers achieve the "end result" of the drivers' work, that is, to provide timely and

7   professional deliveries.  *See Alexander*, 765 F.3d at 990 (finding that no reasonable jury could find

8   that the carriers' detailed requirements for their drivers were "merely control of results under

9   California law").  In any event, even if these requirements were based, in part, on legal

10   requirements or the needs of customers, as Exel asserts, they are nonetheless indicative of the fact

11   that Exel retains the right to exercise extensive control over its drivers, supporting the conclusion

12   that the drivers are employees and not independent contractors.  *See Ruiz*, 754 F.3d at 1102 n. 5

13   (rejecting the district court's conclusion that appearance requirements did not reflect a right to

14   control because they were adopted in response to customer needs and explaining that the *Borello*

15   test does not require a showing of subjective intent; it looks only at whether the employer has the

16   right to control the drivers' work).

17                   **2.  Secondary Factors**

18          In light of the undisputed facts establishing Exel's right to exercise extensive control over

19   how Plaintiffs perform their work, the Court finds that the evidence offered by Exel as to *Borello*'s

20   secondary factors is insufficient to defeat summary judgment that Plaintiffs are employees.

21                   *a.   Distinct occupation or business*

22          This factor favors a finding that Plaintiffs are employees.  As in *Alexander*, the work

23   performed by Plaintiffs is "wholly integrated" into Exel's operation.  765 F.3d at 995 (citing

24   *Estrada*, 154 Cal. App. 4th at 8-9).  Plaintiffs "look like [Exel] employees [and] act like [Exel]

25   employees." *See id*.  Further, as in *Alexander* and *Ruiz*, the Court finds that this factor favors

26   Plaintiffs even though Plaintiffs have opportunities to hire extra drivers and helpers.  As the court

27   in *Alexander* found, "these opportunities themselves are only available subject to [Exel's] needs."

28   *See id*.  Moreover, Exel retains ultimate discretion to approve or reject drivers and helpers hired by

United States District Court
Northern District of California

1  Plaintiffs, and these drivers and employees are also subject to Exel's rules and requirements

2  restricting how and when they perform their work, as discussed above.

3            *b.   Work under principal's direction or by specialist without supervision*

4        The second factor slightly favors Plaintiffs.  *See Alexander*, 765 F.3d at 995.  It is

5  undisputed that drivers can chose the specific roads they take and, construing the facts in the light

6  most favorable to Exel, adjust their assigned routes when the stops are not ordered in a way that

7  makes sense.  These freedoms are outweighed, however, by the extensive supervision and

8  monitoring conducted by Exel of the drivers' work.  *See id.*; *see also Ruiz*, 754 F.3d at 1104.

9            *c.   Skill required*

10        This factor favors Plaintiffs.  As in *Ruiz* and *Alexander*, an individual needs no special

11  skills to be hired as a driver for Exel.  All that is required is that an individual be at least 21 years

12  old, pass a physical examination and drug test, undergo a criminal background check, and have a

13  clean driving record.  *See Piller Motion Decl., Ex. 15 (Compliance Manual) at EDV000305-308;*

14  *Alexander*, 765 F.3d at 995; *Ruiz*, 754 F.3d at 1104 (noting that district court had erred in relying

15  on skill required to install appliances to find that this factor supported a finding that plaintiffs were

16  independent contractors and citing the *Estrada* court's conclusion that delivery drivers were

17  employees based, in part, on the fact that they needed no experience to get the job and only had to

18  know how to drive).

19            *d.   Provision of instrumentalities, tools and place of work*

20        This factor slightly favors Exel.  As in *Alexander*, Plaintiffs provide their own trucks[26] and

21  buy their own tools.  The significance of this factor is undercut, however, by the oversight Exel

22  exercises over the equipment Plaintiffs use, not only recommending vendors and requiring that

23  ───────────────────────

24  [26] The Court notes that for part of the class period, until June of 2013, Exel rented trucks on behalf

25  of class members and deducted the rental payments from their compensation.  *Id.* (citing Piller
Motion Decl., Ex. 5 (Albarano Depo. I) at 215 (testifying that prior to June 2013, Exel could "rent
a vehicle . . . assign it to the contractor and do deductions from the settlement, a contractor's

26  settlement, to pay for the rental").  This undisputed fact cuts in Plaintiffs' favor.  *See Ruiz*, 754
F.3d at 1104 (finding that this factor favored the plaintiffs because the company supplied the

27  trucks and advanced the drivers the costs of leasing and maintaining the trucks, even though the
costs were ultimately paid by the drivers through paycheck deductions).  The Court's conclusion

28  that Plaintiffs are not independent contractors would be the same, however, even if Plaintiffs did
not lease their trucks through Exel at any time during the class period.

1   Plaintiffs use particular types of cell phones and trucks, but also providing delivery supplies, such

2   as blankets, straps and packaging tape, which are then charged back to the drivers.  *See* Piller

3   Motion Decl., Ex. 7 (Smigelsky Depo.) at 200-01 (testifying that Exel purchases certain types of

4   equipment such as blankets, straps and packaging tape, which it then charges back to the drivers),

5   Ex. 20 (ELA) ¶ 10 & Ex. D (listing specific charge-back items, including delivery supplies);

6   *Alexander*, 765 F.3d at 995.  In any event, this factor does not outweigh Exel's right to exercise

7   extensive control over its drivers.  As the California Supreme Court explained in *Tieberg*,

8   ownership of tools, and particularly tools that have substantial value, is significant, under the

9   common law, to the extent it may show that "the alleged servant will follow the directions of the

10  owner in their use." *Tieberg v. Unemployment Ins. Apeals Bd.*, 2 Cal. 3d 943, 954 (1970) (citing

11  Restatement (Second) of Agency).  Any inference that the drivers are *not* subject to Exel's control

12  because Exel does not own Plaintiffs' trucks or tools is clearly contradicted by the undisputed

13  facts.  Further, as the *Alexander* court noted, "numerous California cases find employee status

14  even though the employee provides his own vehicle or tools."  *Id.* (citing *Borello*, 48 Cal. 3d at

15  357; *Estrada*, 154 Cal. App. 4th at 5; *Air Couriers*, 150 Cal. App. 4th at 938; *JHK Enter., Inc. v.

16  Dep't of Indus. Relations*, 142 Cal. App. 4th 1046, 1051 (2006); *Toyota Motor Sales U.S.A., Inc. v.

17  Superior Court*, 220 Cal. App. 3d 864, 876 (Cal. Ct. App. 1990), as modified (June 5, 1990)).

18              *e.   Length of time for which services are performed*

19          This factor favors Plaintiffs.  As the court in *Alexander* explained, the length and indefinite

20  nature of a driver's tenure with a delivery company supports the conclusion the driver is an

21  employee rather than an independent contractor who is "hired to perform a specific task for a

22  defined period of time." 765 F.3d at 996 (citing *Narayan v. EGL, Inc.*, 616 F.3d 895, 903 (9th Cir.

23  2010); *Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 855 (2008) ("[T]he notion that an

24  independent contractor is someone hired to achieve a specific result that is attainable within a

25  finite period of time, such as plumbing work, tax service, or the creation of a work of art for a

26  building's lobby, is at odds with carriers who are engaged in prolonged service to [an employer]");

27  *Air Couriers*, 150 Cal. App. 4th at 938 (noting that lengthy tenure of delivery drivers with

28  employer was inconsistent with independent contractor status)).  The ITA provides that the term of

United States District Court
Northern District of California

88

1    the agreement is one year but that it continues in effect from year-to-year unless terminated.  *See*

2    Piller Motion Decl., Ex. 8 (ITA) ¶ 2 ("Duration" provision).  In other words, the drivers are hired

3    for an indefinite term, which supports the conclusion that they are employees rather than

4    independent contractors.

5                              *f.   Method of Payment*

6            This factor addresses whether a driver is paid based on the time he or she works

7    (supporting a finding that the driver is an employee) or by the job (supporting the independent

8    contractor classification).  Here, it is undisputed that the drivers are paid by the job, as set forth in

9    the ITA.  *See* Piller Motion Decl., Ex. 8 (ITA) ¶ 4 & Ex. A.  Further, while Plaintiffs contend this

10   case is like *Ruiz*, where the court found that the piece rate resembled a regular rate of pay because

11   the drivers were assigned approximately the same number of deliveries every day, the evidence is

12   mixed on this question.  *See Ruiz*, 754 F.3d at 1104-1105.  In particular, as discussed above, Exel

13   has presented evidence that some Plaintiffs work less than full-time.  Because the undisputed facts

14   do not establish that the piece rate paid by Exel is, in practice, more like a regular rate of pay, the

15   Court finds that this factor favors Exel.  Again, however, this factor does not defeat Plaintiffs'

16   request for summary judgment on this issue.  As the court explained in *Tieberg*, this factor is a

17   mere "indicia of control."  2 Cal. 3d at 953.  Thus, "[w]here, as here, there is ample independent

18   evidence that the employer has the right to control the actual details of the [drivers'] work and that

19   it exercises this right, the fact that, for example, the employee is paid by the job rather than by the

20   hour appears to be of minute consequence."  *Id*.

21                              *g.   Parties' belief*

22           This factor slightly favors Exel to the extent that the ITA and ELA describe the drivers as

23   independent contractors.  It is well-established, however, that "the belief of the parties as to the

24   legal effect of their relationship is not controlling if as a matter of law a different relationship

25   exists."  *Grant v. Woods*, 71 Cal. App. 3d 647, 654 (1977); *see also Alexander*, 765 F.3d at 996

26   (acknowledging that Operating Agreement described drivers as independent contractors but

27   employer's policies and procedures establishing extensive control over drivers "belied" that

28   characterization); *Ruiz*, 754 F.3d at1105 (finding that "parties' label is not dispositive and will be

                                         89

1 | ignored if their actual conduct establishes a different relationship") (quoting *Estrada*, 154 Cal.

2 | App. 4th at 10-11)).

3 |                  *h.   Right to terminate at will*

4 |       To the extent the parties have a mutual right to terminate the contract, this secondary factor

5 | is "consistent with either an employer-employee relationship or independent-contractor

6 | relationship." *See Ruiz*, 754 F.3d at 1105.  Therefore, this factor favors neither Plaintiffs nor Exel.

7 |                 *i.   Work part of principal's regular business*

8 |       This factor favors Plaintiffs.  It is undisputed that the work Plaintiffs perform – the pickup

9 | and delivery of furniture and appliances – is essential to Exel's core business.  *See Alexander*, 765

10 | F.3d at 996; *Ruiz*, 754 F.3d at 1105.

11 |          **3.   Conclusion**

12 |       The undisputed facts show that Exel had the right to control the details of Plaintiffs' work

13 | and that the secondary factors under *Borello* also, on balance, point to the conclusion that

14 | Plaintiffs are employees rather than independent contractors.  Therefore, Plaintiffs are entitled to

15 | summary judgment in their favor as to their classification.

16 | **VI.    CONCLUSION**

17 |       For the reasons stated above, Defendants' Motion is GRANTED as to Claims Nine, Ten,

18 | Eleven and Twelve, which are dismissed with prejudice, and DENIED in all other respects.

19 | Plaintiffs' Motion is GRANTED.  The parties are instructed to meet and confer as to the

20 | remaining schedule in the case, including a schedule for Plaintiffs to propose one or more class

21 | representatives who are currently employed by Exel, and to submit a joint proposed schedule for

22 | the case no later than September 14, 2015.  A Case Management Conference shall be held on

23 | September 25, 2015 at 2:00 p.m.

24 |       **IT IS SO ORDERED.**

25 | Dated:  September 3, 2015

_____

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California