1   Joshua G. Konecky (SBN 182897)
2   Nathan B. Piller (SBN 300569)
    SCHNEIDER WALLACE
3   COTTRELL KONECKY WOTKYNS LLP
    2000 Powell Street, Suite 1400
4   Emeryville, California 94608
    Telephone: (415) 421-7100
5   Facsimile: (415) 421-7105
    jkonecky@schneiderwallace.com
6   npiller@schneiderwallace.com

7   Ira Spiro, SBN 67641
    SPIRO LAW CORP.
8   11377 W. Olympic Blvd., Fifth Floor
    Los Angeles, CA 90064
9   Telephone: (310) 235-2350
    Facsimile: (310) 235-2351
10  ira@spiromoore.com

11  Jeff Holmes, SBN 100891
    BLANCHARD LAW GROUP, APC
12  3311 East Pico Blvd.
    Los Angeles, CA 90032
13  Telephone: (310) 396-9045
    Facsimile: (970) 497-4922
    JeffHolmesJH@gmail.com

14  Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17  DANIEL VILLALPANDO, individually and     )   Consolidated Cases:
18  on behalf of all others similarly situated,  )   Case No. 3:12-cv-04137-JCS
                                                 )   Case No. 4:13-cv-03091-JCS
19                                               )
            Plaintiff(s),                        )   **PLAINTIFFS' DAUBERT MOTION TO**
20                                               )   **EXCLUDE SPECULATIVE,**
                                                 )   **UNSUBSTANTIATED AND LEGAL**
21                                               )   **OPINION TESTIMONY OF JONATHAN**
            vs.                                  )   **WALKER**
22                                               )
                                                 )
23  EXEL DIRECT INC., et al.,                    )   Date:  April 20, 2016
                                                 )   Time:  9:30 a.m.
24          Defendant(s).                        )   Judge: The Honorable Joseph C. Spero
                                                 )
25                                               )
                                                 )
26                                               )
27

TAFITI SHEKUR, individually and on               )
behalf  of all others similarly situated,         )
                                                  )
                    Plaintiff,                    )
                                                  )
          vs.                                      )
                                                  )
EXEL DIRECT INC., et al.,                          )
                                                  )
                    Defendants.                    )
                                                  )
                                                  )

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that, on **April 20, 2016**, at **9:30 a.m.**, or as soon thereafter as

4

counsel may be heard, plaintiffs will move the Court for an Order excluding the opinion

5

testimony of Dr. Jonathan Walker that is speculative, unsubstantiated and/or which constitute

6

conclusions of law.

7

This motion is based on the accompanying memorandum of points and authorities; the

8

Declaration of Nathan Piller, including the deposition transcript excerpts and documents attached

9

to the Declaration; such oral argument as may be heard by the Court; and all other papers on file

in this action.

10

Respectfully submitted,

11

Dated:  February 26, 2016          SCHNEIDER WALLACE

12                                  COTTRELL KONECKY WOTKYNS LLP

13

14                                  /s/ *Joshua G. Konecky*

15                                      Joshua G. Konecky
                                        Counsel for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 4

   A.  The Court's gatekeeping role under FRE 702 is to prevent the admission of
      speculative opinion testimony that is unhelpful to the trier of fact ..................................... 4

   B.  Dr. Walker's opinion testimony is unhelpful to the trier of fact because it relies on
      speculation based on the experiences of a few "extreme examples" who comprise
      but a tiny fraction of the class ......................................................................................... 5

   C.  Dr. Walker is not qualified to opine on mileage reimbursement rates .............................. 7

   D.  Dr. Walker's opinion incorrectly presumes that Plaintiffs must prove their damages
      with precision even though Exel's records are incomplete and inadequate ........................ 9

   E.  Dr. Walker's Report is replete with legal conclusions disguised as expert opinion .......... 14

   F.  Dr. Walker's critique of Plaintiffs' expert testimony regarding meal and rest period
      claims misconstrues Plaintiffs' theory of recovery and draws improper
      legal conclusions ........................................................................................................ 15

   G.  Dr. Walker's opinion that Class Members are better off as independent contractors
      than as Exel's second drivers is methodologically flawed and irrelevant ........................ 19

   H.  Walker's extrapolation from unrepresentative "extreme examples" misleads the
      trier of fact about Exel's realistic exposure to the Class .................................................. 20

III.  CONCLUSION ................................................................................................. 22

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

3
*Anderson v. Mt. Clemens Pottery Co.*
   328 U.S. 680 (1946)..................................................................... 10

4
*Avila v. Willits Envtl. Remediation Trust*
   633 F.3d 828 (9th Cir. 2011) ........................................................ 7

5

6
*Bouaphakeo v. Tyson Foods, Inc.*
   765 F.3d 791 (8th Cir. 2014) ...................................................... 11

7
*Butler v. Home Depot, Inc.*
   1997 WL 605754 (N.D. Cal. Aug. 29, 1997..................................... 20

8
*Childress v. Ozark Delivery of Missouri L.L.C.*
   2014 WL 7181038 (W.D. Mo. Dec. 16, 2014) ................................. 11

9

10
*Clear-View Techs., Inc. v. Rasnick*
   2015 WL 3505003 (N.D. Cal. June 2, 2015) ................................... 16

11
*Crow Tribe of Indians v. Racicot*
   87 F.3d 1039 (9th Cir.1996) ...................................................... 14

12

13
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
   509 U.S. 579 (1993).......................................................... 4, 5, 7, 19

14
*Gen. Elec. Co. v. Joiner*
   522 U.S. 136 (1997)............................................................. 15, 22

15

16
*Hart v. Rick's Cabaret Int'l, Inc.*
   73 F. Supp. 3d 382 (S.D.N.Y. 2014)............................................. 10

17
*In re Ford Tailgate Litig.*
   2015 WL 7571772 (N.D. Cal. Nov. 25, 2015) ................................. 19

18

19
*In re Polypropylene Carpet Antitrust Litig.*
   93 F. Supp. 2d 1348 (N.D. Ga. 2000)........................................... 22

20
*In re Reliant Energy Erisa Litig.*
   2005 WL 5989791 (S.D. Tex. Aug. 19, 2005) ................................... 5

21
*Jimenez v. Allstate Insurance Co.*
   765 F.3d 1161 (9th Cir. 2014) ..................................................... 13

22

23
*Kozar v. Sharp Elecs. Corp.*
   2005 WL 2456227 (W.D. Pa. Sept. 30, 2005)................................... 5

24
*Leyva v. Medline Indus. Inc.*
   716 F.3d 510 (9th Cir. 2013) ...................................................... 13

25
*McLaughlin v. Ho Fat Seto*
   850 F.2d 586 (9th Cir. 1988) ...................................................... 10

26

27

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*
  877 F.2d 1333 (7th Cir. 1989) ................................................................ 7, 19

*Ollier v. Sweetwater Union High Sch. Dist.*
  768 F.3d 843 (9th Cir. 2014) ...................................................................... 5

*Pickholtz v. Rainbow Techs., Inc.*
  260 F. Supp. 2d 980 (N.D. Cal. 2003) ...................................................... 13

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*
  371 F. App'x 719 (9th Cir. 2010) .............................................................. 14

*Pooshs v. Philip Morris USA, Inc.*
  904 F. Supp. 2d 1009 (N.D. Cal. 2012) ...................................................... 7

*Radware, Ltd. v. F5 Networks, Inc.*
  2016 WL 590121 (N.D. Cal. Feb. 13, 2016) ............................................... 5

*Samuels v. Holland Am. Line-USA Inc.*
  656 F.3d 948, 952 (9th Cir. 2011) .............................................................. 5

*U.S. v. Williston*
  2015 WL 3490825 (E.D. Okla. June 2, 2015) .......................................... 22

*Voisine v. Danzig*
  1999 WL 33117132 (D. Me. Oct. 26, 1999) ............................................... 5

*Watkins v. Schriver*
  52 F.3d 769 (8th Cir. 1995) ...................................................................... 7

**State Cases**

*Benton v. Telecom Network Specialists, Inc.*
  220 Cal. App. 4th 701 (2013) .................................................................. 17

*Bradley v. Networkers Int'l, LLC*
  211 Cal. App. 4th 1129 (2012) ................................................................ 17

*Brinker Restaurant Corp. v. Super. Ct.*
  53 Cal. 4th 1004 (2012) ........................................................................... 17

*Gattuso v. Harte-Hanks Shoppers, Inc.*
  42 Cal. 4th 554 (2007) ........................................................................... 2, 8

*Hernandez v. Mendoza*
  199 Cal.App.3d  721 (1988) ..................................................................... 10

*Hudgins v. Neiman Marcus Grp., Inc.*
  34 Cal. App. 4th 1109 (1995) .................................................................. 14

*Safeway, Inc. v. Superior Court of Los Angeles County*
  238 Cal.App.4th 1138 (2015) .................................................................. 18

**Rules**

Fed. R. Evid. 702 ......................................................................... 4, 5, 7

**State Regulations**

Cal. Code Regs. tit. 8, § 11090 ................................................................................. 14, 16

**Other Sources**

IRS website, https://www.irs.gov/uac/Newsroom/2016-Standard-Mileage-Rates-for-Business-
Medical-and-Moving-Announced................................................................................. 8

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This Court's Order of September 3, 2016, granted summary judgment in favor of Plaintiffs based on undisputed evidence that Defendant Exel Direct Inc. ("Exel") has misclassified a certified class of approximately 386 delivery drivers as independent contractors rather than employees. [ECF 210]  Trial is set for May 31, 2016.  With respect to class liability, Plaintiffs are primarily relying on Exel's uniform operational documents and the admissions from its executive team and operations managers to establish that the company's uniform compensation and break policies do not measure up to the requirements of California law.  In contrast, Exel's defense on class liability is to speculate that it would have just paid its Drivers the same or less if they were classified as employees, and that not having a meal and rest period policy that conforms with California law somehow means that Drivers are free to take breaks whenever they please.

Neither side has presented any trial experts on the issue of class liability.  On damages, Plaintiffs have presented two experts, Wesley Curtis and David Breshears. *See* Exhibits A-D to Declaration of Nathan Piller in Support of Motion to Exclude Opinion Testimony of Jonathan Walker ("Piller Decl.").  Exel did not present any affirmative experts.  Instead, Exel presented one rebuttal expert, Dr. Jonathan Walker. *See* Piller Decl. at Exhibit E.  Dr. Walker's only experience in wage and hour cases is to opine or consult for the defense. *See* Deposition of Jonathan Walker ("Walker Dep."), at 8:9-15, attached as Exhibit F to Piller Decl.  He is not an expert in the management of logistics companies, not an expert Exel's practices, and hasn't spoken, interviewed or surveyed anyone from Exel. *Id.* at 19:7-12, 21:7-23.  In his report, Dr. Walker speculates, opines and makes inadmissible (and incorrect) legal assumptions about alleged deficiencies in the expert reports of Mr. Curtis and Mr. Breshears.

Mr. Curtis is a former California Highway Patrolman who has operated a trucking consulting business over the past 10 years.  Piller Decl., Exhibit A. Mr. Curtis calculated the cost-per-mile of driving a truck with specifications that matches Exel's standard truck

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

requirements.  He did this by drawing on his own specific experience in the field of trucking audits, inspections and cost analysis, and applying it to Exel's own operational policies, including Exel's standard truck requirements. *Id.* After Mr. Curtis submitted his initial report, Exel produced 20 requests for proposals (RFPs) that it had made to clients in California. (Plaintiffs had to bring a motion to compel to obtain these documents.)  Exel's RFPs contained cost-per-mile figures that were very similar to Mr. Curtis's numbers. *See* Piller Decl., Exh. B at pages 21-22; Exh. D at p.3, ¶ 19.

Although he attempts to critique Mr. Curtis in his report, Dr. Walker admits in deposition that he has no expertise or experience in calculating the cost-per-mile of operating any motor vehicle. Walker Dep. at 76:23-78:10. Dr. Walker also admitted in deposition that he did not even contemplate the concept of determining driving related expenses based on an incremental cost-per-mile approach until after submitting his expert report, *id.* at 73:12-74:7, despite the California Supreme Court's endorsement of this methodology as a means for determining vehicle expense reimbursement obligations of an employer. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 569 (2007).  Dr. Walker's testimony with respect to Mr. Curtis's costs per mile calculations is inadmissible because he is not qualified to opine on mileage reimbursement rates and how they are determined.

Dr. Walker's attack on Mr. Breshears also suffers from several evidentiary problems. By way of background, Mr. Breshears is a certified public accountant in financial forensics, who has worked on numerous cases involving the determination of damages potentially owed to employees misclassified as independent contractors. *See* Piller Decl., Exhibit C.  Mr. Breshears calculated potential wage deduction damages owed to the Class here through the straightforward task of adding up the "deduction" line items presented in the compensation data Exel made available to Plaintiffs.  He then calculated out-of-pocket expense reimbursement damages by applying Mr. Curtis's cost-per-mile calculation to all the electronically stored mileage and dispatch data that Exel made available.  In addition, Mr. Breshears calculated premiums owed due to Exel's alleged failure to pay overtime, failure to pay minimum wage for daily morning

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

meetings, and failure to provide off-duty breaks. He did this by using the usable data Exel made available, and supplementing it with the testimony from Exel's own executive team and operational managers in California, as to the days and hours typically worked by the Class.

In his speculative critique of Mr. Breshears, Dr. Walker simply ignores the manager testimony and operational documents upon which Mr. Breshears properly relied. Instead, Dr. Walker's approach, according to the email instructions he wrote to his staff, was to "identify one or two extreme examples" of Class Members who only worked on an infrequent basis, and then use those few outliers to speculate about how the class as a whole might have different damages from those presented by Mr. Breshears.

Dr. Walker's resulting opinion is inadmissible in several respects. First, it is based on drawing conclusions from a small number of outliers to make generalizations about a larger class—generalizations that contradict the very company admissions Dr. Walker fails to analyze. Second, the report is littered with inadmissible speculation and conjecture. Third, Dr. Walker relies on inadmissible legal presumptions about which expenses are recoverable and which are not recoverable under Labor Code § 2802, as well as a fundamental misunderstanding of Plaintiffs' theory of recovery on the meal and rest period claims. Fourth, as discussed above, Dr. Walker admits he has no expertise or experience whatsoever on how to calculate driving related expenses using a cost-per-mile formula, and therefore has no grounds to criticize Mr. Breshears' incorporation of Mr. Curtis's cost-per-mile figures. Fifth, Dr. Walker devotes a significant portion of his report to speculation about how some Class Members may have done better as independent contractors rather than employees. Aside from the conjecture, this testimony is simply irrelevant to the legal measure of damages. Moreover, Dr. Walker's opinion is premised on an unreliable and tainted methodology for determining the comparable "market rate" for employee wages.

Finally, and perhaps most significantly, Dr. Walker's entire approach turns the remedial protections of the Labor Code on their head, because it is premised on the unprecedented notion that employees who are subject to an unlawful compensation scheme cannot recover damages if

the employer's records are not sufficient to enable an exact computation. Indeed, the lion's share of Dr. Walker's complaints concerning Mr. Breshears' report can be traced back to Exel's own failure to produce complete data in a usable format. While the underlying reason for this may be that Exel simply did not maintain better data, it is against the law and public policy to penalize the employees for their employer's failure to maintain complete and accurate records. Yet, if his testimony is admitted, Dr. Walker's opinions would risk misleading the jury into believing that an employer can evade compensating its employees for an unlawful policy simply by neglecting to keep or produce complete and usable records of the unpaid hours or unreimbursed expenses resulting from that very same policy.

For all the foregoing reasons, Dr. Walker's Report should be excluded in its entirety as speculative, irrelevant, indistinguishable from bare legal conclusions, and therefore unhelpful to the trier of fact. Alternatively, any testimony contained in Dr. Walker's Report that is based on unfounded speculation, indistinguishable from legal conclusions, irrelevant, or concerns mileage reimbursement rates, should be excluded as unhelpful to the trier of fact.

## II. ARGUMENT

### A. The Court's gatekeeping role under FRE 702 is to prevent the admission of speculative opinion testimony that is unhelpful to the trier of fact

Under Federal Rules of Evidence, Rule 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 720. Expert testimony must be excluded, however if, (1) it is not based on the special knowledge of the expert; or (2) it is not helpful to the finder of fact. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993). The expert's "knowledge"

must be "more than subjective belief or unsupported speculation." *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011); *see also* Fed. R. Evid. 702 advisory committee's note, 2000 ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.").

The Court assumes this gatekeeping role to "prevent jury exposure to confusing and unreliable expert testimony" that is not helpful in assisting the trier of fact. *See Daubert*, 509 U.S. at 595–97; *see also In re Reliant Energy Erisa Litig.*, 2005 WL 5989791, at *2 (S.D. Tex. Aug. 19, 2005). By excluding speculative and irrelevant testimony, the Court ensures "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Radware, Ltd. v. F5 Networks, Inc.*, 2016 WL 590121, at *3 (N.D. Cal. Feb. 13, 2016).

**B. Dr. Walker's opinion testimony is unhelpful to the trier of fact because it relies on speculation based on the experiences of a few "extreme examples" who comprise but a tiny fraction of the class**

Under the *Daubert* standard, "speculative testimony is inherently unreliable" and thus inadmissible under FRE 702. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014); *see also Kozar v. Sharp Elecs. Corp.*, 2005 WL 2456227, at *1 (W.D. Pa. Sept. 30, 2005) ("The inquiry into methodology is designed to ensure that an expert's opinions are based upon methods and procedures of science rather than on subjective belief or unsupported speculation.") (internal citations omitted); *Voisine v. Danzig*, 1999 WL 33117132, at *4 (D. Me. Oct. 26, 1999).

Dr. Walker's report is littered with speculation about how the Class Members' damages "could" be different than the figures presented in Mr. Breshears' Report if Mr. Breshears made different assumptions about how long Class Members work for Exel, how many miles they drive for Exel, how they maintain their trucks, and how they conduct themselves during the course of the day. *See* Walker Report, at ¶¶ 32, 33, 48-50, 93, 98, 99, 107.[1] In doing so, Dr. Walker

---

[1] Dr. Walker's report also is permeated by speculation and unsupported claims that Class Members may have benefitted from being classified as independent contractors instead of employees. *See, e.g.* Walker Report, at ¶ 7 (speculating that "[i]ncentive pay systems <u>may</u> benefit workers and companies simultaneously."); ¶ 9 (speculating that deponents' experiences "<u>could</u>

entirely disregards the evidence in the record concerning Exel's operations, including Exel's own testimony regarding the number of miles typically driven, the fact that Exel has standard truck requirements, and the fact that these requirements lead to driving related costs that Exel as a company measures consistently with Plaintiffs' experts.

Moreover, while Dr. Walker speculates about how Mr. Breshears' numbers might be different if he made different factual assumptions, he does not make any serious attempt to offer alternative facts that are borne out by the record, other than to cite snippets of testimony from what appear to be the "extreme examples" that he directed his staff to locate. *See* e-mail correspondence, at JW000040, attached as Exhibit F to Piller Decl.  For example, Dr. Walker criticizes Mr. Breshears for the possibility that he may have included data attributable to second drivers (who are not Class Members) in determining days worked or miles driven. *Id*. at 56-57. Yet, out of a class of 386 individuals, Dr. Walker can only identify 9 who even had a second driver, and many of these individuals testified that they drove full time. *See* Deposition of Edmundo Vega ("Vega Depo") at 43:4-44:13; Deposition of Mauricio Torres ("Torres Depo.") at 23:18-20; Deposition of Juan Mena ("Mena Depo.") at 27:4-16; 33:23-34:2; Deposition of Byron Cifuentes ("Cifuentes Depo.") at 27:6-14,  attached as Exhibits H, I, J, and K to Piller Decl.  Moreover, Dr. Walker makes no attempt to quantify the impact of even these few individuals on the overall damages model of Mr. Breshears.  Nor does he address admissions from Exel's managers, executives, and recruiters that the Drivers typically work full time, 5-6 days per week, and 260 days per year, on average. Deposition of Gregory Smigelksy ("Smigelsky Depo.") at 192:6-15; Deposition of Rene Albarano ("Albarano (PMK) Depo.") at

---

be materially different from the average Class Member."); ¶ 23 ("Presumably, the first few months as a contractor are atypical as the contractor is learning to operate more efficiently."); ¶ 11 ("Exel and Class Members alike may have benefited financially from the contractor model."); ¶ 15 ("Class Members may have benefited relative to working for Exel or anyone else as an employee. They may not even have chosen to service Exel if the only option had been to do so on an employee basis.") (emphasis added).  These opinions are unhelpful to the trier of fact because they amount to unsupported speculation, and for the additional reason that, as discussed in Section II.G., *infra*, they are simply irrelevant.

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

57:8-58:19; Deposition of Cristina De La Rosa ("De La Rosa Depo.") at 94:12-18, attached as Exhs. L, M and N to the Piller Decl.  In essence, Dr. Walker is using a few hand selected outliers to speculate about how damages might be different if Mr. Breshears made other assumptions that are not supported by the record.

### C.  Dr. Walker is not qualified to opine on mileage reimbursement rates

*Daubert* and its progeny make clear that opinions falling outside of the expert's area of expertise are inadmissible. *Daubert*, 509 U.S. at 588; Fed. R. Evid. 702 (providing that only "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.") (emphasis added); *see also e.g. Pooshs v. Philip Morris USA, Inc.,* 904 F. Supp. 2d 1009, 1019 (N.D. Cal. 2012) (reasoning that epidemiologist was qualified to testify on health effects of cigarettes, but lacked knowledge and training necessary to testify regarding cigarette design); *Avila v. Willits Envtl. Remediation Trust,* 633 F.3d 828, 839 (9th Cir. 2011) (reasoning that scientist was qualified to testify regarding toxicology generally, but lacked training or knowledge regarding metal working industries necessary to opine on whether a metalworking company had created the toxins at issue); *Watkins v. Schriver*, 52 F.3d 769, 711 (8th Cir. 1995) (reasoning that expert's qualification as a neurologist did not qualify him to testify regarding how a neurological accident occurred); *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (reasoning that expert's qualification as an economist did not qualify him to opine on traditional banking practices).

Here, Dr. Walker admittedly lacks knowledge or training regarding the calculation of mileage reimbursement rates, and does not claim to possess any qualifications bearing on mileage reimbursement rates. *See* Walker Report at ¶¶ 1-3; Walker Depo. at 76:23-78:10.  It should come as no surprise that Dr. Walker admits he does not know how mileage reimbursement rates are calculated. *Id*.

Moreover, Dr. Walker's Report shows that he may fundamentally misunderstand the purpose and function of cost-per-mile calculations as a method of calculating damages. For

1  example, Dr. Walker speculates that "short term drivers" would be "likely to avoid" the cost of

2  new tires because they would not have worked for Exel long enough to actually replace a tire

3  while they are with Exel, and thus that the cost of tires should not be factored into a reasonable

4  mileage reimbursement rate for such Class Members. *See* Walker Report at ¶ 32.  This statement

5  misunderstands the purpose of cost-per mile reimbursement rates.  Indeed, as Mr. Breshears

6  testified in deposition, "in any mileage-based figure, it's understood that the cost [] to replace a

7  tire is not as a result of that one moment when the nail punctures the tire.  It's the result of

8  driving 100,000 miles on those tires that caused them to some point go bad." Deposition of

9  David Breshears ("Breshears Depo.") at 173:4-25, attached as Exh. O to Piller Decl.  For his

10  part, Dr. Walker claimed not to know whether driving a truck even results in depreciation of

11  tires. Walker Depo. at 70:10-23.  In any event, factoring the cost of tires into a mileage

12  reimbursement rate (which amounted to merely 3 cents per mile of Mr. Curtis' overall mileage

13  reimbursement rate, *see* Curtis Report, at 16), is just one of many components of a reasonable

14  reimbursement rate measuring the monetary costs of miles driven. For purposes of calculating

15  damages, it does not matter *when* a Class Member actually *replaces* his tires—what matters is

16  that enough driving and commensurate wear and tear will require eventual tire replacement.

17         Indeed, mileage reimbursement rates are not a per-mile average calculated from a precise

18  aggregation of specific fixed costs that were actually incurred.  Rather, they are based on studies

19  of the "fixed and variable costs of operating an automobile," *See, e.g.* IRS website,

20  https://www.irs.gov/uac/Newsroom/2016-Standard-Mileage-Rates-for-Business-Medical-and-

21  Moving-Announced (last accessed February 20, 2016).  In this connection, California law allows

22  plaintiffs to measure driving-related expense reimbursement damages using a reasonable mileage

23  reimbursement rate, rather than precisely measuring each driving-related expense incurred, on an

24  item-by-item basis. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 569 (2007)

25  (reasoning that "few employers" reimburse "actual" driving-related expenses, and that employers

26  may satisfy their obligations by using a reasonable mileage reimbursement rate).

In any event, as demonstrated in Mr. Curtis' supplemental report, Exel's own cost-per mile estimates are, on average, generally equivalent to those reached by Mr. Curtis. *See* Amended Curtis Report, at 21-22; Supplemental Breshears Report at 3, ¶ 19 (Piller Decl., Exhs. B & D).  Thus, even if Dr. Walker was qualified to testify as to cost-per mile figures, his criticisms would still be contradicted by the estimates of the very party for whom is providing testimony.

For all the foregoing reasons, Dr. Walker's testimony regarding mileage reimbursement rates should be excluded as unreliable. *See* Walker Report, at ¶¶ 31-42.

### D.  Dr. Walker's opinion incorrectly presumes that Plaintiffs must prove their damages with precision even though Exel's records are incomplete and inadequate

The unsupported and prejudicial impact of Dr. Walker's approach is compounded by the fact that most, if not all, the arguable uncertainty in Mr. Breshears damages analysis results from Exel's failure to produce complete data in a usable format.  For example, Dr. Walker's contends that Mr. Breshears cannot make any assumptions about how many miles a Class Member drove if the Class Member is not in the "iDirect" data produced by Exel. *See* Walker Report, at ¶¶ 45, 46, 57, 60, 94.  This "iDirect" data contains the date, driver number and practical miles driven for approximately 135 of the 386 members of the Class. Breshears Report at ¶ 14; *see also* Walker Report, at ¶ 45 (stating that iDirect data covers 122 Class Members).  Dr. Walker contends that Mr. Breshears cannot calculate damages for the individuals who are not included in the data because he either does not have exact figures regarding their miles and/or cannot be sure that Exel's second drivers did not drive the Class Members' trucks. *See id*. at ¶¶ 45, 57, 60.  Yet, Dr. Walker's position is at odds with well-established authority that an employee cannot be denied recovery simply because the employer did not keep complete or accurate records.[2]

---

[2] Exel has suggested that Plaintiffs do not need to be constrained by the usable data, but instead could attempt to cobble together a damages analysis by sifting through thousands of bankers boxes of driver manifests and logs that it made available for review in a warehouse in Los Angeles.  However, as explained by Mr. Breshears in deposition, these papers are not usable. *See* Breshears Depo. at 32:17-33:11; 151:11-24; 241:16-242:12. They are disorganized, often illegible, and there is no indication that they are even complete. *See id*.  Moreover, it would be

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Indeed, it is well established in the area of wage and hour law that plaintiffs can demonstrate classwide damages through representative testimony and reasonable estimates. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-688 (1946) (explaining that when the employer's records are inaccurate or inadequate, "the solution … is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work…. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inferences to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."); *McLaughlin v. Ho Fat Seto,* 850 F.2d 586, 589 (9th Cir. 1988) ("We hold that the *Mt. Clemens Pottery* standard allows district courts to award back wages under the FLSA to non-testifying employees based upon the fairly representative testimony of other employees."); *Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 391 (S.D.N.Y. 2014) (approving of method of proving class damages through reasonable estimates of the amount of an how often employees received tips, as "[c]onsistent with the *Mt. Clemens* doctrine."); *Hernandez v. Mendoza*, 199 Cal.App.3d  721, 727 (1988) (applying *Mt. Clemens* burden shifting to wage and hour claims under California law).

Moreover, Plaintiffs also may rely on expert witness estimates based on reasonable extrapolation from partial data or surveys of Class Members where defendants' records are

prohibitively costly to copy and analyze them, and even then it is doubtful that they would provide the basis for an adequate analysis. *Id.* at 150:20-151:10.  Indeed, Dr. Walker is not even satisfied with deriving damages from tax returns; it is hard to imagine he would not equally criticize an attempt to extrapolate damages from a haphazard array of half-legible manifests and driver logs.  Plainly, the remedial provisions of the labor laws would not require misclassified employees to taken on this prohibitive level of administrative and financial burden just to obtain the remedy they are owed for the rights that have been violated.

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

incomplete or inaccurate. *See, e.g. Childress v. Ozark Delivery of Missouri L.L.C.*, 2014 WL 7181038, at *3 (W.D. Mo. Dec. 16, 2014) (reasoning that expert could estimate damages in wage and hour class action through "reasonable extrapolation," based on the "policy rationale" discussed in *Mt. Clemens*); *see also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 799 (8th Cir. 2014) (permitting expert witness extrapolation through sampling from limited data sample to prove damages where the defendant's records were incomplete).[3]

In light of the applicable case law, Dr. Walker's damages methodology is fundamentally flawed because it rests on the faulty premise that employees should simply recover nothing for any particular category of damages if there is any uncertainty as to the precise amount owed. Based on this faulty premise, Dr. Walker presents a damages analysis that literally awards all Class Members zero recovery for the following expenses: fuel; truck liability insurance, license, registration and permit fees; cargo insurance, cell phones, tires, repairs and maintenance; workers' compensation insurance; medical insurance; tolls; damage claims; and other miscellaneous costs. *Id.* at ¶¶ 86-105; Figure 8; Deposition of Jonathan Walker ("Walker Depo.") at 48:2-22. Dr. Walker proposes this recovery even though he knows from the record that Class Members routinely incurred expenses within these categories.[4]

As just one illustration of how unhelpful and unsupportable the opinion is, Dr. Walker does not deny that Class Members had to pay out of their own pockets for truck fuel. *See* Walker Depo. at 154:1-18. Indeed, the whole job of an Exel driver is to make deliveries by driving a

---

[3] The *Tyson Foods* decision is currently on appeal before the Supreme Court of the United States. Yet the Justices raised serious concerns with Tyson Foods' position at oral argument, and given the current composition of the Court and recent vacancy, Plaintiffs anticipate an affirmance of the 8th Circuit's ruling (or, at the very least, a 4-4 split, which would have the same effect as an affirmance).

[4] Similarly, as discussed in Section II.F., *infra,* Dr. Walker also opines that no Class Member should receive any compensation for any missed meal or rest periods, despite extensive evidence in the record that Exel has a break policy that fails to remove Drivers from all duty during any time of the day (thus violating the off-duty requirement for meal and rest periods), fails to pay any driver for a single rest period (despite the fact they must be paid under applicable law), and conflicts with other provisions of the California meal and rest period laws.

truck and Exel's policies make clear that the drivers need to pay for their own fuel. *See* Independent Truckman's Agreement, at EDV001680, No. 5, attached as Exh.Q to Piller Decl. Suffice it to say, there is no evidence in the record that the trucks can run without fuel.  Yet, Dr. Walker opines that no Class Member should receive any reimbursement for any fuel costs, simply because the calculation could be more precise. Walker Report at ¶ 94, and Figure 8.

Moreover, Dr. Walker acknowledges that Exel's own data shows that Class Members drove numerous miles while working for Exel. *See id.* at ¶ 94 (acknowledging that mileage information was available at Exel's iDirect database).  Nonetheless, he simply chose to refrain from making any effort to determine the fuel costs that were incurred. *See* Walker Depo. at 154:16-24.  Dr. Walker also ignores the "standard truck requirements" Exel imposed on Class Members, which formed the basis for Mr. Curtis' opinion that Class Members incurred similar costs on a per-mile basis associated with maintaining and operating their trucks. *See* Curtis Report at page 6.  He further disregards testimony from Exel's PMK and former CFO that she conducted a multi-month study, which drew upon the experiences of site managers, senior management, and recruiters, indicating that Class Members drive 200 miles per day. *See* Albarano (PMK) Depo. at 54:23-56:18, attached as Exh. M to Piller Decl.  Indeed, Exel's VP of Operations similarly testified that Class Members typically drive a range of 125-200 miles per day. *See* Deposition of Kenneth Mangen ("Mangen Depo.") at 42:3-43:1, attached as Exh. R to Piller Decl.  Indeed, even the iDirect data shows an average of 164 miles per day. Breshears Report at ¶ 29.   Dr. Walker completely ignores this evidence when speculating that Mr. Breshears' use of 150 miles per day is unreliable.

Significantly, Mr. Breshears used actual mileage data for those individuals found in the iDirect data.  He only used the 150 miles per day estimate when Exel's data did not include the Class Members' trips. *Id.* at ¶ 27.  Yet, Dr. Walker simply uses the incomplete nature of Exel's own data and the possible variability in fuel costs from Class Member to Class Member, as a basis to opine that *no* Class Members should receive *any* reimbursement for fuel, no matter how just and reasonable the recovery may be. *See* Walker Report at ¶¶ 94-98; Figure 8.

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Dr. Walker points to no document, data, or other information in the record supporting the extreme position that fuel or other mileage-related damages should be excluded entirely from the analysis. *See Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 984 (N.D. Cal. 2003) (holding expert testimony inadmissible where "the expert does not point to any specific documents that support his contention.").

Dr. Walker's position demands a level of precision in proof that is both unrealistic and unsupported by law.  Indeed, Dr. Walker went as far as to testify in deposition that even reviewing individual Schedule C forms and other tax return documents on a Class Member by Class Member basis would be insufficient to prove such expenses at trial.  *See* Walker Depo. At 38:7-40:13.  Even when presented with the Named Plaintiff Daniel Villalpando's Schedule C forms, which showed a net loss during one year when he worked for Exel, Dr. Walker nevertheless testified that the document was not reliable because Mr. Villalpando's net income may not have been "reflected accurately in the tax returns." *Id*. at 33:21-37:13.  There is no legal support for this extreme position.  Rule 23 class actions would cease to exist if Dr. Walker's methodology were applied to this case.  In fact, the Ninth Circuit teaches us the opposite of what Dr. Walker demands. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (observing that "damages determinations are individual in nearly all wage-and-hour class actions" and that "we know of no case where this has prevented a court from aiding the class to obtain its just restitution.").[5]

---

[5] In *Jimenez v. Allstate Insurance Co.*, 765 F.3d 1161 (9th Cir. 2014), the Ninth Circuit stated that "statistical sampling and representative testimony are acceptable ways to determine liability so long as the use of these techniques is not expanded into the realm of damages." *Id.* at 1167.  In making this comment, however, the Court at no time suggests that it is overruling or challenging the long line of authorities from the Supreme Court on down, cited above, which hold that plaintiffs can obtain effective relief for themselves and others in a wage and hour through representative evidence.  Rather, *Jimenez* affirms the order of the district court granting class certification and comments that an additional reason in favor of certification is that the Court bifurcated liability and damages. *Id.* at 1168.  Moreover, *Jimenez* is strictly an off-the-clock overtime case.  It does not address the calculation of damages in an independent contractor misclassification case, or preclude the damages model presented by Plaintiffs here.

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**E.  Dr. Walker's Report is replete with legal conclusions disguised as expert opinion**

Dr. Walker's damages analysis is also speculative and inadmissible because it depends on "legal conclusions without underlying factual support." *See Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010); *see also Crow Tribe of Indians v. Racicot,* 87 F.3d 1039, 1045 (9th Cir.1996) (reasoning that expert testimony is not proper for issues of law because the role of experts is to interpret and analyze factual evidence and not to testify about the law).  Indeed, Dr. Walker outright excludes various categories of damages from his alternative damages calculation based on incorrect legal conclusions about what sorts of expenses employees are entitled to have reimbursed under the law.

For instance, Dr. Walker excludes reimbursements for damage "claims" (costs deducted from Class Members' paychecks for property or product damage) from his damages analysis based on the wholly unsupported and speculative premise that Class Members may have "ostensibly caused" any damage and the incorrect legal conclusion that employees may be held liable for such damage absent a showing of wilfulness or reckless disregard. *See* Walker Report at ¶ 87.  Yet, even if the Class Members "caused" the damages, this would not be sufficient to bar their recovery under applicable law. *See* Cal. Code Regs. tit. 8, § 11090 ("No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee."); *see also Hudgins v. Neiman Marcus Grp., Inc.*, 34 Cal. App. 4th 1109, 1111 (1995).  Moreover, despite his search for "extreme examples," Dr. Walker does not point to a single instance in the record of a Class Member wilfully or recklessly causing damage to a delivery item.  This is just one example among many of Dr. Walker drawing legal conclusions to support the extreme position that entire categories of exposure should simply be zeroed out.

Dr. Walker outright excludes several other categories of expense reimbursements based on legal conclusions. *See, e.g.* ¶ 88 (excluding truck liability insurance, license, registration, and permit fees based on legal conclusion that costs incurred in connection with owning or leasing a truck are not reimbursable under the law); ¶ 93 (excluding the cost of parking tickets based on

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

legal conclusion that Exel would not have been required to reimburse employees for such costs); ¶¶ 56-57, 96 (concluding that any expenses incurred on days when a second driver drove and made deliveries are not reimbursable under the law). It is not Dr. Walker's role to draw legal conclusions as to whether employees are entitled to reimbursement for such costs under the law.

Assuming, *arguendo,* the Court held some of Plaintiffs' claimed expenses to not be reimbursable, Plaintiffs' experts could merely remove such line items from their damages analyses. For example, Dr. Walker opines that the cost of parking tickets is not a reimbursable expense. As discussed above, this opinion should be excluded because it is a legal conclusion. Nevertheless, even if the cost of parking tickets or other expenses cannot be claimed as expense reimbursements for purposes of damages, such line items can simply be removed from Plaintiffs' analysis. Indeed, Mr. Breshears' Report pragmatically breaks down damages by each category of expense reimbursements owed on a class basis, such that there are separate allocations for fuel, insurance, depreciation, etc. *See* Breshears Report, at ¶¶ 16, 30. Merely removing one or more line items from the calculus does not undermine Mr. Breshears' ability to testify as to the other categories of expenses.

For all these reasons, Dr. Walker's "corrections" to Mr. Breshears' exposure analysis are inadmissible because they are speculative, contradicted by data in the record, and founded on improper legal conclusions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (reasoning that a district court may exclude expert evidence where "there is simply too great an analytical gap between the data and the opinion proffered."). Thus, ¶¶ 86-105 and Figure 8 of Dr. Walker's report should be excluded.

### F. Dr. Walker's critique of Plaintiffs' expert testimony regarding meal and rest period claims misconstrues Plaintiffs' theory of recovery and draws improper legal conclusions

Dr. Walker's opinion regarding Plaintiffs' claimed meal period and rest break damages is unhelpful to the trier of fact because it is founded on a misapprehension of Plaintiffs' theory of recovery and legal conclusions about when an employer has complied with the meal and rest period provisions of the Wage Orders. *See Clear-View Techs., Inc. v. Rasnick*, 2015 WL

1    3505003, at *2 (N.D. Cal. June 2, 2015) (reasoning that an economic expert may be excluded

2    from testifying under *Daubert* when the "expert's testimony rests on faulty assumptions.").

3          To begin with, Dr. Walker's opinion rests on the faulty assumption that meal and rest

4    period violations must be proved by determining from each individual plaintiff the specific days

5    he or she did not take a meal or rest period, and why. *See* Walker Report at ¶¶ 48-49; *see also id*.

6    at ¶ 108 (stating that Mr. Breshears' meal and rest period damages calculations are "inflated

7    because he assumed, with few exceptions, that Class Members never took the meal periods or

8    breaks they were entitled to."); ¶ 48 (stating that Mr. Breshears failed to account for why meal

9    and rest periods were "missed").  Yet, one of Plaintiffs' theories of the case is that all meal

10   periods at Exel are noncompliant because Exel's uniform policies are that Drivers are not

11   provided any off-duty time (i.e. they must be perpetually responsible for ensuring the safety of

12   the truck and its cargo under the Independent Truckman's Agreement at ¶¶ 7-8, at EDV1680).

13   Similarly, one of Plaintiffs' theories of recovery for the rest period claims is that all rest period

14   are noncompliant because Exel pays according to a piece rate compensation schedule that does

15   not compensate Class Members any additional wage to account for the ten minutes of paid rest

16   time mandated by the Wage Order. *See* Cal. Code Regs., tit. 8, § 11090, at ¶ 12(A); Independent

17   Truckman's Agreement at EDV1683 (stating that Driver compensation "does not include

18   compensation for services above and beyond basic delivery services.").  Given these legal

19   theories of recovery, Mr. Breshears was correct to assume, for purposes of calculating damages,

20   that Class Members were denied at least one compliant meal period and one compliant rest

21   period per day.  Dr. Walker's testimony should be stricken because it premised on an incorrect

22   view of Plaintiffs' legal theory of recovery.[6]

23

24   [6] Dr. Walker also misconstrues Mr. Breshears' analysis by stating that his "basis" for assuming
     meal and rest period violations on each day of work was his review of Class Member deposition
25   testimony. *See id*. at ¶ 49.  On the contrary, Mr. Breshears stated that "[i]f there was no
     deposition testimony, I have been asked to assume, for each Plaintiff, a potential meal period
26   violation for each work day, as any down time drivers may have had was not off duty or within
27

1    Alternatively, even assuming Plaintiffs did not have these two particular legal grounds

2    for demonstrating meal and rest period violations, Dr. Walker incorrectly presumes that it is

3    Plaintiffs' burden to show that meal periods were actually missed, rather than Exel's burden to

4    provide accurate records showing that compliant meal periods were provided. *See Brinker*

5    *Restaurant Corp. v. Super. Ct.,* 53 Cal.4th 1004, 1052-1053 (2012) (Werdegar, J., concurring)

6    ("If an employer's records show no meal period for a given shift over five hours, a rebuttable

7    presumption arises that the employee was not relieved of duty and no meal period was provided.

8    This is consistent with the policy underlying the meal period recording requirement, which was

9    inserted in the IWC's various wage orders to permit enforcement. [Citations.] An employer's

10   assertion that it did relieve the employee of duty, but the employee waived the opportunity to

11   have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's

12   case-in-chief. Rather, as the Court of Appeal properly recognized, the assertion is an affirmative

13   defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove

14   it.") (emphasis added); *see also Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1144-

15   45 (2012) (reasoning that if an employer's records show no meal period for a given shift, a

16   presumption arises that the employee was not relieved of duty and no meal period was provided,

17   shifting the burden to the employer to show that the meal period was waived).  Thus, Dr.

18   Walker's speculation that employees may have taken some meal periods that Mr. Breshears did

19   not account for is actually premised on an incorrect legal presumption that Plaintiffs have the

20   burden of proof.  Yet, given that Exel has not put forth records showing breaks taken other than

21   those specifically identified by Mr. Breshears in his report (and which in Plaintiffs' view are still

22   not compliant), any uncertainty must be construed against Exel as a matter of law.[7]

23   _____

24   the time parameters set forth in the wage orders." *See* Breshears Report at ¶ 40; *see also*
     Breshears Supplemental Report at ¶ 9.

25   [7] Even if Exel had records showing some compliant meal periods being taken, they would serve

26   only as a damages offset. *Benton v. Telecom Network Specialists, Inc.,* 220 Cal. App. 4th 701,
     726 (2013) ("the employer's liability arises by adopting a uniform policy that violates the wage

27

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

1    Aside from the lack of record keeping, Exel's failure to implement a compliant policy

2    also shifts the burden of proof on Defendant to show whether and the extent to which it provided

3    complaint breaks despite the unlawful policy, not on Plaintiffs to identify every single break that

4    they missed in order to obtain a full recovery. *See, e.g., Safeway, Inc. v. Superior Court of Los*

5    *Angeles County,* 238 Cal.App.4th 1138, 1159-1160 (2015) (discussing *Brinker, supra,* in context

6    of meal and rest period case premised on a "deep, system-wide error" by the defendant in its

7    break policy).[8]

8    In other words, Dr. Walker spends a great deal of time critiquing a damages methodology

9    that does not exist and is not required under applicable law.  Given Exel's unlawful policy

10   concerning what is a complaint meal and rest period, Exel's failure to demonstrate records

11   showing meal periods provided, and Exel's failure to implement procedures through which

12   employees may claim additional compensation for meal and rest periods that had been denied,

13   Mr. Breshears' task was merely to count the number of workdays to identify the number of

14   violations. *See* Breshears Report, at ¶ 40; Breshears Supplemental Report at ¶ 9.  Dr. Walker's

15   Report is of little help to the trier of fact as a commentary on Mr. Breshears' meal and rest period

16   damages analysis because it does not address Mr. Breshears' methodology.  At best, Dr.

17   Walker's Report challenges the legal sufficiency of Plaintiffs' theory of liability on the meal and

18   rest period claims.  As discussed above, expert testimony is unhelpful to the trier of fact if it

19   merely offers legal conclusions. *See Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877

20

21   and hour laws. Whether or not the employee was able to take the required break goes to

22   damages…").  Dr. Walker's critique of Mr. Breshears' analysis of Exel's timekeeping records is

     only helpful as a comment on the sufficiency of the records to provide a damages offset. *See*

23   Walker Report, at ¶¶ 50-54.

24   [8] Exel's written policy with regard to meal and rest periods is facially unlawful because, among

25   other things, it (1) provides that off-duty time need only occur after 8 hours of work, and only

     when drivers had to travel an unusually long distance; (2) does not completely remove the

26   Drivers from all duty and responsibility over the cargo; and (3) does not have any provision for

     paying an extra hour of wages for meal and rest periods that are not provided in compliance with

27   the provisions of the Wage Order.

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

F.2d 1333, 1340 (7th Cir. 1989) (excluding opinion testimony where economist expert merely "examined materials produced in discovery and drew inferences from the record, speaking in legal rather than economic terms. He gave a legal rather than an economic opinion.").

### G. Dr. Walker's opinion that Class Members are better off as independent contractors than as Exel's second drivers is methodologically flawed and irrelevant

Dr. Walker devotes a great deal of his report to comparing the net compensation of Class Members to the compensation paid to drivers who make deliveries for Exel as second drivers, apparently to support his opinion that "Class Members' net pay as contractors exceeded market wages." *See* Walker Report, at Section IV; ¶¶ 16-30.  This testimony should be stricken for several reasons.

First, it is simply irrelevant. *See In re Ford Tailgate Litig.*, 2015 WL 7571772, at *5 (N.D. Cal. Nov. 25, 2015), appeal docketed, Dec. 30, 2015 ("Rule 702 does not permit irrelevant or unreliable testimony.") (citing *Daubert*, 509 U.S. at 588).  Indeed, this Court has held that the Class Members are employees as a matter of law.  There is no provision in the Labor Code stating that employers can be excused from complying with the minimum wage, overtime, and expense reimbursement laws simply because these employees may be "better off" than some other group of hypothetical employees.  Thus, Dr. Walker's opinion comparing the wages of Class Members with the wages of Exel's second drivers a small portion of those Class Members have to run the same Exel routes, will not assist the trier of fact in determining a fact in issue because the comparison is irrelevant to whether Exel complied with the provisions of the Labor Code.[9]

---

[9] Dr. Walker's testimony regarding incentive pay systems and speculation that Exel's system provided greater entrepreneurial opportunities is irrelevant for the same reason. *See* Walker Report, ¶¶ 12-15.  Indeed, that some Class Members may have earned more than others under an incentive-based compensation scheme has no bearing on whether Exel violated the law.  The question of whether short-tenured Class Members earned less than longer-tenured Class Members is similarly irrelevant because employees have the same rights under the Labor Code, regardless of the length of their tenure with an employer. *See id.* at ¶ 20.

Second, Dr. Walker's comparison between Class Members and second drivers making deliveries for Exel is fundamentally flawed because it relies on the tainted variable of wages paid to drivers of the same Exel routes as the Class Members as the "market" rate for employee drivers.  Instead of using wage rates of employee drivers determined in a market free from unlawful misclassification, Dr. Walker uses the wages of Exel's second drivers—which were paid directly by Class Members in an environment tainted by misclassification—as a proxy for the "market" rate for employee drivers. *See id.* at ¶¶ 27-30. Wage figures determined within an unlawful environment like Exel's misclassification scheme are "tainted variables" because the unlawful environment tends to skew their value and conceal disparities. *See, e.g. Butler v. Home Depot, Inc.*, 1997 WL 605754, at *11 (N.D. Cal. Aug. 29, 1997) (denying motion for summary judgment where the defendant's statistical analysis depended on the "tainted variable" of starting wages, which were affected by an environment of gender discrimination).  Here, second driver wages were determined by the amount of net wages earned by misclassified Class Members, who passed their own losses onto the second drivers they had to pay.  Tellingly, one of the Class Member witnesses on whose testimony Dr. Walker relies actually testified that he decided what to pay second drivers based in part on the amount of his own expenses. *See* Deposition of Vladimir Marinov, attached as Exhibit S to Piller Decl. ("Marinov Depo.") at 50:16-51:6.  Thus, using second driver wages as a proxy is inherently unreliable and prejudicial because such wages cannot be examined in isolation, outside of the tainted context of misclassification.

### H. Walker's extrapolation from unrepresentative "extreme examples" misleads the trier of fact about Exel's realistic exposure to the Class

Dr. Walker argues in his Report that Mr. Breshears failed to recognize "hiring and subcontracting by Class Members," which he claims "undermines [Mr. Breshears'] estimates in each damages category[.]" *See* Walker Report at ¶ 56.  Yet Dr. Walker has not presented any evidence that any significant number of Class Members enlisted others to drive and perform deliveries for them, nor has he surveyed or spoken with any Class Members regarding their experiences. Walker Depo. at 67:19-23. Instead, Dr. Walker's strategy has been to hone in on

1    nine outlier Class Members—approximately 2% of the Class—to reach the conclusion that Mr.

2    Breshears' entire damages analysis is unreliable.  Dr. Walker's correspondence with his own

3    staff members makes this approach plain. *See* e-mail correspondence, at JW000040 (directing

4    staff members to "identify one or two extreme examples" of Class Members who personally

5    drove and made deliveries only on an infrequent basis).

6         For instance, Walker speculates that Class Members "could ultimately evolve to the point

7    that they were not driving trucks at all, but rather were primarily or exclusively managing

8    businesses that contracted with or employed other drivers," but could identify only one Class

9    Member out of 386 who had such an experience at any point in time. *See* Walker Report at ¶ 13.

10   In fact, Dr. Walker's report refers to only 9 out of 386 Class Members who at any point in time

11   had enlisted a second driver. *Id*. at ¶¶ 23, 27, 56.[10] In deposition, Dr. Walker confirmed that he

12   was not aware of any Class Members who had more than one truck, other than the nine

13   mentioned in his report, and did not know the percentage of the Class that have had more than

14   one truck running for Exel at any given time. Walker Depo. at 79:24-80:14.

15        In contrast, Exel's own executives, recruiters, PMK witness, and class-wide documents

16   produced in this litigation consistently reiterate that the typical work schedule is 10-12 hours per

17   day, 5-6, sometimes 7 days per week. *See* Smigelsky Depo. at 192:7-15; *see also* Albarano Depo.

18   at 57:8-58:9 (testifying that Exel projected in 2007 that the delivery drivers would work an

19   average of 260 days per year); De La Rosa Depo. at 94:12-18 (testifying that Exel's recruiters

20   are "only looking for [Drivers] who have full-time capacity[.]"); Realistic Preview of Business

21   _____

22   [10] Dr. Walker also incorrectly presumes that a Class Member who enlisted second drivers did not
     personally drive on a frequent basis. Yet the Class Member testimony on which Dr. Walker
23   relies actually supports Plaintiffs' position that Class Members typically worked full-time, in
     spite of enlisting second drivers. *See, e.g.* Vega Depo. at 43:4-44:13 (testifying that he typically
24   works for 8-14 hours per day); Torres Depo. at 23:18-20 (works five days per week); *id*. at
     46:10-48:4 (typically works 10-15 hours per day, and works "from the minute we started until
25   the minute we ended [sic]."); Mena Depo. at 27:4-16 (has typically worked 5-6 days per week);
     *id*. at 33:23-34:2 (typically worked between 10 and 12 hours per day when compensated on a
26   per-stop basis); Cifuentes Depo. at 27:6-14 (has typically worked five days per week, and 10-13
     hours per day).

27

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Opportunity, attached as Exhibit T to Piller Decl., EDV012931; *see also* Breshears Depo. at 107:9-108:2 (testifying that he reached the 5 days per week figure based on Exel's admissions).

Dr. Walker demonstrates no basis to speculate that Mr. Breshears could not rely on these company admissions and class-wide evidence merely because an unrepresentative handful of Class Members may not have personally driven and made deliveries on a full-time basis. *See In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1366 (N.D. Ga. 2000) (reasoning that "[e]xclusion of outliers is a common practice in statistical analysis."). Moreover, the deposition testimony of even those individuals who *did* enlist second drivers confirms that such Class Members did, in fact, work on a full-time basis. *See* Note 7.

Nevertheless, Dr. Walker opines that Mr. Breshears' entire damages analysis is "undermined" by not considering these outliers. This conclusion—apparently reached based on incomplete snippets the testimony of 9 out of 386 Class Members—is the result of unfair extrapolation from an unrepresentative sample. *See U.S. v. Williston*, 2015 WL 3490825, at *3 (E.D. Okla. June 2, 2015) (reasoning that courts will not admit conclusions reached by experts if they result from "unfair extrapolation."). Put another way, Dr. Walker's rejection of Mr. Breshears' five-days per week assumption is too great a leap from the testimony of a small sample of handpicked "extreme examples." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Again, Dr. Walker has drawn conclusions by extrapolating from an unrepresentative sample, the very mistake he accuses Mr. Breshears of making. *See* Walker Report, at ¶ 110.

## III. CONCLUSION

For all the foregoing reasons, any sections of Dr. Walker's Report that rely on unfounded speculation, are indistinguishable from legal conclusions, are irrelevant, or concern mileage reimbursement rates, should be excluded as unreliable and unhelpful to the trier of fact.

1    Respectfully submitted,

2        Dated:  February 26, 2016          SCHNEIDER WALLACE
                                            COTTRELL KONECKY WOTKYNS LLP
3

4

5                                           /s/ *Joshua G. Konecky*
                                            Joshua G. Konecky
6                                           Counsel for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFFS' DAUBERT MOTION TO EXCLUDE SPECULATIVE, UNSUBSTANTIATED AND LEGAL OPINION
TESTIMONY OF JONATHAN WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT