Todd M. Schneider (SBN 158253)
Joshua G. Konecky (SBN 182897)
Nathan B. Piller (SBN 300569)
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkonecky@schneiderwallace.com
npiller@schneiderwallace.com

Ira Spiro, SBN 67641
SPIRO LAW CORP.
11377 W. Olympic Blvd., Fifth Floor
Los Angeles, CA 90064
Telephone: (310) 235-2350
Facsimile: (310) 235-2351
ira@spiromoore.com

Jeff Holmes, SBN 100891
BLANCHARD LAW GROUP, APC
3311 East Pico Blvd.
Los Angeles, CA 90032
Telephone: (310) 396-9045
Facsimile: (970) 497-4922
JeffHolmesJH@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL VILLALPANDO, individually and on behalf of all others similarly situated,<br><br>Plaintiff(s),<br><br>vs.<br><br>EXEL DIRECT INC., et al.,<br><br>Defendant(s). | Consolidated Cases:<br>Case No. 3:12-cv-04137-JCS<br>Case No. 4:13-cv-03091-JCS<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' COMBINED *DAUBERT* MOTION AND MOTION TO DECERTIFY THE RULE 23 CLASS**<br><br>Date:  April 20, 2016<br>Time:  9:30 a.m.<br>Judge: The Honorable Joseph C. Spero |

1

2    TAFITI SHEKUR, individually and on          )
     behalf  of all others similarly situated,   )
3                                                 )
4                  Plaintiff,                     )
                                                  )
5            vs.                                  )
                                                  )
6    EXEL DIRECT INC., et al.,                    )
                                                  )
7                  Defendants.                    )
                                                  )
8    _____           )

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    OVERVIEW OF TRIAL PLAN ........................................................................ 3

    A.    Class liability will be tried by measuring Exel's admittedly uniform policies against the requirements of the Labor Code ........................................................ 3

    B.    Class damages will be shown through Exel's own compensation, mileage, and dispatch data, as well as representative documents and testimony from its own management ....................................................................................... 3

    C.    Even assuming, *arguendo*, some damages could not be proved on a class basis, the Class Members could still recover through individual damages proceedings .. 6

III.   TRIAL PLAN ON CLAIM-BY-CLAIM BASIS ............................................ 6

    A.    Unlawful Deductions ................................................................................. 6

    B.    Expense Reimbursements ......................................................................... 8

    C.    Meal and rest periods ............................................................................. 11

    D.    Unpaid Straight Time/Minimum Wage ................................................. 14

    E.    Overtime .................................................................................................. 15

IV.   ALTERNATIVE MANAGEMENT TOOLS FOR DETERMINING DAMAGES ........ 16

    A.    Bifurcation of liability and injunctive relief from damages .................................. 17

    B.    Alternative subclasses and procedures for determining damages ........................ 17

        1.    Damages subclass of Class Members who have enlisted one or more second drivers ...................................................................... 18

        2.    Damages subclass of Class Members who provided services for one or more companies other than Exel during the class period ........................ 19

        3.    Limit class damages to individuals captured by Exel's electronic data.... 19

        4.    Exclude one or more components from the class damages proceeding.... 20

a)     Minimum Wages/All Hours Worked ............................................ 20

b)     Disputed Expenses and Deductions ............................................... 20

V.     EXEL'S MOTION FOR DECERTIFICATION MISSTATES THE LAW AND FLIPS THE BURDEN OF PROOF ........................................................................... 21

    A.     Plaintiffs may prove damages by just and reasonable inference, using representative testimony, averaging, and reasonable estimates ........................... 21

    B.     Exel flips the burden of proof by incorrectly presuming that Plaintiffs must rely on a haphazard array of incomplete time sheets and scheduling manifests ......... 25

    C.     Exel disregards the superiority of a class damages proceeding by ignoring the inherent desirability of concentrating this litigation in one proceeding ............... 28

VI.     EXEL'S DAUBERT MOTION SHOULD BE DENIED ............................................... 29

    A.     The Court's role is to screen expert testimony for unreliability and unhelpfulness, not to weigh the evidence or assure correctness ................................................. 29

    B.     The record amply demonstrates that Mr. Curtis is qualified to opine on mileage reimbursement rates ...................................................................................... 30

    C.     Plaintiffs' experts relied on Exel's own data, internal calculations, and admissions, not on speculation .......................................................................... 31

       1.     Mr. Curtis' cost-per-mile figure is based on a sound, well-established methodology and is corroborated by Exel's own numbers ...................... 31

       2.     Mr. Breshears' damages analysis relies on Exel's own data and admissions, not on speculation ................................................................. 35

       3.     Exel's criticism of Mr. Breshears' analysis originates from its own deficient recordkeeping .......................................................................... 36

    D.     The expert testimony easily meets *Daubert's* minimal relevancy standard ........ 38

    E.     Mr. Breshears' forensic accounting methodology is helpful to trier of fact ........ 39

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1

VII.   CONCLUSION ............................................................................................................. 40

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Federal Cases</u>**

3
*Abaxis, Inc. v. Cepheid*,

4
    2012 WL 2979019 (N.D. Cal. July 19, 2012).......................................................... 29, 30, 31

5
*Aguilar v. Zep Inc.*,

6
    2014 WL 4245988 (N.D. Cal. Aug. 27, 2014) .................................................................. 6

7
*Allstate Ins. Co. v. Balle*,

8
    2014 WL 279651 (D. Nev. Jan. 22, 2014)....................................................................... 39

9
*Anderson v. Mt. Clemens Pottery Co.*,

10
    328 U.S. 680 (1946)................................................................................. 21, 22, 23, 25

11
*Arias v. U.S. Serv. Indus., Inc.*,

12
    80 F.3d 509 (D.C. Cir. 1996)....................................................................................... 26

13
*Barefield v. Chevron, U.S.A., Inc.*,

14
    1988 WL 188433 (N.D. Cal. Dec. 6, 1988) ................................................................. 17

15
*Bates v. United Parcel Service*,

16
    204 F.R.D. 440 (N.D. Cal. 2001).................................................................................. 17

17
*Boomj.com v. Pursglove*,

18
    2011 WL 2174966 (D. Nev. June 3, 2011).................................................................... 39

19
*Bouaphakeo v. Tyson Foods, Inc.*,

20
    765 F.3d 791 (8th Cir. 2014) .................................................................................. 23, 37

21
*Childress v. Ozark Delivery of Missouri L.L.C.*,

22
    2014 WL 7181038 (W.D. Mo. Dec. 16, 2014) ......................................................... 23, 37

23
*Clicks Billiards, Inc. v. Sixshooters, Inc.*,

24
    251 F.3d 1252 (9th Cir.2001) ...................................................................................... 35

25
*Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*,

26
    80 F. Supp. 3d 1180 (E.D. Wash. 2015)....................................................................... 31

27

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

*Craik v. Minnesota State Univ. Board,*

    731 F.2d 465 (8th Cir. 1984) ................................................................. 17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

    509 U.S. 579 (1993)................................................................. passim

*Day v. NLO,*

    851 F. Supp. 869 (S.D. Ohio 1994) ....................................................... 29

*Donovan v. Williams Oil Co.,*

    717 F.2d 503 (10th Cir.1983) ........................................................ 22, 37

*Emblaze Ltd. v. Apple Inc.,*

    52 F. Supp. 3d 949 (N.D. Cal. 2014) ..................................................... 29

*F.T.C. v. Pioneer Enterprises, Inc.,*

    1992 WL 372350 (D. Nev. Nov. 12, 1992) ............................................ 25

*Feske v. MHC Thousand Trails Ltd. P'ship,*

    2012 WL 1123587 (N.D.Cal. Apr. 3, 2012) .......................................... 27

*Frye v. Ayers,*

    2009 WL 1312924 (E.D. Cal. May 12, 2009) .................................... 30, 35

*Garcia v. Bana,*

    2013 WL 621793 (N.D. Cal. Feb. 19, 2013) ......................................... 21

*Gattuso v. Harte-Hanks Shoppers, Inc.,*

    42 Cal. 4th 554 (2007) ........................................................ 4, 9, 10, 33

*Grimes v. Kinney Shoe Corp.,*

    902 F. Supp. 1070 (D. Alaska 1995) ..................................................... 25

*Grochowski v. Phoenix Constr.,*

    318 F.3d 80 (2d Cir. 2003).................................................................... 22

*Hangarter v. Provident Life & Acc. Ins. Co.,*

    373 F.3d 998 (9th Cir.2004) ................................................................. 31

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

*Hart v. Rick's Cabaret Int'l, Inc.*

    73 F. Supp. 3d 382 (S.D.N.Y. 2014)..................................................... 21, 23

*Hunter v. Sprint Corp.,*

    453 F. Supp. 2d 44 (D.D.C. 2006) ............................................................... 9

*i4i Ltd. P'ship v. Microsoft Corp.,*

    598 F.3d 831, 852–856 (Fed.Cir.2010).......................................................... 38

*In re High-Tech Employee Antitrust Litig.,*

    2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ............................................. 23, 37

*In re Nexium (Esomeprazole) Antitrust Litigation,*

    297 F.R.D. 168 (D. Mass. 2013) .................................................................. 37

*In re Tri-State Crematory Litig.,*

    215 F.R.D. 660 (N.D. Ga. 2003)............................................................. 16, 17

*In re Visa Check/MasterMoney Antitrust Litig.,*

    280 F.3d 124 (2d Cir.2001)......................................................................... 16

*Jimenez v. Allstate Insurance Co.,*

    765 F.3d 1161 (9th Cir. 2014) .................................................................... 23

*Johnson v. Big Lots Stores, Inc.,*

    2008 WL 1930681 (E.D.La. Apr.29, 2008) .............................................. 23, 37

*Kamar v. Radio Shack Corp.,*

    254 F.R.D. 387 (C.D. Cal. 2008) ............................................................... 21

*Leyva v. Medline Industries Inc.,*

    716 F.3d 510 (9th Cir. 2013) .......................................................... passim

*Lindell v. Synthes USA,*

    2016 WL 74419  (E.D. Cal. Jan. 6, 2016) ...................................................... 9

*Lucent Techs., Inc. v. Microsoft Corp.,*

    2011 WL 2728317 (S.D. Cal. July 13, 2011) ............................................ 29, 32

*McLaughlin v. Ho Fat Seto*,

    850 F.2d 586 (9th Cir. 1988) .................................................................. 22, 25

*Melgar v. CSk Auto, Inc.*,

    2015 WL 9303977 (N.D. Cal. Dec. 22, 2015) ....................................... 22

*Mformation Techs., Inc. v. Research in Motion Ltd.*,

    2012 WL 1142537 (N.D. Cal. Mar. 29 2012) ........................................ 38

*Minns v. Advanced Clinical Employment Staffing LLC*,

    2015 WL 3491505 (N.D. Cal. June 2, 2015) ......................................... 37

*Minter v. Wells Fargo Bank, N.A.*,

    286 F.R.D. 273 (D. Md. 2012) ................................................................ 27

*Mintz v. Dietz & Watson, Inc.*,

    2009 WL 3378985 (S.D. Cal. Oct. 19, 2009) ....................................... 38

*Monroe, et. al., v. FTS USA, LLC, et al.*,

    No. 14-6063 (6th Cir. March 2, 2016) .............................................. 4, 22

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,

    311 F.R.D. 590 (C.D. Cal. 2015) .................................................. 6, 17, 29

*Naser v. Metro. Life Ins. Co.*,

    2013 WL 4017363 (N.D. Cal. July 31, 2013) ......................................... 7

*Nat'l Electro-Coatings, Inc. v. Brock*,

    1988 WL 125784 (N.D. Ohio July 13, 1988) ........................................ 26

*Norris–Wilson v. Delta–T Group, Inc.*,

    270 F.R.D. 596 (S.D.Cal.2010) .............................................................. 10

*O'Connor v. Uber Technologies, Inc.*,

    2015 WL 5138097 (N.D.Cal.2015) ........................................................ 17

*Oracle Am., Inc. v. Google Inc.*,

    847 F. Supp. 2d 1178 (N.D. Cal. 2012) ................................................ 36

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

*Pooshs v. Phillip Morris USA, Inc.*,
  287 F.R.D. 543 (N.D. Cal. 2012) ............................................................... 31

*Porch v. Masterfoods, USA, Inc.*,
  685 F. Supp. 2d 1058 (C.D. Cal. 2008) ...................................................... 21

*Precision Seed Cleaners v. Country Mut. Ins. Co.*,
  2013 WL 943571 (D. Or. Mar. 11, 2013) .................................................... 39

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir.2010) ....................................................................... 29

*Rai v. Santa Clara Valley Transp. Auth.*,
  308 F.R.D. 245 (N.D. Cal. 2015) ................................................................ 28

*Reich v. S. New England Telecomms. Corp.*,
  121 F.3d 58 (2d Cir. 1997) ................................................................... 22, 26

*Ruiz v. Affinity Logistics Corp*,
  2009 WL 648973 (S.D. Cal. Jan. 29, 2009) ................................................ 10

*Russell v. Wells Fargo & Co.*,
  672 F. Supp. 2d 1008 (N.D. Cal. 2009) ........................................................ 9

*Schilling v. Transcor Am., LLC*,
  2010 WL 583972 (N.D. Cal. Feb. 16, 2010) ............................................... 28

*Secretary of Labor v. DeSisto*,
  929 F.2d 789 (1st Cir. 1991) ...................................................................... 22

*Siddiqi v. Regents of Univ. of California*,
  2000 WL 33190435 (N.D. Cal. Sept. 6, 2000) ............................................ 17

*Smith v. Cardinal Logistics Mgmt. Corp.*,
  2009 WL 2588879 (N.D. Cal. Aug. 19, 2009) .......................................... 7, 9

*Soto v. Castlerock Farming & Transp., Inc.*,
  282 F.R.D. 492 (E.D. Cal. 2012) ................................................................ 27

*Spears v. First Am. eAppraiseIT*,

    2014 WL 4647679 (N.D. Cal. Sept. 16, 2014) .......................................................... 6, 29

*Sterling v. Velsicol Chem. Corp.*,

    855 F.2d 1188 (6th Cir. 1988) ........................................................................................ 29

*Taylor v. Fedex Freight, Inc.*,

    2015 WL 2358248 (E.D. Cal. May 15, 2015) ................................................................ 23

*Thomas v. Baca*,

    231 F.R.D. 397 (C.D. Cal. 2005) .............................................................................. 28, 29

*U.S. Dep't of Labor v. Cole Enterprises, Inc.*,

    62 F.3d 775 (6th Cir.1995) ............................................................................................. 37

*United States ex rel. Englund v. Los Angeles*,

    235 F.R.D. 675 (E.D.Cal.2006) ..................................................................................... 27

*United States v. 14.30 Acres of Land*,

    2009 WL 3713698 (S.D. Cal. Nov. 5, 2009) ................................................................. 33

*United States v. 75.746 Acres of Land*,

    2010 WL 1408896 (D. Ariz. Apr. 7, 2010) .................................................................... 31

*United Steel v. ConocoPhillips Co.*,

    593 F.3d 802 (9th Cir. 2009) ........................................................................................... 8

*Vaccarino v. Midland Nat. Life Ins. Co.*,

    2013 WL 3200500 (C.D. Cal. June 17, 2013) ............................................................... 24

*Valentino v. Carter-Wallace, Inc.*,

    97 F.3d 1227 (9th Cir. 1996) ......................................................................................... 28

*Villalpando v. Exel Direct Inc.*,

    2015 WL 5179486 (N.D. Cal. Sept. 3, 2015) ................................................... 10, 12, 38

*Wang v. Chinese Daily News, Inc.*,

    2008 WL 1805834 (C.D. Cal. Feb. 27, 2008) ............................................................... 21

*Warnecke v. Nitrocision, LLC,*

    2012 WL 5987429 (D. Idaho Nov. 29, 2012) ................................................. 39

*Woods v. Vector Mktg. Corp.,*

    2015 WL 5188682 (N.D. Cal. Sept. 4, 2015) ................................................. 28

*Zinser v. Accufix Research Inst., Inc.,*

    253 F.3d 1180 (9th Cir. 2001) ....................................................................... 17


**State Cases**

*Alberts v. Aurora Behavioral Health Care,*

    241 Cal. App. 4th 388 (2015) ......................................................................... 13

*Benton v. Telecom Network Specialists, Inc.,*

    220 Cal. App. 4th 701 (2013) ......................................................................... 14

*Bradley v. Networkers Int'l, LLC,*

    211 Cal. App. 4th 1129 (2012) ................................................................. 13, 14

*Brinker Restaurant Corp. v. Super. Ct.,*

    53 Cal.4th 1004 (2012) ................................................................................... 13

*Cicairos v. Summit Logistics, Inc.,*

    133 Cal. App. 4th 949 (2005) ......................................................................... 14

*Comcast Corp. v. Behrend,*

    133 S. Ct. 1426 (2013) .................................................................................... 28

*Estrada v. FedEx Ground Package Sys., Inc.,*

    154 Cal. App. 4th 1 (2007) ............................................................................... 6

*Faulkinbury v. Boyd & Associates, Inc.,*

    216 Cal.App.4th 220 (2013) ........................................................................... 11

*Gallegos v. NCRC, Inc.,*

    2012 WL 541505 (Cal. Ct. App. Feb. 17, 2012) ............................................. 9

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

*Hernandez v. Mendoza,*

    199 Cal.App.3d 721 (1988) ...................................................................... 16, 22

*Safeway, Inc. v. Superior Court of Los Angeles County,*

    238 Cal.App.4th 1138 (2015) ......................................................................... 12


## Statutes

California Business & Professions Code Section 17200 ................................................ 39

California Labor Code Section 221 ................................................................................... 7

Labor Code Section 2802............................................................................................ passim


## Rules

Federal Rule of Civil Procedure 26 ......................................................................... passim


## Other Authorities

Newberg on Class Actions Section 12:5 (5th ed.) ................................................... 6, 24

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3             This Court's Order of September 3, 2016, granted summary judgment for Plaintiffs based

4    on undisputed evidence that Defendant Exel Direct Inc. ("Exel") has misclassified approximately

5    386 delivery drivers as independent contractors rather than employees. [ECF 210].  Now that

6    Exel's contractor model has been held unlawful, the remaining issues for trial are class liability,

7    damages, injunctive relief, and civil penalties under the Private Attorneys General Act (PAGA).

8             With respect to class liability, Exel's operational documents and the admissions from its

9    executive team and operations managers will establish that the company's uniform compensation

10   and break policies do not measure up to the requirements of California law.  Indeed, Exel's entire

11   business model was to treat the Drivers as independent contractors, rather than employees.  It will

12   come as no surprise that this policy did not provide the protections required by California

13   employment law.  At trial, Plaintiffs will demonstrate that the Labor Code violations flow directly

14   from Exel's misclassification scheme.

15            The material dispute on Exel's decertification motion concerns damages.  Exel's position,

16   however, relies on the opinion of a single expert who has no experience whatsoever in making

17   expense reimbursement calculations, and whose opinion relies largely on speculation that some

18   members of the class may have incurred less damages than what the sworn testimony from Exel's

19   own management team and internal cost projections consistently show.   Indeed, Exel's

20   methodology for disputing Plaintiffs' damages calculations was, in the words of its own expert, to

21   "identify one or two extreme examples" and then use these outliers to critique Plaintiffs' analysis.

22            Exel speculates that because some small number Class Members may not have personally

23   driven all their routes, there can be no way to calculate class damages.  Yet, Exel's expert identified

24   only 9 individuals who have second drivers and the materials submitted in connection with Exel's

25   decertification motion only identify an additional 6 such individuals (out of 386 in the Class).

26   Many of these 15 individuals testified to working full-time in any event.  The notion that the Class

27   is composed of some large proportion of part-time workers is pure conjecture.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

Exel also takes the position that Plaintiffs cannot calculate damages for the entire class because the mileage data it produced to Plaintiffs covers only one-third of the class. In making this argument, Exel disregards consistent evidence in the record showing that the methodology Plaintiffs' experts used to extrapolate from the data to the class as a whole, is well supported by the Company's own documented observations, instructions and costs projections for the Class. Moreover, Exel's position disregards 70 years of established precedent holding that employees can base their recovery on "just and reasonable" inferences when the employer has failed to maintain records in a manner that would permit a more precise calculation. To the later point, Exel concedes that the document dump of over four million disorganized and sometimes illegible paper manifests and incomplete timesheets are insufficient to calculate damages.

At bottom, Exel's position is that its own incomplete and inaccurate data make proving class damages unmanageable, and that therefore Plaintiffs should not recover anything at all. In doing so, Exel offers no alternatives to determining what reasonable damages may flow from a business model already held to be unlawful, despite the Court's directive to both parties to offer alternatives to their initial positions. In any event, there is simply no legal or factual support for Exel's extreme position. If granted, even in part, Exel's motion would accomplish little more than to splinter these proceedings into a class trial on liability, a partial damages trial for a portion of the Class whose days worked and miles driven are recorded in the usable data, and hundreds of individualized damages proceedings for everyone else. This would be an utter waste of judicial resources. It also would frustrate the effective enforcement of critical wage and hour laws designed to protect employees and make them whole after being subject to illegal employment practices, such as the contractor scheme already found unlawful here.

This all being said, in the spirit of practicality and cooperation, Section IV below lists several alternative damages subclasses and limitations to address the manageability issues Exel attempts to raise. In contrast to Exel's all-or-nothing approach, Plaintiffs are willing to present these alternatives even though they also maintain that damages still can be reasonably and justly determined for the full class on all claims.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

## II.      OVERVIEW OF TRIAL PLAN

### A.      Class liability will be tried by measuring Exel's admittedly uniform policies against the requirements of the Labor Code

Under its <u>unlawful</u> independent contractor model, Exel's admittedly uniform policies violate California law in the following respects:  (1) Exel makes unlawful deductions from the wages paid to its Drivers to cover items such as insurance, uniforms and damaged merchandise; (2) Exel requires the employees to pay out-of-pocket for diesel fuel and other driving related expenses that are necessary to perform the job, in violation of the expense reimbursement requirements of Labor Code § 2802; (3) Exel has failed to establish any off-duty meal period policy that even purports to comply with California law, and in fact requires as part of its contract with the Drivers that they remain responsible for the merchandise during any breaks they may take (i.e. the Drivers are never completely removed from duty); (4) Exel has failed to develop any policy for authorizing and permitting paid rest periods under the requirements of California law, and in fact does not separately compensate employees for any rest time as is required for paid rest periods under California law; (5) Exel has failed to pay any overtime, even though management admits that Drivers typically work 10-12 hours a day; and (6) Exel has failed to pay even minimum wage for time spent in mandatory morning meetings, which Exel management admits happen on a daily basis.  As discussed in further detail below, Exel's operational documents and the admissions from its executive team and operations managers will establish that the company's uniform compensation and break policies do not measure up to the requirements of California law.

### B.      Class damages will be shown through Exel's own compensation, mileage, and dispatch data, as well as representative documents and testimony from its own management

Plaintiffs will present damages based on data that represent approximately one-third (1/3) of the class (approximately 100% of the class for the wage deductions), as well as testimony from Exel's own management showing that the inferences made from this data to the rest of the class are in line with Exel's own internal analysis of its workforce.  This goes well beyond what is sufficient to prove damages on a class basis. *See Monroe, et. al., v. FTS USA, LLC, et al.*, No. 14-

6063 (6th Cir. March 2, 2016), Slip Op. at 23 (holding that class member testimony representing 5.7% of the class is "well above the range commonly accepted by the courts as sufficient evidence," and citing awards based on between 0.49% and 2.5%.).  As discussed in Section V.A, *infra,* decades of established case law permits Plaintiffs to determine class damages based on just and reasonable inference.  Even if it did not, the logical alternative would not be to simply throw up our hands and decertify the whole class, but to have class damages proceedings for the individuals contained in the data, while permitting those outside the data to bring their own damages proceedings. *See* Section IV, *infra*.

In the meantime, Plaintiffs will present testimony from two experts on damages: Wesley Curtis and David Breshears.  Mr. Curtis calculated the cost per mile of driving a truck with specifications that matches Exel's standard truck requirements.  He did this by drawing on his own specific experience in the field of trucking audits, inspections and cost analysis, and applying it to Exel's standard truck requirements and operational policies. *See* Exhibit 1,[1] Amended Expert Report of Wesley Curtis ("Amended Curtis Report") at 3-10.  Mr. Curtis' figure is highly comparable to Exel's own average cost per mile figures contained in the several "requests for proposal," which Exel did not produce until ordered by the Court after Mr. Curtis's initial report. *Id*. at 21-22.  As discussed in Section VI, below, Exel's criticism of Mr. Curtis's cost-per mile approach is based on a fundamental misunderstanding of both the foundation for this approach, as well as established case law that approves of using this kind of methodology for calculating driving related expenses in wage and hour cases. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (2007).

Mr. Breshears, a certified public accountant in financial forensics, calculated out-of-pocket expense damages by applying Mr. Curtis's cost per mile calculation to all the electronically stored mileage and dispatch data that Exel made available (which covers approximately one-third of the

---

[1] All exhibits referenced herein are attached to the Declaration of Nathan Piller, filed concurrently with this memorandum.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

Class). *See* Exh. 2, Expert Report of David Breshears ("Breshears Report") at ¶¶ 16, 27-29, 30-34. Where Exel's mileage data was incomplete, Mr. Breshears assumed that Class Members drove 150 miles per day and drove 5 days per week. *Id.* at ¶¶ 23-27.  These assumptions give Exel the benefit of the doubt.  For example, the available mileage data shows an average of 164 miles per day per person. *Id.* at ¶ 29.   Additionally, Exel's own CFO concluded based on her internal investigation for the company that Class Members drove more than this amount and that they worked 260 days per year, on average.[2]

Mr. Breshears also calculated potential wage deduction damages owed to the Class by summing up the "deduction" line items presented in the compensation data Exel made available. *See* Exh. 2, Breshears Report at ¶¶ 30-34.  This data is <u>not</u> limited to one-third of the class, but covers the whole Class through January 2015.   In addition, Mr. Breshears calculated premiums owed due to Exel's alleged failure to pay overtime, failure to pay minimum wage for daily morning meetings, and failure to provide off-duty breaks. He did this by using the mileage and dispatch data Exel made available, and again supplementing it with testimony from Exel's own executive team and operational managers. *Id.* at ¶ 26. Finally, Mr. Breshears calculated civil penalties under the PAGA (which are not class claims). *Id.* at ¶ 48.

Exel challenges Mr. Breshears on the basis that his analysis may not account for all the instances in which an additional driver (who is not a Class Member) drove an Exel route on behalf of a Class Member. *See* Ds' Br. at 21:19-25. The attack is speculative and overstated. For instance, Dr. Walker's report refers to only 9 out of 386 Class Members who at any point in time had enlisted a second driver. *See* Exh. 6, Expert Report of Jonathan Walker, at ¶¶ 23, 27, 56.[3] The voluminous

---

[2] Exh. 3, Second Deposition of Rene Albarano ("Albarano Depo. II") at 54:23-56:18, 57:8-58:19; Exh. 4, Deposition of Kenneth Mangen ("Mangen Depo.") at 42:3-43:1; Exh. 5, Deposition of Gregory Smigelsky ("Smigelksy Depo.") at 192:6-15.

[3] Many of these 9 individuals testified that they drove full time in any event. *See* Exh. 7, Deposition of Edmundo Vega ("Vega Depo") at 43:4-44:13; Exh. 8, Deposition of Mauricio Torres ("Torres Depo.") at 23:18-20; Exh. 9, Deposition of Juan Mena ("Mena Depo.") at 27:4-16; 33:23-34:2; Exh. 10, Deposition of Byron Cifuentes ("Cifuentes Depo.") at 27:6-14.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

appendices submitted by Exel identify only 6 additional Class Members who may have enlisted second drivers. *See* Declaration of Raul Perez, at ¶¶ 14, 15, 16, 18; Declaration of Keith King, at ¶ 5; Declaration of Scott Sheridan, at ¶ 4; Declaration of Sam Marshall, at ¶ 5.  The possibility that damages for some small minority of Class Members may need to be adjusted due to second drivers is not a basis for decertification.  Even if it was, the Court could create a subclass of such Class Members, who might then determine their damages in separate proceedings. *See* Section IV below.

### C.    Even assuming, *arguendo*, some damages could not be proved on a class basis, the Class Members could still recover through individual damages proceedings

Exel fails to recognize that even if it obtained decertification of one or more categories of damages, the damages claims would not simply disappear.  Rather, each Class Member who is not part of the class damages proceedings would still have the right to present his or her damages on an individual basis. *See, e.g., Spears v. First Am. eAppraiseIT*, 2014 WL 4647679, at *21-22 (N.D. Cal. Sept. 16, 2014) (reasoning that even where damages cannot be shown by extrapolation through representative testimony and estimates, class members can still prove their damages individually without "numerous 'mini-trials' on specific individual class members."); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 593 (C.D. Cal. 2015) ("If calculation of individualized damages is complex, the court has numerous efficient means to resolve such issues, including questionnaires, surveys, representative testimony, the use of a special master and other aggregate analysis."); *cf. Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 21 (2007); *and see* Newberg on Class Actions § 12:5 (5th ed.).  Plaintiffs' alternatives for managing class damages are discussed in more detail in Section IV below.

## III.   TRIAL PLAN ON CLAIM-BY-CLAIM BASIS

### A.    Unlawful Deductions

Exel's own witnesses admit that the company automatically deducts various necessary business costs directly from the Drivers' pay. *See, e.g.,* Smigelsky Depo. at 65:2-21; Exh. 11, Albarano Depo. I at 223:11-229:21. Cal. Lab. Code § 221; *see Aguilar v. Zep Inc.*, 2014 WL 4245988, at *14 (N.D. Cal. Aug. 27, 2014) (quoting *Naser v. Metro. Life Ins. Co.*, 2013 WL

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

4017363, at * 11 (N.D. Cal. July 31, 2013) ("An employment compensation system which deducts company losses and expenses from employee base pay runs afoul of California public policy."). Moreover, Exel's standard contracts with Class Members identify specific categories of necessary costs as "deductions" that are "charged back" after initially being provided directly by Exel. *See* Exh. 12, Equipment Lease Agreement ("ELA"), "Exhibit D: Chargeback Items," at EDV001660-61. Now that the Court has held that the Drivers are employees as a matter of law, this testimony and these standardized contracts will prove class liability.

Exel argues that the piece rate compensation was "inflated" to cover expenses, and the deductions that appear on the Class Members' settlement statements actually signify expense reimbursements. *See* Ds' Br. at 31:14-18. This argument goes to the merits, not decertification, and is the very same argument already rejected by Judge Conti in a highly analogous case. *See Smith v. Cardinal Logistics Mgmt. Corp.*, 2009 WL 2588879, at *4 (N.D. Cal. Aug. 19, 2009).

Exel also contends that proving unlawful deductions will be unmanageable because one component—"damage claims"—may not be reimbursable if it resulted from a Class Member's willful or reckless behavior. *See* Ds' Br. at 31:19-26. Exel points to no evidence in the record that Class Members ever caused damage to customer property willfully or recklessly. Moreover, speculation about the root cause of some damages claims (speculation that Exel would presumably make in individual hearing as well) cannot be a basis for decertification when the reason for such speculation is Exel's failure to put a process in place to determine why the damage was caused before making the deductions. If Exel was following the law, it would have distinguished between reimbursable and unreimbursable damage claims from the get go. It is a perversion of the wage and hour protections to punish the Class Members for Exel's own non-compliance.

Finally, Exel argues that the compensation data showing the unlawful deductions do not show whether the claimed amounts where deducted from wages paid for labor performed by the Class Member as opposed to a second driver. *See* Ds' Br. at 31:1-26. Again, the distinction goes to the merits, not decertification. Under Plaintiffs' legal theory—which is the relevant theory when

determining whether a claim can proceed on a class basis[4]—any deduction (or necessary business expense) is recoverable regardless of who drove the route, because it ultimately comes out of the Class Member's compensation.  Indeed, even for those 15 people identified as potentially having second drivers, Exel is paying them to manage those second drivers (just as many employers typically pay some of their employees to manage other workers).  Thus, even if the expense is incurred in connection with a route driven by a second driver, the deduction still comes out of the Class Member's pay, when it should have been borne by Exel under applicable law.  Either way, this distinction does not provide a basis for decertification.  Any particular issues arising from second drivers can be managed through subclassing, as discussed in Section IV below.

### B.     Expense Reimbursements

Exel's violation of Labor Code § 2802 is evidenced by the standard contracts each Class Member had to sign, which provide that the Driver: "shall pay all costs attendant to the operation and maintenance of the [truck]"; "carry at [his or her] own expense public liability and property damage insurance"; "furnish whatever labor is necessary to provide delivery services"; and "will be liable for loss or damage to items intended for transport[.]" *See* ELA, at EDV001649, ¶ 5; Exh. 13, Independent Truckman's Agreement ("ITA"), at EDV001680, ¶¶ 5-8.

Exel argues that "settlement payments, by design, covered contractor expenses." *See* Ds' Br. at 33:7-34:4. As with other contentions, Exel's "by design" argument goes to the merits, not class certification, as Exel has argued throughout this case that it applies to every class member. Moreover, the claim has no merit, as there is no evidence in the record—for even a single class member—that Exel apportioned any piece rate between wages and expenses.[5]  This is dispositive

---

[4] *See United Steel v. ConocoPhillips Co.*, 593 F.3d 802, 808-10 (9th Cir. 2009) (court decides issues of class certification through the lens of the plaintiff's theory of class liability).

[5] To the contrary, Exel's own PMK admits that any "reimbursements" in the "per-stop" rate are based on "an estimated blend of all costs," *see* Albarano Depo. II at 154:17-155:9 (emphasis added), and are not apportioned separately from the Drivers' wages. *Id*. at 33:24-34:14; 87:25-88:14.  And, Exel's own witnesses will readily admit at trial that the company does not break the pay rate down into expense reimbursements and wages for the Drivers. *See* Exh. 14, Deposition of Cristina De La Rosa ("De La Rosa (Recruiter) Depo.") at 43:4-14; Exh. 15, Deposition of

under the California Supreme Court's controlling authority, which holds that "an apportionment method [between wages and expense reimbursement] is a practical necessity for effective enforcement of section 2802[.]" *Gattuso*, 42 Cal. 4th at 573; *see also Gallegos v. NCRC, Inc*., 2012 WL 541505, at *5 (Cal. Ct. App. Feb. 17, 2012); *Cardinal Logistics*, 2009 WL 2588879, at *4.[6]

Exel's contention that individualized inquiries would be necessary to show whether the piece rate "sufficiently" covered expenses, Ds' Br. at 33:21-34:4, was just rejected by the Eastern District in an analogous case. *See Lindell v. Synthes USA*, 2016 WL 74419, at *5 (E.D. Cal. Jan. 6, 2016). Indeed, the issue is not whether Exel's expense reimbursements were "sufficient," but whether the company reimbursed expenses at all. *Id*. Exel pays no base "wage" rate that is separately allocated from any expense "reimbursements," and its own PMK and former CFO is not even aware of what portion of the piece rate is set out for expenses. *See* note 5, *supra*. Moreover, the concept of "sufficient" reimbursement is hopelessly subjective and meaningless. (Sufficient for what? To make more than minimum wage? To make enough to stay out of

_____

Maria Iniguez-Quintero ("Iniguez-Quintero (Recruiter) Depo.") at 41:23-42:5; 44:3-5; Smigelsky Depo. at 181:2-8 (head of training and recruitment testifying that Exel does not itemize expenses with prospective Drivers); *see also* Albarano (PMK) Depo. I at 28:9-18; 30:13-25; 183:8-184:15.

[6] It is also illogical for Exel to claim that its compensation scheme provided for expense reimbursements when its independent contractor model, by its very definition, treats the Drivers as "businesses" that are <u>not</u> entitled to expense reimbursements. *Cf. Russell v. Wells Fargo & Co.*, 672 F. Supp. 2d 1008, 1013-14 (N.D. Cal. 2009) (reasoning that employers cannot satisfy overtime laws with regard to employees misclassified as exempt "by claiming that they had intended to pay overtime."). In this connection, crediting Exel's conclusory argument would embolden future defendants to err on the side of misclassification, knowing they could simply claim after being caught in an unlawful scheme that the employer still paid all wages owed. *Cf. Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 61 (D.D.C. 2006) (reasoning that application of the fluctuating workweek regulation in the misclassification context would give employers "a substantial incentive" to classify employees as exempt "because the financial risk associated with misclassification would be relatively small[.]").

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

bankruptcy?) In sum, Exel's argument for decertification of the § 2802 claim is really a merits argument, and the merits of this argument are tenuous at best.[7]

Next, Exel argues that using a mileage reimbursement rate is the same as relying on "hypothetical" estimates of "assumed" expenses. *See* Ds' Br. at 34:5-24.  This head-in-the-sand approach is completely divorced from reality.  Suffice it to say, there is no evidence in the record that the trucks can magically run without fuel or depreciation.  For the working people in the Class, these costs are indeed very real, not merely "hypothetical." Moreover, Exel fundamentally misconstrues the basic concept of cost-per-mile calculations as a judicially approved, alternative method of expense reimbursement that can be used *in lieu of* purchase receipts and other evidence. *See Gattuso*, 42 Cal. 4th at 569.  Moreover, Plaintiffs' cost-per-mile figure is roughly equivalent to the average of Exel's own internal cost-per-mile projections. *See* Amended Curtis Report, at 21-22; Exh. 16, Supp. Expert Report of David Breshears ("Breshears Suppl.") at 3, ¶ 19.

Exel also argues that damages are unworkable because determining whether expenses incurred were "entrepreneurial" versus "employee" would require individualized inquiries. *See* Ds' Br. at 37:9-38:2. Exel does not cite any authority confirming that this vague distinction is even relevant.  Indeed, this Court has held in this case that entrepreneurial opportunities do not undermine employee status. *Villalpando v. Exel Direct Inc.*, 2015 WL 5179486, at *48 (N.D. Cal. Sept. 3, 2015).  Even if Exel could make this argument, it would not call for decertification. Nonetheless, Plaintiffs' damages analysis pragmatically breaks down damages by each category of expense reimbursements. *See* Breshears Report, at ¶¶ 16, 30; Exhibit 1 to Exh. 17, Declaration of David Breshears ("Breshears Decl."). To the extent that Exel prevails at trial in showing that

---

[7] Exel's authorities on this point are inapposite. For instance, in *Ruiz v. Affinity Logistics Corp,* Plaintiff had "not shown that expenses were in the same ballpark across the class[,]" which resulted in too much variance in expenses to be tried on a class basis. *See* 2009 WL 648973, at *8 (S.D. Cal. Jan. 29, 2009).  Here, Plaintiffs have shown that expenses are consistent and standardized across the Class.  Exel's own witnesses and documents concede as much.  *Norris–Wilson v. Delta–T Group, Inc.,* 270 F.R.D. 596, 610 (S.D.Cal.2010) (reasoning that class treatment is appropriate where there is a "set of discrete expenses" common to the class that "class members were required to cover themselves[.]").

one or more costs are not reimbursable on the merits of the claim, then those can simply be removed as a line item from Plaintiffs' analysis.

Finally, Exel argues that class damages on expense reimbursements are unmanageable because some Class Members' expenses may have been incurred in the course of providing labor for companies other than Exel. *See* Ds' Br. at 38:3-14.   However, Exel identifies only 2 Class Members out of 386 who provided services for other companies. *See* King Decl. at ¶ 5; Sheridan Decl. at ¶ 4.   This tiny fraction is not a realistic basis for decertification and can be effectively managed in any event. *See* Section IV, below.

### C.   Meal and rest periods

Exel's position on meal periods misconstrues Plaintiffs' theory of recovery and reverses the burden of proof in cases where the defendant does not have a compliant policy.   As to class liability, Plaintiffs will demonstrate a systemic failure to provide complaint meal and rest periods with undisputed evidence that: (a) Exel has declined to institute any policy whatsoever to provide off-duty meal periods of at least 30 minutes by the 5th and 10th hour of work, or paid rest periods during every four hours of work or major fraction thereof;[8] (b) Exel actually instructs its drivers in training materials and otherwise to wait longer than five hours before taking any break;[9] (c) Class Members are not "off-duty"[10] during any alleged break they may have because, among other

---

[8] Exel's own management has uniformly admitted to this classwide deficiency. *See* Exh. 18, Deposition of Henry Capotosto ("Capotosto Depo.") at 140:9-142:4; Exh. 19 Deposition of Jason Moll ("Moll Depo.") at 118:16-22; Exh. 20, Deposition of Ray Dailey ("Dailey Depo.") at 53:9-22; Exh. 21, Deposition of Bob Power ("Power Depo.") at 57:17-58:14.

[9] *See* Moll Depo. at 113:23-115:16 (admitting that the only time Exel instructs Drivers with regard to off-duty breaks is when they travel a particularly long distance, and even then, an off-duty break need only be taken within the first 8 hours of work); *see also* Exh. 22, Exel's standardized training manual, at EDV001569 (including a *sample* driver log showing someone "driving" for 10 hours before going "off duty.").

[10] *Brinker,* 53 Cal.4th at 1039 (explaining that Wage Order requires employer to remove employee of all duty and responsibility during the whole meal period, not just to relieve the employee from productive work); *Faulkinbury v. Boyd & Associates, Inc.,* 216 Cal.App.4th 220, 237 (2013) ("a rest period must be, as the language [of the Wage Order] implies, duty-free.")

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1   things, Exel's standardized contracts with the Class require them to remain responsible for

2   ensuring the safety of the truck and its cargo at all times (or else be subject to damages claims).

3   *See* Exh. 13 (ITA, EDV1680 at ¶¶ 7-8); (d) there is no procedure for paying an extra hour of wages

4   for any meal or rest period that is not provided in a compliant fashion; and (e) Exel does not

5   separately pay for any rest period, despite the legal requirement that an employer must provide

6   "paid" rest periods.  Tellingly, Exel relied entirely on FAAAA pre-emption arguments in its own

7   motion for summary judgment on the meal and rest period claims, rather than submitting evidence

8   of a compliant policy. *See* Defendants' Motion for Summary Judgment [ECF 176] at 15-16.  These

9   are all class-wide facts that will rise and fall on proof common to the class.[11]

10      If Plaintiffs prevail on their claim that Exel has a systemically deficient break policy, then

11   the burden of proof at damages will shift to Exel to demonstrate that it provided compliant breaks.

12   *Safeway, Inc. v. Superior Court of Los Angeles County,* 238 Cal.App.4th 1138, 1153-1161 (2015)

13   (finding that "system-wide" error in providing compensation for missed meal periods raised a

14   presumption that the defendant failed to provide compliant meal periods); *Alberts v. Aurora*

---

[11] Plaintiffs also will convey this harsh reality through representative Class Member testimony. Indeed, of the 21 class members who have been deposed in this case—including Exel's "happy camper" witnesses—not a single one has testified to taking uninterrupted meal periods of at least 30 minutes by the fifth hour of work. *See, e.g.,* Vega (happy camper) Depo. at 45:1-12; Torres (happy camper) Depo. at 47:3-48:4; Mena (happy camper) Depo. at 49:24-52:11; 53:9-54:20; Cifuentes (happy camper) Depo. at 62:14-63:18; Exh. 23, Deposition of Daniel Villalpando (Named Plaintiff) at 294:8-12, 298:24-299:12, 311:13-25; Exh. 24, Deposition of Tafiti Shekur (Named Plaintiff) at 61:3-10; Exh. 25, Deposition of Jose Alcala (Named Plaintiff) at 87:17-88:5; Exh. 26, Deposition of Herman Johnson at 56:12-18; Exh. 27, Deposition of Miguel Jauregui at 89:25-90:23; Exh. 28, Deposition of Victoriano Molina at 115:3-15; Exh. 29, Deposition of Vladimir Marinov at 90:22-91:5; Exh. 30, Deposition of Abel Montes at 98:14-99:2; Exh. 31, Deposition of Asuncion Aguilera at 69:24-25; 98:20-99:2; Exh. 32, Deposition of Theodore Roumbanis at 64:1-7, 106:9-13; Exh. 33, Deposition of Pedro Navarro at 71:2-72:3; Exh. 34, Deposition of Lazaro Padilla at 118:5-10; Exh. 35, Deposition of Juan Saravia at 67:8-68:18; Exh. 36, Deposition of Mazin Yako at 40:8-41:1; Exh. 37, Deposition of Jose Alancastro at 60:20-24; Exh. 38, Deposition of Rogelio De La Fuente at 61:16-20.  Many were so restricted that they had to keep a bottle in the truck to relieve themselves.  Exh. 39, Deposition of Rafael Raymundo at 76:9-12; Molina Depo. at 115:3-15); Exh. 40, Declaration of Daniel Villalpando at ¶ 31; Exh. 41, Declaration of Abel Montes at ¶ 30; Exh. 42, Declaration of Miguel Jauregui at ¶ 28; Exh. 43, Declaration of Pedro Navarro at ¶ 29. Class Members will readily testify to these cold facts at trial.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

*Behavioral Health Care*, 241 Cal. App. 4th 388, 410 (2015) ("If an employer fails to provide legally compliant meal or rest breaks, the court may not conclude employees voluntarily chose to skip those breaks.").

The burden of proof at damages also will shift to Exel on the meal period claims for the additional reason that, by its own tacit admission in the decertification motion, Exel does not have records demonstrating compliant breaks on any classwide or other statistically significant basis. *See* Wage Order 9-2001, at ¶ 7(A)(requiring employers to keep accurate information and records with respect to meal periods); *Brinker Restaurant Corp. v. Super. Ct.,* 53 Cal.4th 1004, 1052-1053 (2012) (Werdegar, J., concurring) ("If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided... An employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief. Rather, as the Court of Appeal properly recognized, the assertion is an affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove it.") (emphasis added); *see also Bradley v. Networkers Int'l, LLC,* 211 Cal. App. 4th 1129, 1144-45 (2012) (recognizing that the employer has the obligation to keep records of compliant meal periods and that if the employer cannot show complete records, the burden shifts to the employer to negate the presumption that the employee did not receive compliant breaks).[12]

Exel's motion for decertification of the meal and rest period claims (as well as its motion to exclude Mr. Breshears' testimony on them) is premised on an incorrect merits argument that

---

[12] Exel argues that the "small subset" of records which actually contain a space allowing Drivers to write in whether they took a break show drivers "recording breaks 68% of the time." *See* Ds' Br. at 28:15-21. This is disingenuous. First, these records admittedly reflect only a small subset of Exel's overall records, most of which do not even include a space for drivers to enter meal periods taken. Second, Exel does not even attempt to argue that the recorded breaks meet the timing requirements of the Labor Code, nor could it. *See* Breshears Suppl. at ¶ 13 (finding that the small subset of records containing a space to show breaks taken show at least one violation on over 90% of workdays lasting over 5 hours).

Plaintiffs have the burden of demonstrating the specific number of days during which the employee did not receive a complaint break.  As the foregoing authorities demonstrate, Exel has it backwards. Moreover, even assuming some Class Members do manage to obtain downtime within the time parameters of California's meal and rest period requirements, this does not undermine the ability of the Plaintiff class to pursue the claims on a class basis. *See, e.g., Benton v. Telecom Network Specialists, Inc.*, 220 Cal. App. 4th 701, 722-23 (2013) (independent contractors); *Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1143 (2012) (independent contractors); *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 962 (2005) (delivery drivers).

There are two additional reasons why Plaintiffs will not need to proof the denial of meal and rest periods on an individual basis.  First, as discussed above, Plaintiffs maintain that as a result of the standardized contractual obligations, no Driver is ever completely removed from duty, and therefore there are simply no compliant breaks for anyone.  Second, as to rest periods, Exel's standardized compensation scheme pays all Class Members on a piece rate basis, without any separate payment for the rest period. Exh. 13 (ITA, at EDV1683). This policy does not comply with the Wage Order, which states: "Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." Wage Order 9-2001, ¶ 12(A). Thus, for every shift of four or more hours, there is at least one noncompliant rest period, and for every shift of five or more hours, there is at least one noncompliant meal period.  Even aside from the shifting of the burden of proof discussed above, the only dispute as to damages for the meal and rest period claims under Plaintiffs' theory of recovery is the number of work days at issue.  Given Plaintiffs' theories on the merits and the burden-shifting discussed above, there is no merit to Exel's motion to decertify the meal and rest period claims.

**D.     Unpaid Straight Time/Minimum Wage**

Exel's principle contention here is that Plaintiffs cannot prove the number of morning meetings that the Class Members attended or the length of those meetings. *See* Ds' Br. at 23:11-18.  The argument goes only to damages, rather than the underlying class liability determination of whether Exel's standardized piece-rate compensation scheme covers morning meetings and

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1    other administrative time that is not directly tied to a particular delivery.  On damages, Exel fails

2    to discuss the testimony of its own management that the morning meetings occur on a daily basis

3    and that Class Members are required to attend. *See* Albarano Depo. I at 158:15-21.  Exel also fails

4    to address the fact that it has documented each morning meeting with a written morning meeting

5    "agenda" and that each day's agenda is the same for all locations. *See* Albarano Depo. I at 162:7-

6    17; 164:10-19; *see also* Exh. 44, sample morning meeting agenda, at EDV005088-5107.  This

7    classwide evidence will make damages manageable.

8        **E.    Overtime**

9        Plaintiffs will demonstrate at trial through Exel's own admissions that the Class Members

10   typically work well over 40 hours per week. *See, e.g.,* Smigelsky Depo. at 192:7-15; *see also* Exh.

11   45, Realistic Preview of Business Opportunity, at EDV012931.  At the same time, Exel's own

12   standard contracts set forth a uniform compensation scheme that does not provide for overtime

13   compensation or even take into account hours worked. *See* Exh. B to ELA, EDV001654; Exh. A

14   to ITA, EDV001683.[13]  The only material disputes go to damages.  Here, Exel concedes that its

15   own data show an average of over 10 hours per day merely in time spent making deliveries

16   (excluding loading, pre-trip inspections, and other pre-route work). *See* Ds' Br. at 6:2-3.

17       Exel has relied on the California Motor Carrier Act exemption to the overtime laws to

18   oppose Plaintiffs' overtime claim, which requires it to show that the Drivers are working in

19   "interstate commerce." *See* Order on Cross Motions for Summary Judgment [ECF 210] at 53:4-

20   56:15.  Yet, Exel failed to provide a factual basis to support the exemption on summary judgment,

21   Order [ECF 210] at 56:16-58:13, and has failed to produce any evidence or expert testimony on

22   the subject since. The classwide failure of proof on a defense is not a basis for decertification.

23

24   ---

     [13] Exel argues that Plaintiffs cannot use this data because other paper records are available. As

25   discussed below, Exel admits that these paper records are inadequate to prove class damages on

     the overtime claim in the same breath that it claims "just and reasonable inferences" are

26   unavailable to Plaintiffs. This is preposterous, given that the reason behind the "just and reasonable

     inference" standard under *Mt. Clemens* is to account for circumstances where employer defendants

27   fail to keep records that can adequately serve as proof of hours worked. *See* 328 U.S. at 687-688.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

Exel argues that Plaintiffs cannot calculate damages based on available drive time data because the data might capture the worktime of second drivers in addition to Class Members. This is not a basis for decertification for the reasons discussed in Sections III.A, *supra*, and IV, *infra.*

Exel also argues that Plaintiffs' regular rate for purposes of calculating overtime damages is "arbitrary," *see* Ds' Br. at 25:18-26:7, but it is based on Exel's own admissions as to average number of hours worked, stops per day, and pay per stop. A jury can decide whether the regular rate calculations are reasonable. Alternatively, the Court can conduct individual damages hearings for all 386 Class Members just to determine their regular rates of pay. The marginal difference this would make in the overall amount of damages does not make it a superior way to adjudicate the overtime claims of the Class. Rather, it would be a waste of judicial resources.

## IV.     ALTERNATIVE MANAGEMENT TOOLS FOR DETERMINING DAMAGES

The Ninth Circuit has firmly held that individual damages issues do not prevent class treatment in wage and hour cases or preclude the courts from "aiding the class to obtain its just restitution." *Leyva v. Medline Industries Inc.,* 716 F.3d 510, 513-514 (9th Cir. 2013). Indeed, "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action…." *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 699, n.28 (N.D. Ga. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir.2001)). In the face of these established procedures and despite the Court's request at the last case management conference to present alternatives, Exel has not provided any realistic alternative to its extreme position that none of Plaintiffs' damages can be determined on a class basis. *See* Ds' Br. at 38:14-39:3. Hiding behind its own incomplete records, Exel asks the Court to allow a policy already found to be illegal, to go without a remedy. *Cf. Hernandez v. Mendoza,* 199 Cal.App.3d 721, 726-727 (1988) (recognizing the "fundamental principle of American jurisprudence that for every wrong there is a remedy" and permitting recovery based on "just and reasonable inference…. even though the result be only approximate") (citations omitted). In contrast, while Plaintiffs still maintain that the Court can manage both liability and damages as to all claims across the class, *see* Section II & III, *supra,* and Section V,

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

*infra,* Plaintiffs nevertheless offer alternative methods that are in keeping with well-established management tools.

### A.    Bifurcation of liability and injunctive relief from damages

Bifurcation "is standard practice in employment class actions." *Barefield v. Chevron, U.S.A., Inc.*, 1988 WL 188433, at *4 (N.D. Cal. Dec. 6, 1988); *Bates v. United Parcel Service*, 204 F.R.D. 440, 449 (N.D. Cal. 2001). "The trial of class actions is usually bifurcated into a liability phase and a remedial phase." *Craik v. Minnesota State Univ. Board,* 731 F.2d 465, 470 (8th Cir. 1984). The procedure promotes judicial economy and lowers the risk of confusion by separating the liability inquiry from the conceptually distinct damages inquiry. *See Siddiqi v. Regents of Univ. of California*, 2000 WL 33190435, at *10 (N.D. Cal. Sept. 6, 2000). Here, Plaintiffs can prove class liability by showing that Exel's uniform and documented policies do not measure up to the requirements of the Labor Code. Damages, on the other hand, will involve distinct questions going to the number of miles driven and hours worked by Class Members as reflected in Exel's usable data, the completeness of the usable data, and the ability to make just and reasonable inferences to Class Members whose work is not contained in it. Given the distinction between the questions at issue when adjudicating the legality of Exel's policies as opposed to the damages owed to Class Members, bifurcation can be a useful trial tool here. *Bates*, 204 F.R.D. at 449.

### B.    Alternative subclasses and procedures for determining damages

Courts in this Circuit regularly use subclasses to streamline and manage proceedings. *See, e.g., Moore*, 311 F.R.D. at 609; *O'Connor v. Uber Technologies, Inc.,* 2015 WL 5138097, *23 (N.D.Cal.2015); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1201 (9th Cir. 2001). Here, Plaintiffs present potential damages subclasses and possible limitations to the damages model. These proposed alternatives can be taken individually or combined. Or, if the Court decides to bifurcate liability and damages, then decisions regarding damages subclasses and limitations can be reserved until after the liability phase of the trial. *See In re Tri-State Crematory Litig.*, 215 F.R.D. at 699, n.28. Before presenting these alternatives, however, Plaintiffs wish to emphasize their underlying position that damages for the entire class can be determined in a manageable

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

fashion by using the available data for those covered by it, and just and reasonable inferences for those who are not in it. *See* Section V, *infra.*  That said, Plaintiffs do wish to provide other alternatives to Exel's all-or-nothing approach.

      1.   <u>Damages subclass of Class Members who have enlisted one or more second drivers</u>

Exel argues that Plaintiffs cannot prove damages with regard to several claims because its timekeeping, compensation and mileage data may not accurately distinguish between work performed and expenses incurred by Class Members as opposed to second drivers.  As discussed above, Exel has identified only a handful of Class Members who have had second drivers, and has not demonstrated how such a small proportion of the Class could present unworkable manageability issues.  Moreover, on the merits, Plaintiffs dispute Exel's contention that Class Members are not entitled to damages for unlawful deductions or unreimbursed expenses incurred in connection with routes driven by second drivers, given that these deductions and expenditures directly impact the Class Members. Moreover, Exel hires the Class Members to manage the second drivers, and therefore any payment the Class Members make to the second drivers is a business expense incurred by that Class Member, and should be reimbursed by Exel.

Nevertheless, any ambiguity in the data or individualized inquires would be rendered moot by creating a subclass of individuals who have enlisted second drivers and then limiting class damages attributable to that subclass to just those workweeks where the data shows they did not have additional drivers helping them to run their routes.  Once damages for these individuals are determined, the remaining claims of this damages subclass (those Class Members who had enlisted second drivers) could be brought individually before a special master or by other means.

Identifying Class Members with second drivers would be manageable because Exel requires each second driver to go through an approval process and then tracks which Class Members they work for. *See* Albarano Depo. I at 110:3-11; Exh. 44, Deposition of Henry Capotosto ("Capotosto Depo.") at 57:21-25; 124:7-125:7.  This approach would address Exel's

1    concerns that Plaintiffs are over-estimating workdays because available data may reflect days

2    worked by second drivers as well as Class Members. *See* Ds' Br. at 14:3-6.

3              2.         Damages subclass of Class Members who provided services for one or
                         more companies other than Exel during the class period
4

5              Exel argues that class damages on expense reimbursements are unmanageable because

6    some Class Members' expenses may have been incurred in the course of providing labor for

7    companies other than Exel. Ds' Br. at 38:3-14.  Exel identifies only 2 Class Members out of 386

8    who provided services for other companies.  Nevertheless, the Court could craft a separate subclass

9    for these individuals, permit them to recover wage and break damages in the class proceedings,

10   and then have them go through individual proceedings to prove their expense reimbursement

11   damages.

               3.         Limit class damages to individuals captured by Exel's electronic data
12
               Exel argues that Plaintiffs are not entitled to extrapolate from available electronic mileage
13

14   and dispatch data to prove damages for Class Members who are not included in the data. *Id*. at

15   15:5-6.  As discussed in Section V, *infra*, decades of wage and hour case law conflict with this

16   narrow position. Nevertheless, the Court could manage the case by limiting damages to just the

17   approximately one-third of the Class included in Exel's "iDirect" and dispatch data.  This would

18   be manageable and reliable because the data show miles driven and days worked by Class

19   Members.   As an illustration, Mr. Breashers has provided a declaration submitted with this

20   opposition brief that explains how his underlying damages analysis can be modified to incorporate

21   the assumptions of Exel's expert, Dr. Jonathan Walker, and limit the damages to just the

22   individuals, workweeks and mileage contained in the data. *See* Breshears Decl. at ¶¶ 6-10.

23   Importantly, damages determinations under this alternative would <u>not</u> involve any extrapolation

24   to individuals outside the data Exel has provided. *See id*., at ¶¶ 2-6.

25

26

27

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

4.      Exclude one or more components from the class damages proceeding

a)  Minimum Wages/All Hours Worked

Exel argues that it is unmanageable to estimate the amount of time Class Members spent attending morning meetings and performing other administrative work not falling under the work category of what Exel terms "hauling revenue." Ds' Br. at 23:11-24:5.  Again, Plaintiffs can prove these damages with representative testimony from Exel's management and Exel's morning meeting agendas showing the dates and content of each morning meeting throughout the country. Nevertheless, this claim also could be excluded from the class damages proceeding and determined individually.

b)  Disputed Expenses and Deductions

Exel has challenged several categories of expense reimbursements and deductions on the bases that they cannot be calculated on a class basis and/or need not be reimbursed under the substantive law.  For instance, Exel argues that property damage claims cannot be adjudicated on a class basis because determining whether Class Members caused the damage willfully or recklessly would require an individual inquiry. Ds' Br. at 31:19-26.  Defendants also argue that cell phone expenses cannot be recovered because distinguishing costs incurred from personal use versus costs incurred from work use also would raise an individual inquiry. *Id.* at 38:5-8. Defendants make similar arguments with regard to the costs of tolls and medical insurance expenses. *Id.* at 36:16-37:8.  Plaintiffs do not believe these marginal critiques render calculation of expense reimbursement and unlawful deduction damages unmanageable, particularly given that Plaintiffs intend to use a reasonable mileage reimbursement rate to measure expenses. Nevertheless, one or more of these disputed categories—e.g., (1) damage claims; (2) cell phone costs; (3) tolls; and (4) medical insurance—can be excluded from the class damages proceeding to the extent that their inclusion would impede manageable adjudication of the claims on a class-wide basis.  This would be manageable, because Mr. Breshears' analysis pragmatically breaks down damages by each category of expense reimbursements, so one or more line items can be removed with ease.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

**V.   EXEL'S MOTION FOR DECERTIFICATION MISSTATES THE LAW AND FLIPS THE BURDEN OF PROOF**

    **A.   Plaintiffs may prove damages by just and reasonable inference, using representative testimony, averaging, and reasonable estimates**

It is black letter law in the Ninth Circuit that differences in damages will not prevent a class proceeding in a wage and hour case. *Leyva v. Medline Industries Inc.,* 716 F.3d 510, 513-514 (9th Cir. 2013) (Ninth Circuit reasoning that it knew "of no case" where the need to make individual damages determinations "has prevented a court from aiding the class to obtain its just restitution."). Yet, Exel's argument for decertification is predicated on the unrealistic expectation that Plaintiffs must demonstrate that they can prove each category of damages with absolute certainty.  This position is misplaced in the context of a wage and hour case like this, where any imprecision in Plaintiffs' damages calculus results from the employer's failure to maintain adequate and complete records.

Cases like this one present precisely the sorts of circumstances that have sustained over 70 years of well-developed precedent allowing Plaintiffs in a wage and hour case to prove their damages by "just and reasonable inference." *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946) ("the solution [for incomplete or inadequate records] . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.")  Rather, the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inferences to be drawn from the employee's evidence." *Id.* at 687-688; *see also Porch v. Masterfoods, USA, Inc.*, 685 F. Supp. 2d 1058, 1074 (C.D. Cal. 2008) (quoting *Mt. Clemens, supra*) (reasoning that "imprecise evidence by the employee can provide a sufficient basis for damages.").

Contrary to Exel's argument, the *Mt. Clemens* doctrine is not limited to FLSA cases, and has been readily applied in Rule 23 class actions. *See, e.g., Garcia v. Bana*, No. C 11-02047 LB, 2013 WL 621793, at *9 (N.D. Cal. Feb. 19, 2013); *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 403 (C.D. Cal. 2008); *Wang v. Chinese Daily News, Inc.*, 2008 WL 1805834, at *5 (C.D.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

Cal. Feb. 27, 2008) (overturned on other grounds); *Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 390 (S.D.N.Y. 2014).  By way of analogy, the California Court of Appeal has adopted this same framework with regard to claims brought under the California Labor Code. *See Hernandez v. Mendoza,* 199 Cal.App.3d 721, 726-727 (1988).  Moreover, the same burden-shifting principles apply to expense reimbursement claims. *See, e.g. Melgar v. CSk Auto, Inc.*, 2015 WL 9303977, at *9 (N.D. Cal. Dec. 22, 2015), *appeal docketed* Jan. 6, 2016 (interpreting section 2802 to affirmatively require employers to keep records of employee expenses).

The Sixth Circuit recently affirmed the use of representative testimony and averaging to calculate damages in a wage and hour case. *See Monroe, et. al., v. FTS USA, LLC, et al.,* No. 14-6063 (6th Cir. March 2, 2016) (citing a consistent line of authority from several circuits, including the Ninth Circuit, approving of the use of representative proof as an integral part of the class action device).   The decision is well in line with well-established authority that averaging from representative testimony and partial data is an appropriate method of proving damages in wage and hour cases where the employers have maintained incomplete or inadequate records. *See, e.g. McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) ("We hold that the *Mt. Clemens Pottery* standard allows district courts to award back wages under the FLSA to non-testifying employees based upon the fairly representative testimony of other employees."); *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66-68 (2d Cir. 1997) (holding that plaintiffs satisfied their burden by providing representative testimony concerning 2.5% of the entire class of employees owed back wages); *Leyva*, 716 F.3d at 515 (reasoning that calculation of class damages was feasible where the Defendant's systems "contain much of the data needed to calculate damages."); *Donovan v. Williams Oil Co.,* 717 F.2d 503, 505 (10th Cir.1983); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) (reasoning that it is the plaintiffs' burden to "present sufficient evidence for the jury to make a reasonable inference as to the number of hours worked by the non-testifying employees."); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991) ("It is well established that not all employees need testify in order to prove the violations or to recoup back wages."); *Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 391 (S.D.N.Y.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

2014) (approving of method of proving class damages through reasonable estimates of the amount of an how often employees received tips, as "[c]onsistent with the *Mt. Clemens* doctrine.").[14]

Plaintiffs also may rely on expert witness estimates based on extrapolation from reasonable estimates and partial records where defendants' records are incomplete or inaccurate. *See, e.g. Childress v. Ozark Delivery of Missouri L.L.C.*, 2014 WL 7181038, at *3 (W.D. Mo. Dec. 16, 2014) (reasoning that expert could estimate damages in wage and hour class action through "reasonable extrapolation," based on the "policy rationale" discussed in *Mt. Clemens*); *see also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 799 (8th Cir. 2014) (permitting expert witness extrapolation from limited data sample to prove damages where the defendant's records were incomplete);[15] *Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681, at *8 (E.D.La. Apr.29, 2008); *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *18 (N.D. Cal. Apr. 4, 2014); *see also* Newberg on Class Actions § 12:5 (5th ed.) ("Plaintiffs may proffer an expert who offers a formula that she derived from the facts of the case that can be applied generally to all class members in order to approximate the aggregate amount of damages the defendant must pay.").

The representative testimony and estimates here are even more probative and reliable than in the typical wage and hour case because they come from research and modeling that Exel's own

---

[14] In *Jimenez v. Allstate Insurance Co.*, 765 F.3d 1161 (9th Cir. 2014), the Ninth Circuit stated that "statistical sampling and representative testimony are acceptable ways to determine liability so long as the use of these techniques is not expanded into the realm of damages." *Id.* at 1167.  In making this comment, however, the Court at no time suggests that it is overruling or challenging the long line of authorities from the Supreme Court on down, cited above, which hold that plaintiffs can obtain effective relief for themselves and others in a wage and hour case through representative evidence.  Rather, *Jimenez* affirms the order of the district court granting class certification and comments that an additional reason in favor of certification is that the Court bifurcated liability and damages. *Id.* at 1168.  Indeed, Jimenez has been cited in support of class certification in an analogous case involving wage and hour claims of truck drivers. *Taylor v. Fedex Freight, Inc.*, 2015 WL 2358248, at *14 (E.D. Cal. May 15, 2015).

[15] The *Tyson Foods* decision is currently on appeal before the Supreme Court of the United States. Yet the Justices raised serious concerns with Tyson Foods' position at oral argument, and given the current composition of the Court and recent vacancy, Plaintiffs anticipate an affirmance of the 8th Circuit's ruling (or, at the very least, a 4-4 split, which would have the same effect as an affirmance).

senior management has admitted to be useful, reliable and important in making business decisions for the company.  For example, former CFO Renee Albarano admitted in deposition that Exel's per-mile and annual cost estimates of helper wages, insurance, tools, uniforms, phones, maintenance, fuel, workers compensation, and damages claims, among other costs, were determined from interviews with numerous executives, managers and recruiters over a multi-month process, and that the ultimate estimates she presented were "useful and reliable in terms of helping [her] bosses to make financial decision[s] for the company." *See* Albarano Depo. II at 158:5-159:6; 54:18-58:9. Similarly, Exel's VP of Operations, Ken Mangen, testified that the estimates generated from the modeling that Exel performs to generate bids for its retail customers come from both information provided by the retail customers as well as through in-house modeling programs that consider numerous inputs, such as number of mileage, number of deliveries, and product type, and that Exel collects the information for the models "to be as accurate as possible on price." *See* Mangen Depo. at 38:2-44:4.  Mr. Mangen also testified that "the models basically go through everything you need to know in order to price a business." *Id.* at 31.  In other words, the "estimates" Plaintiffs can use to help model and corroborate damages are not mere guesses, but admittedly useful and reliable estimates that Exel has generated to make important financial decisions about its own business. *See Vaccarino v. Midland Nat. Life Ins. Co.*, 2013 WL 3200500, at *14 (C.D. Cal. June 17, 2013) (observing that in *Leyva, supra*, the court found that "defendant's own admissions" demonstrated that "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated.").

In addition, Defendants' own witnesses have testified to ranges of miles driven per day and days worked per week, which can be used to supplement Class Member testimony, along with Exel's own estimates, as described above, at trial. *See* Smigelsky Depo. at 192:6-15 (senior manager testifying that a Driver's typical work schedule is 5-6 days per week and 10-12 hours per day); Albarano Depo. II at 57:8-58:19 (CFO testifying that Drivers make deliveries approximately 260 days per year, or approximately 5 days per week, based on conversations with senior and local management, and recruiters) 54:23-56:18 (testifying that Exel's senior management team

estimated that the company's Drivers drive 200 miles per day, on average, across its national operations, based on conversations with site managers, senior management, and recruiters); Mangen Depo. at 42:3-43:1 (testifying that Drivers typically drive 125-200 miles per day).

**B.     Exel flips the burden of proof by incorrectly presuming that Plaintiffs must rely on a haphazard array of incomplete time sheets and scheduling manifests**

Exel suggests that Plaintiffs are required to prove their damages by sifting through more than a thousand bankers boxes of driver manifests, timesheets and logs in a warehouse in Los Angeles. Yet in the same breath, Exel acknowledges that it was "reasonable" for Plaintiffs not to analyze these papers, because assembling the over "4 million documents" for trial would "be incredibly difficult and time consuming (if even possible at all)." *See* Ds' Br. at 24:20-25:6. Ironically, Exel argues that it is Plaintiffs' burden to prove class damages using the inadequate paper manifests and incomplete timesheets, while at the same time acknowledging that these papers would be "entirely inappropriate in the class action context." *Id.*; *see also* Exh. 46, Deposition of David Breshears ("Breshears Depo.") at 30:19-31:2 (explaining that going through the 4 million hard copy papers to find every snippet of information that may or may not relate to each class member would be cost-prohibitive). Exel cannot have it both ways. *See Grimes v. Kinney Shoe Corp.*, 902 F. Supp. 1070, 1074 (D. Alaska 1995) (citing *McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir.1988)) (reasoning that the *Mt. Clemens* standard presumes that the employer "should <u>bear the risk that records will be inadequate</u>.") (emphasis added).[16]

As explained by Mr. Breshears in deposition, the paper manifests and incomplete timesheets are not organized by Class Member, are intermingled with numerous irrelevant documents, are often illegible, and there is no indication that they are even complete. Breshears Depo. at 74:4-75:25; 150:20-151:24; *see, e.g.,* Exh. 47, Sample Manifest, EDV001234-1243

---

[16] As Exel acknowledges, attempting to present the records as a source of common proof at trial would be cumbersome and impractical, and would therefore waste the limited resources of the Court. *See, e.g. F.T.C. v. Pioneer Enterprises, Inc.*, 1992 WL 372350, at *2 (D. Nev. Nov. 12, 1992).

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

(mileage information not legible); *See Nat'l Electro-Coatings, Inc. v. Brock*, 1988 WL 125784, at *7 (N.D. Ohio July 13, 1988) ("Illegibility should not be construed in favor of the [employer] where a[] wage violation would be excused.").  Moreover, it would be prohibitively costly to copy and analyze them, and even then it is doubtful that they would provide the basis for an adequate analysis. *See* Breshears Depo. at 28:15-29:7.

In addition, the paper manifests that Exel suggests Plaintiffs should cobble together are merely schedules setting forth windows of time in which each delivery must be made in a given day—they do not measure time worked as a traditional timekeeping record does, and even the schedules exclude substantial time spent loading merchandise in the warehouse and attending morning meetings, among other tasks, before departing. *See, e.g.,* Sample Manifest, EDV001234 (including only "depart time").

Moreover, Exel has not even attempted to demonstrate that the records are complete or otherwise usable. *See* Ds' Br. at 24:21-23; Cash Decl. at ¶ 2.  Exel's Regional Safety and Compliance Manager also admits the records may be inadequate for other reasons, including that they may not contain Class Members' names, and are largely handwritten.  *See* Murphy Decl. at ¶¶ 4-5 (admitting that "very few" driver logs recorded break time, are filled out by hand, and "do not record the driver's name" other than with a handwritten signature); ¶¶ 8, 15.[17]  Such voluminous, disorganized and incomplete records are inadequate sources of proof. *See, e.g. Reich v. Giaimo*, 1993 WL 724662, at *3 (E.D. Mo. Dec. 30, 1993) (reasoning that employment records were inadequate where they in many instances failed to provide full names, number of hours worked, and deductions from wages); *Arias v. U.S. Serv. Indus., Inc.*, 80 F.3d 509, 512 (D.C. Cir. 1996) (permitting expert to extrapolate where the defendant's records were inadequate to determine damages on their own).

Even assuming, *arguendo*, that the manifests and timesheets were usable in some form, it would not be Plaintiffs' job to sift through them to identify the documents that actually show

---

[17] It appears that Mr. Murphy executed a different version of his Declaration than the version that was submitted with Exel's motion. *See* ECF 239 at 102-103.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

Plaintiffs' damages. *See Minter v. Wells Fargo Bank, N.A.*, 286 F.R.D. 273, 278-79 (D. Md. 2012) (citing *United States ex rel. Englund v. Los Angeles*, 235 F.R.D. 675, 681 (E.D.Cal.2006)) ("A document dump of thousands of documents will not suffice… if the records produced are voluminous, the responding party may need to produce an index to guide their opponent to responsive documents.").

Exel cannot dictate that Plaintiffs use an admittedly cost-prohibitive and inadequate source of proof where suitable alternatives exist. Plaintiffs have opted to use available data produced by Exel and reasonable estimates based on Exel's own admissions and internal calculations, rather than proceeding with the unrealistic process of cobbling together a damages analysis from 4.5 million pages of disorganized and often illegible, handwritten, paper manifests and incomplete timesheets. The cost estimate merely for imaging all 4.5 million pages (which excludes the much more costly data analysis) is immense. *See* Exhibit I to Cash Decl.

The proportionality requirement of F.R.C.P. 26 relieves responding parties of their obligations where the cost of production outweighs the benefit to the receiving party. *See* Fed. R. Civ. P. 26; *see also Feske v. MHC Thousand Trails Ltd. P'ship*, 2012 WL 1123587, at *2 (N.D.Cal. Apr. 3, 2012) ("in the specific context of class-action discovery, sampling advances the goal of proportionality set forth in Fed.R.Civ.P. 26(b)(3)(C)(iii)"); *Soto v. Castlerock Farming & Transp., Inc.*, 282 F.R.D. 492, 504 (E.D. Cal. 2012) (permitting production of sample of records in lieu of compete set, to minimize burden of producing "tens of thousands of pages."). Given that the paper manifests and timesheets are not usable, the evidentiary value of these inadequate records is well out of proportion with the cost. *See* Breshears Depo. at 78:17-24 (testifying that his general approach as a forensic accountant is to use available electronic records that can be used to form the basis of a reasonable estimate rather than incurring high costs to attempt to process and organize voluminous paper records). Plaintiffs invite Exel to rebut their damages analysis using the paper manifests and incomplete timesheets, but Plaintiffs need not use them to make their case in chief.

C.    **Exel disregards the superiority of a class damages proceeding by ignoring the inherent desirability of concentrating this litigation in one proceeding**

Exel spends a great deal of time speculating on the manageability of a class damages proceeding in this case.  Yet at the same time, Exel ignores the reality that even if its rigid argument were successful, the parties and the Court would still have to contend with hundreds of individual damages proceedings. *Leyva*, 716 F.3d at 513 (holding that in the Ninth Circuit, "damage calculations alone cannot defeat certification" and rejecting the defendant's interpretation of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013)).

Whatever challenges that may be presented by a class damages proceeding, they pale in comparison to the resource drain of hundreds of individual damages determinations.  This comparative disadvantage is a common reason why courts in this Judicial District and elsewhere in the Ninth Circuit consistently hold that class proceedings are superior in similar circumstances. *See, e.g. Thomas v. Baca*, 231 F.R.D. 397, 403 (C.D. Cal. 2005) (reasoning that any difficulties "encountered in the management of this class… would be less than the judicial resources that would be expended in adjudicating individual [] actions[.]")*; Woods v. Vector Mktg. Corp.*, 2015 WL 5188682, at *16 (N.D. Cal. Sept. 4, 2015); *Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 265 (N.D. Cal. 2015) ("The class members' claims all stem from [the defendant's] allegedly improper policies, practices, and procedures. It would be both 'redundant' and a 'wildly inefficient use of limited judicial resources' for each operator to file an individual lawsuit alleging claims for their unpaid wages.") (internal citations omitted); *Schilling v. Transcor Am., LLC*, 2010 WL 583972, at *11 (N.D. Cal. Feb. 16, 2010).

It is well-established that Rule 23 is designed to promote efficiency by avoiding duplicative litigation. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reasoning that a class action is the superior method of adjudication "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency."). "Equally important as judicial economy are considerations of the avoidance of the inequality resulting from piecemeal litigation as well as a concern to provide access to the courts for litigants with limited resources and common

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

claims." *Day v. NLO*, 851 F. Supp. 869, 883 (S.D. Ohio 1994).  Indeed, the remedial purposes of the Labor Code would be better served by a class proceeding than by requiring Class Members to come forward individually to be made whole.  *See Thomas v. Home Depot USA, Inc.*, 527 F.Supp.2d 1003, 1010 (N.D. Cal. 2007) (reasoning that the Labor Code is a "comprehensive and detailed remedial scheme" designed to make workers whole).

Even assuming, *arguendo*, that the Court were not inclined to hold class damages proceedings with regard to one or more components of Plaintiffs' damages, Plaintiffs would still be able to maintain a class action on liability and then have the right to recover damages in individual proceedings. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action.").  Indeed, courts in the Northern District and elsewhere in the Ninth Circuit consistently hold that where class liability is established, damages can be determined individually by several alternative management tools. *See, e.g. Spears*, 2014 WL 4647679, at *21-22; *Moore*, 311 F.R.D. at 593.

## VI.     EXEL'S DAUBERT MOTION SHOULD BE DENIED

### A.     The Court's role is to screen expert testimony for unreliability and unhelpfulness, not to weigh the evidence or assure correctness

Federal Rule of Evidence 702 permits admission of specialized knowledge by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." *See Abaxis, Inc. v. Cepheid*, 2012 WL 2979019, at *1 (N.D. Cal. July 19, 2012).  This inquiry is a "flexible one," where even "shaky" evidence "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (quoting *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir.2010)). The jury, not the Court, determines how much weight to give the expert testimony. *Lucent Techs., Inc. v. Microsoft Corp.*, 2011 WL 2728317, at *2 (S.D. Cal. July 13, 2011).  *Daubert* and Rule

702 are "not guarantees of correctness," and the Court does not weigh one methodology over another. *Emblaze*, 52 F. Supp. 3d at 954. "[R]ejection of expert testimony is the exception rather than the rule." *Frye v. Ayers*, 2009 WL 1312924, at *4 (E.D. Cal. May 12, 2009).

### B.   The record amply demonstrates that Mr. Curtis is qualified to opine on mileage reimbursement rates

Mr. Curtis is the only expert before this court who is qualified to opine on mileage reimbursement rates (Exel has not offered an expert on these issues). Exel ignores Mr. Curtis' extensive experience and specialized knowledge in determining the cost of operating a commercial truck, which is all that is necessary to qualify him as an expert here. *See, e.g.* Exh. 48, Deposition of Wesley Curtis ("Curtis Depo.") at 7:4-23 (performs mock DOT audits for clients of his consulting business, which involves review of maintenance records and pricing); 36:4-37:1 (operates own commercial box truck); 42:21-44:18 (conducts cost per mile analyses for clients as part of consulting business); 44:19-45:5 (has done multiple comprehensive analyses of a business's operating cost per mile in terms of commercial truck operation); 55:20-56:16 (familiar with repair, labor, and parts replacement costs, among other costs, based on experience evaluating vehicle maintenance programs); *see also* Amended Curtis Report, at 2-3 (describing extensive knowledge of costs of brining a commercial truck into compliance with California regulatory standards, and the costs of operating a commercial truck in California as a general matter).

Despite his solid qualifications, Exel argues that Mr. Curtis is not qualified to provide testimony on trucking costs because he is not a delivery driver or a statistician. *See* Ds' Br. at 10:13-11:15. Yet, there is no requirement that Mr. Curtis have personal experience in the specific field of home delivery to be able to apply his specialized knowledge of trucking costs to individuals driving trucks within that field. *See Abaxis*, 2012 WL 2979019, at *2-3 ("Rule 702 imposes no requirement that experts have personal experience in an area to offer admissible testimony relating to that area."); *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness... an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). Nor does Exel demonstrate why

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

someone with years of experience in trucking costs also needs to have a degree in statistics or run a regression analysis to calculate fuel and other costs associated with driving a vehicle fitting Exel's standard truck requirements.

Rule 702 is "broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1212 (E.D. Wash. 2015) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.,* 373 F.3d 998, 1015 (9th Cir.2004)).  In this respect, courts routinely qualify experts to provide testimony bearing upon narrow topics falling under the umbrella of their broader areas of specialized knowledge. *See, e.g., Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 551, 553 (N.D. Cal. 2012) (reasoning that epidemiologist with focus on public health was qualified to opine in the "limited area" of advertising and marketing in public health "without also being an expert in the total universe of commercial marketing and advertising."); *United States v. 75.746 Acres of Land*, 2010 WL 1408896, at *3 (D. Ariz. Apr. 7, 2010) (holding that expert with experience in farming and investment was qualified to estimate a reasonable capitalization rate for agricultural property); *Abaxis*, 2012 WL 2979019, at *2-3.  Exel does not argue that Mr. Curtis lacks knowledge of trucking costs.  Accordingly, there is no basis to disqualify him from testifying.[18]

### C.   Plaintiffs' experts relied on Exel's own data, internal calculations, and admissions, not on speculation

#### 1.   Mr. Curtis' cost-per-mile figure is based on a sound, well-established methodology and is corroborated by Exel's own numbers

Exel argues that Mr. Curtis' testimony should be excluded because it applies "hypothetical costs" rather than actual costs. *See* Ds' Br. at 4:7-5:2; 12:19-28 (criticizing Mr. Curtis for not using "actual data.").  Again, the notion that driving related costs are not "real" defies common sense, as the trucks do not mysteriously drive themselves without fuel or wear and tear.  Moreover, the need

---

[18] In contrast, Exel's expert, Dr. Walker, admittedly lacks knowledge or training regarding the calculation of mileage reimbursement rates, and does not claim to possess any qualifications bearing on mileage reimbursement rates. *See* Walker Report at ¶¶ 1-3; Exh. 48, Deposition of Jonathan Walker ("Walker Depo.") at 76:23-78:10.  It should come as no surprise that Dr. Walker admits he does not know how mileage reimbursement rates are calculated. *Id.*

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1   for Drivers to spend at least $100 a day on helpers is not "hypothetical" when Exel's own
2   management uniformly admits that helpers are required, Moll Depo. at 147:9-148:2; Capotosto
3   Depo. at 46:1-25, the Defendant can only identify one person out of 386 who may have paid them
4   less than $100 per day.

5       Exel also misunderstands the very concept of mileage reimbursement rates.  For example,
6   Exel argues that Mr. Curtis should not have factored tire costs into his cost-per-mile figure because
7   he did not use actual receipts of tire replacements. *See* Ds' Br. at 4:9-11.  But this ignores the fact
8   that "in any mileage-based figure, it's understood that the cost [] to replace a tire is not as a result
9   of that one moment when the nail punctures the tire.  It's the result of driving 100,000 miles on
10   those tires that caused them to some point go bad." Breshears Depo. at 173:4-25.  The cost of tires
11   is just one of many components of a reasonable reimbursement rate measuring the incremental
12   wear and tear driving puts on a vehicle.  Those costs do not significantly vary when the company
13   has a standardized set of truck requirements that limit the range of components such as miles per
14   gallon, lifespan of a tire, and the like. Curtis Depo. at 83:19-84:3; Amended Curtis Report at 6.

15       Exel appears to assume that any calculation of costs is speculative if it does not involve the
16   analysis of purchase receipts or an individualized interview of each person incurring the costs. *See*
17   Ds' Br. at 12:24-25; Exh. 49, Deposition of Jonathan Walker ("Walker Depo.") at 33:21-37:13.
18   What Exel fails to understand, however, is that there are alternative methodologies to get to the
19   same result.  For example, while one could theoretically determine fuel costs by adding up all the
20   receipts that the Drivers may have received from all the gas stations they visited during the class
21   period, another equally or more reliable way to get to the same result would be to simply determine
22   the cost per mile using historic fuel prices and the miles per gallon for a vehicle meeting Exel's
23   standard truck requirements.[19]  The Court's role is not to weigh one methodology over another,
24   *Lucent Techs,* 2011 WL 2728317, at *2.

25
26
27

[19] In fact, this cost per mile approach is arguably more reliable than Exel's assumed alternative in that Exel did not have a procedure in place for Drivers to submit their receipts and obtain reimbursement, and therefore measuring fuel costs by receipts is likely to undercut the actual costs. This goes to the weight of the evidence, however.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1    Indeed, California wage and hour law specifically authorizes the measurement of driving-

2    related expense reimbursement damages using a reasonable mileage reimbursement rate, *in lieu* of

3    receipts or other kinds of evidence. *See Gattuso*, 42 Cal. 4th at 569.  Exel does not take issue with

4    Mr. Curtis' fuel price and miles per gallon figures, but rather makes a legal argument that

5    Plaintiffs' reasonable mileage reimbursement rate approach cannot be applied.   The argument

6    contradicts the California Supreme Court's decision in *Gattuso,* and would not undermine Mr.

7    Curtis' analysis even if the law was not decided already in Plaintiffs' favor. *See United States v.*

8    *14.30 Acres of Land*, 2009 WL 3713698, at *3 (S.D. Cal. Nov. 5, 2009) (denying motion to exclude

9    expert testimony because legal issue was yet to be decided).

10    Mr. Curtis properly determined a reasonable mileage reimbursement rate, taking into

11    account costs of operation for the standard type of truck driven by Class Members in this case. *See*

12    Curtis Depo. at 59:18-60:11; 79:2-16; 91:17-92:13; 134:23-135:15.   In this connection, Exel

13    argues that Mr. Curtis chose his exemplar truck "at random." *See* Ds' Br. at 11:4-7.  As Mr. Curtis

14    explains in his report, however, he selected the exemplar because "it is typical of the type and size

15    of box truck used by the Class Members in this case" based on "Exel's 'Standard Truck

16    Requirements,' which reflect that Class Members operate a similar type of truck." *See* Amended

17    Curtis Report at 6.  Exel makes no attempt to explain how the selection of a truck meeting Exel's

18    precise length, weight, and other "Standard Truck Requirements," to which it admits all trucks had

19    to adhere, would present any methodological problems with regard to determining a reasonable

20    mileage reimbursement rate. *See* Ds' Br. at 11:4-7.

21    While the correctness of Mr. Curtis' conclusions go to the weight of the evidence rather

22    than admissibility, the similarity between Mr. Curtis' and Exel's own figures corroborates the

23    soundness of Mr. Curtis' methodology.  Indeed, it is ironic at best for Exel to contend that Mr.

24    Curtis' cost-per-mile figure is unreliable, given that Exel's own cost-per-mile estimates are, on

25    average, generally equivalent to Mr. Curtis' figures. *See* Amended Curtis Report, at 21-22;

26

27

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

Breshears Suppl. at ¶ 19.[20]   Notably, Mr. Curtis reached his cost-per-mile figures before having the benefit of access to Exel's numbers, which Plaintiffs were only able to provide to Mr. Curtis after the Court compelled their production.   Moreover, as discussed above, Exel admits that it uses these figures to make important financial decisions about its own business.   *See* Section II.A(b), above.   Moreover, Exel's RFPs show that several key categories of costs (e.g. helper costs, miles per gallon) are consistent across locations.   *See* Exh. 52, Requests for Proposal.

As another point of comparison, Mr. Curtis' figures also align with the IRS's business standard mileage reimbursement rate for business use of a personal vehicle.[21]   As the IRS's tax revenue procedure guidelines indicate, the business mileage reimbursement rate takes into account depreciation, maintenance and repairs, tires, gasoline, insurance, and license and registration fees. *See* Exh. 50, IRS Rev. Proc. 2010-51, at 7.   The IRS rate changes from year to year, and was between 50 and 58.5 cents during the relevant period. *See* Exh. 51, IRS Standard Mileage Rates, IRS   Website   (https://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates)   (last   accessed March 11, 2016).   Adding together Mr. Curtis' cost per mile figures for depreciation, maintenance and repairs, tires, gasoline, insurance, and license and registration fees works out to a rate of 87 cents per mile.   *See* Breshears Report at ¶ 16 (listing cost per mile figures for each category).   This increase of just over 30 cents from the IRS rate is to be expected, given that the IRS rate uses a personal vehicle as an exemplar, rather than the 26-foot box truck exemplar used by Mr. Curtis to reflect Exel's "Standard Truck Requirements." *See* Amended Curtis Report, at 5-6.

---

[20] In many categories, Mr. Curtis' figures were actually more favorable to Exel than their own estimates.   For instance, Mr. Curtis used a figure of $100 per day for helper costs, whereas Exel's figures consistently used $110 per day, and Mr. Curtis used a miles per gallon figure of 10, whereas Exel's figures ranged from 7-8 miles per gallon. *See* Exh. 52, Compendium of Exel's Requests for Proposal; Amended Curtis Report at 11, 18.

[21] As Mr. Curtis made clear in his report, he is familiar with the IRS's similar approach for determining reasonable mileage reimbursement rates. *See* Amended Curtis Report, at 6 (stating that the IRS takes into account similar fixed and variable costs when determining a mileage reimbursement rate for tax purposes).

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1    Exel does not even attempt to propose a different cost-per-mile number than Mr. Curtis,

2    even though it has admittedly run its own cost-per mile analyses on numerous occasions, using its

3    own proprietary modeling computer programs. *See* Mangen Depo. at 31:2-12; 39:12-40:4.  Exel

4    could have taken issue with the accuracy of Mr. Curtis' rate, but chose not to, presumably because

5    Mr. Curtis' figures are dead on.   Nevertheless, Exel suggests that the result might have been

6    different if Mr. Curtis had not used estimates or if he had made different assumptions. *See* Ds' Br.

7    at 12:18-13:10.   Yet the possibility that the result could be different goes to the weight of the

8    evidence, not admissibility. *See Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263

9    (9th Cir.2001) (reasoning that "critique of conclusions" goes to the weight of evidence).   Exel is

10   free to cross examine Mr. Curtis and present its own estimates to rebut the reasonableness of his

11   figures at trial, but it has no basis to exclude them or a cost-per-mile approach entirely (which Exel

12   admits it has itself used on numerous occasions). *See Frye*, 2009 WL 1312924, at *5 (admitting

13   expert testimony because "the court is prepared and able to critically evaluate [his] qualifications

14   and opinions when he testifies.").

15   Finally, even assuming *arguendo* that Exel can demonstrate that one or more components

16   going into Mr. Curtis' mileage reimbursement rate are either too speculative or not compensable

17   under the applicable legal standard, the damages calculations are structured in such a manner as to

18   allow for removal of any such line item(s) without undermining the overall methodology. *See*

19   Section II.B; Exhibit 1 to Breshears Decl.  For instance, Exel attacks the inclusion of meal expenses

20   in Mr. Curtis's cost-per-mile figure, *see* Ds' Brief, at 11:9-11, but the point is moot because Mr.

21   Breshears excluded this same meal component from his ultimate damages analysis. *See* Breshears

22   Report at ¶ 16.  Similarly, even if the Court denies recovery for one or more additional components

23   of the mileage reimbursement rate, such items could simply be removed from the overall calculus.

24                    2.    Mr. Breshears' damages analysis relies on Exel's own data and
                            admissions, not on speculation

25   Exel attempts to cast Mr. Breshears' testimony as globally reliant on unrepresentative

26   testimony from a handful of Class Member depositions. *See, e.g.,* Ds' Br. at 6:14-18; 14:15-15:4.

27

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1    Perhaps Exel read a different Expert Report than the one submitted by Mr. Breshears.  For instance,

2    while Exel argues that Mr. Breshears relies on a small sample of Class Member testimony to

3    determine minimum wage and meal and rest period damages, Mr. Breshears made clear in

4    deposition that he only looked to Class Member testimony to inform his analysis when Exel's own

5    data was unavailable. *See* Breshears Depo. at 185:1-186:12; 207:8-23.

6          As just one other example, Exel argues that Mr. Breshears' relied on a "fanciful"

7    interpretation of one document to determine a figure for the average number of days worked per

8    week by Class Members. *See* Ds' Br. at 14:3-14. Yet as he testified in deposition, Mr. Breshears

9    reached this figure based on careful consideration of Exel's own admissions with regard to Class

10   Members' typical work schedules and evidence in the record that outlier individuals would skew

11   the average number of days set forth in the available data. *See* Breshears Depo. at 100:9-101:3.

12   This reasoned analysis comes nowhere near the sort of "speculation" that Rule 702 was designed

13   to exclude. *See Oracle Am., Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1183 (N.D. Cal. 2012)

14   (finding that expert's "calculation was not speculative under *Daubert*" where expert performed

15   licensing valuation by "adjusting" the amount upward "based on [the company's] own revenue

16   projections at the time for the value of compatibility.").

17         Even if the trier of fact determines that Class Members worked fewer than 5 days per week,

18   Mr. Breshears' methodology allows the jury to determine a different figure.  For example, Mr.

19   Breshears' alternative damages analysis adopts Dr. Walker's assumptions and limits damages to

20   just the individuals, wage deductions, mileage, and workdays captured within Exel's "iDirect" and

21   compensation data. Breshears Decl. at ¶¶ 6-10; Exhibit 1 to Breshears Decl.

22         3.    <u>Exel's criticism of Mr. Breshears' analysis originates from its own
              deficient recordkeeping</u>

23         As discussed above, Plaintiffs are entitled to prove their claims by "just and reasonable

24   inference" based on reasonable estimates because Exel has not maintained complete and adequate

25   employment records. *See* Section V, above.  Expert witnesses commonly and properly provide

26   admissible damages analyses based on partial records, representative testimony, or other evidence,

27

where a defendant's records are incomplete or inadequate. *See, e.g. Childress*, 2014 WL 7181038, at *3; *Johnson.,* 2008 WL 1930681, at *8; *Bouaphakeo*, 765 F.3d at 799; *Donovan v. Williams Oil Co.,* 717 F.2d 503, 505 (10th Cir.1983); *U.S. Dep't of Labor v. Cole Enterprises, Inc.,* 62 F.3d 775, 781 (6th Cir.1995); *Minns v. Advanced Clinical Employment Staffing LLC*, 2015 WL 3491505, at *9 (N.D. Cal. June 2, 2015); *In re Nexium (Esomeprazole) Antitrust Litigation*, 297 F.R.D. 168, 182, 2013-2 Trade Cas. (CCH) ¶ 78589 (D. Mass. 2013); *In re High-Tech Employee Antitrust Litig..*, 2014 WL 1351040, at *18 (N.D. Cal. Apr. 4, 2014).

Here, Mr. Breshears relied on Exel's own data and admissions to demonstrate the company's exposure "by just and reasonable inference," rather than on speculation from a non-representative sample of class member testimony.  As discussed above, Mr. Breshears relied on the data Exel made available, and supplemented it with the testimony from Exel's own executive team and operational managers in California, as to the days and hours typically worked and the miles typically driven by the Class.

Even if Mr. Breshears had used "extrapolation," (to use Exel's phrasing) this would still not be a basis to exclude his testimony.  Indeed, any "extrapolation" was necessitated by Exel's unlawful classification scheme and resulting deficient recordkeeping.  For example, Exel complains that Mr. Breshears "extrapolated iDirect and Dipatch data" even though other records were available, Ds' Br. at 13:11-21; 15:5-10, while at the same time acknowledging that these other "records" consisting of paper manifests and incomplete timesheets would not be an adequate source of common proof at trial in any event. *Id*. at 24:20-25:6.  Again, Exel cannot have it both ways.  Having failed to keep adequate records, it is Exel's burden to rebut Plaintiffs showing, not to seize on its own deficient recordkeeping as a justification for excluding Plaintiffs' expert testimony.[22]

---

[22] In any event, Mr. Breshears has provided an alternative damages analysis covering merely those Class Members included in the "iDirect data," which therefore involves no extrapolation. See Breshears Decl. at ¶¶ 6-10.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

**D.     The expert testimony easily meets *Daubert's* minimal relevancy standard**

Expert testimony is relevant so long as it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *See Mintz v. Dietz & Watson, Inc.*, 2009 WL 3378985, at *1 (S.D. Cal. Oct. 19, 2009) (citing *Daubert*, 509 U.S. at 588).  If "the evidence relied upon is sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  *See Mformation Techs., Inc. v. Research in Motion Ltd.,* 2012 WL 1142537, at *3 (N.D. Cal. Mar. 29 2012); *see also i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 852–856 (Fed.Cir.2010).

Here, Exel raises relevancy challenges with regard to only two narrow areas of Plaintiffs' expert testimony.  First, Exel argues that any testimony regarding the "cost of furnishing a truck"— a phrase it broadly and arbitrarily defines as encompassing the costs of vehicle records, liability insurance, fuel, license, registration, CVRA, permits, tires, preventative maintenance, major repairs, miscellaneous expenses/losses, depreciation, and truck payments—is irrelevant because such costs are not recoverable under law. *See* Ds' Br. at 16:17-17:3.  Yet there is no legal authority supporting the proposition that the costs of "furnishing" a truck are not recoverable.  While the Court has ruled in this case that lease payments are not recoverable, *see Villalpando*, 2015 WL 5179486, at *38, there has been no determination made as to the various other costs Exel includes in its arbitrary category.[23]   To the contrary, § 2802 broadly calls for reimbursement of "all necessary expenditures or losses incurred by the employee" in the discharge of his or her duties. Cal. Lab. Code § 2802.   Certainly, the costs of fuel, maintenance, repairs, tires, license, registration, and permits, among others, are necessary to run a truck.

Exel also cites no authority to support its contention that Mr. Breshears' analysis of Exel's $23,000 per truck, per year savings from reclassifying its employee drivers to independent contractors is irrelevant. *See* Ds' Br. at 17:4-11. Indeed, Exel's former CFO testified that the company decided to reclassify its employees (who Exel had paid over $50,000 per year) to

---

[23] By way of analogy, the costs of insurance, depreciation, license, registration, permits and maintenance are all factored into the IRS's mileage reimbursement rate. *See* IRS Rev. Proc. 2010-51, at 7.

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1    independent contractors after determining that it would save the company $23,000 per truck, per

2    year. Albarano Depo. II at 50:1-53:12; 81:2-82:14.  Mr. Breshears calculated that this would result

3    in a savings to Exel of $20,883.939 over the course of the Class period, given the number of trucks

4    in operation. Breshears Report at ¶ 50.   This is directly relevant to Plaintiffs' claim under

5    California's Unfair Competition law, which alleges that Exel's unlawful misclassification scheme

6    gave it an unfair competitive advantage, resulting in savings to Exel and commensurate losses to

7    Class Members. *See* Cal. Bus. & Prof. Code § 17200; Consolidated First Amended Complaint

8    [ECF 65] at ¶¶ 173-180.  Mr. Breshears "savings analysis," *see* Breshears Report at ¶¶ 49-52, is

9    demonstrably "tied to the facts of the case" and will help the jury determine whether Exel has

10   violated California's Unfair Competition Law and the measure of restitution that may be warranted

11   to remedy the unfair competitive advantage. *See Daubert,* 509 U.S. at 588.

12            **E.      Mr. Breshears' forensic accounting methodology is helpful to trier of fact**

13           Exel argues that Mr. Breshears' analysis relies on "basic math" and is thus inadmissible

14   because it usurps the jury's fact-finding function. *See* Ds' Br. at 17:12-23.  This novel assertion is

15   belied by the numerous examples of qualified forensic accountants providing similar testimony

16   regarding damages throughout this Circuit. *See, e.g. Boomj.com v. Pursglove*, 2011 WL 2174966,

17   at *4 (D. Nev. June 3, 2011) (denying *Daubert* motion to exclude testimony of forensic accountant

18   who a party retained "to calculate his damages[.]"); *Warnecke v. Nitrocision, LLC*, 2012 WL

19   5987429, at *8 (D. Idaho Nov. 29, 2012); *Precision Seed Cleaners v. Country Mut. Ins. Co.,* 2013

20   WL 943571, at *5 (D. Or. Mar. 11, 2013); *Allstate Ins. Co. v. Balle*, 2014 WL 279651, at *4 (D.

21   Nev. Jan. 22, 2014).   Moreover, Mr. Breshears has applied similar forensic accounting

22   methodologies in numerous other wage-and-hour class actions. *See* Breshears Depo. at 5:22-12:25

23   (describing eight trials in which he provided forensic accounting expert testimony); *see also*

24   Exhibit A to Breshears Report (listing deposition testimony provided in prior cases).

25

26

27

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## VII.    CONCLUSION

For all the foregoing reasons, Exel's Combined *Daubert* Motion and Motion to Decertify should be denied.

Respectfully submitted,

Dated:  March 11, 2016

SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP


/s/ *Joshua G. Konecky*
Joshua G. Konecky
Counsel for Plaintiffs

PLAINTIFFS' MPA IOT DEFENDANTS' COMBINED DAUBERT MOTION AND MOTION TO DECERTIFY