UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL VILLALPANDO, et al.,

    Plaintiffs,

    v.

EXEL DIRECT INC., et al.,

    Defendants.

Consolidated Cases
Case No.  12-cv-04137-JCS
Case No. 13-3091-JCS

**ORDER RE DAUBERT MOTIONS AND DEFENDANTS' MOTION TO DECERTIFY**

Re: Dkt. Nos. 237, 238

## I.    INTRODUCTION

These consolidated cases are scheduled to go to trial on May 31, 2016.  While neither side has offered experts on the issue of liability, the parties have presented three experts on the issue of damages.  In particular, Plaintiffs have presented Wesley Curtis and David Breshears as experts on damages, while Defendants have offered Jonathan Walker as a rebuttal expert.  Presently before the Court are two motions (collectively, "the Motions"): 1) Plaintiffs' *Daubert* Motion to Exclude Speculative, Unsubstantiated and Legal Opinion Testimony of Jonathan Walker ("Plaintiffs' Motion"); and 2) Defendants' Combined *Daubert* Motion and Motion to Decertify the Class Action ("Defendants' Combined Motion" or "Combined Motion").  In the Motions, both parties bring *Daubert* challenges to the qualifications and testimony of the other side's expert(s).  Defendants argue further in their Combined Motion that the class should be decertified because neither liability nor damages can be addressed on a class-wide basis.  In addition, at the request of the Court, the parties have suggested mechanisms that might address Defendants' concerns and/or make adjudication of Plaintiffs' claims more manageable, including the creation of possible subclasses and/or partial decertification.  A hearing on the Motions was held on April 20, 2016.

1    The Court's rulings are set forth below.[1]

2    **II.     BACKGROUND**

3        **A.     Procedural Background**

4        Plaintiffs are delivery drivers for Defendant Exel Direct Inc. ("Exel") who were classified

5    as independent contractors.  They brought a putative Rule 23 class action asserting 15 state law

6    wage and hour claims, contending they had been misclassified and were, in fact, employees.

7    Three of Plaintiffs' claims were dismissed before class certification, on March 28, 2014.  *See*

8    Docket No. 122 (dismissing claims for Cost of Physical Examinations, Coerced Purchases and

9    Willful Misclassification).

10       On November 20, 2014, the Court granted Plaintiffs' motion for class certification,

11   certifying the following class:

12           All individuals who have personally provided delivery services for
             Defendant Exel Direct in California while being classified by Exel
13           Direct as independent contractors, at any time beginning June 14,
             2008 until resolution of this action. Any individual who has signed
14           the Independent Truckman's Agreement with Exel Direct but has
             provided delivery services exclusively through the use of hired
15           second drivers and who has *never* personally made deliveries for
             Exel is excluded from the Class.
16

17   Docket No. 150 ("Class Certification Order") at 34-35. The Court recognized in the Class

18   Certification Order that Plaintiffs' claims would require resolution of some individual issues,

19   "primarily relating to damages," but concluded that issues that are amenable to class treatment

20   predominated. *Id*. at 33-34.

21       Class Notices were sent out in January 2015. *See* Defendants' Combined Motion at 18.

22       On September 3, 2015, the Court granted Plaintiffs' summary judgment motion,

23   concluding, as a matter of law, that Plaintiffs were employees of Exel rather than independent

24   contractors.  *See* Docket No. 210 ("Summary Judgment Order").  In the same Order, the Court

25   granted in part and denied in part Defendants' summary judgment motion, dismissing Plaintiffs'

26   claims for Failure to Keep Accurate Payroll Records, Failure to Furnish Accurate Wage

27   _____

28   [1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28
     U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Statements, and Waiting Time Penalties. *Id*. The Court also dismissed Plaintiffs' claim for

2  Reimbursement of Expenses to the extent Plaintiffs sought reimbursement for rental or lease

3  expenses. *Id*.

4      The claims that remain in the case are as follows: 1) Minimum Wage (Claim One); 2)

5  Overtime (Claim Two); 3) Pay for All Hours Worked (Claim Three); 4) Meal Periods (Claim

6  Four); 5) Rest Periods (Claim Five); 6) Deductions from Wages (Claim Six); 7) Reimbursement of

7  Expenses (except lease or rental expenses) (Claim Nine); 8) UCL (Claim Fourteen); and 9) Private

8  Attorneys General Act ("PAGA") (Claim Fifteen). The parties have agreed that the UCL claim

9  can be tried to the Court following a jury trial. January 15, 2016 Case Management Statement at

10 3. They also appear to agree that the PAGA claims are based on the alleged violations of the

11 California Labor Code and that any additional issues raised by that claim can be decided by the

12 Court following the jury trial. *Id*. at 32.

13     **B.    The Expert Reports**

14         **1.    The Curtis Reports**

15     Curtis is a former California Highway Patrolman who has operated a trucking consulting

16 business for the last 10 years. Declaration of Nathan Piller in Support of Plaintiffs' Motion

17 ("Piller Motion Decl"), Ex. A (August 28, 2015 Expert Report of Wesley Curtis) ("Curtis Report")

18 at 1. His work includes inspecting commercial motor vehicles, conducting mock DOT audits and

19 examining vehicle maintenance programs for regulatory compliance. *Id*. In addition, Curtis has

20 conducted "cost per mile" analyses for company vehicles he operated in connection with his own

21 past businesses – a video arcade and a swimming pool business. *Id*.

22     In his initial expert report, dated August 28, 2015, Curtis calculated the "cost per mile" of

23 driving a truck with the specifications required for Exel drivers. *Id*. at 3. Curtis used a 2012

24 International 4300, 2-axle truck as an exemplar on the basis that it was "typical of the type and

25 size of box truck used by the Class members in this case." *Id*. at 4. In calculating the cost-per-

26 mile of operating such a truck, Curtis drew on deposition testimony of Class Member witnesses

27 and Exel managers, as well as documents produced by Exel, including "Exel's own cost-benefit

28 analyses generated to assess the financial implications of transitioning to an independent

3

United States District Court
Northern District of California

contractor Driver model" and "documents generated by Exel showing estimated annual driver operating expenses." *Id*. at 3.

Curtis divided the expenses associated with operating a truck into categories and came up with cost-per-mile estimates for each category, performing three calculations for each category: one based on the assumption that Exel drivers drive an average of 150 miles per day (36,000 miles a year); a second based on the assumption that they drive 164 miles per day (39,360 miles a year) and a third based on the assumption that they drive 175 miles per day (42,000 miles a year). *Id*. at 6. The categories of costs Curtis estimated were: 1) Fuel; 2) Truck Payment; 3) Truck Insurance; 4) Cargo Insurance; 5) Medical Insurance; 6) Workers Compensation Insurance Premium; 7) License/Registration/Commercial Vehicle Registration; 8) Permits/ Truck Inspection/ UCRA; 9) Meals; 10) Cell Phone; 11) Toll Roads/Bridges; 12) Tires; 13) Preventative Maintenance; 14) Major Repairs; 15) Laborer Wages (for helpers and second drivers); 16) Payroll Taxes for helpers and second drivers; 17) Miscellaneous Expenses; and 18) Depreciation. *Id*. at 8-15.

On October 30, 2015, Curtis submitted an Amended Expert Report in which he addressed evidence the Court ordered Exel to produce after he completed the original report, namely, twenty documents entitled "Delivery Specialist Annual Operating Expenses" containing estimated annual driver operating expenses at twenty Exel locations in California. Piller Motion Decl., Ex. C (October 30, 2015 Amended Expert Report of Wesley Curtis) ("Curtis Amended Expert Report") at 2. According to the deposition testimony of Exel's Vice President of Operations, Kenneth Mangen, these estimates were submitted to potential Exel clients in California in connection with requests for proposals ("RFPs"). *Id*. at 5. Curtis does not recalculate the estimated costs from his earlier report but rather, simply compares the figures in the new Exel documents and concludes that they corroborate his own estimates. *Id*. He notes that the average cost per mile in Exel's estimates is $2.09 whereas his own estimate for a 36,000 mile year was $2.12. *Id*. at 2.

### 2. The Breshears Reports

David Breshears is a Certified Public Accountant who is licensed in Financial Forensics. Piller Motion Decl., Ex. C (August 28, 2015 Expert Report of David Breshears) ("Breshears Expert Report") at 1. He has served as a consultant and expert witness in numerous wage and

4

United States District Court
Northern District of California

hour cases, including misclassification cases such as this one.  Breshears Expert Report at 2 & Ex. A thereto.  In his report, Breshears calculated Plaintiffs' potential damages, including penalties and interest, for the 387 Plaintiffs he had identified in the data provided as of the date of the report.  *Id.* at 2.  Breshears' damages calculation included those resulting from: 1) failure to compensate Plaintiffs for all hours worked (including minimum wage violations); 2) failure to compensate Plaintiffs for all overtime hours worked; 3) failure to reimburse for employment-related expenses and improper deductions from wages to cover certain costs; 4) failure to provide meal periods; and 5) failure to provide rest periods.  *Id.*  at 1.   He also reviewed Exel's "Synergy Calculations" addressing the cost of paying drivers as independent contractors as compared to employees.  *Id*. at 10.  According to Breshears, these calculations showed a savings of $22,962 per driver per year that would result from converting employees to independent contractors and this estimate was likely conservative because Exel may not have taken into account certain additional savings.  *Id*.

In his report, Breshears relied on documents produced by Exel, deposition testimony and the Curtis Expert Report.  Breshears Report at 2-5.  The deposition testimony consists of: 1) deposition excerpts from 10 deposition transcripts obtained through a search using search terms "meet" and "met," of which 6 included testimony about the length of morning meetings; and 2) excerpts from 24 deposition transcripts regarding meal and rest periods, which included 11 depositions in which class members stated a quantifiable frequency of missed meal and/or rest breaks; and 3) deposition excerpts of Exel management addressing meal and rest break policies.  *Id*. at 4.  The Exel documents included: 1) a Settlement Data Summary report, which includes information about actual payments and deductions for certain types of expenses for 383 contractors from their start date through their termination date; 2) a Weeks Worked report including start and termination dates, and corresponding weeks worked, by 387 independent contractors; 3) an iDirect Report containing information about deliveries for the period June 2, 2008 through March 31, 2015, related to 135 contractors;  4) a Sears report covering the period September 25, 2011 through June 22, 2015 for 39 contractors; 5) Driver Daily Logs and "various time sheets"; 6) 379 Dispatch Recap Reports; 7) a Network Driver Pay presentation related to

United States District Court
Northern District of California

driver pay restructuring; and 8) the Synergy Calculation discussed above. *Id.* at 4-5.

In a supplemental report dated October 30, 2015, Breshears reviewed paper records produced by Exel, namely, Drivers Daily Records and Time Sheets, to assess the frequency with which class members missed meal and breaks. *See* Piller Motion Decl., Ex. C (Supplemental Expert Report of David Breshears) ("Breshears Supplemental Report"). Whereas Breshears assumes a 100% violation rate  for all class members for whom there was no specific deposition testimony in his original report, in his supplemental report he came up with a 90.2% meal break violation rate for these class members based on his review of: 1)  Driver's Daily Logs ranging from January 7, 2010 to May 22, 2015 and covering 2,572 driver days with a non-sleeper vehicle; and 2) daily Time Sheets with blank fields for break start and end times ranging from July 2013 to September 2013 and covering 1,271 drivers days.   Breshears Supp. Report at 1.  At oral argument, Plaintiffs' counsel explained that the violation rate based on sampling of the paper records was not offered to replace the estimate of damages in the original Breshears Report but rather, simply to rebut Defendants' assertions that class members often were afforded compliant meal and rest breaks.

In the supplemental report, Breshears described the paper records on which he relied.  He states that it was his understanding that Defendants produced "a large volume of bankers boxes which contained a variety of Defendants' business records" and that Plaintiffs' "search protocol allowed counsel to identify the vast majority, if not all, of the Driver's Daily Logs" that Defendants produced.  *Id.*  The Time Sheets, on the other hand, were produced in a manner that made them difficult to collect: "dispersed within these bankers boxes [ ] were some large caches of daily Time Sheets, which were copied in their entirety.  However, other daily time sheets were attached to driver manifests and other related documents, which were not copied as it would have been cost prohibitive to separate and isolate the daily Time Sheets."  As a result, Breshears stated, his "analysis may not reflect all available daily Time Sheets in the Defendants' possession."  *Id.*

### 3. The Walker Report

Defendants' rebuttal expert, Jonathon Walker, is a labor economist who "consults about labor and employment related issues in the context of litigation and regulation."  Piller Motion

United States District Court
Northern District of California

1    Decl., Ex. G (F.R.C.P. Rule 26(a)(2)(B) Report of Jonathan Walker) ("Walker Expert Report") at

2    2.  In his report, Walker opines that the calculations of costs by Curtis and damages by Breshears

3    are unreliable, pointing to what he contends are a number of shortcomings in the analysis of Curtis

4    and Breshears. *Id*. at 3-6,  15-34.  In a section of the report entitled "Partial Corrections to Mr.

5    Breshears' Analysis," Walker recalculates the potential damages, excluding certain categories of

6    employee costs and recalculating other categories of damages.  *Id*. at 34-38.  Walker also contends

7    Breshears' opinions relating to the "Synergy Calculations" are irrelevant.  *Id*. at 3-4.  He devotes a

8    section of his report to showing that the Class Members are better off being paid as independent

9    contractors than they would have been if they had been paid as employees.  *Id.* at 7-14.

10       **C.    Defendants' Combined Motion**

11           Exel asserts the Plaintiff Class must be decertified, either in its entirety or in part, because

12   Plaintiffs have failed to come forward with data that will allow the Court to adjudicate Plaintiffs'

13   claims on a class-wide basis.  According to Exel, Plaintiffs have drawn on small samples and

14   unrepresentative evidence relating to various subsets of the Plaintiff class and then impermissibly

15   extrapolated the experiences of those class members to the entire class.   Exel also argues that the

16   class must be decertified because of the fact that some class members used second drivers and

17   Plaintiffs do not have class-wide data reflecting which routes were driven by the class member and

18   which were driven by second drivers.   In addition, Defendants contend, some Class members

19   provided services for other companies, giving rise to the need for individualized inquiries relating

20   to the allocation of certain expenses Plaintiffs seek to recover.   Individual inquiries are also

21   required in connection with Exel's overtime exemption defense, according to Exel.

22           Even if the Court declines to decertify the class, Exel argues, Curtis is  not qualified to

23   offer expert testimony and both Curtis and Breshears offer testimony that does not meet the

24   requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow*

25   *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

26       **D.    Plaintiffs' Motion**

27           Plaintiffs contend many of Walker's opinions should be excluded under Rule 702 and

28   *Daubert* on the basis that they are unreliable.  In particular, Plaintiffs contend Walker's opinions

1   are speculative to the extent that he has extrapolated from the experiences of a few class members

2   who are outliers.  Plaintiffs also argue that Walker's opinions about Plaintiffs' mileage

3   reimbursement rates should be excluded because Walker has no knowledge or training in this area.

4   Plaintiffs further assert Walkers opinions should be excluded to the extent they are based on

5   impermissible or incorrect legal assumptions.  Plaintiffs contend, for example, that many of

6   Walker's opinions are premised on the incorrect assumption that when employers fail to keep

7   adequate records to permit an exact computation of damages, the employees can be denied

8   compensation on that basis.

9   **III.   ANALYSIS**

10          **A.   Legal Standards**

11                 **1. Rule 23 and Decertification**

12          Rule 23 of the Federal Rules of Civil Procedure gives district courts the discretion to

13   certify a class where they find that all of the requirements of Rule 23(a) are met and that the

14   lawsuit qualifies for class action status under one of the three criteria found in Rule 23(b).  *See*

15   *Molski v. Gleich*, 318 F.3d 937, 946 (9th Cir. 2003).   In this case, the Court certified a Rule 23

16   class under Rule 23(b)(3).   Rule 23(a) requires that the plaintiff demonstrate (1) numerosity, (2)

17   commonality, (3) typicality, and (4) fair and adequate representation of the class interest.

18   Fed.R.Civ.P. 23(a).   Rule 23(b)(3) allows a class action to be maintained where "the court finds

19   that the questions of law or fact common to class members predominate over any questions

20   affecting only individual members, and that a class action is superior to other available methods

21   for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).  "An individual

22   question is one where 'members of a proposed class will need to present evidence that varies from

23   member to member,' while a common question is one where 'the same evidence will suffice for

24   each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide

25   proof.'"  *Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016) (quoting 2

26   W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012) (internal quotation

27   marks omitted)).

28          In determining whether the predominance requirement is met, courts tend to be more

United States District Court
Northern District of California

8

1   "comfortable" certifying a class where individualized inquires will be necessary to determine

2   damages than they are when such inquiries are necessary to determine liability.  *See Kurihara v.*

3   *Best Buy Co*., No. C 06-01884 MHP, 2007 WL 2501698, at *9 (N.D. Cal. Aug. 30, 2007); *Melgar*

4   *v. CSk Auto, Inc*., No. 13-CV-03769-EMC, 2015 WL 9303977, at *11 (N.D. Cal. Dec. 22, 2015)

5   ("courts are often more forgiving with respect to individualized inquiries as to damages");  *Brinker*

6   *Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1022 (2012)("'As a general rule if the defendant's

7   liability can be determined by facts common to all members of the class, a class will be certified

8   even if the members must individually prove their damages'") (quoting *Hicks v. Kaufman &*

9   *Broad Home Corp*., 89 Cal.App.4th 908, 916 (2001)).  Thus, "[a]s articulated by the California

10  Supreme Court in assessing predominance, trial courts must 'determine whether the elements

11  necessary to establish liability are susceptible of common proof or, if not, whether there are ways

12  to manage effectively proof of any elements that may require individualized evidence.'"  *Dalton v.*

13  *Lee Publications, Inc*., No. 08CV1072-GPC-NLS, 2013 WL 2181219, at *7 (S.D. Cal. May 20,

14  2013) (quoting *Brinker Rest. Corp. v. Superior Court*, 53 Cal.4th 1004, 1024 (2012));  *see also*

15  *Jimenez v. Domino's Pizza, Inc*., 238 F.R.D. 241, 251 (C.D. Cal. 2006) ("To determine whether

16  common issues predominate, this Court must first examine the substantive issues raised by

17  Plaintiffs and second inquire into the proof relevant to each issue").

18       A district court's order granting class certification is subject to later modification,

19  including class decertification.  See Fed.R.Civ.P. 23(c)(1)(C) ("An order that grants or denies

20  class certification may be altered or amended before final judgment").  "In considering the

21  appropriateness of decertification, the standard of review is the same as a motion for class

22  certification: whether the Rule 23 requirements are met."  *Cruz v. Dollar Tree Stores, Inc*., No. 07-

23  2050 SC, 2011 WL 2682967, at *3 (N.D. Cal. July 8, 2011) (citing *O'Connor v. Boeing N. Am.,*

24  *Inc*., 197 F.R.D. 404, 410 (C.D. Cal. 2000)).  "Although certification decisions are not to focus on

25  the merits of a plaintiff's claim, a district court reevaluating the basis for certification may

26  consider its previous substantive rulings in the context of the history of the case, and may consider

27  the nature and range of proof necessary to establish the class-wide allegations."  *Marlo v. United*

28  *Parcel Serv., Inc*., 251 F.R.D. 476, 479 (N.D. Cal. 2008).  In addition, decertification may be

United States District Court
Northern District of California

9

1    appropriate where the plaintiff has failed to offer a realistic plan for conducting a class trial. *See*

2    *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (holding that district court

3    abused its discretion in certifying Rule 23 class based, in part, on the fact that the plaintiffs had

4    made "no showing . . . of how the class trial could be conducted").

### 2. The Use of Representative Evidence in Class Actions

6         The question of whether a particular claim is amenable to class-wide treatment may

7    depend upon whether it is permissible to rely on "statistical evidence, or so-called representative

8    evidence." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. at 1046.  This question was addressed in

9    the seminal case of *Anderson v. Mt. Clemens Pottery Co.*,  328 U.S. 680 (1946), a collective action

10   involving donning and doffing claims asserted under the Fair Labor Standards Act.  In that case,

11   the Court held that where "the employer's records are inaccurate or inadequate and the employee

12   cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he

13   has in fact performed work for which he was improperly compensated and if he produces

14   sufficient evidence to show the amount and extent of that work as a matter of just and reasonable

15   inference." 328 U.S. at 687-88.  The Court reasoned that under these circumstances, the employee

16   should not be penalized "by denying him any recovery on the ground that he is unable to prove the

17   precise extent of uncompensated work" as this would "place a premium on an employer's failure

18   to keep proper records in conformity with his statutory duty" and "would allow the employer to

19   keep the benefits of an employee's labors without paying due compensation as contemplated by

20   the Fair Labor Standards Act." *Id*.   Under *Mt. Clemens*, once the employee's work is

21   demonstrated by "just and reasonable inference,"  "[t]he burden then shifts to the employer to

22   come forward with evidence of the precise amount of work performed or with evidence  to

23   negative the reasonableness of the inference to be drawn from the employee's evidence." *Id*.  "If

24   the employer fails to produce such evidence, the court may then award damages to the employee,

25   even though the result be only approximate." *Id*.

26        The *Mt. Clemens* rule is not limited to FLSA cases.  It has also been invoked in cases

27   involving state law wage and hour claims based on the same reasoning that was applied to FLSA

28   claims in *Mt. Clemens*, namely, that it would unfairly penalize employees to deny recovery

United States District Court
Northern District of California

1    because of the employer's failure to keep proper records.  *See, e.g.*, *Melgar v. CSk Auto, Inc*., No.

2    13-CV-03769-EMC, 2015 WL 9303977, at *9 (N.D. Cal. Dec. 22, 2015) (holding that Rule 23

3    class asserting claim under California Labor Code section 2802, requiring that employees must be

4    reimbursed for business expenses, met predominance requirements under *Mt. Clemens*);  *Garcia*

5    *v. Bana*, No. C 11-02047 LB, 2013 WL 621793, at *9 (N.D. Cal. Feb. 19, 2013), aff'd, 597 F.

6    App'x 415 (9th Cir. 2015) (applying *Mt. Clemens* rule in wage and hour case asserting overtime

7    claims under both FLSA and California state law);  *Kamar v. Radio Shack Corp*., 254 F.R.D. 387,

8    403 (C.D. Cal. 2008), aff'd sub nom. *Kamar v. RadioShack Corp*., 375 F. App'x 734 (9th Cir.

9    2010) (holding that Rule 23 predominance requirement was met in case asserting wage and hour

10   claims under state law based, in part, on *Mt. Clemens* rule);  *Hernandez v. Mendoza*, 199 Cal.

11   App. 3d 721, 725 (1988) (holding that where employer "failed to keep records required by statute"

12   a plaintiff seeking overtime pay under California state law could rely on "imprecise evidence" and

13   citing *Mt. Clemens*).

14        In *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court reiterated the principle of *Mt.*

15   *Clemens* that "when employers violate their statutory duty to keep proper records, and employees

16   thereby have no way to establish the time spent doing uncompensated work, the 'remedial nature

17   of [the FLSA] and the great public policy which it embodies . . . militate against making' the

18   burden of proving uncompensated work 'an impossible hurdle for the employee.'"  136 S. Ct. at

19   1047 (quoting *Mt. Clemens*, 382 U.S. at 687).  In that case, the Court held that it was permissible

20   for the plaintiffs to "introduce a representative sample to fill an evidentiary gap created by the

21   employer's failure to keep adequate records" in order to prove their overtime claim.  *Id*.   In

22   particular, Plaintiffs relied on the opinions of an industrial relations expert who conducted 744

23   videotaped observations to determine the average time class members had spent donning and

24   doffing required protective equipment in different departments.  *Id*. at 1043. The employer had not

25   kept records of its employees' donning and doffing time but had records of the class members'

26   time at their work stations, which another expert used, in combination with the estimated donning

27   and doffing times, to determine how many class members had worked overtime without receiving

28   overtime compensation and how much overtime compensation was owed to the class.  *Id*.

The Court in *Tyson Foods* began its analysis by recognizing that "[i]n many cases, a representative sample is the 'only practicable means to collect and present relevant data' establishing a defendant's liability." *Id*. at 1046 (quoting Manual of Complex Litigation § 11.493, p. 102 (4th ed. 2004)).  It further reasoned that the use of sampling was permissible under the facts of that case because "the study here could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action."  *Id*. at 1048. The Court explained, "[i]n a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class."  *Id*. at 1046.  The Court acknowledged that "[r]easonable minds may differ as to whether the average time [the plaintiffs' expert] calculated is probative as to the time actually worked by each employee" but found that resolving this question "is the near-exclusive province of the jury." *Id*.  at 1049. The Court also made clear that not "all inferences drawn from representative evidence in an FLSA case are 'just and reasonable,'" explaining:

> Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked. Petitioner, however, did not raise a challenge to respondents' experts' methodology under *Daubert*; and, as a result, there is no basis in the record to conclude it was legal error to admit that evidence.

*Id*. at 1048.

In *Tyson Foods*, the Court distinguished its earlier decision in W*al-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), in which it held that a class of more than a million and a half female employees asserting discrimination claims under Title VII was not properly certified because the plaintiffs failed to establish even that there were common questions of fact or law under Rule 23(a).  *Id*. at 1048.  In *Wal-Mart*, the Court explained, "[t]he only corporate policy that the plaintiffs' evidence convincingly establishe[d was] Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters'; and even then, the plaintiffs could not identify 'a common mode of exercising discretion that pervade[d] the entire company.'" *Id*. (quoting 564 U.S. at 355-56).   Thus, the plaintiffs proposed the use of representative evidence to "overcome[e] this absence of common policy."  *Id*.  This "Trial by Formula" was impermissible, the *Tyson*

*Foods* Court explained, because it enlarged the substantive rights of the class members and deprived the defendant of its right to litigate individual statutory defenses. *Id*. Notably, the *Tyson Foods* Court found, in *Wal-Mart*, the sample at issue could not have been used "to establish liability in an individual action" because the Court held that the employees were not similarly situated. *Id*.

### 3. Legal Standards Governing Rule 702 of the Federal Rules of Evidence

Rule 702 of the Federal Rules of Evidence permits a party to offer the testimony of a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This Rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert*, 509 U.S. at 592, and requires that certain criteria be met before expert testimony is admissible. The Rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)). Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated

purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert*, 509 U.S. at 591.

Although the Court has found scant authority addressing the relationship between the *Mt. Clemens* rule and *Daubert*, the Supreme Court in *Tyson Foods* implied that the standard under *Daubert* is the same regardless of whether or not the *Mt. Clemens* rule applies.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. at 1048 (quoted above);  *see also Chavez v. IBP, Inc*., No. CV-01-5093-RHW, 2004 WL 5520002, at *2 (E.D. Wash. Dec. 8, 2004) (rejecting plaintiffs' assertion that in wage and hour cases the burden of proof is lower under *Mt. Clemens*  and therefore the court should apply a "relaxed *Daubert* standard," finding instead that "[t]he burden of proof for damages at trial . . . does nothing to alter *Daubert*'s requirement of reliability").

**B.**     **Whether the Class Should be Decertified in its Entirety or in Part**

**1. Exel's Request for Clarification re Scope of Class**

Exel asserts that the following three limitations should be placed on the class definition: 1) to ensure due process, the class should include only individuals who received the class notices that issued in January 2015, because only those individuals had the opportunity to opt out of the class; 2) the class period should end as of January 6, 2015 because Plaintiffs' experts examined data only up to that date; and 3)  the class should include only those individuals who provided delivery services pursuant to the Independent Truckman's Agreement.  Plaintiffs stipulated at oral argument that they do not object to these limitations.  Therefore, the Court accepts Exel's proposed limitations.

**2. Whether Plaintiffs have Offered a Sufficient Trial Plan**

Plaintiffs have set forth their plans for proving liability and damages on the remaining claims, on a claim-by-claim basis, in the Joint Case Management Conference Statement filed January 15, 2016 and in the briefing on the pending motions.  *See* Docket No. 225;  *see also* Docket No. 242 (Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Combined *Daubert* Motion and Motion to Decertify the Rule 23 Class ("Plaintiffs' Opposition")) at 6-16.   Therefore, the Court declines Exel's invitation to decertify the class on the basis that Plaintiffs have not offered a detailed trial plan.  To the extent Exel challenges specific aspects of

United States District Court
Northern District of California

14

1    Plaintiffs' plan, the Court will address these issues below in the context of its consideration of

2    Exel's decertification and *Daubert* challenges.

3                    **3.  Whether *Mt. Clemens* Applies to Plaintiffs' Claims**

4            Exel contends Plaintiffs are not entitled to rely on the *Mt. Clemens* rule as to any of their

5    claims because it has produced to Plaintiffs over 4 million paper documents that included paper

6    manifests and timesheets, and that it was Plaintiffs' obligation to review all of these documents to

7    determine the actual damages of the class members.  The Court disagrees.

8            Under *Mt. Clemens*, it is the employer that bears the burden of maintaining adequate

9    records.  *See Grimes v. Kinney Shoe Corp*., 902 F. Supp. 1070, 1074 (D. Alaska 1995) (*Mt.*

10   *Clemens* "presupposes that the employer will be in the best position to keep accurate records of an

11   employee's work and should bear the risk that records will be inadequate") (citing *McLaughlin v.*

12   *Ho Fat Seto*, 850 F.2d 586 (9th Cir.1988)). Aside from the difficulty of reviewing millions of

13   paper documents, Plaintiffs' expert has identified numerous inadequacies as to the records

14   produced by Exel: The paper manifests and times sheets were not organized in any particular

15   manner, were mixed up with other, irrelevant documents, and are sometimes illegible; the paper

16   manifests also do not provide accurate timekeeping records to the extent they consist only of lists

17   of delivery windows and appear to omit time spent loading and unloading merchandise at the

18   warehouse; and most troubling, there is no way to know whether these paper records are complete

19   and Exel does not even attempt to establish that they are.  *See* Breshears Dep. at 74-75, 150-151;

20   Piller Opposition Decl., Ex. 47 (sample manifest).   In short, Exel has not demonstrated that it

21   maintained adequate records and therefore Plaintiffs are entitled to prove their claims by

22   reasonable inference under *Mt. Clemens*. *See, e.g., Arias v. U.S. Serv. Indus., Inc*., 80 F.3d 509,

23   512 (D.C. Cir. 1996)  ("In light of the evidentiary difficulties appellants faced as a result of [the

24   employer's] failure to maintain accurate time and payment records by workweek, and to

25   denominate clearly the number of hours being compensated by some payments, [the estimates of

26   the employee's expert are] sufficient to establish an amount and extent of work and wages as a

27   matter of just and reasonable inference as contemplated by *Mt. Clemens*"). Exel is, of course,

28   entitled to attempt to rebut those inference by using the paper records to demonstrate the precise

United States District Court
Northern District of California

15

1     amount of work performed by the class members.  It is the Court's understanding, however, that

2     Exel recognizes that review of the 4 million paper records is not realistic (and perhaps of little

3     probative value as well) and that it will not be pursuing that option.

4          The Court also rejects Exel's assertion that *Mt. Clemens* does not apply to employee

5     reimbursement under California Labor Code section 2802.  *See* Defendants' Combined Motion at

6     34 ("*Mt.* Clemens does not apply here, where Exel had no duty to track class members' employee

7     business expenses.  Indeed, the legal duty to maintain records here fell to the contractors

8     themselves, who must be able to substantiate Schedule C business deductions").  This same

9     argument was rejected in *Melger v. CSK Auto, Inc.*, No. 13-cv-3769 EMC, 2015 WL 9303977, at

10    *9 (N.D. Cal. Dec. 22, 2015), in which the court held that even if there is no explicit statutory duty

11    requiring employers to maintain records of employee expenses, to the extent section 2802 imposes

12    an "affirmative duty on employers to reimburse such expenses when it has knowledge thereof" it

13    is "obvious[] [that] some recordkeeping [on the part of the employer] is required." *Id*.  Therefore,

14    the court concluded, the burden of the employer's failure to maintain records of business expenses

15    falls on the employer rather than the employee under *Mt. Clemens* and *Hernandez*.  *Id*.  The

16    undersigned agrees with the reasoning of *Melger* on this question.

17         The Court rejects Exel's reliance on the fact that class members must document their

18    business expenses in a Schedule C to obtain a tax deduction for them.  Any duty class members

19    may have on that score is an entirely separate issue and does not negate Exel's obligations under

20    California's wage and hour laws. The Court also notes that the question of whether Exel had a

21    good faith belief that its drivers were properly classified as independent contractors and therefore

22    was  not required to reimburse its drivers for business expenses or maintain records of such

23    expenses does not have any bearing on whether *Mt. Clemens*  applies. *See Mt. Clemens*, 328 U.S.

24    at 688 ("And even where the lack of accurate records grows out of a bona fide mistake as to

25    whether certain activities or non-activities constitute work, the employer, having received the

26    benefits of such work, cannot object to the payment for the work on the most accurate basis

27    possible under the circumstances").

28         For these reasons, the Court concludes that Plaintiffs may prove their claims based on

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    reasonable inferences as to the time worked (e.g., how many days a week drivers worked, how

2    many hours a day, how long meetings lasted) and the amount of employee expenses for which

3    Plaintiffs seek reimbursement.

4              **4. Specific Issues Related to Class Members who Employ Second Drivers**

5              One of Exel's recurring challenges to proceeding on a class basis is the problems it

6    contends arise in connection with class members who used second drivers. See Defendants' Notice

7    of Motion at 3 ("Plaintiffs' fundamental problem of proof, going to both liability and damages, is

8    that they lack class-wide data to identify, for each day of delivery service, who (the contractor or

9    someone else) drove the route"); Defendants' Combined Motion at 1 (asserting that absence of

10   class-wide data showing whether routes were driven by class members or second drivers is a

11   fundamental flaw in trial on a class-wide basis because class members can "pursue Labor Code

12   claims only for those days they personally performed services; as to other days there were no

13   wages to earn, no meal or rest breaks to take, no employee business expenses to incur");  *id.* at 21

14   (arguing that "many class members acted as entrepreneurs, not employees, when they utilized

15   second drivers" and therefore, that Plaintiffs "erred in *assuming* where records are absent, that

16   [the] class member performed labor every day a truck was under contract"); 22 (arguing that

17   Plaintiffs erred in "assum[ing] that weekly settlement statements record *employee* expenses, even

18   though settlement expenses . . .include class members acting as *entrepreneurs* as well as class

19   members acting as employees"); 24 ("Class members who drove infrequently (e.g., rarely or just a

20   couple of days per week, while second drivers drove on remaining days) . . . would have no

21   overtime claim at all"); 29 (arguing that meal break claim is unmanageable because iDirect data

22   and Dispatch data do not cover all class members or the entire class period and "it is undisputed

23   that substitute or second drivers handled many routes"); 30 (asserting that same problems with

24   addressing meal violations on a class-wide basis "apply with even greater force as to the claim for

25   rest pay"); at 31 (arguing with reference to unlawful deduction claim that "settlement payments,

26   by definition, are *not* class-member wages when paid for a week when the class member

27   exclusively used the labor of second drivers" and that individualized inquiries will be necessary

28   because the "settlement data *do not identify whether the contractor or a second driver operated a*

17

1  *truck in performing deliveries*" and because "there is no way to determine whether a deducted

2  amount was ultimately charged to the helper or the second driver); 32 (Plaintiffs trial plan "would

3  systematically overstate liability by including . . . entrepreneurial expenses as well as employee

4  expenses"); 37-38 (same).

5  It is not clear how many class members used second drivers.  Plaintiffs note that Exel's

6  expert refers to only nine specific class members (out of 386) who at any point used a second

7  driver.  *See* Plaintiffs' Opposition at 5 (citing Walker Report ¶¶ 23, 27, 57). According to Plaintiff,

8  Exel's exhibits reveal only six more class members who employed second drivers.  *Id*. at 5-6

9  (citing Perez Decl. ¶¶ 14, 15, 16, 18; King Decl. ¶ 5; Sheridan Decl. ¶ 4; Marshall Decl. ¶ 5). Exel,

10  on the other hand, points to evidence suggesting the number is higher, though it does not state an

11  exact number.  *See* Defendants' Reply at 8 (citing King Decl. ¶ 8 (stating that at the Ontario hub,

12  the delivery trucks "generally have not been driven by the contractors themselves, but rather by

13  'second drivers'"); Molina Dep. at 49 (testifying that he personally drove his truck for the first two

14  months he worked for Exel and then he "handed it over to a second driver"); Supp. Crossman

15  Decl., Ex. A (reflecting that as of December 2014 there were 153 "active second drivers" in

16  California).  Whether this group contains only 16 class members or is somewhat larger, however,

17  the Court concludes the claims against them raise some legal and factual questions as to both

18  liability and damages that do not apply to the class as a whole.

19  One of the primary issues that may give rise to individualized inquiries is how much of the

20  time these class members spent personally driving a truck, which has implications for the

21  minimum wage claim (how often did these class members actually attend the meetings given that

22  they may not have driven five days a week), the overtime claim (how many hours a week did these

23  class members drive and was it enough to entitle them to overtime pay), and the meal and rest

24  break claims (on what days  were these contractors working as employees such that they were

25  entitled to meal and rest breaks). Exel has offered at least anecdotal evidence indicating that the

26  assumptions of Plaintiffs' experts as to driving time for these class members may be less

27  reasonable than they are for the class as a whole.

28  Another closely related issue is whether class members who employed second drivers can

18

recover employee expenses – or improper deductions - where the expenditures or deductions are associated with second drivers rather than class members.  This is not only a fact question; it also requires the Court to address legal disputes as to whether so-called "entrepreneurial expenses" are subject to the provisions of the California Labor code upon which Plaintiffs' wrongful deduction and employee reimbursement claims are based.

At oral argument, Plaintiffs' counsel also asserted that under the California Labor Code, the term "employee" includes not just individuals but also entities and therefore, any class members who have used second drivers can assert some or all of the claims in this case on behalf of themselves and their second driver(s) on the theory that the class member and the second driver(s) constitute a single "employee."  Plaintiffs further asserted these "entity employees" can recover the expenses of both the first and the second drivers. These are legal issues that are common to all class members who have used second drivers.[2]

The Court concludes that the legal and factual issues that relate to class members who have used second drivers do not require decertification of the class but instead, can be managed through the creation of a subclass of class members who used a second driver during the class period.  The Court notes that the majority of the issues relating to these class members are associated with the determination of damages and that there are ways to handle the variations among these class members as to the time worked, including using a claims procedure.  The Court declines to designate the subclass as a damages only  subclass, however, because there is at least one claim (the overtime claim) where there may be an issue as to liability.  Accordingly, the subclass will be used both for the determination of liability and for damages.[3]

_____

[2] To the extent Exel seeks to challenge Plaintiffs' legal theory as to the "entity employees" it should make that challenge in a motion in limine.  If the Court decides that a class member with second drivers cannot assert the claims in this action collectively on behalf of himself and the second driver(s) as a unitary "employee," it may reconsider the question of whether the Class should be decertified as to the individuals who used second drivers because it does not appear the Plaintiffs have offered sufficient evidence to show liability or damages for these class members if their second drivers are not included.

[3] Exel also challenges class treatment of certain claims based on evidence that some class members performed deliveries for other companies while they worked for Exel. This issue does not pose significant problems as to manageability, however, as only two class members have been identified who worked for another delivery company while also working for Exel.  Therefore, the Court concludes that it is not necessary to create a subclass for these individuals;  nor do any

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

With the additional subclass for class members with second drivers in mind, the Court addresses below the manageability issues associated with each of Plaintiffs' claims.

### 5. Claim One (Minimum Wage)

#### a. Background

In the January 15, 2016 Joint Case Management Statement, Plaintiffs stated that they were pursuing two theories on their minimum wage claim: 1) that Exel "does not compensate drivers for the administrative work and non-productive time required for the job, such as attending morning stand-up meetings and filling out paperwork"; and 2) that drivers within the class ended up making less than minimum wage during one or more work weeks when subtracting the chargebacks and out-of-pocket expenses from their piece rate compensation for the week." Docket No. 225 at 11-12.  At oral argument, Plaintiffs stipulated that the minimum wage claim is now based solely on the morning meeting time theory.

Exel contends Plaintiffs' claim for unpaid time for morning meetings  cannot be tried on a class-wide basis because there is no common proof  showing when morning meetings occurred or how long they lasted and moreover, Exel had no duty to separately record morning meeting time except insofar as drivers recorded their on-duty, pre-driving time on daily logs.  Defendants' Combined Motion at 23.  Consequently, Exel contends, this claim will require individualized inquiries to determine the time class members spent in morning meetings. *Id*.  This is not merely a question of damages, according to Exel, because there may be class members who never attended a morning meeting.  *Id*.  Exel emphasizes the possibility that class members who hired second drivers would have sent the second driver to the meeting instead of personally attending morning meetings.  Defendants' Combined Motion at 23.  Exel also cites evidence that at some locations, morning meetings were not held every day.  *Id*. Finally, it contends the conclusion of Plaintiffs' expert that morning meetings lasted on average 23.75 minutes is an "arbitrary concoction" that amounts to "Trial by Formula" and is impermissible under *Dukes*.

#### b. Discussion

individualized issues raised in connection with these class members warrant decertification.

United States District Court
Northern District of California

1        A claim for unpaid wages under California Labor Code § 1194 requires a plaintiff to

2  prove: "1) Plaintiff performed work for defendant; 2) plaintiff was paid less than the minimum

3  wage for some or all hours worked; and 3) the amount of wages owed." *Dalton v. Lee

4  Publications, Inc.*, No. 08-cv-1072-GPC-NLS, 2013 WL 2181219, at *9 (S.D. Cal. May 20,

5  2013). While the *amount* of wages owed is a damages question, whether a class member is owed

6  *any* amount in unpaid minimum wage is a question of liability. *See id.* at *10.

7        Plaintiffs propose to prove liability on this claim based on the Independent Truckman's

8  Agreement, which states that independent contractors are not compensated for "services above and

9  beyond basic delivery services," such as "warehouse operations" and "transportation

10  management." *See* January 15, 2016 Joint Case Management Statement at 11. Plaintiffs also plan

11  to rely on admissions by Exel witnesses that morning meetings occur regularly and to present

12  emails, agendas and morning meeting packets documenting the morning meetings. This is the

13  sort of common proof that is typically found to warrant class treatment. *See Brinker Restaurant

14  Corp. v. Superior Court*, 53 Cal. 4th 1004, 1033 (2012) ("Claims alleging that a uniform policy

15  consistently applied to a group of employees is in violation of the wage and hour laws are of the

16  sort routinely, and properly, found suitable for class treatment"). The Court finds that this

17  common evidence is sufficient to try class-wide liability on this claim – especially as Exel has not

18  offered any evidence that there is a single class member who never attended a morning meeting.

19        The Court also finds that damages can be handled through use of common proof. In

20  particular, in addition to the meeting agendas and Exel testimony discussed above, Plaintiffs offer

21  the testimony of their expert as to the length of the meetings to establish the time spent in

22  meetings by reasonable inference. As discussed above, in light of Exel's failure to maintain

23  adequate records, Plaintiffs are entitled to establish that time based on reasonable inference from a

24  representative sample. The Court rejects Exel's suggestion that Plaintiffs' could (and therefore

25  should be required to) prove the time spent in morning meetings with precision based on the driver

26  daily logs, *see* Defendants' Combined Motion at 23. In addition to the problems with the paper

27  records discussed above, Plaintiffs' expert has testified that the time spent in morning meetings

28  cannot be discerned from the driver daily logs because they include tasks other than the morning

1   meetings in their pre-driving time, resulting in a "comingling of time" that makes it impossible to

2   determine from these logs how long drivers spent in meetings.  *See* Breshears Dep. at 79, 81.

3          Even a sample that constitutes a relatively small percentage of the class may allow for a

4   reasonable inference, *see, e.g., Reich v. S. New England Telecommunications Corp*., 121 F.3d 58,

5   67 (2d Cir. 1997) ("there is no bright line formulation that mandates reversal when the sample is

6   below a percentage threshold. It is axiomatic that the weight to be accorded evidence is a function

7   not of quantity but of quality"). However, to the extent Exel intends to challenge the conclusions

8   of Plaintiffs' expert on the basis that they are "unrepresentative or inadequate," this defense is

9   itself "common to the claims made by all class members."  *See Tyson Foods*,  136 S. Ct. 1036

10  (2016) (noting that "[s]ince there were no alternative means for the employees to establish their

11  hours worked, petitioner's primary defense was to show that [Plaintiffs' expert's] study was

12  unrepresentative or inaccurate and holding that "[t]hat defense is itself common to the claims

13  made by all class members").

14         Finally, to the extent Exel points to the issues related to class members who employed

15  second drivers, these issues can be addressed through the creation of a sub-class, as discussed

16  above.

17                  **6. Claim Two (Overtime Pay)**

18              a.   Background

19         Plaintiffs intend to prove liability on their overtime claim with deposition testimony by

20  Exel managers that class members typically work more than 40 hours a week as well as an Exel

21  Recruiting document (Realistic Preview of Business Opportunity) discussing the typical schedule

22  of a driver; they intend to show that class members were not paid overtime based on the ITA and

23  the Equipment Lease Agreements, which describe Exel's compensation scheme and do not

24  provide for the payment of overtime.  Plaintiffs' Opposition at 15.  They will rely on the opinions

25  of their expert to establish damages.

26         Exel argues that this claim will require individualized inquiries as to its interstate

27  commerce exemption defense (as to which the Court found on summary judgment there were fact

28  questions that precluded summary judgment) and challenges Plaintiffs' ability to establish on a

United States District Court
Northern District of California

22

1   class-wide basis hours worked and the proper pay rate to be used for determining overtime pay.

2   Defendants' Motion at 24-26; Reply at 13.  Exel asserts that class members who used second

3   drivers pose a particularly difficult problem for handling this claim on a class-wide basis.  Reply at

4   13.  Exel also argues that Plaintiffs cannot rely on *Mt. Clemens* to prove the amount of overtime

5   by reasonable inference because Exel produced paper records that would have allowed them to

6   prove their overtime damages with precision. Defendants' Combined Motion at 26.

7             b.   Discussion

8        Plaintiffs assert their claim for overtime wages under California Labor Code sections  510,

9   515.5, 1194 and 1198 and IWC Wage Order No. 9-2001. These provisions require generally that

10  employees be paid one and a half times their regular rate of pay for hours worked in excess of 40

11  hours per week and eight hours per day.  Plaintiffs' theory of liability is based on Exel's uniform

12  contracts and general policies and practices and therefore can be addressed on a class-wide basis.

13  As discussed above, the Court rejects Exel's reliance on the production of paper records to avoid

14  the *Mt. Clemens* rule. It is Exel's burden to demonstrate that these documents would have been

15  sufficient to establish the actual amount of overtime to which Plaintiffs may be entitled and it has

16  not done so.  The Court also finds that damages can be addressed through common proof, namely,

17  the opinions of Plaintiffs' expert as to hours driven by class members and the applicable rate.

18       Finally, although Exel asserts that its overtime exemption defense will require

19  individualized inquiries, that assertion is not persuasive given that the main issue relating to the

20  applicability of that is exemption is the intent of the shippers, not that of the drivers themselves.

21  *See S. Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 617 (9th Cir. 1977).  ("Whether transportation is

22  interstate or intrastate is determined by the essential character of the commerce, manifested by

23  shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained

24  from all of the facts and circumstances surrounding the transportation").  Exel has not pointed to

25  any specific evidence it intends to introduce on this issue or explained why individualized

26  inquiries will be necessary.  Therefore, the Court concludes that this claim is manageable and need

27  not be decertified at this time.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### 7. Claim Three (Pay for All Hours Worked)

According to the January 15, 2016 Joint Case Management Statement, this claim is essentially the same as the minimum wage claim except that if Plaintiffs prevail on liability on this claim,  they are entitled to damages based on their regular rate of pay instead of minimum wage. *See* January 15, 2016 Joint Case Management Statement at 18.  At oral argument, Plaintiffs conceded that they cannot recover damages on both Claim One and Claim as this would be duplicative.  Thus, if Plaintiffs prevail on Claim Three, they will dismiss Claim One.  Claim Three raises no separate issues as to manageability.

### 8. Claims Four and Five (Meal and Rest Breaks )

#### a.  Background

Plaintiffs intend to prove liability on their meal and rest break claims based on evidence showing that Exel's policies as to providing breaks for drivers are not compliant with California law.  January 15, 2016 Case Management Statement at 19.  Plaintiffs plan to present evidence that Exel affirmatively instructs drivers that breaks need not be taken until after eight hours of work, that it requires drivers to remain on duty during breaks to protect the products in the delivery vehicle, that it does not pay drivers for missed meal periods or breaks, and that it does not keep records as to employee meal periods.  Plaintiffs' Opposition at 11.

With respect to damages, Plaintiffs plan to "provide testimony from [Exel] managers that the drivers typically work more than 5 hours in a day, as well as Exel's compensation and dispatch data showing the number of days worked by the class."  *Id*. at 20. Plaintiffs then will multiply the number of days worked by the class by the regular rates of pay from Exel's settlement data. Plaintiffs contend that once they have established a non-compliant policy the burden shifts to Exel to demonstrate that compliant breaks were provided or that it paid the required hour of pay for missed meal or rest breaks.  January 15, 2016 Case Management Statement at 20 (citing *Safeway, Inc. v. Superior Court*, 238 Cal. App. 4th 1138, 1153-61 (2015); *Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1144 (2012); *Brinker*, 53 Cal. 4th at 1053-54).

Exel counters that it does not have a policy of prohibiting drivers from taking breaks. Defendants' Reply at 11. It also argues that the requirement that drivers protect the contents of

1    their trucks does not make breaks noncompliant with California law.  *Id.*  Even if the policy were

2    unlawful, Exel contends, Plaintiffs cannot rely only on the policy to demonstrate liability – they

3    must also demonstrate that it was implemented.  *Id.* (citing *Campbell v. Vitran Express Inc.*, No.

4    CV1105029RGKSSX, 2016 WL 873009, at *3 (C.D. Cal. Mar. 2, 2016)).  In addition, Exel

5    argues that individualized inquiries will be necessary to determine whether the class members

6    were actually denied breaks or if, instead, they simply chose not to take them.  *Id.*  Exel points out

7    that under *Brinker*, the employer's obligation is simply to make rest breaks available; an employer

8    is not liable if it makes a break available but the employee chooses not to take it.  *Id.* at 12.

9            b.   Discussion

10           California law requires: 1) an off-duty meal period by the fifth hour of the shift and another

11   meal period by the 10th hour of the shift; 2) that the employee be relieved of "all duty" during the

12   meal period; and 3) that the employer keep accurate information for each employee reflecting

13   meal periods.  Wage Order 9-2001;  *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004,

14   1040-41 (2012).  Employees are also entitled to 10 minutes for each four hours of work "or major

15   fraction thereof." *Brinker*, 53 Cal. 4th at 1028 (citing Wage Order 5, Subdivision 12(A)).   Like

16   meal breaks,  an employer is required to "authorize and permit the [rest] break or pay the

17   employee one hour of pay at the employee's regular rate for each workday the rest break is not

18   provided." *Faulkinbury v. Boyd & Associates, Inc.*, 216 Cal. App. 4th 220, 236 (2013) (citing

19   *Brinker*, 53 Cal.4th at pp. 1029–1031; Cal.Code Regs., tit. 8, § 11040, subd. 12.)

20           In *Brinker*, the California Supreme Court held that an employer satisfies its obligations as

21   to meal breaks so long as it "relieves its employees of all duty, relinquishes control over their

22   activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and

23   does not impede or discourage them from doing so."  53 Cal. 4th at 1040.  The employer is not

24   "obligated to police meal breaks and ensure no work thereafter is performed."  *Id.* at 1040-41.  The

25   court recognized, however, that a "common scheduling policy that made taking breaks extremely

26   difficult would show a violation" of California's meal break laws.  *Id.* at 1041 (citing *Jaimez v.

27   DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1303 (2010)).

28           In *Brinker*, the court remanded to the trial court to allow it to reconsider the class definition

United States District Court
Northern District of California

25

as to the meal break claim in that case in light of the court's clarification of the law. *Id*. at 1050-

51.  In a concurring opinion Justice Wederger, who also authored the majority opinion, wrote to

"emphasize what our opinion does not say." *Id*. at 1052.  She states:

> the opinion of the court does not endorse Brinker's argument, accepted by the Court of Appeal, that the question why a meal period was missed renders meal period claims categorically uncertifiable.  Nor could it, for such a per se bar would be inconsistent with the law governing reporting obligations and our historic endorsement of a variety of methods that render collective actions judicially manageable.

*Id*. at 1052. She explained, "If an employer's records show no meal period for a given shift over

five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal

period was provided." *Id*. at 1053. Thus, "[a]n employer's assertion that it did relieve the

employee of duty, but the employee waived the opportunity to have a work-free break, is not an

element that a plaintiff must disprove as part of the plaintiff's case-in-chief" but instead, "is an

affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead

and prove it." *Id*.

Justice Werdeger further explained that while "individual issues arising from an

affirmative defense can in some cases support denial of certification, they pose no per se bar." *Id*.

She recognized that while such defenses pose  issues of manageability, it is "rarely if ever"

appropriate to deny certification based merely on the need to conduct  individual damages

inquiries going only to the amount of damages rather than the underlying question of liability. *Id*.

Courts have justified this approach on the basis that "individual claims . . . might otherwise go

unpursued" giving a "windfalls to defendants that harm many in small amounts rather than a few

in large amounts." *Id*. (citing *Sav–On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 339–

340 (2004); *Daar v. Yellow Cab Co*., 67 Cal.2d 695, 714–715 (1967)).  She continued,

"[r]epresentative testimony, surveys, and statistical analysis all are available as tools to render

manageable determinations of the extent of liability." *Id*.

In *Safeway, Inc. v. Superior Court*, the California Court of Appeal applied these principles

in a case involving a meal break claim based on the theory that the employer had a "systemwide

practice" of failing to pay meal break premiums when required.  238 Cal. App. 4th 1138, 1144

1    (2015).  On appeal, the employer challenged the trial court's certification of the meal break claim,

2    presenting evidence that it did, in fact, provide breaks and that many employees took those breaks.

3    *Id*. at 1050-51.  In particular, it pointed to the opinion of its expert, based on time-punch data, that

4    there was significant variability as to whether employees took their breaks and that there was no

5    evidence of a companywide policy or practice of depriving employees of breaks.  *Id*.  Under these

6    circumstances, the employer argued, there were individualized issues as to liability that

7    predominated and the class should not have been certified.  *Id*.  The Court of Appeal rejected the

8    employer's argument, however, reasoning that it failed to address the employees' theory of

9    liability.  *Id*. at 1156.  The court found that the plaintiffs' "evidence supports the reasonable

10   inference that in the context of a class action, they could establish that [the employer] engaged in

11   the alleged practice, that is, they never paid meal break premium wages, even though a significant

12   number of employees accrued them."  *Id*. at 1159;  *see also Alberts v. Aurora Behavioral Health

13   Care*, 241 Cal. App. 4th 388, 411 (2015)(noting that "California courts routinely consider 'pattern

14   and practice evidence, statistical evidence, sampling evidence, expert testimony, and other

15   indicators of a defendant's centralized practices in order to evaluate whether common behavior

16   towards similarly situated plaintiffs makes class certification appropriate' and holding that the trial

17   court had applied a "flawed rationale" in refusing to certify a class on the basis that some

18   employees had 'voluntarily' skipped breaks" because it had "disregard[ed] plaintiffs' theory of

19   recovery, i.e., that there was no real choice to be made 'voluntarily.'").

20          In light of the case law discussed above, the Court concludes that Plaintiffs' are entitled to

21   proceed on their meal and rest break claims on a class-wide basis.  Like the cases discussed above,

22   their theory of liability is based on common policies that make it difficult or impossible for class

23   members to take breaks.  This theory can be addressed on a classwide basis.[4]  Exel's defense that

24

25   [4] Exel seeks to distinguish *Safeway* on the basis that the evidence in that case included testimony
     that managers often "pressured" employees to skip breaks and that time-punch data reflected
26   "millions" of omitted, shortened, or delayed meal breaks.  Exel states, "Here, in contrast, there are
     no time-punch data and no evidence of a systematic practice of pressuring employees to skip meal
27   breaks."  Reply at 11 n. 12.  Exel misses the point.  *Safeway* does not hold that any specific type of
     evidence, such as time-punch cards, is required to establish a policy or practice.  In that case, the
28   employees relied on this evidence to show a system-wide practice of failing to pay meal break
     premiums.  Here, Plaintiffs plans to rely on written break policies and training materials to show a

United States District Court
Northern District of California

1    it does not have such policies is merely the flip side of this inquiry and turns on common questions

2    as well.  To the extent Plaintiffs establish that Exel's policies and practices are non-compliant,

3    Exel will bears the burden of showing that it provided compliant meal and rest breaks.  This is a

4    damages issue, however, and Exel has not shown that it cannot be addressed through the use of the

5    various tools that are routinely used to determine damages, including sampling and expert

6    testimony. Further, the fact that it may not be possible to come up with the exact number of breaks

7    the class members actually missed does not warrant decertification, as the cases discussed above

8    make clear.

9              **9. Claim Six (Deductions from Wages)**

10                  a.  Background

11          This claim is based on the allegation that Exel automatically deducts from drivers' pay

12   certain categories of expenses, in violation of California Labor Code § 221.   Plaintiffs intend to

13   present testimony by Exel witnesses confirming this practice, as well as the standard contracts

14   with class members that identify the specific items that are deducted as "charge backs."

15   Plaintiffs' Opposition at 7.  Further, according to Plaintiffs, damages "can be easily calculated by

16   adding up the amounts that [Exel] itself has recorded for the deductions in its compensation and

17   settlement data."  January 15, 2016 Joint Case Management Statement at 25.

18          Exel contends this claim presents too many individualized issues to address on a class-

19   wide basis.  Defendants' Combined Motion at 31.  First, as to class members who hired second

20   drivers, Exel argues that settlement payments to the class member for the work of a second driver

21   are not wages, and therefore there can be no claim for deductions from "wages" in that scenario;

22   further, Exel contends, there is no way to identify whether routes were driven by the class member

23   or the second driver for the class members who employed second drivers without individualized

24   inquiries.  *Id*.  Second, Exel asserts, the settlement payments may be inflated, in which case the

25   deductions would not "invade the class members' wages";  here again, Exel asserts, individualized

26

27   _____

     non-compliant policy, along with testimony of Exel witnesses about its policies.  Nothing in
28   *Safeway* suggests that Plaintiffs' approach here, which relies on common proof, is any less
     suitable for class-wide treatment than the approach of the plaintiffs in *Safeway*.

1    inquiries would be necessary.  *Id*.  Other individualized questions that Exel contends make this

2    claim unmanageable are: 1) did class members who employed helpers or second drivers charge

3    any of the deductions to those helpers or second drivers; 2) where deductions were based on

4    damage claims, was the damage the result of the independent contractor's willful conduct (in

5    which case Exel would not have an obligation to cover the claim); and 3) were the deductions

6    "secret" as Exel contends is required under section 221, citing *Koehl v. Verio, Inc.*, 142 Cal. App.

7    4th 1313, 1337 (2006).  *Id*. at 31-32.

            b.   Discussion

8

9            California Labor Code section 221 provides that "[i]t shall be unlawful for any employer to

10   collect or receive from an employee any part of wages theretofore paid by said employer to said

11   employee."  The Court finds that common issues predominate and that this claim can be addressed

12   on a class-wide basis.

13           Plaintiffs plan to rely on class-wide proof to establish liability, namely, testimony of Exel

14   representatives and standard contracts signed by all class members. Although Exel contends the

15   settlement payments are inflated to cover these expenses, it has not explained why this issue is not

16   also a question of Exel's general policies and procedures; nor has it pointed to evidence suggesting

17   that it will be necessary to conduct a separate inquiry on this question for each class member.

18   Further, to the extent Plaintiffs challenge the legality of Exel's argument that it is not liable

19   because it "inflated" settlement payments, that is an issue that also can be addressed on a class-

20   wide basis.  *See* January 15, 2016 Joint Case Management Statement at 25.  Similarly, Exel's

21   defense that the deductions were not secret appears to be premised on common practices.  *See*

22   Defendants' Combine Motion at 32 ("the deductions were transparent [and] mutually agreed-

23   upon").

24           The Court also is not persuaded that the possibility that a claim for which a deduction was

25   taken was based on damages that were caused by willful conduct will make adjudication of this

26   claim on a classwide basis unmanageable.  Exel has not pointed to any evidence that any

27   deductions from any class members' settlement payments were associated with damage that were

28   the result of willfully conduct.  Assuming that there is such evidence, Exel has not demonstrated

United States District Court
Northern District of California

that introducing it at trial will create problems of manageability.[5]

The remainder of Exel's challenges focus on the individualized inquiries it contends will be necessary as to class members who employ second drivers.  As discussed above, the Court concludes that these issues can be addressed through the creation of a subclass of the class members who have employed second drivers.

### 10. Claim Nine (Reimbursement for Employee Expenses)

a.  Background

Plaintiffs intend to prove this claim based on language in the standard contracts requiring that drivers must pay the expenses associated  with operating and maintaining their trucks.  They will use settlement data, where available, to establish the expenses of class members, and where no such information is available they will rely on the opinions of their experts as to the estimated amounts of these expenses for class members.  January 15, 2016 Case Management Statement at 27-28.

Exel argues that this claim is unmanageable and should be decertified for several reasons. First, it contends the settlement payments provided "enhanced compensation" to cover some of the expenses Plaintiffs have claimed as unreimbursed expenses.  Motion at 33.  According to Exel, "only individualized inquiries would determine which class members were not fully reimbursed for expenses and by how much."  *Id*.   Second, Exel contends class members are required to prove their actual expenses and may not rely on estimates because the lack of expense records is "Plaintiffs' problem, not Exel's."  *Id*. at 34. Third, for the class members who have employed second drivers, Exel contends expenses associated with those second drivers are "entrepreneurial" and therefore not recoverable.  *Id*. at 37.  Fourth, Exel contends that for class members who work for other delivery companies, some of the expenses may not be attributable to the class member's employment with Exel.  *Id*. at 38.

Exel suggests that these issues could be addressed by "limiting the class to those

---

[5] Plaintiffs do not appear to dispute that as a legal matter, Exel is entitled to deduct from wages claims for damage that was caused by willful conduct and therefore, that these deductions are not subject to reimbursement.

1    contractors who, during the periods covered by iDirect and Dispatch data, were the only people to

2    drive their trucks in service of Exel." *Id*. at 38.

3          b.   Discussion

4          California Labor Code section 2802 requires that an employer "indemnify his or her

5    employee for all necessary expenditures or losses incurred by the employee in direct consequence

6    of the discharge of his or her duties."  As discussed above, the Court concludes that to the extent

7    this section imposes an obligation on the employer to reimburse employees for work-related

8    expenses, it also imposes an obligation to keep records of those expenses adequate to show that

9    the employer is fulfilling this obligation.  To the extent the employer fails to satisfy that

10   requirement, *Mt. Clemens* applies.  With this in mind, the Court concludes that common questions

11   predominate on this claim.

12         With respect to liability, Plaintiffs will rely on the standard contracts to show that it is

13   Exel's policy not to reimburse class members for many work-related expenses.  The main dispute

14   as to liability appears to be whether Exel will be able to prevail on its argument that it "inflated"

15   the settlement payments to cover these expenses.  This argument turns on a common question of

16   law, namely, whether such an approach is permissible or rather, whether employers are required to

17   separately apportion any employee reimbursements from wages under section 2802, as Plaintiffs

18   contend.  *See* Plaintiffs' Opposition at 9 (citing *Gattuso*, 42 Cal. 4th at 573).  Further, as discussed

19   above in connection with the unlawful deduction claim, Exel has not explained how individualized

20   inquiries would be conducted to show this alleged "inflation" or even why this practice could not

21   be addressed based on Exel's general policies and practices.

22         As to damages, many of Exel's challenges are based on Plaintiffs' reliance on estimates

23   rather than actual evidence.  As discussed above, however, the absence of complete and accurate

24   information is a result, at least in part, of Exel's failure to maintain records of these expenses and

25   therefore Plaintiffs may prove these expenses as a matter of reasonable inference.  To the extent

26   Exel challenges certain individual expenses on the basis of their availability as a legal matter (e.g.

27   certain costs associated with furnishing a truck that Exel contends are not considered "employee

28   expenses"), these challenges can be resolved on a class-wide basis.  Similarly, challenges to the

United States District Court
Northern District of California

31

assumptions of Plaintiffs' experts in coming up with the amounts of the cost estimates raise

common questions.  Finally, the issues associated with expenses of class members who employed

second drivers can be handled by creating a separate subclass for these class members.

### C.    The Parties' *Daubert* Challenges

#### 1.  Curtis Testimony

Exel argues that Curtis does not have the experience necessary to qualify him as an expert

on the subject of cost-per-mile of operating a delivery truck and therefore, that he should not be

permitted to offer expert testimony under Rule 702.  Defendants' Combined Motion at 9-10.  In

addition, Exel argues that Curtis's estimates are unreliable because they are based on speculation

and not actual evidence of the class members' expenses. *Id*. at 12.  In connection with this

challenge, Exel criticizes the inclusion of or assumptions upon which Curtis based his estimates as

to the following costs: 1) tires, towing and repairs; 2) medical insurance; 3) cell phone expenses;

4)  parking and traffic tickets; 5) payroll taxes;  6) tolls; 7) meals; and 8) payroll taxes for helpers.

*Id*. at 4, 13.  Finally, Exel argues that to the extent Curtis offers opinions about the costs of truck

ownership (including yearly truck payments, liability insurance, license and registration, permits,

fuel, tires, preventative maintenance, and repairs), this testimony is irrelevant and should be

stricken under Rule 702 because California Labor Code section 2802 does not permit recovery of

the cost of furnishing a truck.  *Id*. at 16-17 (citing Docket No. 210 (September 3, 2015 Order Re

Cross Motions for Summary Judgment) at 67-68).[6]   The Court is not persuaded by Exel's

challenges to the Curtis testimony.

First, the Court rejects Exel's contention that Curtis is not qualified to offer opinions about

the costs incurred in operating a delivery truck.  Rule 702 permits a witness to testify as an expert

if he or she is qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid.

702. The Ninth Circuit has emphasized that Rule 702 "contemplates a *broad conception* of expert

qualifications." *Hangarter v. Provident Life & Acc. Ins. Co*., 373 F.3d 998, 1015 (9th Cir. 2004)

---

[6] In its Order re Cross Motions for Summary Judgment, the undersigned found that the cost of
lease payments on an employee's truck is not subject to reimbursement under California Labor
Code section 2802.  Docket No. 210 at 67-68.

United States District Court
Northern District of California

(emphasis in original).   In his capacity as a consultant in the commercial truck consulting business, Curtis has "perform[ed] cost analyses for clients . . ., examin[ed] vehicle maintenance programs, and conduct[ed] mock DOT audits and truck inspections."  Curtis Report at 1;  *see also* Declaration of Nathan Piller in Support of Plaintiffs' Opposition to Defendants' Combined *Daubert* Motion and Motion to Decertify Rule 23 Class ("Piller Opposition Decl."), Ex. 48 (Curtis Dep.) at 7, 42-44, 55-56.  In addition, he has conducted several comprehensive analyses of vehicle operating costs for his own businesses. *See* Piller Opposition Decl., Ex. 48 at 44-45.  The Court finds that Curtis's knowledge and experience are sufficient to qualify him as an expert as to the cost of operating delivery trucks and that Exel's suggestions that Curtis must have training as a statistician or have operated his own delivery truck are misplaced.

Second, the Court does not agree with Exel's assertion that Curtis's cost estimates are unreliable simply because they are not based on investigation of the class members' actual costs through, for example, a review of their receipts.  The California Supreme Court has held that employers may use a "mileage reimbursement method" to determine the amount employees should be reimbursed under California Labor Code section 2802, even though it is "inherently less accurate than the actual expense method" because of the "onerous burdens that the actual expense method imposes on both employer and employee." *Gattuso v. Harte-Hanks Shoppers, Inc*., 42 Cal. 4th 554, 569 (2007).   When this approach is used, the "employee must be permitted to challenge the resulting reimbursement payment" by demonstrating that his or her actual expenses were greater than the approximate amount paid under the mileage reimbursement method. *Id*. Similarly, the undersigned concludes that the methodology used by Curtis is sufficiently reliable to meet the requirements of Rule 702 so long as Exel has the opportunity to challenge Curtis's estimates.  These challenges go to the weight of the evidence rather than admissibility, however. *See Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir. 2001).

The approach taken in *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1 (2007), cited by Exel, does not require a contrary result.  In that case, the Court of Appeal upheld the trial court's refusal to permit a class of delivery drivers to establish expenses on a class-wide basis using expert testimony in which expenses were estimated, requiring instead that the

1    drivers prove their expenses through receipts and records.  154 Cal. App. 4th 1, 19-20 (2007).   In

2    particular, the drivers were to provide a package to the referee containing, for each driver, receipts,

3    certain personal records and records from the defendant relating to their expenses.  *Id.*  The trial

4    court's ruling was based on its conclusion that the drivers' expenses would be "too disparate

5    because of the economic differences in the California geographic area."  *Id.*  The Court of Appeal

6    upheld the ruling, rejecting the plaintiff's assertion that they should have been allowed to offer

7    class-wide estimates of expenses on the basis that the record in that case showed that the drivers'

8    claim was "susceptible of exact proof."  *Id.*   Although the Court of Appeal did not cite *Mt.*

9    *Clemens*, it implied that if the claim had *not* been susceptible to exact proof, the plaintiffs might

10    have been entitled to prove their expenses based on the estimates of their experts.  *Id.*

11        Here, in contrast to *Estrada*, the Court has made no finding that the expense claim is

12    susceptible of exact proof; nor has Exel pointed to evidence that would permit exact

13    determinations of expenses for each of the class members.  Further, this absence of evidence is

14    likely at least partially attributable to the fact that Exel has treated Plaintiffs as independent

15    contractors rather than employees and has no system in place for reimbursing drivers for work-

16    related expenses.  Under these circumstances, it is appropriate to permit Plaintiffs to rely on

17    estimates that may permit a "fair and reasonable inference" as to their expenses, as discussed

18    above.  The Court also notes that while Exel may present evidence at trial showing that there are

19    significant regional variations in class members' expenses, it is has not established at this stage of

20    the proceedings that such variations are sufficient to justify precluding Curtis's estimates.  Finally,

21    there is nothing in *Estrada* suggesting that the trial court in that case excluded the experts'

22    estimates as part of its gatekeeping role of excluding evidence that is unreliable or irrelevant.

23    Thus, *Estrada* does not support Exel's challenge to the Curtis testimony under *Daubert*.

24        Third, the Court finds that many of Exel's challenges to the inclusion of certain specific

25    types of costs in Curtis's cost-per-mile estimates (e.g., medical insurance, license and registration

26    fees, parking and traffic tickets) raise legal questions as to the availability of certain types of

27    damages that are more appropriately addressed on motions in limine or in the Court's instructions

28    to the jury.  Further, Exel's challenges to the assumptions Curtis used in estimating certain costs

United States District Court
Northern District of California

34

1   (e.g., tolls, towing and repairs) go to the weight of Curtis's opinions, not their admissibility as

2   Exel has not demonstrated that Curtis's methodology as to his estimates is unreliable or lacking

3   any factual basis.

4         Finally, the Court declines to strike as irrelevant Curtis's estimates as to the costs

5   associated with owning a truck that Exel contends are not available under California Labor Code

6   section 2802.  The Court previously held that truck lease payments cannot be recovered under

7   section 2802 but it has not addressed whether other costs such as yearly payments on trucks

8   purchased by class members (rather than leased), liability insurance, licenses and registration,

9   permits, fuel, tires, preventative maintenance, and repairs are also excluded.  While Exel may

10  bring a motion in limine on this question, the Court declines to exclude this testimony under

11  *Daubert*.

12        **2. Breshears Testimony**

13        Exel's primary challenge to the testimony of Breshears is that his opinions are speculative

14  because he extrapolated from incomplete and non-representative data, and that his conclusions are

15  unfounded to the extent he relied on the Curtis estimates.  Defendants' Combined Motion at 2-3.

16  Exel contends Breshears' testimony is speculative on the following grounds: 1) where he did not

17  have records showing who drove contractors' trucks, he assumed it was the class member rather

18  than a second driver, leading to an overestimate of employee expenses; 2) he did not account for

19  different rates of pay in different parts of California; 3) he assumed that "all class members

20  worked 12 hours per day and five days per week, based on a fanciful interpretation of one Exel

21  document" even though the contractors with second drivers may have driven less and data for

22  Sears drivers indicated those drivers only drove 4.33 days per week on average; 4) he relied on

23  deposition testimony of a small number of class members to estimate the time of morning

24  meetings; 5) he extrapolated the Dispatch data (which covers 109 of 386 contractors for the period

25  beginning July 2013) and iDirect data (which covers 122 contractors for two hub locations for the

26  entire class period) to come up with estimates for the entire class for the entire class period; 6) he

27  reviewed timesheets and logs for less than 2% of all routes driven to come up with estimates for

28  break violations, assuming that when no break was shown it was not provided and that no driver

United States District Court
Northern District of California

35

United States District Court
Northern District of California

freely waived the break. *Id.* at 13-15. Exel also argues that Breshears' opinions regarding the money Exel allegedly saved by converting its drivers from employees to independent contractors, and about the costs of furnishing a delivery truck, is irrelevant and should be stricken under *Daubert*. The Court rejects Exels challenges.

Several of Exel's challenges (numbers 1, 3 and 5 in the list above) relate to the methodology Breshears used to determine the number of weeks, days and hours each class member drove for the purposes of calculating the various forms of damages. Breshears describes the basis for his opinions as follows:

> 23. With respect to the potential number of work weeks each Plaintiff worked with Defendants, I have used the number of weeks between the start and termination dates (or January 6, 2015 if no termination date) per the Weeks Worked report.

> 24. With respect to the potential number of days worked per week, I have used for each Plaintiff, when available, his average number of dates worked in a week per the iDirect Report and/or the Sears report. If there was no iDirect Report and/or Sears report information for a Plaintiff, I have used for each Plaintiff, when available, his average number of dates worked in a week per the Dispatch Recap Reports. If there were no Dispatch Recap Reports for a Plaintiff, I have assumed that, for each potential work week, each Plaintiff worked five days per work week.

> 25. With respect to the potential number and type of hours worked per week, I have used for each Plaintiff, when available, his average number of regular, overtime, and/or double time hours worked in a week as determined per the Dispatch Recap Reports. If there were no Dispatch Recap Reports for a Plaintiff, I have assumed that each Plaintiff worked 12 hours per work day.

Breshears Report ¶¶ 23-25. Breshears goes on to explain that the assumption that contractors as to whom there was no Dispatch or iDirect data drove five days a week, 12 hours a day, is based on an Exel recruiting document stating that the typical work schedule is five to six days per week and usually 10-12 hours a day including loading, as well as testimony by Exel executives. *Id.* ¶ 26.

To the extent Exel challenges as speculative the assumptions Breshears made to fill in gaps in the iDirect and Dispatch data, the Court disagrees. First, Exel's position ignores the teaching of *Mt. Clemens* and *Tyson Foods* that representative data may be used where an employer does not keep adequate records of employee work time. As discussed above, that rule applies here. Given that Plaintiffs are entitled to prove their time worked based on reasonable inference, the Court

36

1    finds that the assumptions Breshears has used to fill in the gaps are supported by sufficient

2    evidence to render them non-speculative and potentially helpful to the jury, which is all that

3    *Daubert* requires.

4            In assuming that drivers for whom there was no actual data drove five days a week, 12

5    hours a day, Breshears relied on guidelines used by Exel recruiters stating as much, as well as

6    deposition testimony of Exel Support Manager Greg Smigelsky and Exel Recruiter Cristina de la

7    Rosa regarding the schedule typically expected of Exel drivers.  *See* Breshears Report at 5;

8    Breshears Dep. at 100.  While Exel is entitled to cross-examine Breshears and present testimony

9    of its own to show that this assumption does not accurately reflect class members' daily and/or

10   weekly schedule, Breshears' testimony is based on sufficient evidence to take it out of the realm of

11   speculation.[7]  Similarly, Exel has not pointed to any evidence showing that it was unreasonable to

12   use the actual data that was provided for some of the class members to estimate the schedules for

13   those class members for the portion of the class period that was *not* covered by that data.

14           The Court also rejects Exel's challenge based on Breshears' failure to apply different rates

15   of pay for different geographical regions in estimating unpaid overtime for the class (number 2,

16   above).  In his expert report, Breshears performed two calculations based on two assumed wage

17   rates:

18               37. For purposes of this report, I have assumed a regular rate of
19               $30.00 per hour, which was calculated as (c) the piece rate of $24
                 per stop multiplied by an average of 15 stops per day (i.e., $360 per
20               day) divided by (d) 12 estimated hours worked per day. . . .

21               38.  For purposes of this report, I have also prepared an alternative
                 calculation, which assumes a regular rate of $18.29 per hour, which
22               was based on the General Freight Trucking hourly mean wage for
                 53-3033 Light Truck or Delivery Services Drivers per the May 2014
23               Occupational Employment and Wages . . .

24   Breshears Report ¶¶ 37-38.  Breshears conceded at his deposition that he did not attempt to

25   calculate overtime using different rates for different regions.  Breshears Dep. at 193.  He also

26

27   [7] To the extent Breshears concedes he did not factor into his calculation data for the 20 to 39 class
     members who worked for Sears, see Bresehears Dep. at  51, Exel may present that evidence at
28   trial.  The Court does not find, however, that this omission is significant enough to render
     Breshears testimony unreliable for the purposes of *Daubert*.

1   explained the basis for his conclusion that the statewide averages he used would provide a good

2   measure of damages for the class. *Id*. at 95-96. Exel has not pointed to any case suggesting that

3   this methodology is impermissible under *Daubert*; nor has it offered any evidence that the ultimate

4   damages figure would have been different regional rates had been used to calculate overtime rates

5   The Court concludes this is an issue more appropriately addressed at trial through cross-

6   examination and rebuttal evidence.

7          Exel also contends Breshears' estimate of morning meeting time, which is offered in

8   support of Plaintiffs' claim for unpaid wages, should be stricken as speculative. Again, the Court

9   disagrees. As discussed above, Breshears explained in his deposition that he relied on deposition

10  testimony of the only six class members who testified as to the precise length of the morning

11  meetings and then took an average of those times. Breshears Dep. at 81. He also explained that

12  there was *no* information available as to the actual start and end times of daily meetings and that

13  the drivers' daily logs also would not have allowed for such a determination because they included

14  tasks other than the morning meeting in their pre-driving time, resulting in a "comingling of time."

15  *Id*. at 79, 81. Under these circumstances, *Mt. Clemens* and *Tyson Foods* permit reasonable

16  inferences to be drawn from samples. It was Exel's duty to maintain records of employee work

17  time. As Exel failed to do so, Plaintiffs may use sampling to attempt to establish the amount of

18  time that class members spent in morning meetings. Exel, in turn, may attempt to establish at trial

19  that Breshears' estimate is inflated. It has not, however, shown that this testimony falls below the

20  standards of *Daubert*.

21         The Court also rejects Exel's assertion that Breshears' meal and rest break estimates do not

22  satisfy *Daubert* (number 6). Exel complains that Breshears sampled timesheets and logs for less

23  than 2% of all routes driven to come up with estimates for break violations. It also challenges

24  Breshears' assumption that when the timesheets did not reflect that a break was taken, the driver

25  was not provided with an opportunity to take a break (as opposed to having voluntarily waived the

26  break). As Plaintiffs' made clear at the hearing, their theory of damages on these claims (and

27  Breshears' damages estimates) assumes a 100% violation rate and thus, the claim does not depend

28  upon Breshears' analysis in his supplemental report, where he reviewed paper records to obtain a

United States District Court
Northern District of California

1   violation rate based on the sample captured by those records.  In any event, the Court concludes

2   that the sampling used by Breshears in his supplemental report was adequate to satisfy *Daubert*.

3   Further, to the extent Exel argues that many class members did, in fact, either take breaks or

4   voluntarily waive them, it will be Exel's burden to prove that class members received compliant

5   break periods (assuming Plaintiffs can establish liability by establishing that Exel's policy as to

6   breaks does not comply with California law).

7          Finally, the Court declines to strike Breshears' testimony about the costs of furnishing a

8   truck and the alleged savings to Exel resulting from treating drivers as independent contractors

9   rather than employees on the basis of relevance.  As discussed above, the Court has not yet ruled

10  on the legal question of whether the specific expenses Plaintiffs seek to recover are available

11  under section 2802 and therefore it is premature to hold that this testimony is irrelevant under

12  *Daubert*.  Similarly, the relevance of Breshears' testimony relating to the alleged savings Exel

13  enjoyed from treating drivers as independent contractors is more appropriately addressed closer to

14  trial or during trial, when the Court can evaluate the relevance of this testimony in the context of

15  the actual evidence and legal theories put forward by the parties.

16         For the reasons stated above, the Court concludes the Breshears testimony satisfies the

17  requirements of *Daubert*.

18                        **3. Walker**

19         Plaintiffs object to the testimony of Exel's rebuttal expert, Jonathan Walker, on the

20  grounds that he is not qualified to opine as to Curtis's mileage reimbursement rates.  They object

21  to Walker's critique of the Breshears' reports on the basis that Walker simply chose "a few

22  outliers to speculate about how the class as a whole might have different damages from those

23  presented by Mr. Breshears."  Plaintiffs' Motion at 3.  In doing so, Plaintiffs contend, Walker

24  ignored the Exel testimony and documents upon which Breshears relied in support of his

25  calculations.  *Id.*  Plaintiffs contend Walker's report is "littered with inadmissible speculation and

26  conjecture," that he "relies on inadmissible legal presumptions about which expenses are

27  recoverable and which are not recoverable under Labor Code § 2802," that he "fundamentally

28  misunderstands Plaintiffs' theory of recovery on the meal and rest period claims,"  and that he is

1    unqualified to opine as to Breshears' use of Curtis's cost-per-mile figures because he himself has

2    no expertise or experience in calculating driving related expenses using a cost-per-mile formula.

3    *Id*.  Plaintiffs also assert that Walker's testimony that drivers were better off as independent

4    contractors than as employees is speculative, irrelevant, and tainted as to the methodology  he used

5    for determining the comparable market rate for employee wages.  *Id.*  Finally, Plaintiffs argue that

6    all of Walker's opinions are premised on the incorrect assumption that Plaintiffs are required to

7    prove their damages with precision even though it was Exel's failure to maintain proper records

8    that prevents them from doing so.

9           The Court finds that Walker's opinions addressing purported flaws in Breshears' damages

10   calculations due to possible variations among class members are sufficient to satisfy *Daubert*.

11   This includes Walker's opinion that Breshears' damages estimates may be inflated because he did

12   not take into account class members who employed second drivers, *see* Walker Report ¶¶ 56-57,

13   and his challenge to Breshears' calculation of meal and rest break penalties based in part on

14   testimony of class members who testified that they did not record their breaks on daily logs and

15   time sheets, *id*. ¶ 48-50.  While Walker does not attempt to evaluate the magnitude of the impact

16   these variations may have on Breshears' damages estimates, he does offer some anecdotal

17   evidence to show that Breshears' estimates may be flawed.  The Court concludes this is sufficient

18   to satisfy *Daubert*.  Plaintiffs will be able to challenge Walker's reliance on what Plaintiffs

19   contend are outliers in support of his opinions at trial.   Similarly, Plaintiffs will have an

20   opportunity to introduce evidence as to Exel's policies and practices to show, if they can, that

21   Walker's opinions are unfounded.

22          Further, to the extent Plaintiffs challenge Walker's opinions as being based on incorrect

23   legal assumptions relating to what expenses are recoverable under Labor Code section 2802, the

24   Court concludes that these are issues that should be addressed in motions in limine, as discussed

25   above, rather than on a *Daubert* motion.  As to Walker's critiques of Breshears' calculation of

26   damages on meal and rest breaks, which challenge Breshears' sampling to determine the meal

27   break violation rate as well as Breshears' assumption that where employees did not record a break

28   on their timesheets they were denied a break, *see* Walker Report ¶¶ 48-50, the Court does not find

United States District Court
Northern District of California

40

1  these opinions so misleading as to require their exclusion.  With proper instruction about the

2  allocation of burdens of proof on the meal and rest break claims, the jury may find this testimony

3  helpful and is unlikely to be confused.

4        The Court also declines to strike Walker's testimony opining that drivers were better off as

5  contractors on the grounds that this testimony is not relevant.  While Plaintiffs may renew their

6  relevance challenge at trial under Rule 403, the Court concludes that such a determination is

7  premature at this point.  To the extent that Plaintiffs challenge the wage rate used to calculate the

8  alleged benefits of working as independent contractors, this issue can be adequately addressed

9  through cross-examination at trial.

10        With respect to the section of Walker's Report entitled "Partial Corrections to Mr.

11  Breshears' Analysis," the Court concludes that the opinions expressed by Walker are not so

12  misleading as to require exclusion under *Daubert*.  Although Walker purports to come up with

13  what appears to be his own cost-per-mile estimate – an area in which he admits he has no expertise

14  or experience – the methodology he uses to come up with that estimate is straightforward and does

15  not require specific expertise in calculating cost-per-mile rates; so long as he is clear in his

16  testimony as to his reasons for excluding certain items from the overall damages figure, and is

17  careful not to invade the province of the court in setting forth the law (particularly as to the level

18  of certainty that is required to prove Plaintiffs' damages), or the jury in resolving issues relating to

19  the sufficiency of the evidence, Walker's opinions may be helpful to the jury

20  **IV.    CONCLUSION**

21        Defendants' Combined Motion and Plaintiffs' Motion are DENIED.   The Court modifies

22  the Class definition, which is as follows:

23        All individuals who have: 1) signed the Independent Truckman's
          Agreement with Exel Direct; 2) personally provided delivery
24        services for Defendant Exel Direct in California while being
          classified by Exel Direct as independent contractors under the
25        Independent Truckman's Agreement at any time between June 14,
          2008 and January 6, 2015; and 3) received the official notice of this
26        action that was approved by the Court and sent to potential class
          members in January 2015.   Any individual who has signed the
27        Independent Truckman's Agreement with Exel Direct but has
          provided delivery services exclusively through the use of hired
28        second drivers and who has *never* personally made deliveries for

41

1    Exel is excluded from the Class.

2    In addition, the following Subclass will be added:

3    All individuals who are members of the Class and who at any time
     during the class period employed second drivers to perform
4    deliveries for Exel.

5    Finally, the Court has not decided whether it makes sense to conduct the jury trial in

6    phases, with the first phase addressing liability and the second phase addressing damages.  The

7    parties should be prepared to address this question at the Pre-Trial Conference.

8    **IT IS SO ORDERED.**

9

10   Dated: April 21, 2016

11

12

13   JOSEPH C. SPERO
     Chief Magistrate Judge